1

2  David C. Brownstein (SBN: 141929)    Kellie Lerner (*pro hac vice* to be filed)
   **FARMER BROWNSTEIN JAEGER**    Ben Steinberg (*pro hac vice* to be filed)
3  **GOLDSTEIN KLEIN & SIEGEL**    **SHINDER CANTOR LERNER LLP**
   **LLP**    14 Penn Plaza, 19th Floor
4  155 Montgomery Street, Suite 301    New York, NY 10122
   San Francisco, CA 94104-2733    Telephone: (646) 960-8601
5  Telephone: (415) 962-2873    Facsimile: (646) 960-8625
6  Facsimile: (415) 520-5678    kellie@scl-llp.com
   dbrownstein@fbjgk.com    benjamin@scl-llp.com
7

8  Brian D. Caplan (*pro hac vice* to be filed)
9  Julie Wlodinguer (*pro hac vice* to be filed)
   **REITLER KAILAS & ROSENBLATT LLP**
10 885 Third Avenue, 20th Floor
   New York, New York 10022
11 Telephone: 212-209-3050
   Fax: 212-371-5500
12 bcaplan@reitlerlaw.com
13 jwlodinguer@reitlerlaw.com

14

15

16                    UNITED STATES DISTRICT COURT

17              FOR THE NORTHERN DISTRICT OF CALIFORNIA

18

19 LYRICFIND, INC.,                    Case No.

20           Plaintiff,               **COMPLAINT**

21

22 v.                                  **DEMAND FOR JURY TRIAL**

23 MUSIXMATCH S.P.A. and TPG
   Global, LLC,
24
25           Defendants.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ...................................................................5

THE PARTIES ...................................................................................13

RELEVANT THIRD PARTIES..............................................................14

JURISDICTION AND VENUE...............................................................14

FACTUAL ALLEGATIONS ..................................................................15

I.      INDUSTRY BACKGROUND ......................................................15

        A.      MUSIC STREAMING AND THE INCREASING DEMAND
                FOR SYNCED LYRIC DATA.............................................15

        B.      MUSIC PUBLISHERS' ROLE IN THE INDUSTRY.......................19

        C.      COPYRIGHT ENFORCEMENT BY MUSIC PUBLISHERS..........21

        D.      LYRIC SERVICE PROVIDERS...........................................22

        E.      DSPS REQUIRE A COMPLETE LYRICAL CATALOG ................24

        F.      LYRICFIND'S LONG AND PROFITABLE RELATIONSHIP
                WITH WCM ...............................................................26

II.     THE RELEVANT MARKETS ......................................................27

        A.      THE LYRIC RIGHTS LICENSING MARKET .................................27

        B.      THE LYRIC DATA SERVICES MARKET.......................................29

        C.      THE RELEVANT GEOGRAPHIC MARKET IS
                WORLDWIDE................................................................30

        D.      BARRIERS TO ENTRY ....................................................30

III.    MUSIXMATCH FACED GROWING COMPETITION FROM
        LYRICFIND, WHICH LED TO DEFENDANTS' SCHEME.....................32

IV.     DEFENDANTS' SCHEME TO ELIMINATE COMPETITION IN
        THE RELEVANT MARKETS .......................................................35

        A.      ██████████████████████████████

2

███████████████████████████████ ..........................35

B.   ██████████████████████████████
     ████████████████████████ .....................................40

C.   TPG AND MUSIXMATCH COORDINATED WITH WCM
     TO IMPOSE THE WCM-MUSIXMATCH EXCLUSIVE.................41

D.   LYRICFIND IS CUT-OFF FROM SERVICING WCM'S
     CATALOG.....................................................................................44

E.   SPOTIFY IS FORCED TO SUBLICENSE WCM'S LYRIC
     RIGHTS FROM MUSIXMATCH. .........................................46

V.   MUSIXMATCH HAS MARKET POWER IN THE RELEVANT
     MARKETS ............................................................................................47

     A.   MUSIXMATCH'S MONOPOLY IN THE LYRIC DATA
          SERVICES MARKET................................................................47

     B.   MUSIXMATCH'S MARKET POWER IN THE LYRIC
          RIGHTS LICENSING MARKET AND ITS ATTEMPTED
          MONOPOLIZATION...............................................................49

VI.  DEFENDANTS HAVE FORECLOSED COMPETITION IN THE
     RELEVANT MARKETS AND CAUSED MARKETWIDE HARM ..........50

CAUSES OF ACTION .............................................................................53

FIRST CAUSE OF ACTION VIOLATION OF SECTION 1 OF THE
SHERMAN ACT, 15 U.S.C. § 1 (AGAINST TPG AND MUSIXMATCH)..........53

SECOND CAUSE OF ACTION  MONOPOLIZATION OF THE LYRIC
DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE
SHERMAN ACT, 15 U.S.C. § 2 (AGAINST MUSIXMATCH) ...........................54

THIRD CAUSE OF ACTION ATTEMPTED MONOPOLIZATION OF
THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION
2 OF THE SHERMAN ACT,  15 U.S.C. § 2  (AGAINST MUSIXMATCH)........55

FOURTH CAUSE OF ACTION CONSPIRACY TO MONOPOLIZE THE
LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF
THE SHERMAN ACT,  15 U.S.C. § 2 (AGAINST TPG AND
MUSIXMATCH)...............................................................................................57

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIFTH CAUSE OF ACTION MONOPOLY LEVARAGING OF THE
LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF
THE SHERMAN ACT,  15 U.S.C. § 2 (AGAINST MUSIXMATCH) ................. 58

SIXTH CAUSE OF ACTION ATTEMPTED MONOPOLIZATION OF
THE LYRIC RIGHTS LICENSING MARKET IN VIOLATION OF
SECTION 2 OF THE SHERMAN ACT,  15 U.S.C. § 2  (AGAINST
MUSIXMATCH) ................................................................................................ 59

SEVENTH CAUSE OF ACTION CONSPIRACY TO MONOPOLIZE THE
LYRIC RIGHTS LICENSING MARKET IN VIOLATION OF SECTION 2
OF THE SHERMAN ACT,  15 U.S.C. § 2 (AGAINST TPG AND
MUSIXMATCH) ................................................................................................ 60

EIGHTH CAUSE OF ACTION UNLAWFUL EXCLUSIONARY
ARRANGEMENT IN VIOLATION OF  15 U.S.C § 14 (AGAINST TPG
AND MUSIXMATCH) ...................................................................................... 61

NINTH CAUSE OF ACTION AGREEMENT IN VIOLATION OF
CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§
16720 ET SEQ.  (AGAINST TPG AND MUSIXMATCH) ................................... 62

TENTH CAUSE OF ACTION UNFAIR COMPETITION IN VIOLATION
OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. &
PROF. CODE §§ 17200 ET SEQ.  (AGAINST TPG AND MUSIXMATCH) ....... 63

ELEVENTH CAUSE OF ACTION   INTENTIONAL INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TPG
AND MUSIXMATCH) ...................................................................................... 64

TWELFTH CAUSE OF ACTION NEGLIGENT INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TPG AND
MUSIXMATCH) ................................................................................................ 66

THIRTEENTH CAUSE OF ACTION █████████████████
████████████████ ............................................................. 67

PRAYER FOR RELIEF ................................................................................... 68

JURY TRIAL DEMAND ................................................................................. 69

Plaintiff LyricFind, Inc. ("LyricFind" or "Plaintiff") brings this Complaint and requests a jury trial against Defendants Musixmatch, S.p.A. ("Musixmatch"), and TPG Global, LLC ("TPG") (collectively, "Defendants"). LyricFind alleges, upon personal knowledge as to events or actions taking place in its presence, and upon information and belief as to all other events or actions, as follows:

## NATURE OF THE ACTION

1.    LyricFind and Musixmatch are competitors who provide music lyric services to digital services providers ("DSPs"), like Spotify and YouTube Music, which display music lyrics on their digital streaming platforms. LyricFind brings this Complaint to redress the unlawful misconduct of Musixmatch, the dominant supplier of lyric data fulfillment and administration services, and TPG, the private equity group that owns, controls, and directs Musixmatch. Among other wrongdoing, Musixmatch and TPG orchestrated an anticompetitive scheme with the music publisher Warner Chappell Music, Inc. ("WCM") to foreclose competition from Musixmatch's sole global competitor, LyricFind, as well as other smaller competitors, and thus cement Musixmatch's monopoly position.

2.    To display lyrics on their platforms and services, DSPs need three things: (i) a license conveying the rights to display the lyrics, (ii) a transcription of the lyrics in the form of digital files, and (iii) the ability to administer royalty payments to the holders of the lyric rights. The first component above constitutes "Lyric Rights Licensing." The latter two components constitute "Lyric Data Services." LyricFind and others compete with Musixmatch to provide both Lyric Rights Licensing and Lyric Data Services to DSPs.

3.    LyricFind has worked for years to erode Musixmatch's monopoly over Lyric Data Services by offering higher-quality lyric services to DSPs at lower prices. As this competitive threat from LyricFind grew, ███████████████████ ██████████████████████████ to exclude LyricFind and other providers from

- 5 -

1  the market so it could continue charging unlawfully inflated prices without the risk

2  of losing business.

3      4.    ████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████

8  ███████████

9      5.    ████████████████████████████████████████████████

10 █████████████████████████████  ensuring only Musixmatch, and not

11 LyricFind or any other provider, could access the full range of lyric data and licenses

12 needed to provide lyric services to DSPs.

13     6.    Central to this anticompetitive scheme was an exclusive agreement

14 between Musixmatch and the music publisher WCM that cut off LyricFind's and

15 other providers' previous non-exclusive access to WCM's lyric catalog, and with it,

16 many of the popular lyrics needed to compete for any DSPs' business. Specifically,

17 Musixmatch gained exclusive access to two critical inputs that DSPs need to display

18 lyrics: (1) Lyric Data Services and (2) Lyric Rights Licensing, as each is defined

19 below.

20     7.    To foreclose this competition, Musixmatch, working together with

21 TPG, paid WCM to become the exclusive provider of Lyric Data Services and the

22 exclusive sub-licensor of Lyric Rights Licensing for all WCM titles. This agreement,

23 referred to herein as the "WCM-Musixmatch Exclusive" or "Exclusive," was

24 unprecedented in the music industry and cut-off LyricFind's and others' ability to

25 furnish Lyric Data Services and Lyric Rights Licensing for WCM lyrics, which

26 LyricFind had provided for more than 15 years. Historically, all so-called "major"

27 music publishers, including Sony Music Publishing, Universal Music Publishing

28 Group, and WCM, permitted both LyricFind and Musixmatch to provide Lyric Data

Services for their catalogs on a non-exclusive basis. This permitted Musixmatch and LyricFind to compete for DSPs' business—that is, until the WCM-Musixmatch Exclusive abruptly ended this competition.

8.    TPG and Musixmatch's anticompetitive scheme did not end there. To further force DSPs to contract with Musixmatch, TPG and Musixmatch conspired to force DSPs to remove lyrics supplied by anyone but Musixmatch and quickly caused WCM to terminate its contractual relationship with LyricFind. Defendants also coordinated with WCM to ensure WCM would not provide a direct lyric rights license to Spotify (despite their prior licensing negotiations), nor to other DSPs, and would instead force Spotify and other DSPs to sublicense lyric rights and data from Musixmatch.

9.    TPG's and Musixmatch's goal was simple: make sure that Spotify, and other DSPs, have no choice but to obtain Lyric Data Services and Lyric Rights Licensing from Musixmatch despite its higher fees—a plainly anticompetitive result. LyricFind brings this lawsuit to stop Defendants' unlawful conduct, which has eliminated competition and raised prices for Lyric Data Services and Lyric Rights Licensing worldwide and in the United States, in violation of state and federal law.

10.    As a result of the scheme identified herein, TPG-owned Musixmatch has maintained and expanded its monopoly in the sale of Lyric Data Services and foreclosed competition for Lyric Rights Licensing—the essential services that allow DSPs to display song lyrics, typically in a choice of languages synced in time with music. Musixmatch, which is owned and directed by TPG, one of the largest private equity groups in the world, services more than 80% of DSPs by streaming volume and has agreements with six of the seven largest DSPs by global subscribers.

11.    LyricFind, by contrast, was founded by three friends fresh out of college twenty years ago and has taken no institutional investment. LyricFind is the only significant global competitor to Musixmatch, servicing most of the remaining market.

1      12.    WCM is one of just three major music publishers which own,

2    administer, and control the lyrics that are necessary to provide Lyric Data Services

3    and Lyric Rights Licensing. The other two major publishers are Sony Music

4    Publishing and Universal Music Publishing Group. Collectively, these "Big Three"

5    publishers own or administer rights to over 10 million titles worldwide, including

6    most of the world's most popular and important songs. WCM's market control is

7    substantial. WCM has full or partial ownership, and thus effective control, of

8    approximately 30% of all streams licensed on major platforms. As of November

9    2024, WCM also effectively controlled 64 of the top 100 songs on Billboard's Top

10   Radio Airplay Chart, and 59 of the top 100 songs on Billboard's Hot 100 Songs

11   Chart.

12     13.    The most common customers for Lyric Data Services are music DSPs,

13   which display lyrics alongside musical content. These DSPs include the world's most

14   popular music streaming services like Spotify, Apple Music, YouTube Music,

15   Amazon Music, Deezer, Pandora, and many others.

16     14.    To display lyrics, DSPs need a license from the rights holders of each

17   song. DSPs typically obtain Lyric Rights Licensing from a lyric services provider

18   like Musixmatch or LyricFind, and at times, in the case of large DSPs, directly from

19   certain publishers.

20     15.    Separately, and in addition to this licensing, DSPs need an actual copy

21   of the lyrics to display, which they obtain from lyric data services providers like

22   LyricFind and Musixmatch. Music publishers typically do not invest the resources

23   necessary to create copies of the lyrics for the songs they control in a workable digital

24   format, so LyricFind and Musixmatch have undertaken the significant time and effort

25   to maintain and administer their large databases of lyric text files with translations

26   and synchronization data (synchronizing the display of the lyrics in time with audio),

27   which they provide to DSPs for a fee. Musixmatch and LyricFind compete to provide

28   these Lyric Data Services to customers like DSPs.

16.     To compete effectively, LyricFind and Musixmatch must be able to provide Lyric Data Services for all major publishers' song titles, including WCM's. DSPs expect that providers of Lyric Data Services will have access to WCM's catalog because it represents a key portion of what users wish to stream; without it, DSPs would not be able to display lyrics for many, and in some cases a majority of, popular songs. Until March 2024, LyricFind enjoyed a long-standing, mutually profitable relationship with WCM, partnering together on a non-exclusive basis with respect to Lyric Rights Licensing and Lyric Data Services for more than 15 years without issue.

17.     That changed when Musixmatch and TPG discovered that Spotify, the largest customer in the market for Lyric Data Services, was very far along in negotiations with LyricFind to replace Musixmatch as Spotify's Lyric Data Services provider. Spotify claims to account for as much as 50% of the total streamed songs worldwide and is particularly crucial for independent and new artists. Spotify's negotiations with LyricFind progressed quickly from the fall of 2023 into March 2024. One of the challenges in switching from one lyric provider to another is the technical integration required to source lyrics from the new provider. Spotify had undertaken and largely finalized the technological integration needed to switch from Musixmatch to LyricFind, including a successful internal test using LyricFind lyrics. The parties were in the final stages of negotiating the contract through which LyricFind would provide Lyric Data Services for Spotify, on information and belief, at a significant discount to the rates commanded by Musixmatch.

18.     TPG and Musixmatch were desperate. ███████████████████ ███████ they now risked losing Spotify, Musixmatch's largest customer, to its main competitor. Rather than compete against LyricFind on the merits through lower prices and better services, TPG and Musixmatch seized the opportunity to cement Musixmatch's monopoly and extinguish the competitive threat posed by LyricFind once and for all. To do so, TPG and Musixmatch paid WCM a significant premium

1    to execute the first-of-its-kind Exclusive that would block Spotify from signing with

2    LyricFind and force Spotify, along with all other major DSPs, to purchase Lyric Data

3    Services from Musixmatch at substantially higher prices.

4        19.    ███████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ██████████████████████████████████

8        20.    ███████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████

15       21.    ████████████████████████████████████████████████

16   ███████████████████████████████████    TPG    and    Musixmatch

17   orchestrated the unprecedented Exclusive with WCM that cut-off LyricFind's ability

18   to furnish Lyric Data Services and Lyric Rights Licensing for WCM titles. On

19   information and belief, Musixmatch paid WCM an amount that far exceeds any

20   legitimate commercial goal to become the exclusive provider of Lyric Data Services

21   and exclusive sub-licensor of Lyric Rights Licensing for all WCM titles, meaning

22   only Musixmatch can provide Lyric Data Services for WCM's titles and only

23   Musixmatch    can    sublicense    rights    to    WCM's    lyrics.    Underscoring    the

24   anticompetitive nature of the Exclusive, neither Defendants nor WCM has publicly

25   disclosed the Exclusive, despite their longstanding practice of disclosing commercial

26   deals of this import.

27       22.    *Fourth,* based on the rights Musixmatch obtained in the Exclusive, TPG,

28   Musixmatch, and WCM conspired to force Spotify to sign with Musixmatch for both

- 10 -

Lyric Data Services and Lyric Rights Licensing. Upon information and belief, WCM ended its direct-licensing negotiations with Spotify and informed Spotify that its only option for obtaining licenses and lyric data for WCM's titles was from Musixmatch. Spotify was forced to abruptly end its negotiations with LyricFind for Lyric Data Services, as well as end its negotiations with WCM for direct Lyric Rights Licensing. Musixmatch has also sought to fortify the Exclusive by signing similar exclusivity deals with other publishers.

23.    Defendants' scheme had the intended effect: it foreclosed competition for Lyric Data Services and Lyric Rights Licensing and allowed Musixmatch to charge unlawfully inflated fees. DSPs, especially major DSPs like Spotify, need access to all three major publishers' lyrics to provide a comprehensive product to their users, otherwise they cannot display lyrics for many popular songs. As a result of the WCM-Musixmatch Exclusive, LyricFind and other lyric service providers are no longer able to compete with Musixmatch because they cannot provide Lyric Data Services or Lyric Rights Licensing for approximately 30% of streams and around 60% of the top 100 songs, which are owned in whole or in part by WCM. Simply put, Spotify and other DSPs cannot offer the market a viable lyric product without the lyrics in WCM's catalog. The only remaining practical choice for DSPs is to contract with Musixmatch, at whatever price Musixmatch demands.

24.    In April 2024, Spotify informed LyricFind that because of the WCM-Musixmatch Exclusive, Spotify had no choice but to halt its potential transition to LyricFind. Spotify then renewed its agreement with Musixmatch, on information and belief, despite Spotify having already negotiated a significantly better price and service with LyricFind. LyricFind was robbed of an opportunity to partner with Spotify on a contract worth tens of millions of dollars to LyricFind, and that would have strengthened LyricFind's competitive position in the rest of the market.

25.    The WCM-Musixmatch Exclusive also forecloses LyricFind from signing new agreements, or renewing existing agreements, with other DSPs that need

to display WCM's lyrics, as all major DSPs do. For example, iHeartRadio, another significant DSP, recently ended renewal negotiations with LyricFind when it learned that LyricFind would no longer be able to service WCM's catalog. iHeartRadio was then forced to sign with Musixmatch at a price over five times higher than what LyricFind had previously charged iHeartRadio. Other DSPs that have already invested great sums to integrate LyricFind's system will also be forced to switch to Musixmatch, and nobody else, at a significant cost, while paying Musixmatch's monopoly fees. LyricFind's viability as a business is now in jeopardy, as it can no longer compete for DSPs' business.

26.    The WCM-Musixmatch Exclusive will also foreclose other providers from participating in the Lyric Data Services and Lyric Rights Licensing markets. A handful of smaller competitors, as well as artists, labels, and distributors that have provided WCM lyrics directly to DSPs, are now barred from doing so under the Exclusive. With only Musixmatch left to service the market, prices will rise; choices will be limited; there will be fewer songs with lyrics, translations, sync, and premium data available; and the competitive impetus for innovation for Lyric Data Services and Lyric Rights Licensing will grind to a halt.

27.    Nor is the harm limited to Lyric Service Providers and DSPs. Other publishers, collective management organizations, and songwriters that jointly own and control song rights with WCM are also harmed by the Exclusive because their lyrics must now be provided only by Musixmatch. Artists and record labels whose works are associated with WCM are now dependent on Musixmatch to provide Lyric Data Services and Lyric Rights Licensing for their songs and cannot do so independently or through another provider.

28.    There is no legitimate business justification for the WCM-Musixmatch Exclusive. Rather than compete based on price or quality, TPG and Musixmatch undertook an anticompetitive scheme to protect, maintain, and increase Musixmatch's monopoly in the Lyric Data Services market and its dominance in the

- 12 -

1  Lyric Rights Licensing market. Because Musixmatch has been a monopolist in the
2  Lyric Data Services market at all times relevant to this lawsuit, Defendants' actions
3  were intended to maintain and further that monopoly power in violation of state and
4  federal law.

5      29.    As a result of Defendants' anticompetitive practices, LyricFind seeks
6  damages, costs, and attorneys' fees pursuant to Section 1 and 2 of the Sherman Act,
7  Section 3 of the Clayton Act, California's Cartwright Act, and California's Unfair
8  Competition Law. While subject to proof at trial, LyricFind estimates that its
9  damages may exceed $1 billion post-trebling. LyricFind also seeks damages with
10 respect to Defendants' ███████████████████████████ and their
11 intentional and/or negligent interference with LyricFind's prospective economic
12 advantage.

13
14                              **THE PARTIES**

15     30.    Plaintiff LyricFind is a company organized and existing under the laws
16 of Ontario, Canada, with its principal place of business located at 40 Eglinton Avenue
17 East, Suite 400, Toronto, Ontario, Canada. LyricFind is a global provider of Lyric
18 Data Services and Lyric Rights Licensing for a broad range of customers.

19     31.    Upon information and belief, Defendant Musixmatch is a company
20 organized and existing under the laws of Italy, with its principal place of business
21 located at Via San Vitale, 5, Bologna, Italy. Musixmatch is a competitor of
22 LyricFind's in the markets for Lyric Data Services and Lyric Rights Licensing. Upon
23 information and belief, at all relevant times herein, Musixmatch has maintained and
24 operated from offices in San Francisco, California and frequently transacts business
25 in this district.

26     32.    Upon information and belief, Defendant TPG is a limited liability
27 company existing under the laws of Delaware, with its principal place of business at
28 301 Commerce St #3300, Fort Worth, TX 76102. Upon information and belief, at all

- 13 -

1    relevant times herein, TPG has maintained and operated from offices at 345

2    California Street, #3300, San Francisco, California and frequently transacts business

3    in this district. TPG is a large private equity firm that, upon information and belief,

4    owns a controlling stake in Musixmatch, which it purchased in or around July 2022.

5

6                             **RELEVANT THIRD PARTIES**

7         33.    WCM is a company organized and existing under the laws of California,

8    with its principal place of business at 777 Santa Fe Avenue, Los Angeles, California.

9    WCM is the global publishing arm of Warner Music Group and publishes and

10   administers the rights to a wide array of popular musical compositions written by

11   songwriters.

12

13                            **JURISDICTION AND VENUE**

14        34.    This action arises in part under Sections 1 and 2 of the Sherman Act, 15

15   U.S.C. §§ 1, 2. The Court has subject matter jurisdiction under 28 U.S.C. § 1331

16   (federal question), 15 U.S.C. § 15 (antitrust), and 15 U.S.C. § 26 (injunctive relief).

17   The Court also has supplemental jurisdiction with respect to Plaintiff's state law

18   claims pursuant to 28 U.S.C. § 1367(a).

19        35.    The Court has personal jurisdiction over Defendant Musixmatch

20   because Musixmatch regularly transacts business within this district and the state of

21   California, including by contracting with WCM and other licensors within California,

22   contracting with customers and licensees within California, engaging in marketing

23   and business development within this district and elsewhere in California, providing

24   lyric products and services to consumers in this district and California, attending key

25   executives' meetings in this district, and maintaining an office in San Francisco,

26   California.

27        36.    The Court has personal jurisdiction over Defendant TPG because TPG

28   regularly transacts business within this district and the state of California, including

                                      - 14 -

by its ownership and control over Musixmatch, contracting with customers within California, engaging in marketing and business development within this district and elsewhere in California, attending key executives' meetings in this district, and maintaining an office in San Francisco, California. TPG Growth, the division of TPG that manages and directs Musixmatch, has its headquarters in San Francisco.

37.    The violations of law alleged in this Complaint took place in part in this judicial district. Venue is therefore appropriate in the Northern District of California under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c).

38.    The conduct complained of herein has occurred in and had a substantial effect on interstate trade and commerce.

## FACTUAL ALLEGATIONS

### I.    INDUSTRY BACKGROUND

39.    This case involves the infrastructure that supports online music streaming, which has become the dominant method by which consumers access and listen to music in today's digital world. The Lyric Data Services and Lyric Rights Licensing that LyricFind and Musixmatch provide—which enable the display of real time lyrics with music—are part of the music streaming experience that consumers now expect and demand. The following background is necessary to show how Defendants' scheme has caused and will continue to cause harm to lyric service providers like LyricFind, along with consumers, musicians, and various other parties.

### A.    Music Streaming and the Increasing Demand for Synced Lyric Data

40.    The advent of digital streaming has transformed how people enjoy music. Today, modern music streaming services allow people to access extensive music libraries for a relatively low subscription fee (and in some cases, for free, often supplemented by advertising), enabling listeners to explore a wide range of genres

and artists without purchasing individual albums or tracks. These music streaming services, known as DSPs, include Spotify, Apple Music, YouTube Music, Amazon Music, Deezer, Pandora, and many others. Table A below shows the major DSPs' subscriber market share in the U.S. as of early 2024. Figure A below displays the major DSPs' share of subscribers worldwide as of the 3rd quarter of 2023.

**Table A – Share of Music Streaming Subscribers in the U.S.**

| | |
|---|---|
| Spotify | 36% |
| Apple Music | 30.7% |
| Amazon Music | 23.8% |
| YouTube Music | 6.8% |
| Pandora | 1.9% |
| Tidal | 0.5% |

1

2    **Figure A – Share of Music Streaming Subscribers Worldwide**

3

4

5

6

7    

8

9

10

11

12

13

14

15    **Note(s):** Worldwide; Q3 2023
      Further information regarding this statistic can be found on page 8.
      **Source(s):** MIDiA Research; Music Industry Blog; ID 653926

16

17    41.    These music streaming services have continually evolved to meet

18    consumer demands. DSPs use sophisticated algorithms to offer personalized music

19    recommendations and curated playlists to help users discover new and emerging

20    artists. One popular feature that consumers demand across all streaming platforms is

21    the synchronized display of lyrics with songs. Most music consumers consider lyrics

22    to be a key part of their music experience and are more likely to pay for a streaming

23    service that offers compelling lyrics features across its streaming library.

24    42.    Over the past decade, DSPs have responded to this demand by

25    integrating new lyrics features into their platforms. DSPs like Spotify, Apple Music,

26    Amazon Music, YouTube Music, and Deezer offer synchronized lyrics for many of

27    their songs, allowing users to read or sing along with lyrics synchronized line-by-line

28    or word-by-word with music. These platforms also provide lyric content for users to

share with others on social media. Additionally, as the demand for lyrics has increased, platforms like Spotify have experimented with driving subscriber growth by restricting access to lyrics for their non-subscriber customers.

43.    Figures B and C below illustrates how Spotify, the largest DSP, incorporates lyrics on its mobile and desktop platforms by prominently displaying them at the center of the user interface when a song is played or selected.

**Figure B -
Spotify's Desktop Display**

**Figure C – Spotify's
Mobile Display**



44.    Music streaming platforms are not the only music service providers that demand lyric-related features. Social media platforms also have started incorporating lyrics features when music is played. For example, Instagram and Facebook have introduced features that allow users to add song lyrics to their Reels and Stories when they use music from Meta's library. All DSPs recognize, and are exploring ways to satisfy, consumers' increasing demand for lyrical content.

45.    As a result, DSPs have an increasing demand for Lyric Data Services and Lyric Rights Licensing, which are the necessary inputs required to display lyrics

1   on their platforms. Music publishers and songwriters, who hold the rights to lyrical

2   works and other rights associated with musical works, play a crucial role in the Lyric

3   Data Services and Lyric Rights Licensing markets.

4           **B.**      **Music Publishers' Role in the Industry**

5         46.     Music publishers secure and manage copyrights for musical

6   compositions, including promoting their catalog's songs to recording artists,

7   licensing compositions for use by films, television, advertisements, and music

8   streaming services, monitoring song usage, and collecting and distributing royalties

9   to their clients.

10        47.     The Independent Music Publishers International Forum reports that the

11  global music publishing business was estimated to be worth $15.5 billion in 2023, an

12  increase of 15% from the previous year.

13        48.     The largest music publishers include WCM, Sony Music Publishing

14  ("Sony"), Universal Music Publishing Group ("UMPG"), Kobalt Music Publishing

15  ("Kobalt"), BMG Rights Management, and Concord Music Publishing. The Big

16  Three major music publishers—Sony, UMPG, and WCM—collectively accounted

17  for over 60% of the global music publishing market on a revenue basis in 2024, with

18  Sony accounting for 25%, UMPG 23%, and WCM 12%. The Big Three publishers

19  collectively own or administer over 10 million compositions.

20        49.     However, the scope of the major music publishers' industry influence

21  exceeds their revenue-based market shares due to the size and shared control of their

22  musical catalogs. For example, according to its 2023 annual report, Warner Music

23  Group (WCM's parent) believes its catalog is "differentiated by the scale, reach and

24  broad appeal of our music" and that its "collection of owned and controlled recording

25  and musical compositions, spanning a large variety of genres and geographies over

26  many decades, cannot be replicated." In Warner Music Group's words: "[a]s one of

27  the world's largest music entertainment companies, we believe we are well

28  positioned to take advantage of growth in digital distribution and emerging

1    technologies to maximize the value of our assets." In 2024, WCM generated over $1

2    billion in music publishing revenue, an increase of 11% from the prior year.

3        50.    One area where publishers can "take advantage of growth in distribution

4    and emerging technologies" is Lyric Rights Licensing. Music publishers such as

5    WCM understand the value of lyrics to both consumers and DSPs and have made it

6    an important part of their business and a growing source of revenue. The importance

7    of lyrics is expected to continue to grow as new technologies enable users to enjoy

8    and interact with lyrics in new ways.

9        51.    Music publishers license rights to lyrical works differently from other

10    rights associated with music compositions. While music publishers own or

11    administer the copyrights of musical compositions, performing rights organizations

12    ("PROs"), collective management organizations ("CMOs"), and the Mechanical

13    Licensing Collective ("MLC") often represent publishers in granting licenses for

14    non-lyrical musical rights, including to DSPs. In the U.S., for example, PROs like

15    the American Society of Composers, Authors and Publishers ("ASCAP") and

16    Broadcast Music, Inc. ("BMI") offer blanket licenses for public performance rights

17    on behalf of many songwriters and publishers, and the Mechanical Licensing

18    Collective ("MLC") was established to administer a blanket license for certain

19    mechanical rights under the Music Modernization Act.

20        52.    The government has regulated some PROs through consent decrees and

21    regulates the MLC's licensing practices under the Music Modernization Act. The two

22    largest U.S. PROs—ASCAP and BMI—are each regulated by separate antitrust

23    consent decrees that require them to offer equivalent license terms to similarly

24    situated services and venues, facilitating market entry for competing services and

25    generating more revenue for publishers and songwriters.

26        53.    Unlike the regulated blanket license regime for non-lyrical music rights,

27    lyric rights are licensed on a music publisher-by-music publisher basis. Customers

28    seeking to license lyric rights negotiate a license directly with each music publisher,

1    or indirectly through lyric service providers like LyricFind or Musixmatch, which

2    are authorized to sublicense rights on behalf of contracted music publishers.

3                    **C.    Copyright Enforcement by Music Publishers**

4        54.    Because many songs, especially popular songs, are written by multiple

5    songwriters, the intellectual property rights for those songs are often owned by

6    multiple songwriters and/or music publishers, which jointly administer the rights to

7    their songs and lyrics. Co-written songs are thus often controlled by multiple

8    publishers. For example, if a song's lyrics and music have three equal co-writers, one

9    writer may be represented by WCM, another by Sony, and the third by UMPG, each

10   of which may hold a 33.33% interest—i.e. a "fractional interest"— in the copyright,

11   including the lyrics.

12       55.    Under U.S. copyright law, the default rule for joint works (including

13   non-musical works) is that co-owners hold the copyright as tenants-in-common,

14   allowing each co-owner to grant non-exclusive licenses to the full work in the

15   absence of a contract to the contrary. However, in music publishing, co-owners

16   generally do not grant full licenses out of respect for all publishers and contributing

17   writers. Thus, for split works, a co-owner typically will not grant a "full work" license

18   unilaterally. Instead, each co-owner typically grants "fractional licenses," which

19   cover only the rights to the particular fraction of the work that each publisher owns

20   or controls.

21       56.    As a result, multiple publishers often own or control fractional rights to

22   the same song, which can be effectively licensed only if all fractional owners agree

23   to license their respective interests. This is the case for a large percentage of the most

24   popular songs on streaming services. Any publisher that holds a fractional interest to

25   a song can only effectively license its fractional share and thus depends on the other

26   publishers/owners to also grant licenses for their fractional interests. This means that

27   any single fractional rights holder has effective control to deny the licensing over any

28   song in which they have any partial rights, even with as little as 1% ownership (or

- 21 -

less). Music service providers understand that a fractional license from one publisher will not suffice to avoid infringement risk. They must identify all songwriters, verify the various publishers that represent them, and obtain licenses from each co-publisher.

57.     As one example, WCM has a 1.2% ownership stake in the hit song "7 Rings" by Ariana Grande, which has been streamed 2.4 billion times on Spotify and 1.4 billion times on YouTube. Despite WCM's minimal ownership interest in this song, DSPs still must obtain WCM's licensing approval before they can display the song's lyrics on their platforms. Thus, WCM can effectively control the display rights for "7 Rings," along with approximately 60% of other top songs, based on its fractional ownership stakes that can be as low as 1%.

58.     Due to this fractional-ownership framework, and the high concentration of music publishers, each publisher wields greater market power than its revenue-based market shares might suggest—a concern that regulators have scrutinized. A publisher wields the same effective control over a song if it holds a 100% interest or a 25% interest. Music publishers' market power thus hinges on the amount of songs they effectively control through fractional ownership.

59.     On information and belief, WCM controls approximately 30% of the lyric display rights serviced by LyricFind, accounting for both partial and whole ownership. WCM's effective market share is notably higher for popular contemporary music, which is critical to the commercial success of major DSPs like Spotify. According to Billboard's November 2024 Publishers Quarterly, WCM has effective control, in whole or in part, of 64 of the top 100 songs on Billboard's Top Radio Airplay Chart and 59 of the top 100 songs on Billboard's Hot 100 Songs Chart in the United States.

## D.    Lyric Service Providers

60.     For the same reason that blanket licensing and collective societies emerged to help administer non-lyrical music rights—to lower transaction costs,

make the licensing process more efficient, and facilitate copyright enforcement—a similar need arose for intermediaries to collect, manage, and furnish lyrical works on behalf of publishers, labels, and songwriters. Lyric service providers like LyricFind and Musixmatch fulfill these roles, which include Lyric Data Services and Lyric Rights Licensing.

61.    To facilitate Lyric Rights Licensing, lyric service providers source lyric rights licenses from tens of thousands of music publishers, collection societies, and songwriters. They then aggregate these licenses and sublicense them to clients, like DSPs, who display lyrics to their customers. LyricFind's current suite of licensing rights covers over 50,000 music publishers around the world. LyricFind sublicenses these rights to more than 50 clients, including Amazon, YouTube Music, Pandora, and many other DSPs.

62.    LyricFind's contracts with its customers require that DSPs obtain a license to display the lyrics to any song for which they display lyric data provided by LyricFind, regardless of whether the license is obtained from LyricFind or a music publisher directly. Not all DSPs use lyric service providers for Lyric Rights Licensing. Some large DSPs secure their own licenses directly from music publishers, especially from major publishers like Sony, UMPG, and WMG.

63.    In addition to, and separate from, Lyric Rights Licensing, lyric service providers provide Lyric Data Services to customers like DSPs. While music publishers usually own or control the copyright in song lyrics, they do not typically possess or invest in the creation of actual transcriptions of the lyrics, and therefore cannot offer them to DSPs. DSPs instead obtain lyrical transcriptions and associated data from lyric services providers like LyricFind and Musixmatch. Lyric service providers furnish these Lyric Data Services by sourcing or transcribing lyrics and creating text files that contain the lyrical transcriptions. These text files often also include detailed translations and synchronization data, which allow lyrics to be displayed line-by-line or word-by-word in synch with music.

64.     In addition to these text files, Lyric Data Services also include royalty administration services, i.e. collecting, allocating, and paying lyric-related royalties to the correct rights holders. For example, LyricFind's royalty administration system utilizes the usage data tracked and/or submitted by clients and applies the amounts paid by each client, type of use, territory of use, minimum guarantees or advances, and royalty rates, to allocate the appropriate amounts due to each copyright owner in each country for each DSP.

65.     Many customers obtain both Lyric Rights Licensing and Lyric Data Services from a single lyric service provider, like LyricFind or Musixmatch. However, many DSPs, including many of the largest DSPs, do not need a provider's help to license lyrics from major publishers because they obtain their own direct licenses from them. These DSPs still seek licenses from smaller publishers through a lyric service provider. Regardless of how DSPs license lyrics—directly or via sublicense—they still need to procure Lyric Data Services to display lyrics to users. Providers of Lyric Data Services thus strive to maintain as complete a lyrical catalog as possible, even for songs they do not have the right to sublicense, because DSPs may still need Lyric Data Services for songs that are separately licensed.

### E.     DSPs Require a Complete Lyrical Catalog

66.     In the modern era of music streaming, music consumers expect that major music platforms will allow them to stream most, if not all, mainstream music. As such, major DSPs like Spotify and Apple Music host music from all major publishers' catalogs and do not tend to compete on the number of songs on their platforms. DSPs instead compete on other aspects of their services like product features and price. This is markedly different from the film or television industry, where streaming platforms like Netflix and Hulu fiercely compete based on their differing, and sometimes exclusive, content offerings.

67.     Thus, when sourcing Lyric Data Services, DSPs expect providers to offer a complete catalog of lyrics from all major publishers in order to cover an

- 24 -

adequate portion of lyric requests. To fill this need, lyric service providers like LyricFind and Musixmatch strive to aggregate all lyrics from all major publishers, along with independent publishers and songwriters, regardless of whether they have lyric licenses in place for all of the subject works. While LyricFind and Musixmatch's lyrics offerings do not completely overlap, both have historically maintained databases that, at a minimum, contain the vast majority of lyrics for the musical compositions controlled by all the major publishers. In the years before the Exclusive, LyricFind and Musixmatch competed based on price, the quality of their Lyric Data, and the scope of their lyric offerings for works not controlled by the major publishers. Some DSPs preferred LyricFind's offering while others may have preferred Musixmatch's.

68.    Most DSPs expect to source Lyric Data Services from a single provider because it is not practical or economical to integrate Lyric Data from multiple databases or switch among them. Building the infrastructure to source Lyric Data requires a significant investment of time and resources to ingest, maintain and operate a provider's unique database. Therefore, DSPs typically are not willing to spend the resources to source Lyric Data from multiple providers. While two large DSPs, Amazon Music and Google/YouTube Music, have chosen to incur the extra expense of sourcing Lyric Data from both LyricFind and Musixmatch, they are the exception because of their vast resources. For most DSPs, such a cost cannot be justified.

69.    Once a DSP partners with one lyric services provider, it tends to remain with that provider due to the significant costs associated with switching, absent strong competition from another provider. This is particularly true if an incumbent were to obtain the exclusive rights to furnish a major publisher's Lyric Data. In that event, DSPs effectively would have no choice but to stay with the incumbent, as no other provider would be able to furnish Lyric Data Services associated with that major publisher's titles.

70.    WCM, with whom TPG and Musixmatch orchestrated the Exclusive, is one of the Big Three publishers with effective control of approximately 30% of total music streams and around 60% of the top 100 most popular songs. By locking up the exclusive right to provide Lyric Data Services for these WCM titles and offer associated Lyric Rights Licensing, TPG and Musixmatch have ensured that only Musixmatch will be a viable option for most, if not all, DSPs, as no other provider will be able to offer a viable lyrical catalog without WCM's titles.

71.    In Spotify's prescient words: "The music industry has a high level of concentration, which means that one or a small number of entities may, on their own, take actions that adversely affect our business." "Our business may be adversely affected if our access to music is limited or delayed because of deterioration in our relationship with one or more of these rights holders or if they choose not to license to us for any reason. These rights holders also may attempt to take advantage of their market power (including by leveraging their publishing affiliate) to seek onerous financial or other terms from us or otherwise impose restrictions that hinder our ability to further innovate our service offerings."

### F.    LyricFind's Long and Profitable Relationship with WCM

72.    LyricFind recognizes the importance of offering a comprehensive catalog of lyrics to its clients. LyricFind has consistently sourced lyrics from a diverse range of publishers, distributors, and songwriters so that its catalog meets the needs of its clients.

73.    Among the music publishers that have partnered with LyricFind, the Big Three—Sony, UMPG, and WCM—are particularly significant, as their large catalogs are crucial to clients like DSPs. WCM is especially notable because it owns and/or controls copyright interests in many of the most popular songs that consumers expect to stream on DSPs' platforms. Until the WCM-Musixmatch Exclusive, LyricFind had, for many years, provided Lyric Data Services to customers for all three major

publishers' songs, regardless of whether the customers obtained a sublicense from LyricFind or a direct license from the publisher.

74.    LyricFind's partnership with WCM began in 2008, and the two companies have maintained a strong and amiable working relationship since. LyricFind's most recent agreement with WCM was executed in 2018 and has been extended/amended twice until June 30, 2024.

75.    This business relationship, spanning over fifteen years, has been mutually beneficial and profitable. In 2023, for example, LyricFind administered lyrical rights for hundreds of thousands of songs for WCM on a non-exclusive basis and through its sublicensing and administration of direct licenses helped generate millions of dollars of royalties for WCM.

## II.    THE RELEVANT MARKETS

76.    Lyric service providers like LyricFind and Musixmatch operate in two related, but separate relevant markets: (1) the Market for Lyric Data Services ("Lyric Data Services Market"); and (2) the market for Lyric Rights Licensing ("Lyric Rights Licensing Market"), which contains a submarket for the *sublicensing* of Lyric Rights from lyric service providers ("Lyric Rights Sublicensing Submarket") (collectively, the "Relevant Markets"). The relevant geographic market for each of the relevant product markets is worldwide, as described below.

### A.    The Lyric Rights Licensing Market

77.    Market participants in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket are lyric service providers that sublicense the lyric rights owned or administered by major music publishers or other rights holders. Other rights holders can include aggregators of music licensing rights, independent publishers, and songwriters themselves.

78.    DSPs are customers in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket. In some cases, DSPs obtain lyric rights through sublicenses administered by lyric service providers. Other times, DSPs negotiate with

- 27 -

large rights holders like WCM to license lyric rights directly. Regardless of whether a license is obtained directly or via sublicense, DSPs still need to procure Lyric Data Services to display lyrics on their platforms. It is therefore well recognized that Lyric Rights Licensing and Lyric Data Services are distinct products with distinct market demands.

79.    The Lyric Rights Sublicensing Submarket, i.e. the sublicensing of lyric rights by lyric service providers, is a distinct submarket of the Lyric Rights Licensing Market because DSPs often do not have the resources to obtain direct licensing from music publishers at the scale required for their platforms, nor the resources to administer a large volume of lyric license agreements. As a result, in many cases, DSPs must rely on lyric service providers to obtain and administer lyric rights via sublicenses. Thus, for many lyric rights, DSPs can only obtain sublicenses in the Lyric Rights Sublicensing Submarket and cannot reasonably switch to direct licenses in the event of a non-transitory price increase.

80.    At all relevant times, Musixmatch has had market power in the Lyric Rights Licensing Market and monopoly power in the Lyric Rights Sublicensing Submarket. On information and belief, before the Exclusive, Musixmatch serviced approximately 31% of the Lyric Right Licensing Market based on licensing revenue, while LyricFind serviced approximately 16% of the market. Most of the rest of the Lyric Rights Licensing Market, approximately 53%, was comprised of direct licensing by music publishers. Musixmatch's market share in the Lyric Rights Sublicensing Submarket before the Exclusive was approximately 66% by licensing revenue.

81.    A key component of the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket is the need for lyric service providers to offer sublicenses for the works of all major publishers with whom DSPs do not have a direct license. Nearly all DSPs seek "one stop shopping" for their lyric licensing

needs, meaning they want a single provider to provide sublicenses for all of the major publishers' catalogs and as many smaller publishers/songwriters as possible.

82.    Given a small but substantial, non-transitory increase in the price of licensing within the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket, within the relevant geographic market, actual and prospective customers would not substitute to a different service without the necessary characteristics.

## B.    The Lyric Data Services Market

83.    The Lyric Data Services Market is related to, but distinct from, the Lyric Rights Licensing Market. Lyric service providers in the Lyric Data Services Market provide lyric data and royalty administration, which is the technical infrastructure required to implement the lyric display licenses and allocate related royalties.

84.    The primary participants in the Lyric Data Services Market are Musixmatch and LyricFind. At all relevant times, Musixmatch has been a monopolist in the Lyric Data Services Market, with a current market share of approximately 80%. The rest of the Lyric Data Services Market is primarily serviced by LyricFind. Other minor participants in the Lyric Data Services market include entities such as Genius (which provides Lyric Data Services to Apple), and Sockets and SyncPower (which provide Lyric Data Services in Japan). On information and belief, these other providers of Lyric Data Services collectively account for a *de minimis* share of the Lyric Data Services Market by revenue.

85.    Fulfilling Lyric Data requires the creation of data files that contain the actual text of lyrical transcriptions, as well as the data to synchronize the transcriptions to sound recordings, either line-by-line or word-by-word. Lyric Data Services also include processing and distributing lyric-related royalties. Lyric service providers process usage data to determine the appropriate royalties due to each rights holder, based on factors set forth in the relevant licensing agreements (e.g., amount of use, type of use, territory of use, minimum guarantees, advances, etc.). They then

pay the appropriate amounts due to each rights holder on a song-by-song, customer-by-customer, and country-by-country basis.

86.    Customers in the Lyric Data Services Market are primarily DSPs. As in the Lyric Rights Licensing Market, nearly all customers expect a single provider to fulfill Lyric Data Services for all publishers, including major publishers, because it is not economical to integrate data from multiple providers.

87.    Given a small but substantial, non-transitory increase in the price of Lyric Data Services within a relevant geographic market, actual and prospective customers would not substitute to a different service without the necessary characteristics.

### C.    The Relevant Geographic Market is Worldwide

88.    The relevant geographic market for both the Lyric Rights Licensing Market and Lyric Data Services Market is worldwide. Customers and providers in both markets primarily operate on a global basis. While certain local and regional DSPs exist, DSPs that operate on a global basis represent more than 90% of total global streams and revenue within the markets.

89.    In the Lyric Rights Licensing Market, the typical license granted by a music publisher is global in nature, as are most of the sublicenses granted by lyric services providers. In the Lyric Data Services Market, Lyric Data is the same globally, so DSPs typically use a single global provider of Lyric Data Services, as it does not make sense to source the same lyric file separately in different countries.

90.    As such, customers in both the Lyric Rights Licensing Market and Lyric Data Services Market typically require global service from lyric service providers.

### D.    Barriers to Entry

91.    There are just two main lyric service providers that participate in both the Lyric Rights Licensing Market and the Lyric Data Services Market at scale: Musixmatch and LyricFind. This market concentration is due, in part, to substantial barriers to entry in both Relevant Markets.

- 30 -

1        92.    In the Lyric Data Services Market, creating a comprehensive catalog of

2    song data and accompanying lyric files, and building the infrastructure to administer

3    royalty calculations and payments, takes years of effort, and substantial expenditures.

4    Although some publishers make small amounts of Lyric Data available, developing

5    a lyric database requires creating lyric transcriptions and translations, as well as

6    synchronization data, for the vast majority of songs for which lyrics are displayed.

7    Less than 0.1% of the lyrics in LyricFind's database have been provided by major

8    publishers, despite them owning or controlling roughly 60% of the rights market.

9        93.    Further, the cost to develop the technology to administer Lyric Data

10   Services for various DSPs requires many millions of dollars of investment and years

11   of development time. These upfront costs inhibit market entry and expansion.

12       94.    Additionally, in the Lyric Rights Licensing Market, providers must

13   engage in individual negotiations with numerous publishers and songwriters, and

14   major publishers often require significant advances and minimum guarantees to

15   secure sublicensing rights. The technical infrastructure needed to manage those

16   sublicenses is also very significant, constituting a further barrier to entry.

17       95.    High switching costs also bar entry to the Relevant Markets. The vast

18   majority of the Relevant Markets (roughly 90% by revenue) is limited to a small

19   number of major DSPs, all of which have an existing Lyric Data Service provider.

20   These DSPs have already expended substantial costs to integrate their technology

21   with a specific provider's infrastructure and are often bound by multi-year

22   agreements. This makes switching to a new third-party lyric services provider more

23   difficult because it would take a significant improvement in price or quality to justify

24   the added costs of a new provider, particularly if it would require terminating an

25   existing contract. Thus, once an incumbent lyric services provider is in place, there

26   is usually a substantial "stickiness" that reduces the opportunities for other providers

27   to compete for a DSP's business.

28

### III.    MUSIXMATCH FACED GROWING COMPETITION FROM LYRICFIND, WHICH LED TO DEFENDANTS' SCHEME

96.    As the two largest competitors in the Lyric Data Services and Lyric Rights Licensing Markets, LyricFind and Musixmatch have competed for years to offer the best service and pricing for Lyric Data Services and Lyric Rights Licensing. This includes many instances of head-to-head competition, which has intensified in recent years. Defendants' anticompetitive scheme, detailed below, was a direct response to this intensifying competition from LyricFind, which threatened to dislodge Musixmatch's monopoly in the Lyric Data Services Market and reduce its market power in the Lyric Rights Licensing Market.

97.    In 2022, for example, Meta (at the time, and still, a Musixmatch customer) negotiated with both Musixmatch and LyricFind over a new contract for Lyric Data Services and Lyric Rights Licensing. Although LyricFind did not win the business, on information and belief, Musixmatch had to significantly lower its proposed price, reportedly by over a million dollars, to retain Meta as a customer. Meta also informed LyricFind that because of Musixmatch's price reduction, and despite LyricFind's better offer, it could not justify the switching costs to bring on LyricFind as its lyric service provider.

98.    Similarly, in 2023, LyricFind competed aggressively against Musixmatch to provide Lyric Data Services and Lyric Rights Licensing to Tidal, another major DSP. On information and belief, Musixmatch was forced to make significant price concessions to maintain the Tidal business due to LyricFind's competing offer. This heightened competition loomed even larger with respect to Spotify, the largest and most important DSP customer of Lyric Data Services and Lyric Rights Licensing, whose contract with Musixmatch was set to expire in 2024.

99.    In addition to its higher prices, Musixmatch risked losing these DSPs' business due to the lower quality of its services. For years, consumers have complained that Musixmatch's lyrics are, among other things, inaccurate, slow or fail to appear, do not properly synch with music, and lack accurate translations.

Musicians are equally frustrated: they complain that Musixmatch's process for submitting lyrics is cumbersome, non-functional, and bug-ridden, while at the same time lacking customer service. Publicly, consumers have described Musixmatch's lyric services as a "living nightmare," "as close as it gets to a scam," and "unfathomably bad," leading some to question why the world's premier DSP would partner with such a poorly regarded service. As one user wrote, "[Musixmatch] somehow secured an exclusive deal with Spotify, and does a terrible, terrible job at its only task. . . . The only positive is that their contract will expire at some point, and the music industry won't have to deal with [Musixmatch] anymore."

100.    The growing competitive threat from LyricFind also stemmed from LyricFind's consistent improvements to its products and services. For example, in December 2023, LyricFind acquired Rotor Videos, which provides self-service video creation tools that musicians use to create videos for streaming platforms alongside LyricFind's existing "Videos by LyricFind" feature. These tools allow users to create their own video content, e.g., Spotify Canvas Videos, Lyric Videos, Music Videos, Art Videos, Apple Motion Art Videos, and more. LyricFind has also developed LyricIQ, a set of innovative data analysis and filtering tools that analyze the content of music lyrics and categorize them based on themes, topics, and content categories. LyricIQ allows customers to identify and curate music playlists for their business environments—e.g., limiting a stream to child-friendly music, or music appropriate for an in-store shopping environment.

101.    As LyricFind's competitive advantages mounted, TPG and Musixmatch became increasingly concerned that DSPs like Spotify would switch to LyricFind due to its better services and lower prices as their contracts with Musixmatch expired. ████████████████████████████████████████████████████ ███

102.    ████████████████████████████████████████████ TPG and Musixmatch realized they now risked losing Musixmatch's contract for Spotify, its

largest DSP customer, which was set to expire at the end of April 2024. Their fears were legitimate. From the fall of 2023 through April of 2024, LyricFind had been negotiating with Spotify to take over Musixmatch's role as Spotify's supplier of Lyric Data Services. LyricFind was also negotiating with Spotify to become the sub-licensor of Lyric Rights Licensing for all of the music publishers that LyricFind licenses, other than WCM, Sony, Universal, and Kobalt, from whom Spotify planned to obtain licenses directly.

103.   Because Spotify was negotiating to obtain lyric licenses directly from these major publishers, including WCM, its negotiations with LyricFind focused on Lyric Data Services and sub-licenses for "non-major" publishers. These negotiations accelerated between the fall of 2023 and March 2024. LyricFind and Spotify met several times, including multiple in-person meetings at Spotify's offices. By early 2024, LyricFind and Spotify had completed the framework for a potential agreement under which LyricFind would provide Lyric Data Services and Lyric Rights Licensing to Spotify on a global basis.

104.   As detailed below,



105.

106.   Spotify, however, continued to negotiate with LyricFind because the terms of its offer were considerably better than Musixmatch's. With the terms of their potential agreement nearly finalized, Spotify made significant investments in the technology and infrastructure necessary to switch from Musixmatch to LyricFind.

1    This included the technical integration of Lyric Data Services needed to switch to

2    LyricFind and a successful internal beta test with Spotify staff using LyricFind's data.

3        107.   At the last moment, however, Spotify was forced to abandon its plans

4    with LyricFind and remain with Musixmatch because of the unprecedented WCM-

5    Musixmatch Exclusive. On the eve of Spotify's renewal deadline with Musixmatch,

6    WCM broke the news of the WCM-Musixmatch Exclusive to Spotify (even before

7    informing LyricFind). WCM informed Spotify that, because of the Exclusive,

8    LyricFind could no longer supply Lyric Data Services for WCM's titles, and WCM

9    would not directly license lyric rights to Spotify despite their prior negotiations.

10    Because each DSP needs to have WCM content available to its customer base,

11    LyricFind no longer could offer a full and comprehensive range of lyric services to

12    Spotify.

13        108.   Because of the Exclusive and WCM's refusal to directly license lyrics

14    to Spotify, Spotify was forced to renew its agreement with Musixmatch at

15    substantially higher fees than those offered by LyricFind. Indeed, all other major

16    DSPs, as their contracts expire, will be forced to do the same.

17        109.   This outcome was not the result of competition, but a multifaceted

18    scheme by Defendants to eliminate competition in the Lyric Data Services Market,

19    and restrain competition in the Lyric Rights Licensing Market, through

20    anticompetitive means. ████████████████████████████████████████

21    ████████████

22    **IV.    DEFENDANTS' SCHEME TO ELIMINATE COMPETITION IN**
23    **THE RELEVANT MARKETS**

24        **A.**    ████████████████████████████████████

25    110.   ████████████████████████████████████████████████

26    ████████████████████████████████████████████████████

27

28



1    114. █████████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ████████

9    115. █████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   ███ TPG resorted to orchestrating the anticompetitive Exclusive between WCM

18   and Musixmatch—while also seeking exclusives with other publishers—to exclude

19   LyricFind, and all other competitors, from the Lyric Data Services Market.

20       116.   TPG laid the groundwork for its scheme almost immediately after

21   acquiring Musixmatch in July 2022. TPG quickly appointed multiple TPG Partners

22   to Musixmatch's board of directors, including David Trujillo and Jacqui Hawwa.

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████

26   117. █████████████████████████████████

27   ████████████████████████████████████████

28   ████████████████████████████████

1

118. ████████████████████████████████████

2 ███████████████████████████████████████████

3 ████

4 119. ████████████████████████████████████

5 ███████████████████████████████████████████

6 ████████████████████████████████████████

7 120. ████████████████████████████████████

8 ███████████████████████████████████████████

9 ███████████████████████████████████████████

10 █████████

11 121. ████████████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ██████████████████████████████

17 122. ████████████████████████████████████

18 ███████████████████████████████████████████

19 ███████████████████████████████████████████

20 ████████████████████

21 123. ████████████████████████████████████

22 ███████████████████████████████████████████

23 ███████████████████████████████████████████

24 ███████████████████████████████████████████

25 ██████████████████

26    124.   Of particular concern to both TPG and Musixmatch was the possibility

27 that LyricFind would take over Musixmatch's contract with Spotify, which was set

28 to expire in 2024 and generated millions of dollars of annual revenue for

- 38 -

Musixmatch. In addition to potentially losing this revenue, TPG and Musixmatch were concerned that Musixmatch would no longer be Spotify's exclusive lyric services provider, which was a critical selling point for the Musixmatch Pro service. Musixmatch Pro is a subscription service that purportedly helps independent songwriters and publishers get their lyrics on major streaming platforms. The Musixmatch Pro service is offered to independent artists, songwriters, and publishers at several annual pricing tiers, from $36 to more than $350, as shown in Figure D. All of the tiers are premised on the idea that independent artists and publishers can get their lyrics on major streaming platforms—particularly Spotify—only by paying for Musixmatch Pro.

125.   On information and belief, the Musixmatch Pro service is responsible for a substantial share of Musixmatch's total revenue and profit on an annual basis. If TPG and Musixmatch lost the ability to ensure lyric availability on Spotify, the revenue generated from Musixmatch Pro would be substantially reduced, as would Musixmatch's overall profitability and overall enterprise value to TPG.

1

**Figure D – May 29, 2024, Screenshot of Musixmatch Webpage**

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16    **B.** ███████████████████████████████████████

17

18    126.    TPG and Musixmatch's fears about losing Spotify's business mounted

19    as LyricFind's negotiations with Spotify progressed towards the end of 2023. TPG

20    and Musixmatch were aware of LyricFind's negotiations with Spotify and became

21    increasingly concerned that Musixmatch would lose Spotify's business to LyricFind

22    due to LyricFind's better services and lower prices.

23    127.    █████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████████████████████████████

26    ████████████████████████████████████████████████

27    ████████████████████████████████████████████████

28    ████████████████████████████████████████████████

1    ███████████████████████████████████████████████████████
2    ██████████████
3    128.  ████████████████████████████████████████
4    ███████████████████████████████████████████████████████
5    ███████████████████████████████████████████████████████
6    █████████████████
7    129.  ████████████████████████████████████████
8    ███████████████████████████████████████████████████████
9    ████████████████████████████████████████████████
10   130.  ████████████████████████████████████████
11   ██████████████████████████████████

████████  At the same time, Spotify continued integrating LyricFind's technical infrastructure for Lyric Data Services in anticipation of potentially switching from Musixmatch to LyricFind. It was not until the WCM-Musixmatch Exclusive that these negotiations came to a decisive end.

**C.    TPG and Musixmatch Coordinated with WCM to Impose the WCM-Musixmatch Exclusive.**

131.  ████████████████████████████████████████

████████  TPG and Musixmatch hatched a new plan to force DSPs to sign with Musixmatch: ensuring only Musixmatch, and no other provider, could provide Lyric Data Services and Lyric Rights Licensing for WCM's songs.

132.  Before the Exclusive, LyricFind and Musixmatch were both able to fulfill this role. Publishers like WCM had never restricted which companies could furnish Lyric Data Services for their songs, allowing LyricFind and Musixmatch to compete based on price and quality. When their other anticompetitive tactics failed, TPG and Musixmatch realized they could avoid this competition by locking up an exclusive deal for a major publisher's catalog, like WCM's, as DSPs would not be

willing to deal with LyricFind or other providers that lacked the ability to provide lyric services for WCM's songs.

133.    This is the anticompetitive path TPG and Musixmatch chose rather than to compete fairly on price or quality. As Spotify grew closer to signing with LyricFind, TPG and Musixmatch coordinated with WCM to impose the unprecedented Exclusive that would force Spotify and other major DSPs to sign with Musixmatch at substantially higher rates.

134.    At the direction of TPG, Musixmatch entered into the WCM-Musixmatch Exclusive on or around March 20, 2024, just before Spotify was slated to potentially finalize its deal with LyricFind. Although LyricFind has not yet received an executed copy of the written Exclusive contract, WCM informed LyricFind of its contents. Specifically, the WCM-Musixmatch Exclusive gives Musixmatch (1) the exclusive right to provide Lyric Data Services for WCM's titles and (2) the exclusive right to sublicense Lyric Rights Licensing for WCM's titles. In effect, the Exclusive makes Musixmatch the only practical supplier of Lyric Data Services, and the only practical sub-licensor of Lyric Rights Licensing, for most DSPs.

135.    On information and belief, in return for these dual exclusivity rights, Musixmatch, at TPG's direction, agreed to make substantial monetary payments and financial incentives to WCM, which amounted to an anticompetitive bribe.

136.    Under the terms of the Exclusive, DSPs like Spotify that wish to display lyrics for WCM's titles must now obtain Lyric Data Services from Musixmatch at whatever cost it imposes, even those DSPs that previously sourced Lyric Data from LyricFind or others at a fraction of the price. As WCM confirmed to LyricFind, under the Exclusive, "all DSPs/partners can only source WCM lyrics from Musixmatch and would need to remove lyric data from other sources." The WCM-Musixmatch Exclusive thus purports to prevent DSPs from sourcing Lyric Data from LyricFind

or other providers, generating it themselves, or, incredulously, even obtaining it from the songwriters, artists, or even co-publishers who own the lyric rights.

137. The WCM-Musixmatch Exclusive was not the byproduct of any legitimate business needs, but rather a coordinated effort among TPG, Musixmatch, and WCM to purchase market exclusivity for a substantial price. Upon information and belief, Musixmatch entered into the Exclusive at the direction of TPG, [REDACTED] directly orchestrated and approved of the Exclusive as an alternative means of boosting Musixmatch's value. Far from a passive owner, TPG was directly involved in trying to end the competitive threat that LyricFind posed to Musixmatch—[REDACTED] by orchestrating the WCM-Musixmatch Exclusive that would foreclose LyricFind from the Relevant Markets.

138. Further underscoring the anticompetitive nature of the Exclusive, WCM never asked LyricFind for a competing bid. LyricFind first learned of the Exclusive when WCM informed LyricFind it was terminating its ability to provide Lyric Data Services and Lyric Rights Licensing for WCM titles. Furthermore, Musixmatch and WCM have yet to announce the agreement to the public, as would be expected with an agreement of this magnitude.

139. The WCM-Musixmatch Exclusive is unprecedented in the lyric services industry. Never before has a music publisher granted a single lyric services provider the exclusive right to provide Lyric Data Services for its catalog, much less the exclusive right to provide *both* Lyric Data Services and Lyric Rights Licensing.

140. As discussed above, given the scope of WCM's catalog and the commercial need for DSPs to display WCM's lyrics, the only option for most DSPs will be to contract with Musixmatch, effectively excluding LyricFind, and all other providers, from the Relevant Markets while threatening their ability to remain operational. Having rid itself of competition and cemented its monopoly through the

1   WCM-Musixmatch Exclusive, Musixmatch will be free to raise prices for Lyric Data

2   Services and Lyric Rights Licensing to supracompetitive levels.

3       141.   Unsurprisingly, WCM and Musixmatch have not publicly announced

4   the existence or specific terms of the WCM-Musixmatch Exclusive, despite their

5   practice of publicly announcing commercial deals. Indeed, Musixmatch announced

6   a deal regarding the licensing of its lyric video service on March 21, 2024, the day

7   after executing the WCM-Musixmatch Exclusive.

8       142.   There is no legitimate, pro-competitive justification for the WCM-

9   Musixmatch Exclusive. Its sole goal is to exclude competition for Lyric Data

10  Services and Lyric Rights Licensing, particularly from LyricFind, whose viability as

11  a business is now at risk.

12      143.   While the WCM-Musixmatch Exclusive will foreclose competition on

13  its own, Musixmatch also has pursued additional Lyric Rights Licensing and Lyric

14  Data Services exclusives with other notable music publishers to reenforce its market

15  power. On information and belief, in May 2024 Musixmatch proposed that Reservoir

16  Media, a large independent music publisher based in New York City, enter into an

17  exclusive deal similar to the WCM-Musixmatch Exclusive. Musixmatch also

18  approached Downtown Music Publishing, another New York City-based publisher,

19  for a similar exclusive deal. Upon information and belief, both music publishers

20  rejected Musixmatch's anticompetitive proposals.

21          **D.    LyricFind Is Cut-Off from Servicing WCM's Catalog.**

22      144.    Prior to the WCM-Musixmatch Exclusive, LyricFind and WCM had

23  worked together successfully for more than fifteen years. LyricFind considered its

24  relationship with WCM to be excellent, one of its strongest with any music publisher,

25  and was not aware of any concerns from WCM about its performance.

26      145.   LyricFind's relationship with WCM had been governed by written

27  agreements since 2008. Most recently, LyricFind and WCM entered into an

28  agreement in 2018 (the "2018 Agreement") that has been extended on a biennial basis

on mutually agreed terms. The 2018 Agreement authorized LyricFind, on a non-exclusive basis, to display, and to authorize third party sub-licensees to display, WCM-owned lyrics—that is, to provide Lyric Data Services and Lyric Rights Licensing for WCM's titles. Generally, there were no limitations to the length or terms of any third-party sublicense granted by LyricFind under the 2018 Agreement, and WCM's custom and practice was to permit LyricFind to enter into sublicenses at any time during the term of its agreement with WCM, and to grant sublicenses that extended beyond the term of the 2018 Agreement. In December 2023, WCM confirmed in writing that it would renew the terms of the 2018 Agreement through June 30, 2024.

146. Nonetheless, after entering into the WCM-Musixmatch Exclusive, WCM terminated LyricFind's right to provide Lyric Data Services and Lyric Rights Licensing for WCM's titles. LyricFind was told that, based on the Exclusive, (i) LyricFind must stop providing Lyric Data Services for WCM titles by March 20, 2025, and (ii) LyricFind's customers must remove any WCM-owned Lyric Data provided by LyricFind, or any other non-Musixmatch entity, by that same date. Thus, after March 20, 2025, DSPs wishing to display Lyric Data for WCM titles will be forced to contract with Musixmatch, and Musixmatch alone, at monopolistic prices.

147. In addition to foreclosing LyricFind and other providers from future competition, the Exclusive's March 20, 2025 cut-off date will force LyricFind to breach its existing customer contracts. Because the March 20, 2025 cut-off date precedes the termination date for many of the sublicenses that LyricFind issued under the 2018 Agreement, this purported deadline will cause LyricFind to breach its existing contractual terms with its customers.

148. LyricFind reasonably agreed to multi-year contract terms with its customers, consistent with its long-standing practice for WCM and other publishers, because the 2018 Agreement did not limit the length of the sublicenses that LyricFind

could issue. Nothing in the 2018 Agreement permitted WCM to cap the term of LyricFind's sublicenses, much less do so retroactively.

### E.    Spotify is Forced to Sublicense WCM's Lyric Rights from Musixmatch.

149.    Becoming the exclusive *sub*-licensor of lyric rights for WCM was not enough for Musixmatch, as it feared DSPs might still evade its monopoly if they could obtain lyric rights licenses directly from WCM. Indeed, before the Exclusive, Spotify had been working to obtain Lyric Rights Licensing directly from Universal, Sony, and Kobalt and, on information and belief, eventually obtained direct licenses from each. Spotify had also been negotiating a direct licensing agreement with WCM, and on information and belief, was close to executing that agreement before the Exclusive.

150.    WCM's provision of direct licenses risked undercutting the Exclusive's anticompetitive goals because DSPs who obtained direct licenses from WCM would be one step closer to displaying WCM's lyrics without Musixmatch's involvement, as they could potentially source Lyric Data from other providers.

151.    To foreclose that possibility, and fully corner the Relevant Markets, TPG and Musixmatch took the additional step of ensuring that WCM would not provide direct licenses to Spotify and instead would force Spotify to obtain both Lyric Rights Licensing *and* Lyric Data Services from Musixmatch.

152.    By granting Musixmatch exclusivity over both Lyric Data Services and Lyric Rights Licensing for WCM's titles, the Exclusive doubly ensures that DSPs like Spotify will be forced to contract with Musixmatch, as each type of exclusivity reenforces the other. Before the Exclusive, customers were free to source Lyric Data Services and Lyric Rights Licensing separately. For example, some DSPs obtained Lyric Rights Licensing directly from major publishers while separately obtaining Lyric Data Services from LyricFind or Musixmatch. Now, Defendants have ended

1   this separation for WCM's titles by effectively requiring Spotify and other DSPs to

2   obtain both Lyric Rights Licensing and Lyric Data Services from Musixmatch.

3        153.   This *de facto* bundling of Lyric Rights Licensing and Lyric Data

4   Services reinforces Musixmatch's dominance, and eliminates competition, in each

5   Relevant Market. Because most DSPs use only one lyric service provider, a DSP that

6   is forced to obtain Lyric Rights Licensing from Musixmatch will also generally use

7   Musixmatch for Lyric Data Services. And vice versa: a DSP that is forced to obtain

8   Lyric Data Services from Musixmatch will generally also use Musixmatch for Lyric

9   Rights Licensing.

10       154.   The Exclusive also empowers Musixmatch to leverage its exclusive

11  access to WCM's catalog to ensure it becomes DSPs' sole lyrics provider.

12  Musixmatch can now force DSPs that use other or multiple lyric providers—or might

13  wish to do so in the future—to forego those relationships, and work exclusively with

14  Musixmatch, as a condition of receiving WCM-controlled lyrics. This would

15  foreclose competition for virtually all DSPs' business, including the few DSPs that

16  have sourced lyrics from LyricFind and Musixmatch simultaneously.

17  **V.    MUSIXMATCH HAS MARKET POWER IN THE RELEVANT**
18  **MARKETS**

19       155.   By virtue of Musixmatch's market shares in the Relevant Markets, and

20  the barriers to entry and switching costs in each, Musixmatch possesses, and at all

21  relevant times has possessed, monopoly power in the Lyric Data Services Market and

22  market power in the Lyric Rights Licensing Market. In both Relevant Markets,

23  Musixmatch has possessed the power to control prices and/or exclude competition.

24  **A.    Musixmatch's Monopoly in the Lyric Data Services Market**

25       156.   Musixmatch controls approximately 80% of the global Lyric Data

26  Services Market and has possessed a similarly large market share for several years.

27  Musixmatch provides Lyric Data Services to approximately 82% of DSPs on a global

28

- 47 -

basis by streaming revenue and, as shown in Table B below, has agreements with six of the seven largest DSPs, which account for more than 90% of global subscribers.

**Table B – Major DSPs and Their Lyric Service Providers**

| DSP | Global Subscribers[1] | Subscriber Share in the U.S.[2] | Lyric Services Provider |
|---|---|---|---|
| Spotify | 239 million globally | 36% | Musixmatch |
| Apple | 92 million globally | 30.7% | Musixmatch |
| Amazon | 83 million globally | 23.8% | Musixmatch & LyricFind |
| YouTube Music | 100 million globally (global data is in combination with YouTube Premium) | 6.8% | Musixmatch & LyricFind |
| Tidal | Unknown | 0.5% | Musixmatch |
| Pandora | 6 million paid subscribers (46 million monthly active users) (U.S. only) | 1.9% | LyricFind |
| JioSaavn | 100 million active users (not subscribers) | N/A | Musixmatch |

157.    In addition to the DSPs listed above, Musixmatch is also the current provider of Lyric Data Services to two of the largest social media platforms, Meta (Facebook/Instagram) and Snapchat, which incorporate Lyric Data Services to allow users to edit and create videos that include synced lyrics. Social media companies

---

[1] Based on the data available for each DSP between 2022 and 2024.
[2] Based on report dated July 2024.

like Meta and Snapchat are significant sources of revenue for music publishers and Lyric Data Service providers, and key music consumption platforms.

158.   In addition to Musixmatch's high market share, the Lyric Data Services Market is characterized by significant barriers to entry, as described above. There have been few, if any, new entrants into the Lyric Data Services Market for at least the last ten years. The lack of entry is due to the millions of dollars in capital investment required to obtain and maintain a competitive database of Lyric Data.

159.   The Lyric Data Services Market is also characterized by significant barriers to entry in the form of switching costs, as described above.  Once a customer begins sourcing Lyric Data Services from a given provider, there are substantial costs related to switching to a competitor; namely, engineering a solution that will be compatible with a new provider's technologies. For many customers, this switching cost is prohibitive and, in most cases, allows the incumbent provider to maintain their position absent a breakdown in business relations.

160.   As a result of the above-described barriers to entry and switching costs, Musixmatch's market power in the Lyric Data Services Market has been durable.  On information and belief, Musixmatch has maintained at least 80% of the Lyric Data Services Markets for years.

161.   The WCM-Musixmatch Exclusive and the other anticompetitive conduct described herein will further foreclose competition for Lyric Data Services, reenforcing Musixmatch's monopoly and allowing it to raise prices to supracompetitive levels.

**B.    Musixmatch's Market Power in the Lyric Rights Licensing Market and Its Attempted Monopolization**

162.   Upon information and belief, Musixmatch controls approximately 31% of the global Lyric Rights Licensing Market by licensing revenue, and approximately 66% of Lyric Rights Sublicensing Submarket. As in the Lyric Data Services Market, approximately 82% of DSPs on a global basis by streaming revenue use Musixmatch

- 49 -

for Lyric Rights Licensing, as do six of the seven largest DSPs by global subscribers. At all relevant times, Musixmatch has had the ability to raise prices or reduce output in the Lyric Rights Licensing Market and the Lyric Rights Sublicensing Submarket above the competitive level without losing significant market share.

163.    The Exclusive seeks to expand Musixmatch's market power in the Lyric Rights Licensing Market into monopoly power, and cement Musixmatch's monopoly power in the Lyric Rights Sublicensing Submarket. As described above, due to the technical infrastructure associated with Lyric Rights Licensing and the other switching costs, most DSPs source Lyric Rights Licensing from a single lyric services provider and use the same provider for both Lyric Rights Licensing and Lyric Data Services.

164.    Thus, by forcing DSPs to obtain Lyric Data Services from Musixmatch, the Exclusive practically ensures that DSPs will also obtain Lyric Rights Licensing from Musixmatch, as DSPs will have no reason to source Lyric Rights Licensing separately from LyricFind. As DSPs are forced to switch to (or stay with) Musixmatch for Lyric Data Services, Musixmatch will also take control of the share of the Lyric Rights Licensing Market previously serviced by LyricFind, transforming Musixmatch's market-power into a monopoly.

165.    The WCM-Musixmatch Exclusive thus leverages Musixmatch's monopoly in the Lyric Data Services market to expand its market power in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket, making it all but inevitable that Musixmatch will achieve monopoly power in each Relevant Market.

## VI.    DEFENDANTS HAVE FORECLOSED COMPETITION IN THE RELEVANT MARKETS AND CAUSED MARKETWIDE HARM

166.    TPG's and Musixmatch's anticompetitive conduct has foreclosed competition in the Relevant Markets and cemented Musixmatch's monopoly in the Lyric Data Services Market, resulting in damages to LyricFind that may exceed $1 billion post-trebling. Defendants' conduct has also harmed virtually every

stakeholder in the Relevant Markets except for Defendants and their co-conspirators. This includes LyricFind, other lyric service providers, DSPs, DSP users, other music publishers, and musicians themselves.

167. The harm to LyricFind, as well as other minor and potential lyric service providers, such as Genuis, is substantial. Defendants have precluded LyricFind and other providers from competing for DSPs' business in both the Lyric Data Services Market and Lyric Rights Licensing Market. The harm to LyricFind is particularly notable given the LyricFind was deprived of a rare and lucrative opportunity to replace Musixmatch as Spotify's provider of Lyric Data Services and Lyric Rights Licensing.

168. The WCM-Musixmatch Exclusive forecloses virtually all current and potential business opportunities in the Relevant Markets for all providers other than Musixmatch. For example, 95% of LyricFind's present customers, which accounted for more than 97% of its 2023 revenue, use LyricFind to obtain either Lyric Rights Licensing or Lyric Data Services for WCM songs. By barring everyone other than Musixmatch from servicing WCM's catalog, the WCM-Musixmatch Exclusive will make it near-impossible for anyone but Musixmatch to compete for new contracts, or maintain their existing contracts long-term.

169. Indeed, one significant DSP, iHeartRadio, recently cut off contract renewal negotiations with LyricFind as a result of the Exclusive. Despite once-promising negotiations, iHeartRadio ultimately declined to renew with LyricFind once it learned that LyricFind would no longer be able to provide lyrics for WCM's catalog. In late September and early October, 2024 iHeartRadio's President of Business Development & Strategic Partnerships, Michael Biondo, explained that iHeartRadio could not continue sourcing lyrics from LyricFind if LyricFind lacked the ability to service WCM's titles. Upon information belief, iHeartRadio then signed with Musixmatch at a price over five times higher than what iHeartRadio had been paying LyricFind, as now only Musixmatch could service WCM's catalog.

170.   As a result of Defendants' anticompetitive conduct, LyricFind has suffered damages including, but not limited to, lost profits based on both existing and potential business opportunities that were eliminated, as well as decreased enterprise value. This includes the lost profits associated with LyricFind's loss of the Spotify business. Given LyricFind's enterprise value before the Exclusive, and the fact that its viability as a business is now at risk, LyricFind estimates that it will have suffered damages exceeding $1 billion after automatic trebling.

171.   The anticompetitive conduct described herein harms other actual and potential competitors in the Relevant Markets too. Because of the WCM-Musixmatch Exclusive, no lyric service provider other than Musixmatch will be able to offer a full catalog of Lyric Data Services or Lyric Rights Licensing to DSPs customers, and thus will be foreclosed from meaningfully competing in both Relevant Markets.

172.   Defendants' scheme also will cause substantial harm to customers in the Relevant Markets, particularly DSPs. By foreclosing competition, Musixmatch will be able to eliminate choice and charge supracompetitive prices for both Lyric Data Services and Lyric Rights Licensing. By reducing overall market output and eliminating competitors, Musixmatch has been able, and will continue to be able, to keep prices above what they would be in a competitive market. Customers, including DSPs like Spotify, Tidal, Apple, Google, and Amazon, will end up paying higher prices in both Relevant Markets.

173.   Musixmatch's dominance in the Relevant Markets harms consumers globally and in this district. By increasing the costs of Lyric Rights Licensing and Lyric Data Services, DSPs and other music service providers will end up charging consumers more for their music streaming services. There is also a substantial likelihood of reduced quality of service and innovation in the Lyric Rights Licensing and Lyric Data Services markets. For instance, if a DSP chooses not to deal with Musixmatch due to higher monopolistic prices, consumers will lose access to a range of lyrics on that DSP's services.

174.   Defendants' scheme also harms other music publishers and songwriters. Because of the WCM-Musixmatch Exclusive, music publishers that share ownership of a work with WCM will be forced to accept Musixmatch as the provider of Lyric Data Services for any shared works. Publishers and songwriters that wish to have their lyrics provided to DSPs will be forced to accept lower payments for their works due to the lack of competition in the Relevant Markets.

175.   Defendants' scheme will particularly harm independent songwriters. Musixmatch already exploits these artists by forcing them to pay for Musixmatch Pro to have their lyrics displayed on DSPs, particularly Spotify and Meta. LyricFind provides the only meaningful competition to Musixmatch Pro by offering a *free* service that helps independent artists get their lyrics on DSPs. By excluding LyricFind and other providers from the Relevant Markets, Musixmatch will be free to charge songwriters significantly more for a service LyricFind offers for free, both raising costs for songwriters and reducing output for consumers.

176.   Defendants' conduct lacks any plausible procompetitive benefits or justifications, and none exist that would outweigh the anticompetitive effects of Defendants' scheme. The Exclusive, and TPG and Musixmatch's surrounding scheme, are neither necessary nor reasonably tailored to any legitimate pro-competitive goal. They only serve to increase Musixmatch's dominance and restrict competition in the Relevant Markets in violation of Sections 1 and 2 of the Sherman Act and the other laws set forth below.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### (AGAINST TPG AND MUSIXMATCH)

177.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

- 53 -

178.   As alleged above, TPG, Musixmatch, and WCM conspired to effectuate the WCM-Musixmatch Exclusive and surrounding anticompetitive scheme, with the effect of unreasonably restraining trade and commerce in both the Lyric Data Services Market and Lyric Rights Licensing Market.

179.   The WCM-Musixmatch Exclusive and surrounding conspiracy constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in both the Lyric Data Services Market and Lyric Rights Licensing Market in violation of Section 1 of the Sherman Act.

180.   The WCM-Musixmatch Exclusive and surrounding conspiracy foreclose a substantial share of competitors, and had anticompetitive effects, in both Relevant Markets.

181.   The WCM-Musixmatch Exclusive and surrounding conspiracy have no procompetitive benefits or justification. Their anticompetitive effects outweigh any purported procompetitive justifications.

182.   As a result of the WCM-Musixmatch Exclusive and the surrounding conspiracy, and the harm to competition they caused, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

183.   LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

**SECOND CAUSE OF ACTION**
**MONOPOLIZATION OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST MUSIXMATCH)**

184.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

185.   Musixmatch has monopolized the Lyric Data Services Market in violation of Section 2 of the Sherman Act.

1      186.   At all relevant times, Musixmatch possessed monopoly power in the

2   Lyric Data Services Market, as demonstrated by its high market share, barriers to

3   entry, Musixmatch's actual exclusion of competition, and its ability to charge

4   supracompetitive prices in the Lyric Data Services Market.

5      187.   Through the scheme described above, and other conduct likely to be

6   revealed in discovery, Musixmatch has willfully and unlawfully maintained and

7   enhanced its monopoly power in the Lyric Data Services Market. Musixmatch's

8   conduct constitutes exclusionary conduct within the meaning of Section 2 of the

9   Sherman Act.

10     188.   Musixmatch has suppressed competition and produced anticompetitive

11  effects in Lyric Data Services Market, including causing LyricFind's antitrust injury

12  and damages.

13     189.   Musixmatch's monopolistic conduct has no procompetitive benefit or

14  justification. The anticompetitive effects of its monopolistic conduct outweigh any

15  purported procompetitive justifications.

16     190.   As a result of Musixmatch's monopolistic conduct, and the harm to

17  competition caused by it, LyricFind has suffered substantial injuries to its business

18  and property in an amount to be proven at trial and automatically trebled, as provided

19  by 15 U.S.C. § 15.

20     191.   LyricFind is also entitled to recover from Musixmatch the costs of suit,

21  including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

22
                          **THIRD CAUSE OF ACTION**
23          **ATTEMPTED MONOPOLIZATION OF THE LYRIC DATA SERVICES**
           **MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT,**
24                              **15 U.S.C. § 2**
                          **(AGAINST MUSIXMATCH)**
25

26     192.   LyricFind re-alleges and incorporates by reference each of the

27  allegations set forth above.

28

                                    - 55 -

1    193.    As alleged above, Musixmatch has attempted to monopolize the Lyric

2    Data Services Market in violation of Section 2 of the Sherman Act.

3    194.    Musixmatch possesses substantial market power in the Lyric Data

4    Services Market, as demonstrated by its high market share, its actual exclusion of

5    competition, and its ability to charge supracompetitive prices in the Lyric Data

6    Services Market.

7    195.    Musixmatch has been implementing the anticompetitive scheme set

8    forth above, and other conduct likely to be revealed in discovery, with the specific

9    intent to monopolize the Lyric Data Services Market. Musixmatch's scheme

10    constitutes exclusionary conduct, within the meaning of Section 2 of the Sherman

11    Act.

12    196.    There is a dangerous probability that Musixmatch will succeed in

13    unlawfully extending its monopoly in the Lyric Data Services Market through its

14    anticompetitive scheme.

15    197.    Musixmatch's scheme has suppressed competition and has produced

16    anticompetitive effects in the Lyric Data Services Market, including LyricFind's

17    antitrust injury and damages.

18    198.    Musixmatch's conduct has no procompetitive benefit or justification;

19    even if Musixmatch were to argue it did, the anticompetitive effects of its behavior

20    outweigh any purported procompetitive justifications.

21    199.    As a result of Musixmatch's conduct, and the harm to competition

22    caused by it, LyricFind has suffered substantial and continuing injuries to its business

23    and property in an amount to be proven at trial and automatically trebled, as provided

24    by 15 U.S.C. § 15.

25    200.    LyricFind is also entitled to recover from Musixmatch the costs of suit,

26    including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

27

28

## FOURTH CAUSE OF ACTION
### CONSPIRACY TO MONOPOLIZE THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (AGAINST TPG AND MUSIXMATCH)

201.  LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

202.  As alleged above, TPG, Musixmatch, and WCM conspired to effectuate the WCM-Musixmatch Exclusive and the surrounding anticompetitive scheme, with the effect of unreasonably restraining trade and commerce in both the Lyric Data Services Market and Lyric Rights Licensing Market.

203.  TPG and Musixmatch orchestrated the WCM-Musixmatch Exclusive and surrounding scheme with the specific intent of causing Musixmatch to expand, preserve, or obtain a monopoly in the Lyric Data Services Market.

204.  TPG and Musixmatch acted in furtherance of the conspiracy by ██████████████████████████████████ orchestrating the WCM-Musixmatch Exclusive, and leveraging it to exclude LyricFind and other lyric providers from being able to effectively compete to provide Lyric Data Services.

205.  Defendants' conduct has no procompetitive benefit or justification. The anticompetitive effects of their behavior outweigh any purported procompetitive justifications.

206.  As a result of Defendants' conduct, and the harm to competition caused by that conduct, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

207.  LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

COMPLAINT
CASE NO:

1
2
3
4

**FIFTH CAUSE OF ACTION**
**MONOPOLY LEVARAGING OF THE LYRIC DATA SERVICES**
**MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT,**
**15 U.S.C. § 2**
**(AGAINST MUSIXMATCH)**

5
6

208.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

7
8
9
10

209.   Musixmatch has leveraged its monopoly power in the Lyric Data Services Market to obtain or attempt to obtain a monopoly in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket in violation of Section 2 of the Sherman Act.

11
12
13
14

210.   At all relevant times, Musixmatch possessed monopoly power in the Lyric Data Services Market, as demonstrated by its high market share, barriers to entry, Musixmatch's actual exclusion of competition, and its ability to charge supracompetitive prices in the Lyric Data Services Market.

15
16
17
18
19

211.   Through the scheme described above, and other conduct likely to be revealed in discovery, Musixmatch willfully abused its monopoly power in the Lyric Data Services Market with the specific intent, and dangerous probability of success, of monopolizing the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket.

20
21
22

212.   Musixmatch has suppressed competition and produced anticompetitive effects in Lyric Data Services Market and Lyric Rights Licensing Market, including causing LyricFind's antitrust injury and damages.

23
24
25

213.   Musixmatch's monopolistic conduct has no procompetitive benefit or justification. The anticompetitive effects of its monopolistic conduct outweigh any purported procompetitive justifications.

26
27
28

214.   As a result of Musixmatch's monopolistic conduct, and the harm to competition caused by it, LyricFind has suffered substantial injuries to its business

- 58 -

and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

215.   LyricFind is also entitled to recover from Musixmatch the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

**SIXTH CAUSE OF ACTION**
**ATTEMPTED MONOPOLIZATION OF THE LYRIC RIGHTS LICENSING MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(AGAINST MUSIXMATCH)**

216.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

217.   As alleged above, Musixmatch has attempted to monopolize the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket in violation of Section 2 of the Sherman Act.

218.   Musixmatch possesses substantial market power in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket, as demonstrated by its high market share, its actual exclusion of competition, and its ability to charge supracompetitive prices.

219.   Musixmatch has been implementing the anticompetitive scheme set forth above, and other conduct likely to be revealed in discovery, with the specific intent to monopolize the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket. Musixmatch's scheme constitutes exclusionary conduct, within the meaning of Section 2 of the Sherman Act.

220.   There is a dangerous probability that Musixmatch will succeed in obtaining monopoly power in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket through its anticompetitive scheme.

1    221.   Musixmatch's scheme has suppressed competition and produced

2    anticompetitive effects in the Lyric Rights Licensing Market and Lyric Rights

3    Sublicensing Submarket, including LyricFind's antitrust injury and damages.

4    222.   Musixmatch's conduct has no procompetitive benefit or justification;

5    even if Musixmatch were to argue it did, the anticompetitive effects of its behavior

6    outweigh any purported procompetitive justifications.

7    223.   As a result of Musixmatch's conduct, and the harm to competition

8    caused by it, LyricFind has suffered substantial and continuing injuries to its business

9    and property in an amount to be proven at trial and automatically trebled, as provided

10   by 15 U.S.C. § 15.

11   224.   LyricFind is also entitled to recover from Musixmatch the costs of suit,

12   including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

13
14   **SEVENTH CAUSE OF ACTION**
     **CONSPIRACY TO MONOPOLIZE THE LYRIC RIGHTS LICENSING**
     **MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT,**
15   **15 U.S.C. § 2**
     **(AGAINST TPG AND MUSIXMATCH)**
16

17   225.   LyricFind re-alleges and incorporates by reference each of the

18   allegations set forth above.

19   226.   As alleged above, TPG, Musixmatch, and WCM conspired to effectuate

20   the WCM-Musixmatch Exclusive and the surrounding anticompetitive scheme, with

21   the effect of unreasonably restraining trade and commerce in both Relevant Markets.

22   227.   TPG and Musixmatch orchestrated the WCM-Musixmatch Exclusive

23   and surrounding scheme with the specific intent of causing Musixmatch to obtain,

24   expand, and preserve a monopoly in the Lyric Rights Licensing Market and Lyric

25   Rights Sublicensing Submarket. There is a dangerous probability that Musixmatch

26   has obtained or will obtain monopoly power in the Lyric Rights Licensing Market

27   and Lyric Rights Sublicensing Submarket.

28

- 60 -

1      228.   TPG and Musixmatch acted in furtherance of the conspiracy by

2      ████████████████████████████████████████████████████████

3      orchestrating the WCM-Musixmatch Exclusive, and leveraging it to exclude

4      LyricFind and other lyric providers from being able to effectively compete to provide

5      Lyric Rights Licensing.

6      229.   Defendants' conduct has no procompetitive benefit or justification. The

7      anticompetitive effects of their behavior outweigh any purported procompetitive

8      justifications.

9      230.   As a result of Defendants' conduct, and the harm to competition caused

10     by that conduct, LyricFind has suffered substantial injuries to its business and

11     property in an amount to be proven at trial and automatically trebled, as provided by

12     15 U.S.C. § 15.

13     231.   LyricFind is also entitled to recover from Defendants the costs of suit,

14     including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

15
16     **EIGHTH CAUSE OF ACTION**
       **UNLAWFUL EXCLUSIONARY ARRANGEMENT IN VIOLATION OF**
       **15 U.S.C § 14**
17     **(AGAINST TPG AND MUSIXMATCH)**

18
19     232.   LyricFind re-alleges and incorporates by reference each of the

20     allegations set forth above.

21     233.   LyricFind has the requisite standing to assert antitrust claims against

22     TPG and Musixmatch because Lyrics is a participant and competitor in the Relevant

23     Markets.

24     234.   TPG and Musixmatch's conspiracy with WCM to orchestrate the

25     WCM-Musixmatch Exclusive and surrounding arrangements constitute an unlawful

26     agreement, contract, and concerted activity that have the effect of substantially

27     lessening competition in each Relevant Market in violation of Section 3 of the

28     Clayton Act.

235.   Defendants' anticompetitive scheme to substantially lessen competition sought to eliminate, and succeeded in eliminating, LyricFind as a viable competitor to Musixmatch's business, as well as competition generally in each Relevant Market.

236.   Defendants' exclusionary conduct has foreclosed a substantial share of competition and had anticompetitive effects in the Relevant Markets.

237.   Defendants' exclusionary conduct has no procompetitive benefit or justification. The anticompetitive effects of the exclusionary contract outweigh any purported procompetitive justifications.

238.   As a direct and proximate result of the WCM-Musixmatch Exclusive and surrounding conspiracy, and the harm to competition caused by them, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled.

239.   LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

## NINTH CAUSE OF ACTION
### AGREEMENT IN VIOLATION OF CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§ 16720 ET SEQ. (AGAINST TPG AND MUSIXMATCH)

240.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

241.   TPG and Musixmatch's actions, ███████████████████ and conspiracy to effectuate the WCM-Musixmatch Exclusive, constituted concerted action that was an unreasonable restraint of trade or commerce throughout California and the United States in violation of the Cartwright Act, § 16720 of the California Business and Professions Code.  The WCM-Musixmatch Exclusive had the purpose of eliminating competition in the Relevant Markets and ensuring that Musixmatch maintained its monopoly in the Lyric Data Services Market.

242.   Plaintiff LyricFind has been injured as a direct and proximate result of the WCM-Musixmatch Exclusive and surrounding conduct. In addition, customers

- 62 -

and suppliers in the Relevant Markets have been harmed by the actions of Defendants, and that harm is ongoing. The unlawful conspiracy between TPG, Musixmatch, and WCM has had the effect of increasing prices and/or limiting supply in the Relevant Markets, as well as reducing innovation in the market.

243.   As a result of Defendants' conduct, and the harm to competition caused by it, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by the Cartwright Act.

244.   LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by § 16750(a) of the California Business and Professions Code.

## TENTH CAUSE OF ACTION
### UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200 ET SEQ. (AGAINST TPG AND MUSIXMATCH)

245.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

246.   As set forth above, Defendants have engaged, and continue to engage in, unlawful and unfair business acts or practices in violation of California Business and Professions Code §§ 17200 et seq. ("California's Unfair Competition Law").

247.   Defendants have violated the Sherman Act, Clayton Act, and the Cartwright Act and thus Defendants have violated California's Unfair Competition Law.

248.   Defendants' acts and business practices, whether or not in violation of the Sherman Act, Clayton Act, or Cartwright Act, constitute unfair methods of competition in violation of California's Unfair Competition Law.

249.   Defendants' acts and business practices are otherwise unfair within the meaning of California's Unfair Competition Law, and thus Defendants have violated California's Unfair Competition Law.

250.   As a result of Defendants' violations of California Business and Professions Code § 17200, Defendants have been unjustly enriched at LyricFind's expense. The unjust enrichment continues to accrue as the unlawful and unfair business acts and practices continue. Therefore, LyricFind is entitled to obtain restitutionary disgorgement in an amount to be determined at trial.

251.   Defendants should also be permanently enjoined from continuing their violations of California Business and Professions Code § 17200, as provided by § 17203 of the California Business and Professions Code. Without injunctive relief, LyricFind will continue to suffer irreparable injury as a result of Defendants' unlawful conduct. LyricFind's remedy at law is not by itself adequate to compensate LyricFind for the harm inflicted and threatened by Defendants.

## ELEVENTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST TPG AND MUSIXMATCH)

252.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

253.   At the time that TPG and Musixmatch conspired with WCM to effectuate the WCM-Musixmatch Exclusive, both LyricFind and Musixmatch were engaged in negotiations with Spotify and iHeartRadio as described above, and both LyricFind and Musixmatch anticipated engaging in similar negotiations with other DSPs. The combined value of the Spotify and iHeartRadio business to LyricFind, while subject to proof at trial, was tens of millions of dollars.

254.   Defendants were aware of LyricFind's negotiations with Spotify and iHeartRadio, and its existing and prospective negotiations with other DSPs, and undertook the anticompetitive and unlawful scheme described herein to undermine LyricFind's negotiations and ensure that Musixmatch, not LyricFind, was awarded these contracts.

- 64 -

1    255.    ████████████████████████████████████████

2    ██████████████████████████████████████████████████

3    ██████████████████████████████████████████████████

4    ████████    Then, after orchestrating the WCM-Musixmatch Exclusive,

5    Musixmatch informed Spotify about the unlawful and anticompetitive

6    WCM-Musixmatch Exclusive to discredit LyricFind, and interfere with LyricFind's

7    prospective commercial relationship with Spotify, by indicating that LyricFind no

8    longer had access to WCM's lyric catalog.

9    256.    Through their conduct, Defendants intended to, and did, disrupt

10   LyricFind's relationship with Spotify, iHeartRadio, and other DSPs to favor

11   Musixmatch.

12   257.    LyricFind's relationships with Spotify and iHeartRadio were ultimately

13   disrupted by Defendants' scheme, as Spotify and iHeartRadio informed LyricFind

14   they could not award LyricFind their business because of the WCM-Musixmatch

15   Exclusive, and instead awarded their business to Musixmatch.

16   258.    LyricFind has been injured in its business or property through the loss

17   of past, present, and future profits, by the loss of customers and potential customers,

18   by the loss of goodwill and product image, and by the prospective destruction of its

19   business. Defendants' conduct was a substantial factor in causing this harm.

20   259.    Defendants' conduct was intentional and deprived LyricFind of

21   business opportunities in violation of the law and otherwise caused injury and was

22   despicable conduct that subjected LyricFind to cruel and unjust hardship and

23   oppression in conscious disregard of its rights, so as to justify an award of exemplary

24   and punitive damages.

25

26

27

28

- 65 -

**TWELFTH CAUSE OF ACTION**
**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE**
**(AGAINST TPG AND MUSIXMATCH)**

260.    LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

261.    At the time that TPG and Musixmatch conspired with WCM to effectuate the WCM-Musixmatch Exclusive, both LyricFind and Musixmatch were engaged in negotiations with Spotify and iHeartRadio as described above, and both LyricFind and Musixmatch anticipated engaging in similar negotiations with other DSPs. The value of the Spotify and iHeartRadio business to LyricFind, while subject to proof at trial, was valued in the tens of millions of dollars.

262.    Defendants were aware of LyricFind's negotiations with Spotify and iHeartRadio, and its existing and prospective negotiations with other DSPs, and undertook the anticompetitive and unlawful conduct described herein to undermine LyricFind's negotiations and ensure that Musixmatch, not LyricFind, was awarded these contracts.

263.    ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████  Then, after Musixmatch entered into the WCM-Musixmatch Exclusive, Musixmatch informed Spotify about the unlawful and anticompetitive WCM-Musixmatch Exclusive in order to harm LyricFind, and interfere with LyricFind's prospective commercial relationship with Spotify, by indicating that LyricFind no longer had access to WCM's lyric catalog.

264.    Through their conduct, Defendants knew or should have known that their wrongful conduct would disrupt LyricFind's relationship with Spotify, iHeartRadio, and other DSPs to favor Musixmatch.

- 66 -

265.   LyricFind's relationships with Spotify and iHeartRadio were ultimately disrupted by Defendants' scheme, as they informed LyricFind they could not award LyricFind their business because of the WCM-Musixmatch Exclusive, and instead awarded their business to Musixmatch.

266.   LyricFind has been injured in its business or property through the loss of past, present, and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its business in the United States.  Defendants' conduct was a substantial factor in causing this harm.

**THIRTEENTH CAUSE OF ACTION**

████████████████████████████████

267.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

268.   ██████████████████████████████
███████████████

269.   ██████████████████████████████
███████

270.   ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████

271.   ██████████████████████████████
██████████████████████████████████
██████████████████████████████████

272. ████████████████████████████████

273. ████████████████████████████████████

274. ████████████████████████████████████

## **PRAYER FOR RELIEF**

275. WHEREFORE, LyricFind respectfully requests the following relief from this Court:

- Awarding LyricFind money damages, trebled pursuant to law;

- Awarding LyricFind punitive damages;

- Awarding LyricFind the costs of the lawsuit, including reasonable attorneys' fees and court costs;

- Disgorgement in the amount gained by Defendants due to Defendants' violation of the law;

- Declaring Defendants' conduct unlawful, improper, and in violation of the above-referenced laws; and

- Ordering such other and further relief as the Court may deem just, proper, and equitable.

- 68 -

1
## JURY TRIAL DEMAND

2

3      LyricFind hereby demands trial by jury on all issues so triable under Rule 38

4  of the Federal Rules of Civil Procedure.

5

6  Dated: March 5, 2025

   By:  _____*/s/ David C. Brownstein*_____
7      David C. Brownstein
       **FARMER BROWNSTEIN JAEGER**
8      **GOLDSTEIN KLEIN & SIEGEL LLP**
       155 Montgomery Street, Suite 301
9      San Francisco, CA 94104-2733
       Telephone: (415) 962-2873
10     Facsimile: (415)-520-5678
       dbrownstein@fbjgk.com
11

12     Kellie Lerner (*pro hac vice* to be filed)
13     Ben Steinberg (*pro hac vice* to be filed)
       **SHINDER CANTOR LERNER LLP**
14     14 Penn Plaza, 19th Floor
15     New York, NY 10122
       Telephone: (646) 960-8601
16     Facsimile: (646) 960-8625
       kellie@scl-llp.com
17     benjamin@scl-llp.com
18

19     Brian D. Caplan (*pro hac vice* to be filed)
20     Julie Wlodinguer (*pro hac vice* to be filed)
       **REITLER KAILAS & ROSENBLATT**
21     **LLP**
       885 Third Avenue, 20th Floor
22     New York, New York 10022
       Main: 212-209-3050
23     Fax: 212-371-5500
       bcaplan@reitlerlaw.com
24     jwlodinguer@reitlerlaw.com
25

26

27     *Attorneys for Plaintiff LyricFind*

28

- 69 -