Matthew L. McGinnis (admitted *pro hac vice*)
matthew.mcginnis@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
F: (617) 951-7050

*Attorney for Defendant Musixmatch S.p.A.*

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| LYRICFIND, INC., <br><br> Plaintiff, <br><br> v. <br><br> MUSIXMATCH S.P.A. and <br> TPG Global, LLC, <br><br> Defendants. | Case No. 25-cv-02265-JSC <br><br> **MUSIXMATCH'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hon. Jacqueline Scott Corley <br><br> Hearing Date: August 21, 2025 <br><br> Hearing Time: 10:00 AM |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on August 21, 2025, at 10:00 AM, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Jacqueline Scott Corley, located at 450 Golden Gate Avenue, San Francisco, CA 94102, 19th Floor, Courtroom 8, Defendant Musixmatch S.p.A. ("Musixmatch") will and hereby does respectfully move for an order dismissing Plaintiff LyricFind, Inc.'s ("LyricFind") Complaint (1) pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction on the ground that Plaintiff failed to carry its burden of making a *prima facie* showing that Musixmatch is subject to the jurisdiction of this Court, and (2) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted on the grounds set forth in the accompanying memorandum of points and authorities.

This motion is based on the memorandum of points and authorities contained herein; any reply papers that Musixmatch may file; the accompanying declaration of Aman Khullar; all pleadings, records, and papers on file in this action; and such further arguments as may be presented to the Court at or prior to the hearing on the motion.

Dated: June 5, 2025

Respectfully submitted,

*/s/ Matthew L. McGinnis*
Matthew L. McGinnis (admitted *pro hac vice*)
matthew.mcginnis@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
F: (617) 951-7050

Rocky C. Tsai (Cal. Bar No. 221452)
rocky.tsai@ropesgray.com
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111
T: (415) 315-6300
F: (415) 315-6350

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David A. Young (admitted *pro hac vice*)
david.young@ropesgray.com
Adam R. Safadi (admitted *pro hac vice*)
adam.safadi@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC 20006
T: (202) 508-4600
F: (202) 508-4650

*Attorneys for Defendant Musixmatch S.p.A.*

# TABLE OF CONTENTS

Statement of the Issues ........................................................................................................2

I.  This Court Lacks Personal Jurisdiction Over Musixmatch ..........................................2

    A.  Relevant Legal Standard ...........................................................................2

    B.  Relevant Facts ..........................................................................................3

    C.  Argument ..................................................................................................4

        1.  Musixmatch Is Not Subject to General Jurisdiction in California .................5

        2.  Musixmatch Is Not Subject to Specific Jurisdiction in California.................6

II.  LyricFind Fails to State a Claim That Entitles It to Relief..........................................13

    A.  LyricFind's Allegations ............................................................................13

    B.  Relevant Legal Standard ...........................................................................15

    C.  LyricFind Lacks Antitrust Standing and Injury (Counts 1–10) ...................16

    D.  LyricFind Fails to Allege an Unlawful Exclusive Contract (Counts 1–10).............18

        1.  The Complaint Does Not Allege That the WCM/Musixmatch Agreement Forecloses LyricFind for a Competitively Significant Amount of Time ........................................................................................19

        2.  The Complaint Does Not Adequately Allege Foreclosure From a Substantial Share of a Relevant Market ........................................................20

        3.  The Complaint Concedes That DSPs Can and Do Source Lyric Rights and Services from Multiple Providers .................................................23

    E.  LyricFind Does Not Plausibly Allege that Musixmatch Has Market or Monopoly Power in Any Relevant Market (Counts 1, 2, 3, 5, 6, 8, 9, and 10).........25

        1.  LyricFind Has Not Plausibly Alleged a Relevant Market..........................25

        2.  LyricFind Has Not Plausibly Alleged Monopoly or Market Power .............27

    F.  LyricFind Fails to Adequately Allege Concerted Action (Counts 1, 4, 7, 8, and 9)........................................................................................................30

        1.  Musixmatch Is Incapable of Conspiring with TPG......................................31

        2.  The WCM/Musixmatch License Agreement Is Not "Concerted Action" Under the Antitrust Laws ...............................................................31

i

G.  LyricFind Fails to Plead Specific Intent to Monopolize on the Part of Each Alleged Co-Conspirator (Counts 4 and 7)................................................................33

H.  Monopoly Leveraging Is Not an Independent Theory of Section 2 Liability (Count 5) ......................................................................................................................33

I.  Section 3 of the Clayton Act Does Not Apply to Licensing or Services Agreements (Count 8) ...................................................................................................34

III.  LyricFind Fails to Plead Any Valid State Law Claims .........................................................34

A.  The Complaint Fails to State a Claim under California's Cartwright Act or Unfair Competition Law (Counts 9 and 10)..............................................................34

B.  The Complaint Fails to State a Claim for Interference (Intentional or Negligent) with Prospective Economic Advantage (Counts 11 and 12).................36

C.  The Complaint Fails to State a Claim for Breach of Contract (Count 13)...............37

Conclusion.............................................................................................................................................39

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abokasem v. Royal Indian Raj Int'l Corp.*,
    No. C-10-01781, 2011 WL 635222 (N.D. Cal. Feb. 11, 2011) ................................. 3

*AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*,
    No. 19-cv-04789, 2020 WL 1531322 (N.D. Cal. Mar. 31, 2020) .......................... 10

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
    260 F. Supp. 2d 941 (N.D. Cal. 2003) ................................................. 36, 37

*Aguilera v. Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000) ................................................................ 38

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ................................................................. 33

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ................................................................. 18

*American Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) ......................................................................... 31

*American Pan Co. v. Lockwood Mfg., Inc.*,
    No. C-3-06-197, 2008 WL 471685 (S.D. Ohio Feb. 15, 2008) .......................... 38

*AMA Multimedia, LLC v. Wanat*,
    970 F.3d 1201 (9th Cir. 2020) ................................................................. 9

*Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*,
    551 F.2d 784 (9th Cir. 1977) .................................................................. 3

*Amoco Egypt Oil Co. v. Leonis Nav. Co.*,
    1 F.3d 848 (9th Cir. 1993) ................................................................... 11

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
    480 U.S. 102 ............................................................................. 11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................... 15, 16, 24

*Azzarello v. Navagility, LLC*,
    No. C-08-2371, 2008 WL 4614667 (N.D. Cal. Oct. 16, 2008) ............................ 8

*Barry Wright Corp. v. ITT Grinnell Corp.*,
    724 F.2d 227 (1st Cir. 1983) ................................................................. 19

iii

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 15

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
  No. 16-cv-0057, 2016 WL 3199520 (N.D. Okla. June 8, 2016) .......................... 29

*Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*,
  No. 13-cv-00297, 2019 WL 3767510 (D. Conn. Aug. 9, 2019) ........................... 38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................................................ 16

*Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998) ............................................................................. 12

*Calder v. Jones*,
  465 U.S. 783 (1984) ....................................................................................... 7, 8

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ........................................................................................ 16

*Chelson v. Oregonian Pub. Co.*,
  715 F.2d 1368 (9th Cir. 1983) .......................................................................... 34

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
  No. C-10-4429, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ............................. 19

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) .............................................................................. 13, 30, 31

*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
  99 F.3d 937 (9th Cir. 1996) .............................................................................. 34

*County of Toulumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) .......................................................................... 34

*Dahlia v. Rodriguez*,
  735 F.3d 1060 (9th Cir. 2013) .......................................................................... 16

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) .............................................................................. 3, 4, 5, 12

*Davis v. Cranfield Aerospace Sols., Ltd.*,
  71 F.4th 1154 (9th Cir. 2023) ..................................................................... 7, 8, 12

*Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*,
  No. 11-1290, 2011 WL 6935276 (D.N.J. Dec. 30, 2011) ................................... 33

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018) .............................................................. 8, 9

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986) ................................................................... 17

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ............................................................... 8, 10

*In re Dynamic Random Access Memory Indirect Purchaser Litig.*,
   No. 18-cv-2518, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ..................... 35

*Dynamic Software Servs. v. Cyberbest Tech., Inc*,
   No. C-13-04217, 2014 WL 3373924 (N.D. Cal. July 9, 2014) ......................... 8

*E & E Co. v. Kam Hing Enters., Inc.*,
   No. C-08-871, 2008 WL 4962991 (N.D. Cal. Nov. 19, 2008) ................... 36, 37

*E & L Consulting, Ltd v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006) ....................................................................... 17

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
   711 F. Supp. 2d 1074 (C.D. Cal. 2010) ....................................................... 10

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   44 F.4th 959 (10th Cir. 2022) ............................................................. 19, 24

*Fields v. Sedgwick Associated Risks, Ltd.*,
   796 F.2d 299 (9th Cir. 1986) ............................................................... 4, 12

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) ................................................................... 28

*FTC v. Microsoft Corp.*,
   136 F.4th 954 (9th Cir. 2025) ................................................................... 18

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ................................................................... 25

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) ................................................. 26, 29

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................... 16

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
   284 F.3d 1114 (9th Cir. 2002) ....................................................... 5, 9, 11, 12

*Go-Video, Inc. v. Akai Elec. Co.*,
   885 F.2d 1406 (9th Cir. 1989) ..................................................................... 6

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ................................................................... 26

v

*HomeLight, Inc. v. Shkipin*,
    721 F. Supp. 3d 1019 (N.D. Cal. 2024)..............................................................35

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    No. 20-cv-11233, 2021 WL 4205618 (C.D. Cal. Mar. 26, 2021)..........................26

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989)...........................................................................28

*J'Aire Corp. v. Gregory*,
    24 Cal. 3d 799 (1979)........................................................................................37

*Jack Russell Terrier Network of N. Cal. v. American Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005)............................................................................31

*Jobscience, Inc. v. CVPartners, Inc.*,
    No. C 13-04519, 2014 WL 93976 (N.D. Cal. Jan. 9, 2014)..................................37

*Levi Case Co. v. ATS Prods., Inc.*,
    788 F. Supp. 428 (N.D. Cal. 1992)................................................................31, 32

*Lindblad v. Linde AG*,
    No. 23-cv-06179, 2024 WL 923773 (N.D. Cal. Mar. 4, 2024)....................4, 6, 10

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012)..............................................................38

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998)......................................................................16, 17

*Martinez v. Aero Caribbean*,
    764 F.3d 1062 (9th Cir. 2014).............................................................................5

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015)...........................................................................21

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 728 (D. Md. 2001) ...................................................................33

*Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
    878 F. Supp. 804 (D. Md. 1995) ........................................................................22

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016)..............................................................................27

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    795 F.3d 1124 (9th Cir. 2015)...........................................................................34

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
    No. 18-cv-03587, 2018 WL 4904918 (N.D. Cal. Oct. 9, 2018).............................21

vi

*NSS Labs, Inc. v. Symantec Corp.*,
  No. 18-cv-05711, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019)............................................ 25

*O.S.C. Corp. v. Toshiba Am., Inc.*,
  491 F.2d 1064 (9th Cir. 1974) ..................................................................................................... 9

*Ocean SW, Inc. v. Canam Pet Treats, Inc.*,
  No. 14-cv-2059, 2015 WL 2180492 (S.D. Cal. May 7, 2015)............................................... 10

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ..................................................................................................................... 17

*In re Packaged Seafood Prods. Antitrust Litig.*,
  338 F. Supp. 3d 1118 (S.D. Cal. 2018) ....................................................................................... 6

*Paddock Publ'ns, Inc. v. Chicago Trib. Co.*,
  103 F.3d 42 (7th Cir. 1996)...................................................................................... 20, 22, 23, 24

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ................................................................................................... 22

*In re Pandora Media, LLC*,
  No. 22-cv-00809, 2023 WL 6370884 (C.D. Cal. Apr. 5, 2023) ............................................ 32

*Pebble Beach Co. v. Caddy*,
  453 F.3d 1151 (9th Cir. 2006) ................................................................................................... 10

*Picot v. Weston*,
  780 F.3d 1206 (9th Cir. 2015) ..................................................................................................... 6

*PNY Techs., Inc. v. SanDisk Corp.*,
  No. 11-CV-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ....................................... 19

*Prevail Legal, Inc. v. Gordon*,
  No. 20-cv-07173, 2021 WL 1947578 (N.D. Cal. May 14, 2021) ............................................ 2

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
  No. 12-2102, 2013 WL 3936394 (C.D. Cal. July 30, 2013) .................................................. 34

*Ranza v. Nike, Inc.*,
  793 F.3d 1059 (9th Cir. 2015)...................................................................................................... 4

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)...................................................................................................... 27

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2010)..................................................................................... 26

*Rush v. Savchuk*,
  444 U.S. 320 (1980) ....................................................................................................................... 4

*Sabol v. PayPal Holdings, Inc.*,
   No. 23-cv-05100, 2024 WL 3924686 (N.D. Cal. Aug. 23, 2024)......................................34, 35

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ......................................................................................6, 7, 8

*Serpa Corp. v. McWane, Inc.*,
   199 F.3d 6 (1st Cir. 1999) ...............................................................................................17

*Sher v. Johnson*,
   911 F.2d 1357 (9th Cir. 1990) ...........................................................................................2

*Space Data Corp. v. X*,
   No. 16-cv-03260, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) ...........................................37

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ......................................................................................................25

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) .........................................................................................20, 21

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ......................................................................................................18

*Tevra Brands, LLC v. Elanco Animal Health Inc.*,
   No. 24-cv-04683, 2025 WL 964694 (N.D. Cal. Mar. 31, 2025)............................................34

*Top Rank, Inc. v. Haymon*,
   No. CV 15-4961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ...........................................31

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*,
   No. 08-cv-00513, 2009 WL 2596493 (D. Colo. Aug. 21, 2009) ...........................................26

*Tuazon v. R.J. Reynolds Tobacco Co.*,
   433 F.3d 1163 (9th Cir. 2006).............................................................................................6

*U.S. Vestor, LLC v. Biodata Info. Tech. AG*,
   290 F. Supp. 2d 1057 (N.D. Cal. 2003).................................................................................4

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) .................................................................................18

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*,
   89 F.3d 233 (5th Cir. 1996).............................................................................................28

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................20, 21, 27

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004)..............................................................................26

viii

*United States v. U.S. Sugar Corp.*,
    No. 21-1644, 2022 WL 4544025 (D. Del. Sept. 28, 2022) ................................... 26

*Uston v. Hilton Casinos, Inc.*,
    564 F.2d 1218 (9th Cir. 1977) ........................................................................... 4

*Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.*,
    307 F.3d 277 (4th Cir. 2002) .............................................................................. 30

*Visto Corp. v. Sproqit Techs., Inc.*,
    360 F. Supp. 2d 1064 (N.D. Cal. 2005) .............................................................. 36

*Walden v. Fiore*,
    571 U.S. 277 (2014) ............................................................................... 6, 7, 9

*Wallace Sales & Consulting, LLC v. Tuopo N. Am., Ltd.*,
    No. 2:15-cv-10748, 2015 WL 4509349 (E.D. Mich. July 24, 2015) ................... 38

*Western Parcel Express v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) .............. 19, 27, 29

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................................ 18, 19

**Statutes**

15 U.S.C. § 1 ....................................................................................... *passim*

15 U.S.C. § 2 ....................................................................................... *passim*

15 U.S.C. § 14 ............................................................................................ 34

17 U.S.C. § 106(1), (3), (5) ........................................................................ 17

Cal. Bus. & Prof. Code § 16720 ................................................................... 34

Cal. Bus. & Prof. Code § 17200 ................................................................... 35

**Other Authorities**

Fed. R. Civ. P. 4(k)(1) ................................................................................. 4

Fed. R. Civ. P. 8 .................................................................................. 37, 38

Fed. R. Civ. P. 11 ...................................................................................... 27

Fed. R. Civ. P. 12(b)(2) ...................................................................... 2, 3, 4

Fed. R. Civ. P. 12(b)(6) ......................................................................... 2, 13

Phillip Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2024) ...................... 18, 19, 22, 34

## MEMORANDUM OF POINTS AND AUTHORITIES

The Complaint tells a story common to many antitrust cases: the Plaintiff, LyricFind, Inc. ("LyricFind"), was angered by the decision of a supplier, Warner Chappell Music Limited ("WCM"), to end their relationship and instead license and distribute solely through a rival, Defendant Musixmatch S.p.A. ("Musixmatch"). LyricFind contends that this lost relationship with WCM deprives it of the essential intellectual property it needs to compete as a supplier of lyrics, and so it seeks to recover damages based on its supposed impending doom. But LyricFind has not sued WCM or challenged the lawfulness of WCM's decision to end their relationship, and for good reason: under the U.S. Copyright Act, WCM indisputably has the right to exclusively license and distribute its intellectual property as it sees fit, and has exercised that right by contracting with Musixmatch. LyricFind, unable to convince WCM to do business with it instead, has filed this meritless antitrust suit against Musixmatch and TPG Global, LLC ("TPG"), Musixmatch's private equity sponsor, hoping it can obtain through litigation what it was unable to win in the marketplace.

As the Court well knows, the antitrust laws protect competition, not particular competitors, and this case should be dismissed for myriad reasons. For one, LyricFind's alleged injury flows from WCM's lawful decision to end its relationship with LyricFind, which means that LyricFind would have been injured regardless of whether Musixmatch or a different firm was appointed as WCM's agent. LyricFind thus cannot plausibly allege an "antitrust injury" that flows from the actions of Musixmatch, a deficiency that defeats all of its claims. Nor has LyricFind plausibly alleged how it is foreclosed from competing in the marketplace: the Complaint is conspicuously silent on the duration of the agreement, and contradictory and implausible allegations about the actual scope of exclusivity defeat any plausible claim of substantial foreclosure. The Complaint's allegations about Musixmatch's purported market or monopoly power are similarly inadequate and are based on contradictory allegations and incoherent statistics. Nor has LyricFind plausibly alleged (nor could it) that WCM has the requisite specific intent to drive LyricFind from the marketplace, or that WCM and Musixmatch have engaged in the requisite "concerted action" with respect to licensing WCM's intellectual property for purposes of a Sherman Act Section 1 claim.

1   These flaws are more than sufficient to dismiss this case.  But the Court need not, and should

2   not, reach them, because Musixmatch is not even subject to personal jurisdiction in California.

3   Musixmatch is incorporated and has its principal place of business in Italy.  It is therefore not subject

4   to this Court's general jurisdiction, and LyricFind does not allege as much.  Nor has LyricFind

5   alleged that its antitrust, tort, and contract claims arise out of or relate to Musixmatch's contacts with

6   California such that this Court has specific jurisdiction over Musixmatch.  The WCM/Musixmatch

7   agreement that LyricFind—a Canadian corporation—claims is unlawful is between an Italian

8   company and an English company, was executed in the United Kingdom, and is subject to the laws

9   of England and Wales.  Subjecting Musixmatch to the jurisdiction of California courts is therefore

10  inconsistent with fundamental notions of due process, fair play, and substantial justice.

11      For these reasons, LyricFind's Complaint against Musixmatch should be dismissed with

12  prejudice under Rules 12(b)(2) and 12(b)(6).

**STATEMENT OF THE ISSUES**

13

14      Whether LyricFind has (1) established that this Court has personal jurisdiction over

15  Musixmatch to survive dismissal under Rule 12(b)(2); or (2) stated any claim for relief sufficient to

16  survive dismissal under Rule 12(b)(6).

17  **I.    THIS COURT LACKS PERSONAL JURISDICTION OVER MUSIXMATCH**

18      **A.    Relevant Legal Standard**

19      LyricFind bears the burden of demonstrating that this Court has personal jurisdiction over

20  Musixmatch.  *See Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).  To avoid dismissal,

21  LyricFind must make a *prima facie* showing of jurisdictional facts.  *Id.*  Uncontroverted jurisdictional

22  allegations in the Complaint should be taken as true.  *Prevail Legal, Inc. v. Gordon*, No. 20-cv-

23  07173, 2021 WL 1947578, at *2 (N.D. Cal. May 14, 2021).  But if the defendant "adduces evidence

24  controverting the allegations, . . . a court 'may not assume the truth of allegations in a pleading which

25  are contradicted by [the evidence].'"  *Id.* (citations omitted).  A plaintiff cannot then "simply rest on

26  the bare allegations of its complaint, but rather [is] obligated to come forward with facts, by affidavit

27

28

2

1  or otherwise, supporting personal jurisdiction." *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d

2  784, 787 (9th Cir. 1977).

3  **B.   Relevant Facts**

4  The facts bearing on Musixmatch's challenge to personal jurisdiction are straightforward and

5  contained both in LyricFind's Complaint and the attached declaration of Aman Khullar, dated June 4,

6  2025 ("Decl.").[1]

7  Plaintiff LyricFind is a company organized under the laws of Ontario, Canada, with its

8  principal place of business in Toronto, Ontario, Canada.  Compl. ¶ 30.  LyricFind is a global provider

9  of so-called "Lyric Data Services" and "Lyric Rights Licensing" for some of the biggest names in

10  the music and technology space, including Google, YouTube, Amazon, Deezer, Xperi, and Pandora.

11  *Id.*

12  Defendant Musixmatch is an Italian company founded by a group of engineers led by

13  Massimo Ciociola in Bologna, Italy.  Decl. ¶ 3.  Musixmatch is organized under the laws of Italy,

14  with its principal place of business in Bologna, Italy.  Compl. ¶ 31.  Contrary to LyricFind's

15  allegations, Musixmatch does not have an office in California (or elsewhere in the United States).

16  Decl. ¶ 6.  Musixmatch also does not pay (and is not responsible for paying) state or federal taxes in

17  the United States, and does not have a bank account anywhere in the United States.  *Id.* ¶ 7.

18  Musixmatch's largest licensing contracts are all with UK companies with registered offices in

19  London, UK, and none of the Musixmatch employees responsible for negotiating these agreements

20  is located in California.  *Id.* ¶ 10.  Those contracts are all governed by the laws of England and Wales,

21  and have London forum selection clauses.  And the licenses granted under them are worldwide.

22  Musixmatch also provides Lyric Data Services and Lyric Rights Licensing to a range of customers

23  worldwide, including streaming services and social media companies.  *See id.* ¶ 15.  Its largest

24  customers are global companies, and the scope of its licenses and services is consequently global.

25

26  _____

27  [1] On a Rule 12(b)(2) motion, a court may consider materials outside the pleadings, including the
parties' declarations and exhibits.  *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 123 (2014);

28  *Abokasem v. Royal Indian Raj Int'l Corp.*, No. C-10-01781, 2011 WL 635222, at *10 n.7 (N.D. Cal.
Feb. 11, 2011) (considering declaration in determining issue of personal jurisdiction).

1    LyricFind's claims against Musixmatch relate to a 2024 sublicensing agreement between

2    Warner Chappell Music Limited and Musixmatch.  *See id.* ¶¶ 11, 12.  WCM was incorporated in

3    1950 under the laws of the United Kingdom and has its principal place of business in London,

4    England.  *See id.* ¶ 13; *id.*, Exs. 1 & 2.

5        ### C.    Argument

6        The Complaint against Musixmatch must be dismissed under Rule 12(b)(2) for lack of

7    personal jurisdiction.  LyricFind fails to make, and cannot make, a *prima facie* showing of personal

8    jurisdiction over Musixmatch, an Italian company.  "Courts recognize two forms of personal

9    jurisdiction, general and specific."  *Lindblad v. Linde AG*, No. 23-cv-06179, 2024 WL 923773, at *1

10   (N.D. Cal. Mar. 4, 2024).  The personal jurisdiction inquiry focuses on the scope and nature of each

11   particular defendant's distinct contacts with the forum.  *See Daimler AG v. Bauman*, 571 U.S. 117,

12   122 (2014); *see also Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980) (considering the "defending

13   parties" together and aggregating their forum contacts in determining jurisdiction is forbidden).

14   Personal jurisdiction exists when authorized by federal statute or by the law of the forum state.  *See*

15   Fed. R. Civ. P. 4(k)(1); *Lindblad*, 2024 WL 923773, at *2.

16       LyricFind cannot establish that this Court has either general or specific personal jurisdiction

17   over Musixmatch.[2]  LyricFind's alleged basis for this Court's exercise of personal jurisdiction is the

18   incorrect assertion that Musixmatch entered into an agreement with Warner Chappell Music, Inc., a

19   California company.  Not so: Warner Chappell Music Limited, the actual counterparty to the

20

21   _____

[2] The analysis must focus on Musixmatch's particular connections to the jurisdiction:  TPG's (as
22   either the private equity sponsor of Musixmatch or its alleged co-conspirator) contacts with the
jurisdiction are irrelevant to the jurisdictional analysis.  *See Rush v. Savchuk*, 444 U.S. 320, 332
23   (1980) ("The requirements of *International Shoe* . . . must be met [separately] as to each defendant.");
*Uston v. Hilton Casinos, Inc.*, 564 F.2d 1218, 1219 (9th Cir. 1977) (affirming dismissal for lack of
24   personal jurisdiction, holding that "[t]he fact that [defendant's] parent corporation does business in
California cannot in itself render the subsidiary . . . subject to in personam jurisdiction there"); *Fields
25   v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 302 (9th Cir. 1986) ("[A] parent corporation's ties
to a forum do not create personal jurisdiction over the subsidiary."); *Ranza v. Nike, Inc.*, 793 F.3d
26   1059, 1074 (9th Cir. 2015) (interlocking directors and "[s]ome employees and management
personnel mov[ing] between [them]   does not undermine the entities' formal separation" for
27   jurisdictional purposes); *see also U.S. Vestor, LLC v. Biodata Info. Tech. AG*, 290 F. Supp. 2d 1057,
28   1065 (N.D. Cal. 2003) (rejecting conspiracy theory of jurisdiction).

challenged agreement, is a company headquartered and doing business in the United Kingdom.  *See*
Decl. ¶ 13.  LyricFind is likewise mistaken about Musixmatch having an office in California—
Musixmatch never had an office in California or anywhere else in the United States.  *See id.* ¶ 6.
Stripped of these incorrect (and now rebutted) assertions, what is left are boilerplate allegations of
Musixmatch doing business with unspecified third parties in California ungrounded in any
supporting factual allegations and untethered from any explanation of how they relate to LyricFind's
claims or alleged harm.

### 1.    Musixmatch Is Not Subject to General Jurisdiction in California

LyricFind does not allege (nor could it) that Musixmatch is subject to general jurisdiction in
California.  General jurisdiction requires contacts so continuous and systematic as to "approximate
physical presence."  *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114,
1124–25 (9th Cir. 2002) (citation omitted) (a defendant must do more than "step[] through the door"
of the forum, it must "[sit] down and [make] itself at home").  For corporate defendants, "the place
of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction,'"
and the analysis "calls for an appraisal of [their] activities . . . nationwide and worldwide" because
"[a] corporation that operates in many places can scarcely be deemed at home in all of them."
*Daimler*, 571 U.S. at 137, 139 n.20 (first alteration in original) (citation omitted).

Here, LyricFind concedes that Musixmatch is incorporated and has its principal place of
business in Italy, not California.  Compl. ¶ 31.  And there are no factual allegations in LyricFind's
Complaint to support a finding that Musixmatch is one of the rare, "exceptional case[s]" that would
otherwise warrant exercise of general jurisdiction over a foreign company.  *Martinez v. Aero
Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014).  Allegations that Musixmatch transacts business
with or generates revenue from California customers do not change the outcome.  *See Glencore*, 284
F.3d at 1124–25 ("[E]ngaging in commerce with residents of the forum state is not in and of itself
the kind of activity that approximates physical presence within the state's borders.").[3]

---

[3] *See also, e.g.*, *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1174 (9th Cir. 2006) (sales
and licensing arrangements insufficient); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F.
Supp. 3d 1118, 1141–42 (S.D. Cal. 2018) (finding no general jurisdiction even where firm raised

1    Musixmatch is accordingly not subject to general personal jurisdiction in California.

2         **2.    Musixmatch Is Not Subject to Specific Jurisdiction in California**

3         LyricFind likewise fails to allege sufficient "minimum contacts" with California for this

4    Court to exercise specific personal jurisdiction over Musixmatch.   "California's long-arm

5    jurisdictional statute is coextensive with federal due process requirements," and requires that the

6    defendant "have at least 'minimum contacts' with the relevant forum such that the exercise of

7    jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"

8    *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004) (quoting *Int'l Shoe*

9    *Co. v. Washington*, 326 U.S. 310, 316 (1945)); *cf. Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406,

10   1416 (9th Cir. 1989) (noting that, under the Clayton Act's service statute, "due process demands [a

11   showing of minimum contacts]" (alteration in original) (citation omitted)).   For specific jurisdiction

12   to exist, "the defendant's *suit-related conduct* must create a substantial connection with

13   [California]." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added); *see also Lindblad*, 2024

14   WL 923773, at *2 ("Specific jurisdiction exists when a case arises out of or relates to the defendant's

15   contacts with the forum." (citation omitted)).   And the analysis "must focus on [Musixmatch's]

16   contacts with [California], not [Musixmatch's] contacts with [residents of California]." *Picot v.*

17   *Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015).

18        The Ninth Circuit has articulated three requirements that a plaintiff must satisfy to show that

19   the exercise of specific jurisdiction is proper:

20        (1) [t]he non-resident defendant must purposefully direct his activities or
     consummate some transaction with the forum or resident thereof; or perform some
21       act by which he purposefully avails himself of the privilege of conducting activities
     in the forum, thereby invoking the benefits and protections of its laws; (2) the claim
22       must be one which arises out of or relates to the defendant's forum-related activities;
     and (3) the exercise of jurisdiction must comport with fair play and substantial justice,
23       i.e. it must be reasonable.

24   *Schwarzenegger*, 374 F.3d at 802.   "If the plaintiff fails to satisfy either of [the first two] prongs,

25   [specific] jurisdiction is not established . . . . If the plaintiff succeeds in satisfying both of the first

26

27   ──────────────
     two-thirds of its capital from forum investors and owned forum portfolio companies because the firm
28   "controlled its investments from London").

1    two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise

2    of jurisdiction would not be reasonable." *Id.* (citation omitted).

3        As set forth below, none of these three requirements is satisfied here.

4        ***(1)    No Purposeful Direction or Availment.***  LyricFind has not adequately alleged that

5    Musixmatch either purposefully directed its conduct to California or availed itself of the privilege of

6    conducting business in the state.  LyricFind must, but cannot, show that Musixmatch purposefully

7    "reach[ed] out beyond" its home forum by "entering a contractual relationship that 'envisioned

8    continuing and wide-reaching contacts,'" *Walden*, 571 U.S. at 285 (citation omitted), or by

9    "distribut[ing] in the forum state . . . goods originating elsewhere," *Schwarzenegger*, 374 F.3d at

10   803.  The requirement of purposeful direction is assessed under the three-part "effects" test from

11   *Calder v. Jones*, 465 U.S. 783 (1984): the defendant must have "(1) committed an intentional act,

12   (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

13   suffered in the forum state," *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162–63 (9th

14   Cir. 2023) (citation omitted).  Simply put, LyricFind would need to show that California is the "focal

15   point" of the conduct and the alleged harm.  *Walden*, 571 U.S. at 287.  LyricFind does not and cannot

16   clear this bar.

17       LyricFind generally alleges that Musixmatch entered into an exclusive agreement with

18   "Warner Chappell Music, Inc.," allegedly a "California entity," that resulted in harm to market

19   participants worldwide.  Compl. ¶¶ 88, 96, 133–43, 88.  As noted above, Musixmatch never entered

20   into any agreement with "Warner Chappell Music, Inc.," in California or anywhere else.  The

21   challenged agreement is between Musixmatch and Warner Chappell Music Limited, a company

22   incorporated in 1950 under the laws of the United Kingdom and with its principal place of business

23   in London, England.  *See* Decl. ¶ 12; *id.*, Exs. 1 & 2.  The WCM/Musixmatch agreement was also

24   negotiated outside of California by executives located outside of California.  *See* Decl. ¶ 13.

25   LyricFind, moreover, alleges that the anticompetitive effects of the WCM/Musixmatch agreement

26   affect "worldwide" geographic markets.  Compl. ¶ 76.  As such, by LyricFind's own admission, the

27   WCM/Musixmatch agreement is not "aimed at" California.  *Calder*, 465 U.S. at 789 (mere

28

7

1    "foreseeability" of potential "effect in California is not sufficient for an assertion of jurisdiction");

2    *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 208 (S.D.N.Y. 2018) (foreseeability

3    of effect in the forum found insufficient to support jurisdiction).

4         LyricFind also fails to adequately allege that Musixmatch "purposefully availed" itself of the

5    privilege of conducting business in the forum, thus "invoking the benefits and protections of [the

6    state's] laws." *Schwarzenegger*, 374 F.3d at 802.  The WCM/Musixmatch agreement is between

7    Italian and English companies, was negotiated and executed outside of California, is governed by

8    the laws of England and Wales, and provides for resolution of related disputes in London courts. *See*

9    Decl. ¶¶ 5, 10–13.  No aspect of the alleged conduct could establish that Musixmatch availed itself

10   of the benefits of California's laws by entering into the agreement. *See Doe v. Unocal Corp.*, 248

11   F.3d 915, 924 (9th Cir. 2001) (purposeful availment standard not satisfied where contract was

12   negotiated outside of the forum, was governed by foreign law, and involved subject matter unrelated

13   to the forum).[4]  Similarly, Musixmatch's alleged transactions with licensors and/or customers based

14   in California are not relevant to the purposeful availment analysis. *See Azzarello v. Navagility, LLC*,

15   No. C-08-2371, 2008 WL 4614667, at *4 (N.D. Cal. Oct. 16, 2008) (finding parties' prior dealings

16   in connection with plaintiff's role as investor in defendant irrelevant to the purposeful availment

17   analysis where claim was for breach of loan agreement unrelated to the investment).[5]

18        The Complaint's boilerplate jurisdictional allegations are insufficient to cure these

19   deficiencies.  LyricFind alleges that Musixmatch "regularly transacts business within this district and

20   the state of California, including by contracting with . . . other licensors within California, contracting

21   with customers and licensees within California, engaging in marketing and business development

22   within this district and elsewhere in California, providing lyric products and services to consumers

23   in this district and California, [and] attending key executives' meetings in this district." Compl. ¶ 35.

24   _____

25   [4] *See also Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1163–64 (9th Cir. 2023) (finding

26   no purposeful availment where contract negotiation, terms, contemplated consequences and parties' course of dealing did not reflect an intent by defendant to invoke forum's "benefits and protections").

27   [5] *See also Dynamic Software Servs. v. Cyberbest Tech., Inc*, No. C-13-04217, 2014 WL 3373924, at

28   *9 (N.D. Cal. July 9, 2014) ("The total amount of business [d]efendant conducted in the forum is not relevant to the purposeful availment analysis in the contract context.").

1    But LyricFind provides no factual support for any of these allegations, and none of these purported

2    activities could establish the requisite minimum contacts.  Each of these assertions, moreover, could

3    apply to any number of jurisdictions around the world, because Musixmatch contracts with licensors

4    and customers around the world.  *See* Decl. ¶¶ 10, 12.  And to the extent Musixmatch has agreements

5    with California-based customers, those agreements—in addition to not being at issue here—establish

6    connections with Musixmatch's counterparties, "not *[with] the forum* in which . . . such

7    counterparties were located."  *Dennis*, 343 F. Supp. 3d at 207 (emphasis added); *cf. O.S.C. Corp. v.*

8    *Toshiba Am., Inc.*, 491 F.2d 1064, 1068 (9th Cir. 1974) (no evidence that defendant Japanese

9    corporation "transacted business" within the meaning of the Clayton Act's service statute where

10   defendant was not registered to do business, did not own or lease property, and had no bank accounts

11   in the forum).

12       The unremarkable fact that some of Musixmatch's customers are large technology companies

13   that may be at home in California is also not grounds for the exercise of personal jurisdiction over

14   Musixmatch in this case.  *See Dennis*, 343 F. Supp. 3d at 207 (allegations that the forum was a

15   "substantial market for [the relevant product] speak only to the foreseeability of the effect . . . in the

16   [forum]," an insufficient basis for jurisdiction).  Nor can jurisdiction over Musixmatch be premised

17   on LyricFind's allegation that Musixmatch's lyric services ultimately reach consumers in California

18   through Musixmatch's customers: a defendant's relationship with the forum must "arise out of

19   contacts that the 'defendant *himself*' creates with the forum."  *Walden*, 571 U.S. at 284 (citation

20   omitted).[6]  The conduct of Musixmatch's customers (i.e., digital services providers' provision of

21   lyric services to end users who may be located in California) or the popularity of those services thus

22   cannot serve as grounds for the exercise of jurisdiction over Musixmatch.

23

24   _____

25   [6] *See also, e.g.*, *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123
     (9th Cir. 2002) ("By requiring that contacts proximately result from actions by the defendant *himself*

26   that create a substantial connection with the forum State, the Constitution ensures that a defendant
     will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated'

27   contacts.") (internal quotations omitted) (citations omitted); *AMA Multimedia, LLC v. Wanat*, 970
     F.3d 1201, 1210 (9th Cir. 2020) (popularity of website's content in the forum "does not show that

28   [defendant] expressly aimed the site at the [forum]").

1    LyricFind thus cannot satisfy the first prong of the specific jurisdiction test.  *See Pebble*

2    *Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) ("If any of the three requirements is not

3    satisfied, jurisdiction in the forum would deprive the defendant of due process of law." (citation

4    omitted)).

5        *(2)    No Nexus to Any Musixmatch Conduct in California.*  LyricFind also cannot satisfy

6    the second prong of the specific jurisdiction test, because it has not and cannot show that its claims

7    arise out of conduct undertaken by Musixmatch in California.  "[LyricFind] would have needed to

8    allege facts demonstrating 'but for' causation, in which 'a direct nexus exists between

9    [Musixmatch's] contacts with [California] and the cause of action.'"  *Lindblad*, 2024 WL 923773,

10   at *3 (citation omitted); *see also Unocal*, 248 F.3d at 924 (inquiry is "whether [LyricFind's] claims

11   would have arisen but for [Musixmatch's] contacts with California").

12       LyricFind does not even attempt to explain how its claims are connected to any activity by

13   Musixmatch in California, let alone to establish "but for" causation.  Specific jurisdiction does not

14   exist where the only alleged activity by a defendant in the forum is unrelated to the claim.  *See*

15   *AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, No. 19-cv-04789, 2020 WL 1531322, at *8 (N.D. Cal.

16   Mar. 31, 2020) (no specific jurisdiction where defendants' conduct in the forum was unrelated to the

17   breach of contract claims); *Ocean SW, Inc. v. Canam Pet Treats, Inc.*, No. 14-cv-2059, 2015 WL

18   2180492, at *8 (S.D. Cal. May 7, 2015) (alleged "marketing and sales of [defendant's] products in

19   California and other incidental agreements . . . are not relevant to the specific-jurisdiction analysis

20   within the boundaries of the causes of action asserted in this case to recover allegedly outstanding

21   debts"); *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1093

22   (C.D. Cal. 2010) (allegations of business meetings in the forum with no facts pled to link those

23   meetings to the claims in the case fail both the effects test and "but for" causation prongs of the

24   jurisdictional analysis).

25       *(3)    Exercise of Personal Jurisdiction Is Unreasonable.*  Lastly, exercising jurisdiction

26   over Musixmatch in California would not comport with fair play and substantial justice.  When

27

28

assessing whether the exercise of jurisdiction would be reasonable, courts consider:

> (1) the extent of [the] defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's home state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Glencore*, 284 F.3d at 1125 (citation omitted).

LyricFind does not even allege—and is unable to show—that Musixmatch "purposefully interjected" itself into California's affairs. *See Amoco Egypt Oil Co. v. Leonis Nav. Co.*, 1 F.3d 848, 852 (9th Cir. 1993) (noting that the purposeful interjection analysis "parallels the question of minimum contacts"). The burden on Musixmatch—a foreign defendant with no office in the forum—of defending this action in California is not counterbalanced by any benefit that adjudicating the case in California can be said to have to LyricFind, a Canadian entity. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."). LyricFind is seeking relief that extends beyond California, and it can obtain it "convenient[ly] and effective[ly]" in a more appropriate forum. *Glencore*, 284 F.3d at 1125 (citation omitted).

Sovereignty considerations also weigh against the exercise of jurisdiction: Italy, as Musixmatch's home forum, and the UK, the place with the closest connection with the WCM/Musixmatch agreement and its negotiation and performance, both have more significant interests in adjudicating the matter. *See Leonis*, 1 F.3d at 852 ("Where . . . the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction."). "Because [LyricFind] is not a California resident, California's legitimate interests in the dispute have considerably diminished." *Asahi*, 480 U.S. at 114.[7]

---

[7] To be sure, California, the world's fourth largest economy, could expect to feel the effects of all types of worldwide conduct. That does not mean it always has a significant interest in policing that conduct and enforcing its substantive (statutory or common) laws by exercising personal jurisdiction

11

The existence of the UK and Italy as alternative fora further weighs against the exercise of jurisdiction.  *See Glencore*, 284 F.3d at 1126.  LyricFind can bring analogous claims and seek adequate remedies in English or Italian courts.[8]  Nothing suggests that courts in those nations would be any less equipped to adjudicate its claims.  *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 302 (9th Cir. 1986) (weighing efficiency and convenience factors in favor of adjudication in English courts where dispute revolved around a British contract, plaintiff showed little added convenience in litigating in California, and the UK's interest in the dispute was greater than California's).

This Court thus should not allow a foreign plaintiff to hale a foreign defendant before it based on little more than a suggestion that, because it provides digital services worldwide, that foreign defendant should expect its activities to have some effect in California.  *See Daimler*, 571 U.S. at 139 ("If [defendant's] California activities sufficed to allow adjudication of this [foreign]-rooted case in California, the same global reach would presumably be available in every other State in which [defendant's] sales are sizable.  Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'") (citation omitted).

The Court should accordingly dismiss all claims against Musixmatch for lack of personal jurisdiction.

---

over foreign companies.  *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987) (definition of California's interest for personal jurisdiction purposes as "protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards" found "overly broad" (citation omitted)); *Davis*, 71 F.4th at 1166 (rejecting interest in regulating and promoting aviation safety as grounds to exercise personal jurisdiction, noting that courts have no "license to dispense with constitutional requirements" on public policy grounds).

[8] *See, e.g.*, *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) (dismissing Sherman Act Section 1 and Section 2 claims and various common law claims on *forum non conveniens* grounds because plaintiffs could litigate the subject-matter of their claims and obtain money damages in English courts).

1

## II.    LYRICFIND FAILS TO STATE A CLAIM THAT ENTITLES IT TO RELIEF

2

Even if the Court finds that it has personal jurisdiction over Musixmatch, all of the claims

3

against it should still be dismissed.[9]  LyricFind is suing because it is a jilted competitor for WCM's

4

business.  Such claims fail at the outset because LyricFind lacks the requisite antitrust standing and

5

injury to bring its antitrust claims.  The Complaint also fails to plausibly plead anticompetitive

6

exclusive contracting, or that Musixmatch has market power in any properly defined antitrust market.

7

LyricFind's Section 1 and Section 2 conspiracy allegations also fail under *Copperweld*, and its

8

Section 2 conspiracy claims fail to adequately allege the requisite "specific intent to monopolize."

9

LyricFind's state law tort and breach of contract claims fare no better—LyricFind does not

10

adequately allege disruption of any business prospects or damages caused by any conduct of

11

Musixmatch.  Accordingly, LyricFind fails to state any claims upon which it is entitled to relief.[10]

12

### A.    LyricFind's Allegations

13

This dispute concerns the licensing and distribution of a music publisher's copyrighted lyric

14

content.[11]  Music publishers such as WCM, Sony Music Publishing, Universal Music Group, and

15

Kobalt Music Group, among many others, own and manage the copyrights necessary to perform,

16

reproduce, or distribute musical compositions.  Music publishers license their intellectual property

17

rights, either directly or through intermediaries, for use in film, television, advertisements, radio or

18

music streaming services, and for other uses.  Compl. ¶¶ 46, 62, 65.

19

Music publishers, and the songwriters they represent, also own and control the separate

20

copyrights to the lyrical content of their music.  *Id.* ¶ 15.  These rights are licensed to various digital

21

services providers ("DSPs") who desire to use that content.  *Id.* ¶¶ 15, 63.  DSPs include not only

22

music streaming platforms like Apple Music, Spotify, and YouTube Music, but also search engines

23

---

24

[9] Musixmatch adopts all of the arguments stated in TPG's separate Motion to Dismiss, filed on June 5, 2025.

25

[10] Given the scattershot assortment of claims asserted by LyricFind, a chart summarizing the

26

application of each of Musixmatch's Rule 12(b)(6) arguments to LyricFind's various claims is attached as Exhibit A.

27

[11] Solely for purposes of its Rule 12(b)(6) arguments, Musixmatch accepts LyricFind's allegations

28

as true, as it must.

1   like Google Search and Microsoft Bing, social media networks like Instagram and Facebook, and

2   others. *Id.* ¶¶ 1, 6, 39.  However, music publishers often do not maintain actual transcriptions of the

3   lyrics for their songs, and are unable to provide that lyric content to DSPs, despite their ability to

4   grant DSPs the right to utilize those lyrics.

5   To address that gap, Musixmatch compiled a database of song lyrics and makes that lyric

6   content available to DSPs through proprietary technology solutions.  Musixmatch supplies not only

7   the lyrics for musical compositions, but other associated lyric content (e.g., translations,

8   synchronization files) that enrich the lyrics provided to DSPs.  LyricFind pursued a similar strategy.

9   *Id.* ¶ 60.

10  Like the DSPs themselves, Musixmatch and LyricFind must first license the lyric copyrights

11  from the music publishers who own and control the rights before distributing lyric content. *Id.* ¶¶ 14,

12  62, 65, 78.  Although music publishers like WCM can and often do license their lyric copyrights to

13  DSPs directly, in many instances Musixmatch and LyricFind also act as agents for music publishers

14  and sublicense the lyric content while supplying the DSPs with the lyrics themselves and supporting

15  lyric content data. *Id.* ¶¶ 61, 63.  In addition, both Musixmatch and LyricFind provide a back-office

16  "data fulfillment" service that is integral to the distribution of copyrighted material: they administer,

17  collect, and distribute the royalty payments from the DSPs back to the publishers (together with the

18  content and synchronization services, "Lyric Data Services"). *Id.* ¶¶ 2, 64, 96.  Moreover, DSPs can,

19  and often do, source Lyric Data Services from multiple providers. *Id.* ¶ 68.

20  Last year, WCM elected to sublicense and administer its lyric intellectual property solely

21  through Musixmatch.  This was, of course, a decision that WCM, as the intellectual property owner,

22  was free to make for its own commercial reasons, and LyricFind does not suggest otherwise. *Id.*

23  ¶ 134.  LyricFind also acknowledges that WCM terminated its business relationship with LyricFind

24  effective March 20, 2025—again, for WCM's own commercial reasons. *Id.* ¶ 138.  The Complaint

25  contains no factual allegations regarding the duration of the WCM/Musixmatch agreement, leaving

26  no basis to assess the agreement's competitive significance or impact.

27

28

1    LyricFind asserts that Musixmatch, TPG, and WCM conspired to restrain trade in violation

2  of Section 1 of the Sherman Act (Count 1) and California's Cartwright Act (Count 9); conspired to

3  monopolize the alleged Lyric Rights Licensing and Lyric Data Services markets in violation of

4  Section 2 of the Sherman Act (Counts 4 and 7); and entered into an agreement that may substantially

5  lessen competition in the alleged relevant markets in violation of Section 3 of the Clayton Act

6  (Count 8). *See id.* ¶¶ 178, 202, 227, 234.  LyricFind further claims that Musixmatch, through

7  its agreement with WCM, either monopolized (Count 2) or attempted to monopolize (Count 3)

8  the alleged Lyric Data Services market in violation of Section 2. *See id.* ¶¶ 185, 193.  LyricFind also

9  alleges that the WCM/Musixmatch agreement allows Musixmatch to attempt to monopolize the

10  alleged Lyric Rights Licensing market and alleged Lyric Rights Sublicensing submarket in violation

11  of Section 2 (Counts 5 and 6). *See id.* ¶¶ 209, 217.  LyricFind also claims that it is the victim

12  of unfair competition in violation of California's Unfair Competition Law (Count 10) and of

13  an assortment of torts and breaches allegedly committed by Musixmatch and TPG (Counts 11

14  through 13). *See id.* ¶¶ 246 *et seq.*

15    LyricFind now contends—after waiting almost a year to file its Complaint, *see id.* ¶ 24—that

16  it is on the brink of disaster thanks to this so-called "scheme" hatched by Musixmatch, TPG, and

17  WCM to enable Musixmatch to gain a competitive advantage. *See id.* ¶¶ 96, 133–43, 88.  But

18  stripped of buzzwords and hyperbole, the core of LyricFind's Complaint is simply that WCM chose

19  Musixmatch instead of LyricFind to license its lyric copyrights and distribute its lyric content. *Id.*

20  ¶ 138.

21    **B.    Relevant Legal Standard**

22    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

23  as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

24  (2009) (citation omitted).  The allegations "must be enough to raise a right to relief above the

25  speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While "a court must

26  accept as true all of the allegations contained in a complaint," that acceptance "is inapplicable to

27  legal conclusions," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere

28

1   conclusory statements, do not suffice" to state a claim.  *Iqbal*, 556 U.S. at 678.  The court is not

2   "required to accept as true allegations that are . . . unwarranted deductions of fact, or unreasonable

3   inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted),

4   and may "reject, as implausible, allegations that are too speculative to warrant further factual

5   development," *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

6   ### C.    LyricFind Lacks Antitrust Standing and Injury (Counts 1–10)

7        LyricFind fails to adequately allege antitrust injury and standing, which are prerequisites for

8   all of its state and federal antitrust claims.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104,

9   113 (1986) (antitrust injury a prerequisite to standing).  An antitrust injury must both be "of the type

10  the antitrust laws were intended to prevent" and one "that flows from that which makes defendants'

11  acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

12       LyricFind lacks antitrust injury because it cannot establish the required causation: that is, an

13  alleged injury that "flows from" the actions of Musixmatch that violate the antitrust laws.  *Id.*

14  LyricFind claims it is injured because it is unable to "compete effectively" without the ability to

15  license and supply WCM's copyrighted lyric content to DSPs.   Compl. ¶¶ 16, 167.  But this alleged

16  injury flows directly from ***WCM's*** decision to ***terminate*** its licensing and distribution agreement

17  with LyricFind.   Compl. ¶ 146 (WCM "terminated LyricFind's right to provide [services and

18  licensing] for WCM's titles" after March 20, 2025).  Critically, LyricFind does not allege (nor could

19  it in good faith) that, but for the WCM/Musixmatch agreement, WCM would have chosen to continue

20  working with LyricFind.  Nor does the Complaint allege that Musixmatch coerced WCM to contract

21  on an exclusive basis.  Rather, LyricFind admits that it had a prior relationship with WCM, but that

22  WCM ended the relationship, as was its right.  Indeed, as LyricFind even acknowledges, "WCM

23  never asked LyricFind for a competing bid" before entering into the agreement with Musixmatch.

24  *Id.* ¶ 138.

25       These omissions and admissions are fatal under binding precedent. In *Lucas*, the Ninth

26  Circuit considered a competitor's standing under Section 4 of Clayton Act (which authorizes suits

27  for alleged violations of the antitrust laws, including the Sherman Act) and held that a disappointed

28

1    competitor that fails to secure an exclusive supplier contract lacks the requisite antitrust injury to

2    recover damages from its competitor because it "would have suffered the same injury" even if a firm

3    other than the defendant had secured the contract.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone,*

4    *Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998).  The *Lucas* court so held even though the plaintiff had

5    alleged that the exclusive agreement to supply the product at issue had given its rival 75% and 90%

6    shares of the respective relevant markets.  *Id.* (citing *Brunswick*, 429 U.S. at 487–89); *see also Serpa*

7    *Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999) (dismissing complaint for lack of antitrust

8    injury where plaintiff's "injuries flow from the termination of its distributorship, and not from any

9    anticompetitive effects of defendant's" conduct).

10        The reasoning in *Lucas* applies with full force to LyricFind's claims.  LyricFind's purported

11    injury occurred because it cannot license, or supply data services for, WCM lyrics.  That injury was

12    caused by WCM's lawful exercise of the power granted to it by the Copyright Act to appoint

13    Musixmatch as the exclusive distributor for its intellectual property, *see* 17 U.S.C. § 106(1), (3), (5)

14    (copyright owner has the "exclusive rights to do and to authorize" each of the enumerated rights),

15    and its corollary lawful refusal to deal with LyricFind, *see Dimidowich v. Bell & Howell*, 803 F.2d

16    1473, 1478 (9th Cir. 1986); *accord Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448

17    (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal.").

18    And LyricFind's alleged injury would also have occurred whether or not WCM had decided at

19    the same time to license exclusively to Musixmatch, or instead to license directly to DSPs, or on a

20    non-exclusive basis to Musixmatch and others, but not LyricFind.  As in *Lucas*, the source of the

21    injury is WCM's lawful decision not to work with LyricFind—not Musixmatch's agreement with

22    WCM.  *See also E & L Consulting, Ltd v. Doman Indus. Ltd.*, 472 F.3d 23, 29–30 (2d Cir. 2006)

23    (dismissing antitrust claims challenging exclusive distributorship for lack of antitrust injury).[12]

24

25    ───────────────
      [12] *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) ("A vertical

26    arrangement provides no monopolistic benefit to [the manufacturer] that it does not already enjoy
      and would not continue to enjoy if the exclusive distributorship were enjoined. To put it another way,

27    had [the manufacturer] established its own in-house distribution system with the same monopoly that
      [the exclusive distributor] is alleged to possess, there would have been no increase in the restriction

28    of output . . . and in the resultant misallocation of resources.").

17

1    Notably, LyricFind is not challenging WCM's decision not to renew their agreement.  Indeed,

2   as of the date of this filing, LyricFind has not even sued WCM.[13]  As a result, even if LyricFind were

3   to prevail on any of its claims in this case, it would not obtain the ability to license WCM's lyrics, as

4   this Court could not order WCM, a non-party, to furnish those lyric rights to LyricFind.  LyricFind

5   therefore has not alleged the requisite antitrust injury or standing to bring its antitrust claims.

6       **D.      LyricFind Fails to Allege an Unlawful Exclusive Contract (Counts 1–10)**

7           LyricFind's antitrust allegations should also be dismissed because of another fatal flaw: All

8   of its antitrust claims (Counts 1 through 10) fail to adequately allege an unlawful exclusive

9   arrangement.  *See* Compl. ¶¶ 179, 187, 194, 204, 210, 218, 228, 234, 241, 246.  An exclusive

10  agreement violates the antitrust laws only where it is "probable that performance of the contract will

11  foreclose competition in *a substantial share of the line of commerce affected.*"  *Tampa Elec. Co. v.*

12  *Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (emphasis added).  Substantial foreclosure serves a

13  screening function because "[t]here are 'well-recognized economic benefits to exclusive dealing

14  arrangements, including the enhancement of interbrand competition.'"  *Allied Orthopedic*

15  *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (citation omitted);

16  *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (exclusive contracts

17  "may reduce expenses, provide protection against price fluctuations, and offer the possibility of a

18  predictable market"); Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1820 (4th ed. 2024)

19  (Courts routinely find exclusive agreements lawful because of their "significant efficiency

20  potential . . . and . . . limited threats of competitive harm.").

21          The Complaint falls far short of the requirement that it allege substantial foreclosure because

22  (1) it does not allege that the agreement is of such an extended duration as to result in substantial

23  foreclosure, (2) it fails to properly define a relevant market from which LyricFind is foreclosed, and

---

[13] Any such effort to sue WCM would fail:  A "copyrightholder's 'exclusive' rights, derived from
the Constitution and the Copyright Act, include the right, within broad limits, to curb the
development of . . . a derivative market by refusing to license a copyrighted work or by doing so only
on terms the copyright owner finds acceptable."  *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F.
Supp. 2d 349, 352 (S.D.N.Y. 2000); *see also FTC v. Microsoft Corp.*, 136 F.4th 954, 971 (9th Cir.
2025) ("It is in the nature of intellectual property rights that the holder ultimately has exclusive
control over them.").

(3) it acknowledges that DSPs can and do multisource lyric content from both LyricFind and Musixmatch at the same time. LyricFind thus has not plausibly alleged it has been foreclosed from competing for a "substantial share" of any relevant market.

### 1. The Complaint Does Not Allege That the WCM/Musixmatch Agreement Forecloses LyricFind for a Competitively Significant Amount of Time

LyricFind does not allege that it will be foreclosed for any competitively significant amount of time. *See ZF Meritor*, 696 F.3d at 271–72 (stating that challenges to exclusive dealing agreements require a showing of "contracts of sufficient duration to prevent meaningful competition by rivals"). Short-term or readily terminable contracts are "of little antitrust concern" because rivals can simply "wait for the contracts to expire or make alluring offers to initiate termination." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022); *see also* Areeda & Hovenkamp, *supra* ¶ 1802g2 ("Even an exclusive-dealing contract covering a dominant share of the relevant market need have no adverse consequences if the contract is let out for frequent rebidding."). Courts routinely affirm the lawfulness of short-term exclusive contracts on this basis. *See, e.g.*, *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) (contracts ranging in duration from 30 days to 3 years characterized as "hav[ing] relatively short durations"), *aff'd*, 190 F.3d 974 (9th Cir. 1999); *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689, 2014 WL 1677521, at *4 (N.D. Cal. Apr. 25, 2014) (dismissing claims for failure to adequately plead foreclosure where alleged exclusive contracts were "much shorter" than the three- to five-year contracts found lawful in other cases); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (two-year contracts found not to be exclusionary).

LyricFind is conspicuously silent about the duration or terminability of the WCM/Musixmatch agreement, both indispensable facts for a plausible exclusive dealing theory. *See Church & Dwight Co. v. Mayer Lab'ys, Inc.*, No. C-10-4429, 2011 WL 1225912, at *15 (N.D. Cal. Apr. 1, 2011) ("Without allegations as to . . . the length of the agreements, etc., this claim standing alone does not adequately state a plausible exclusive dealing claim under the Sherman Act.") (citing *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 47 (7th Cir. 1996) (holding that the duration of

1    exclusive dealing contract is relevant to whether contract is illegal)).  Indeed, LyricFind admits that,

2    although its WCM license expired on June 30, 2024, WCM allowed it to continue to provide WCM

3    Lyric Data Services until very recently, March 20, 2025.  Compl. ¶¶ 74, 146.  Nowhere in the

4    Complaint does LyricFind explain why it will be unable to compete for the right to distribute WCM's

5    lyric content at the end of the WCM/Musixmatch agreement, or even that the agreement is of such

6    duration that LyricFind is substantially foreclosed from competing in the future.  As Judge

7    Easterbrook concluded when evaluating similar claims, "other firms that want to enter the market

8    can do so by competing at intervals for these contracts."  *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*,

9    103 F.3d 42, 45 (7th Cir. 1996) (citing *Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024,

10   1032–34 (7th Cir. 1988)).  LyricFind's silence as to the duration of the agreement dooms its

11   foreclosure theory.

12              **2.      The Complaint Does Not Adequately Allege Foreclosure From a
                         Substantial Share of a Relevant Market**

13

14              LyricFind's exclusive contracting claims also fail because the Complaint does not plausibly

15   allege that LyricFind is foreclosed from a "substantial portion" of a properly defined relevant market.

16   "[A]n exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful

17   effect upon competition, [and so] the requirement of a significant degree of foreclosure serves a

18   useful screening function."  *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (en

19   banc); *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68

20   (1st Cir. 2004) ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they

21   are less than 30 or 40 percent.").

22              Here, LyricFind makes the conclusory and curious allegation that the WCM/Musixmatch

23   agreement forecloses not a substantial share of any relevant market, but "a substantial share *of

24   competitors*," Compl. ¶ 180; *see also id.* ¶ 236 ("substantial share *of competition*") (emphases added).

25   But LyricFind fails to put forth any plausible allegations about the portion of the alleged relevant

26   markets it is purportedly excluded from.  Instead, LyricFind focuses on the portion of the music

27   publishing market that *WCM* controls and alleges that WCM's catalog is "must have."  *See, e.g.*,

28

                                                    20

1   Compl. ¶ 140 (noting "the scope of WCM's catalog and the commercial need for DSPs to display

2   WCM's lyrics"); *id.* ¶ 23 (asserting that "DSPs, especially major DSPs like Spotify, need access to

3   all three major publishers' lyrics to provide a comprehensive product to their users").  Even then,

4   LyricFind admits that WCM is only the third largest music publisher, with rights accounting for just

5   12% of the music publishing market by revenue, *id.* ¶ 48, far below the required thresholds necessary

6   to allege substantial foreclosure.  Faced with this inadequacy, LyricFind tries to further inflate

7   WCM's power by claiming that because copyrights for individual musical works are often split

8   among multiple copyright holders (resulting in so-called "fractional" copyrights), WCM has

9   "control' of 30% of "all *streams licensed on major platforms*," *id.* ¶ 12 (emphasis added).

10          These allegations are insufficient and implausible.  As a threshold matter, even if one adopts

11  LyricFind's most favorable construct, 30% foreclosure has repeatedly been found insufficient to

12  sustain an exclusive dealing claim.[14]  Moreover, even if "fractional" copyrights were the proper

13  numerator for assessing the share of the lyric content market "controlled" by any one music

14  publisher, LyricFind's calculation is inaccurate and self-serving, because it assumes that WCM owns

15  fractional rights while conveniently ignoring the fact that *every other publisher* also "controls" a

16  significantly higher share based on their fractional rights.  LyricFind's flawed methodology would

17  mean the total "shares" would illogically add up to much more than 100%.

18          LyricFind also does not explain why WCM's proportion of ownership should be assessed

19  relative to "streams" (as opposed to all licensed songs out there) or relative to just "major platforms"

20  (as opposed to all platforms, major and minor, streaming and social media included).  LyricFind

21  admits that DSPs that "stream" music such as Spotify, Apple Music, or YouTube Music are just one

22

23  _____

24  [14] *See Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-cv-03587, 2018 WL 4904918, at *5
    (N.D. Cal. Oct. 9, 2018) (dismissing antitrust claims for failure to plausibly allege substantial

25  foreclosure, noting that "[c]ourts have quantified substantial share as '40% to 50% of the relevant
    market'" (citations omitted)); *see also McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015)

26  ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive
    dealing cases."); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68

27  (1st Cir. 2004) ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they
    are less than 30 or 40 percent."); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)

28  (en banc) (roughly 40% or 50% share is usually required in order to establish a violation).

1    type of DSP customer.  Other customers use and display lyrics without streaming—in Google Search

2    for example, or on Facebook, Instagram, or TikTok.[15]  The Complaint contains no rational basis for

3    LyricFind's suggestion that the share of "fractional" copyrights or the share of "streams" are relevant

4    metrics for assessing competition, and LyricFind's allegations of "substantial" foreclosure are

5    therefore implausible.

6         At base, LyricFind's core contention is that the right to access and use WCM's lyrics is

7    essential for any lyric content distributor because DSPs need a "comprehensive [lyric content]

8    product."  Compl. ¶ 23.  This amounts to a claim that WCM's lyrics are a so-called "essential

9    facility," which the Complaint does not and cannot support.  The typical "essential facilities" scenario

10   involves a plaintiff who alleges that a monopolist's "facility" or input is so superior or necessary that

11   competitors cannot succeed without it—a railroad or utility, for example.  *See, e.g.*, *Paladin Assocs.,*

12   *Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) (stating that "[a] facility is 'essential'

13   only if control of the facility carries with it the power to eliminate competition in a downstream

14   market").  But Musixmatch does not control the alleged "essential facility" (i.e., WCM's copyrights),

15   nor does LyricFind explain how WCM's lyrics in particular are "superior or necessary" to all DSPs.

16   *See id.* (liability under the essential facilities doctrine requires showing that defendant controls a

17   facility that is "essential"); *see also Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master*

18   *Corp.*, 878 F. Supp. 804, 817 (D. Md. 1995) (same).  To the contrary, the Complaint admits that

19   WCM is just the third largest music publisher; that there are at least five other major publishers; and

20   that LyricFind licenses tens of thousands of lyrics from thousands of publishers, rights aggregators,

21   and artists.  *See* Compl. ¶ 48.

22        The Seventh Circuit in *Paddock* dealt with an analogous set of facts and found no antitrust

23   violation.  In that case, the largest Chicago newspapers contracted for exclusive access to copyrighted

24   wire services and opinion and entertainment content.  The plaintiff, the third largest newspaper in

25

26   ─────────────────────
     [15] *Cf.* Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1821b (4th ed. 2024) (noting that
27   "in *Tampa Electric* the Supreme Court measured the competitive harm by examining the larger area
     in which competing coal companies sold their coal, rather than the smaller area served by the public
28   utility that purchased the coal subject to the exclusive-dealing contract").

Chicago, contended that the pattern of exclusive distribution rights violated antitrust laws by depriving smaller papers of access to the "most popular" or "best" content, thereby making it harder for them to compete.  Judge Easterbrook described the plaintiff's claim as "fundamentally an 'essential facilities' claim–but without any essential facility" because multiple alternative sources of content existed, rendering each one non-essential.  *Paddock*, 103 F.3d at 44–45.  In other words, "a newspaper deprived of access to the *New York Times* crosswords puzzles can find others, even if the *Times* has the best known one." *Id.* ("[E]xclusive [content] help[s] the newspapers differentiate themselves, the better to compete with one another.  A market in which every newspaper carried the same [content] would be a less vigorous market than the existing one.  And a market in which the creators of intellectual property . . . could not decide how best to market it for maximum profit would be a market with less (or less interesting) intellectual property created in the first place.").

The same logic applies here.  As in *Paddock*, LyricFind's claims that access to WCM's catalog is required "to offer a viable lyrical catalog," Compl. ¶ 70, are implausible.  The existence of numerous competing copyright holders "not only means that none is an 'essential facility' but also means that each of [them] is entitled to sign an exclusive contract with a favored user." *Paddock*, 103 F.3d at 45.  LyricFind thus cannot plead the requisite substantial foreclosure.

### 3.      The Complaint Concedes That DSPs Can and Do Source Lyric Rights and Services from Multiple Providers

LyricFind's allegations are further undermined by its concession that DSPs can and do source lyric licenses and data services from multiple providers, because that concession confirms that LyricFind can still compete to provide licenses and data services for other publishers' catalogs to DSPs.  *See, e.g.*, Compl. ¶ 68.  LyricFind admits that Amazon, Google, and YouTube Music source lyrics from both Musixmatch and LyricFind, and that they have continued to do so in the year since the WCM/Musixmatch agreement was signed.  LyricFind thus remains able to compete to license and fulfill DSPs' lyric data needs for other publishers' content, which, by LyricFind's own admission, accounts for anywhere between 70% and 88% of the music publishing business.  LyricFind's allegation that Amazon, Google, and YouTube are the only customers with the "vast"

1   technical and financial resources necessary to multisource is dubious, as the Complaint itself

2   acknowledges that other DSPs include technology and streaming giants like Apple, Meta, and

3   Spotify. Any or all of them could do what Amazon, Google, and YouTube do—namely, source lyric

4   licenses and related data services from multiple providers for access to the broadest set of lyrics.

5   Stated another way, any or all of these customers could source lyric rights and services for WCM's

6   catalog from Musixmatch, but turn to LyricFind for lyric content and services for other publishers'

7   catalogs. LyricFind need only offer a compelling product. Though LyricFind claims that

8   "Musixmatch can now force DSPs that use other or multiple lyric providers—or might wish to do so

9   in the future—to forego those relationships, and work exclusively with Musixmatch, as a condition

10  of receiving WCM-controlled lyrics," *id.* ¶ 154, it notably does not allege that such coercion has

11  occurred over the past year. Such hypotheticals that are inconsistent with market realities cannot

12  sustain a claim for relief. *See Iqbal*, 556 U.S. at 678–79.

13      Underneath the self-serving but conclusory claims of impact on competition, LyricFind's real

14  grievance here is that it lost the competition for an agreement to sublicense and service WCM's

15  intellectual property. *See Paddock*, 103 F.3d at 45 ("Competition-for-the-contract is a form of

16  competition that antitrust laws protect rather than proscribe, and it is common."). LyricFind does

17  not allege that it was barred from seeking an exclusive arrangement with WCM, or that it is unable

18  to negotiate for exclusive or non-exclusive rights for the remaining 88% of the music publishing

19  market. Rather than petition this Court for competitive advantage, LyricFind "'need only offer a

20  better product or a better deal' to reverse, and possibly wield, exclusivity." *In re EpiPen*, 44 F.4th

21  at 989 (citation omitted); *see also Paddock*, 103 F.3d at 47 ("The [plaintiff] has never tried to make

22  a better offer, and we conclude that it has come to the wrong forum. It should try to outbid [its rivals]

23  in the marketplace, rather than to outmaneuver them in court.").

24      Because LyricFind has not plausibly pled facts showing foreclosure from a significant share

25  of any relevant market for a competitively significant amount of time, counts 1 through 10 should be

26  dismissed.

27

28

E.    **LyricFind Does Not Plausibly Allege that Musixmatch Has Market or Monopoly Power in Any Relevant Market (Counts 1, 2, 3, 5, 6, 8, 9, and 10)**

LyricFind's antitrust claims also must be dismissed for failure to plausibly allege that Musixmatch has (or is dangerously close to achieving) monopoly or market power in any relevant market. LyricFind's Sherman Act Section 1, Clayton Act Section 3, and Cartwright Act claims (Counts 1, 8, and 9) require plausible allegations that Musixmatch has "market power" in a properly defined "relevant market." LyricFind's monopolization claim (Count 2) requires even more—actual "monopoly power." Finally, LyricFind's "attempted monopolization" and "monopoly leveraging" claims (Counts 3, 5, and 6) must plausibly allege a "dangerous probability" that Musixmatch will achieve "monopoly power" in a relevant market. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). And to the extent LyricFind's California Unfair Competition Law claim (Count 10) is premised on an alleged antitrust violation, that claim fails for the same reason.

LyricFind has failed to meet any of these requirements because (1) its alleged market definitions are defective and (2) its power allegations are implausible and internally contradictory.

1.    **LyricFind Has Not Plausibly Alleged a Relevant Market**

LyricFind's market and monopoly power allegations are deficient in the first instance because the Complaint fails to define a proper relevant market. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). The Complaint purports to define two relevant markets:

> (1) a market for Lyric Data Services, which refers to (i) "a transcription of the lyrics in the form of digital files," and (ii) "the ability to administer royalty payments to the holders of the lyric rights," Compl. ¶ 2; and

> (2) a market for Lyric Rights Licensing, which refers to a "license conveying the rights to display the lyrics," *id.*, and purportedly includes a "submarket" for the sublicensing of Lyric Rights from lyric service providers, *id.* ¶ 76.

These purported market definitions are insufficient: An antitrust plaintiff must "identify the economic substitutes for the product markets" and "plead any facts regarding the cross-elasticity of demand." *NSS Labs, Inc. v. Symantec Corp.*, No. 18-cv-05711, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims for improper market definition). LyricFind has not done so, and indeed makes no attempt to define the outer boundaries of its alleged product markets. *See*

25

*Honey Bum, LLC v. Fashion Nova, Inc.*, No. 20-cv-11233, 2021 WL 4205618, at \*6 (C.D. Cal. Mar. 26, 2021) ("[Plaintiff's] failure to address the rule of reasonable interchangeability . . . renders [its] alleged relevant market legally insufficient.").  For instance, LyricFind does not explain why DSPs could not turn to other transcription or royalty administration solutions (or even artificial intelligence) in the face of a potential future monopoly.  *See, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1158–59 (N.D. Cal. 2004) (rejecting definition of market that excluded outsourcing to third-parties and "mid-market" software that could enter the segment).  Instead, LyricFind conclusorily asserts that "[g]iven a small but substantial, non-transitory increase in . . . price . . . within the [defined (sub-)markets] actual and prospective customers would not substitute to a different service without the necessary characteristics." Compl. ¶¶ 82, 87.  Without plausible factual allegations showing what those "necessary characteristics" are, this conclusory recitation of the hypothetical monopolist test is insufficient.  *See Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, No. 08-cv-00513, 2009 WL 2596493, at \*7 (D. Colo. Aug. 21, 2009) (dismissing Section 1 and Section 2 claims for failure to properly allege the relevant market where plaintiff failed to "provide any firm allegations of the factors necessary to evaluate the market"); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010) (granting motion to dismiss monopolization claims because of "vague and conclusory" market allegations).

LyricFind's purported "submarket" for Lyric Rights Sublicensing is even more flawed.  LyricFind concedes that DSPs can obtain lyric rights directly from publishers and other rights owners/administrators or indirectly from rights aggregators and sublicensors like LyricFind and Musixmatch.  *See* Compl. ¶¶ 77–78.  LyricFind does not and cannot allege that there is any meaningful difference between the rights conferred by a lyric license and those conferred by a lyric sublicense.  The two are exact substitutes and belong in the same market.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (alleged submarket must be economically distinct from the general product market); *see also United States v. U.S. Sugar Corp.*, No. 21-1644, 2022 WL 4544025 (D. Del. Sept. 28, 2022) (refiners and distributors found to belong in the same product market where they supplied the same product); *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 756

26

1    (N.D. Cal. 2020) (rejecting alleged "diesel passenger vehicles" submarket because not meaningfully

2    distinct from other passenger vehicles), *aff'd sub nom. Audubon Imports, LLC v. Bayerische Motoren*

3    *Werke Aktiengesellschaft (In re German Auto. Mfrs. Antitrust Litig.)*, No. 20-17139, 2021 WL

4    4958987 (9th Cir. Oct. 26, 2021).

5                          **2.    LyricFind Has Not Plausibly Alleged Monopoly or Market Power**

6         LyricFind's antitrust claims also fail because its allegations about Musixmatch's purported

7    monopoly or market "power" are insufficient.  This power can be pled directly, with evidence of

8    restricted output or supracompetitive prices, or indirectly, with evidence of market share and barriers

9    to entry.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also*

10   *Microsoft Corp.*, 253 F.3d at 51 (direct proof of market power is "only rarely available"); *Mylan*

11   *Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016) (same).  "[A]

12   showing of market share is one of the requirements for a circumstantial showing of market power."

13   *W. Parcel Express*, 65 F. Supp. 2d at 1060–61.  "Market share data must reflect the actual

14   circumstances in a relevant market and must not be extrapolated from separate or parallel markets."

15   *Id.* at 1061.  LyricFind fails to state market and monopoly power allegations adequately grounded

16   in the circumstances and dynamics of either of its two alleged markets, as explained below.

17        ***Lyric Rights Licensing.***   LyricFind's claim that Musixmatch has market power or a

18   "dangerous probability" of obtaining "monopoly power" in the so-called "Lyric Rights Licensing"

19   market is flawed at the outset.  Compl. ¶¶ 80, 162, 196.  For one, LyricFind's only allegations of

20   *direct evidence* of "market power" are offhand, wholly conclusory suggestions that Musixmatch has

21   the ability to raise prices to supracompetitive levels *in the future.  See* Compl. ¶ 140 ("Musixmatch

22   will be free to raise prices . . . to supracompetitive levels."); *id.* ¶ 172 ("By reducing overall market

23   output . . . , Musixmatch has been able, and will continue to be able, to keep prices above what they

24   would be in a competitive market.").[16]  LyricFind does not specify when or what type of output is

25   restricted; there are, for example, no allegations in the Complaint that fewer licenses or fewer lyrics

26

27   _____

     [16] LyricFind has not made any non-conclusory allegation, nor could it consistent with Rule 11, that
28   the cost of services to consumers will or could increase as a result of Musixmatch's alleged market
     power.

                                              27

1    or fewer relevant services will be available to DSPs or end users.  LyricFind's mere recitation of

2    buzzwords cannot sustain any inference of market—let alone monopoly—power.  *See also Forsyth*

3    *v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (allegations that alleged monopolist charged

4    higher prices and earned higher profits than competitors fails to present direct evidence of market

5    power), *aff'd*, 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa County*,

6    693 F.3d 896 (9th Cir. 2012).

7         LyricFind's allegations of *indirect evidence* of market power in the Lyric Rights Licensing

8    market fare no better.  *First*, any "market power" in that alleged market belongs to songwriters and

9    music publishers *who created and own the intellectual property*—not to their mere agent,

10   Musixmatch.  *See, e.g.*, *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236–37

11   (5th Cir. 1996) ("Economic power derived from contractual agreements such as [licenses] . . . 'has

12   nothing to do with market power, ultimate consumers' welfare, or antitrust.') (citation omitted)).

13   Absent ultimate control over the lyrics copyrights, any power Musixmatch wields is entirely

14   derivative of the power conferred on the ultimate licensors by the intellectual property regime.  *See*

15   *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) ("Market share

16   indicates market power only when [they] reflect control of the productive assets . . . , for only then

17   does it reflect an ability to curtail total market output.").

18        *Second*, LyricFind concedes that direct licensing (i.e., licensing by the publishers rather than

19   by lyric service providers like Musixmatch or LyricFind) accounts for a majority of lyrics rights

20   licensing.  *See* Compl. ¶ 80; *see also id.* ¶ 65 ("[M]any DSPs, including many of the largest DSPs,

21   do not need a provider's help to license lyrics from major publishers because they obtain their own

22   direct licenses from them.").  This concession is fatal:  music publishers like WCM not only control

23   the intellectual property, but they can and do directly license that intellectual property to DSPs on

24   their own when it suits them.  There is no plausible probability that one of these publishers' agents,

25   Musixmatch, will obtain market or monopoly power in such a licensing market.  *See Ind. Grocery*,

26   864 F.2d at 1414 (where defendant did not control the productive assets, it would never be able to

27   "come close to having the ability to control total market output and prices").

28

1    Apparently aware of this deficiency, LyricFind tries to concoct "monopoly power" by

2    defining an idiosyncratic sublicensing "submarket" comprised solely of lyric service providers like

3    Musixmatch and LyricFind.  This allows LyricFind to inflate Musixmatch's alleged share of revenue

4    to an artificial 66%.  Compl. ¶ 80.  But that move fails:  LyricFind concedes that the lyric rights that

5    music publishers directly license are identical to the lyric rights that Musixmatch or LyricFind

6    sublicense.  *See id.* ¶ 53.  There is no plausible basis to assert that such direct—identical no less—

7    substitutes, wholly under the control of the publishers, could constitute a separate submarket.  *See In*

8    *re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d at 756 (rejecting alleged "diesel passenger

9    vehicles" submarket because not meaningfully distinct from other passenger vehicles).

10    **Lyric Data Services.**  LyricFind's allegations of Musixmatch's actual or potential power in

11    the purported "Lyric Data Services" market are likewise based on flawed metrics and lack

12    plausibility.  As with the alleged Lyric Rights Licensing market, nothing in the Complaint plausibly

13    constitutes *direct evidence* of restricted output or supracompetitive prices in the Lyric Data Services

14    market.    Likewise, LyricFind's allegations of *indirect evidence*—that Musixmatch has

15    "approximately 80%" of the Lyric Data Services market because it provides services to

16    "approximately 82% of DSPs . . . by streaming revenue,"  Compl. ¶¶ 10, 84, 156—are nonsensical

17    and internally contradictory, for multiple reasons.

18    *First*, LyricFind never explains why the *streaming revenue* of the *customers* is a relevant or

19    appropriate metric by which to measure shares in a market defined to encompass *lyric data services*.

20    The revenue that certain DSP customers derive from their own customers has nothing to do with the

21    revenue Musixmatch or LyricFind earn from supplying lyric data services.   A market power

22    allegation premised on the revenues earned by customers competing in completely unrelated markets

23    is insufficient to state a claim. *See W. Parcel Express*, 65 F. Supp. 2d at 1061 (rejecting 83% share

24    extrapolated from market other than relevant market); *Bristow Endeavor Healthcare, LLC v. Blue*

25    *Cross & Blue Shield Ass'n*, No. 16-cv-0057, 2016 WL 3199520, at *8 (N.D. Okla. June 8, 2016)

26    (dismissing monopolization claim because allegations about shares in the health insurance market

27

28

were irrelevant to the relevant product market of delivery of healthcare services to patients), *aff'd* 691 F. App'x 515 (10th Cir. 2017).

*Second,* LyricFind itself admits elsewhere that "streaming" is just a subset of the potential uses for lyrics and lyric content services. *See* Compl. ¶ 44 ("Music streaming platforms are not the only music service providers that demand lyric-related features.); *see also id.* ¶ 157. This means that revenue is derived from sources well beyond streaming, and revenue from those additional sources is not captured in LyricFind's purported market and market shares, skewing the results.

*Third*, LyricFind's attempt to define market shares in an alleged Lyric Data Services market based on customers' volume or financial metrics ignores the fact that LyricFind has admitted that major customers like Amazon, Google, and YouTube source lyrics from multiple providers. This means that LyricFind's chosen metric double counts significant sources of streaming revenue and results in a total marketplace greater than 100%. Assume, for instance, five streaming platforms, each of which accounts for 20% of streaming revenue. Two platforms use LyricFind services, two use Musixmatch, and one uses both LyricFind and Musixmatch. By LyricFind's logic, LyricFind and Musixmatch each would have 60% of the Lyric Data Services market. That is plainly wrong. Allegations based on such ad hoc statistics are not plausible or sufficient to state a claim.

Because LyricFind fails to plausibly allege monopoly or market power in any relevant market, its antitrust claims must fail.

**F.    LyricFind Fails to Adequately Allege Concerted Action (Counts 1, 4, 7, 8, and 9)**

LyricFind's antitrust claims must also be dismissed because Musixmatch has not engaged, and cannot engage, in the requisite "concerted action" under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), with either TPG or WCM. With respect to Musixmatch's alleged conspiracy with TPG, LyricFind's allegations that TPG controls Musixmatch are fatal to its claims and require dismissal. Likewise, WCM's unilateral delegation of sublicensing authority and lyric data services to Musixmatch does not constitute "concerted action" because the parties' economic interests are wholly aligned. *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 282 (4th Cir. 2002) (holding that "concerted activity . . . is activity in which multiple parties

join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)").  Accordingly, all of LyricFind's counts premised on agreements or "conspiracies" between Musixmatch and TPG or WCM (Counts 1, 4, 7, 8 and 9) should be dismissed.

### 1.     Musixmatch Is Incapable of Conspiring with TPG

As an initial matter, LyricFind's claims asserting an agreement or conspiracy between Musixmatch and TPG (Counts 1, 4, 7, 8 and 9) should be dismissed under *Copperweld*.  Section 1 and Section 2 conspiracy claims require "concerted action" between two "separate economic actors pursuing separate economic interests."  *Copperweld*, 467 U.S. at 768–69; *see also Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 430 (N.D. Cal. 1992) (applying *Copperweld* Section 1 analysis to Section 2 conspiracy claims).  LyricFind admits that TPG "owns a controlling stake in Musixmatch."  Compl. ¶¶ 32, 115.  That allegation is fatal to its conspiracy claims with respect to TPG: under *Copperweld*, an investor and its majority-owned portfolio company cannot "conspire" with one another.  467 U.S. 771 ("[A] parent and its wholly owned subsidiary must be viewed as . . . a single enterprise for purposes of § 1 of the Sherman Act."); *see also Top Rank, Inc. v. Haymon*, No. CV 15-4961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) (applying *Copperweld* to relationship between investor and portfolio company).  TPG and Musixmatch are not "separate economic actors pursuing separate economic interests" and cannot conspire with one another.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (citation omitted).  LyricFind's attempt to plead a conspiracy claim between Musixmatch and TPG in the face of these precedents thus fails.

### 2.     The WCM/Musixmatch License Agreement Is Not "Concerted Action" Under the Antitrust Laws

*Copperweld*'s reasoning likewise compels dismissal of claims premised on a conspiracy between WCM and Musixmatch (Counts 1, 4, 7, 8 and 9).  LyricFind does not allege that Musixmatch and WCM are pursuing separate economic interests, or that Musixmatch and WCM "were either actual or potential competitors." *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005).  Rather, WCM's decision to appoint Musixmatch

31

as the exclusive sublicensor and distributor of WCM's intellectual property reflects unilateral conduct in pursuit of a single, unified purpose:  maximizing royalties from the licensing and distribution of WCM's lyrics.

This Court and others in the Circuit have previously dismissed claims involving very similar relationships.  In *Levi Case Co.*, this Court held that a patent holder and its exclusive licensee were incapable of conspiring for purposes of Sherman Act Section 1, reasoning that "no agreement between [a patent holder and an exclusive licensee] involving the exploitation of the patent in which they both held an interest can be considered to deprive the marketplace of 'independent sources of economic power previously pursuing separate interests.'"  788 F. Supp. at 432 (citation omitted).  The recent decision in *In re Pandora Media, LLC*, No. 22-cv-00809, 2023 WL 6370884, at *7–8 (C.D. Cal. Apr. 5, 2023), is even more on point:  There the district court rejected antitrust claims brought by a streaming service against licensing organizations and popular comedians who had contracted with the organizations to exclusively manage the rights to their performances.  The Court recognized that the alleged exclusive agreements did not "deprive the marketplace of independent sources of economic power previously pursuing separate interests"; accordingly, the "'exclusive license' shows a degree of economic unity such that [the rights administrators] and their [members] 'could not compete' in the [relevant] market."  *Id.* (citation omitted).  The court concluded that plaintiff alleged "a principal-agent relationship that cannot form the basis of an agreement to restrain trade in violation of section 1."  *Id.*

The same logic applies here:  WCM and Musixmatch are not, and never have been, competitors.  As WCM's agent, Musixmatch is compelled to act in WCM's interests in sublicensing its lyric rights.  Nothing in the Complaint suggests that WCM's delegation of this authority to Musixmatch deprived the marketplace of an independent source of economic power pursuing separate interests.  LyricFind's related conspiracy and exclusive dealing claims should thus be dismissed.

1

2

**G.    LyricFind Fails to Plead Specific Intent to Monopolize on the Part of Each Alleged Co-Conspirator (Counts 4 and 7)**

3

LyricFind's conspiracy to monopolize claims (Counts 4 and 7) suffer from an additional

4

dispositive flaw: LyricFind does not allege that WCM, Musixmatch's purported "co-conspirator,"

5

shared a "specific intent to monopolize" the alleged markets. *Deborah Heart & Lung Ctr. v. Penn*

6

*Presbyterian Med. Ctr.*, No. 11-1290, 2011 WL 6935276, at *10 (D.N.J. Dec. 30, 2011) ("[The]

7

specific intent to monopolize . . . must be shared by all the conspirators."); *see also In re Microsoft*

8

*Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 733 (D. Md. 2001) (same).

9

LyricFind's Complaint repeatedly casts WCM as the "co-conspirator" of Musixmatch and

10

TPG, Compl. ¶¶ 22, 178, 202, 226 ("TPG, Musixmatch, and WCM conspired to effectuate the

11

WCM-Musixmatch Exclusive and surrounding scheme.").  But it conspicuously omits averring that

12

WCM specifically intended that Musixmatch monopolize the alleged antitrust markets.  Mere

13

conclusions that WCM reached an agreement with Musixmatch are not enough: "specific intent"

14

"signifies something more than willing, voluntary, and knowing participation in the illegal course of

15

conduct." *Microsoft*, 127 F. Supp. 2d at 731.  It means an alleged co-conspirator "participat[ed] in

16

that course of conduct for the specific, *shared purpose*" of creating or maintaining a co-conspirator's

17

monopoly.  *Id.* (emphasis added).

18

Here, the Complaint says nothing about any WCM "shared purpose" with Musixmatch, nor

19

does it explain how WCM would benefit from or have an incentive to help Musixmatch achieve a

20

monopoly in the alleged markets.  LyricFind has thus not plausibly alleged WCM's specific intent

21

to assist Musixmatch in the purported conspiracy, and the conspiracy to monopolize claims should

22

therefore be dismissed.

23

**H.    Monopoly Leveraging Is Not an Independent Theory of Section 2 Liability (Count 5)**

24

LyricFind's monopoly leveraging claim (Count 5) fails for an additional reason: the Ninth

25

Circuit has squarely "reject[ed] [the doctrine] as an independent theory of liability under Section 2."

26

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991).  To the extent

27

LyricFind alleges that Musixmatch sought to use its alleged monopoly power in the market for Lyric

28

33

Data Services to monopolize the Lyric Rights Licensing market, *see* Compl. ¶¶ 208 *et seq.*, the claim is properly construed as one of attempted monopolization and requires proof of all of the elements of that offense, *see Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 951–52 (9th Cir. 1996); *Tevra Brands, LLC v. Elanco Animal Health Inc.*, No. 24-cv-04683, 2025 WL 964694, at *16 (N.D. Cal. Mar. 31, 2025) (dismissing leveraging claims where plaintiff failed to allege sufficient facts to support each element of an attempted monopolization claim). Because LyricFind has failed to plead a valid attempted monopolization claim, its monopoly leverage claim must also be dismissed.

### I.  Section 3 of the Clayton Act Does Not Apply to Licensing or Services Agreements (Count 8)

LyricFind's claim under Section 3 of the Clayton Act, 15 U.S.C. § 14 (Count 8) also fails because that statute "applies only to tangible goods or commodities." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-2102, 2013 WL 3936394, at *5 (C.D. Cal. July 30, 2013). LyricFind's Section 3 claim challenges an agreement to *license* WCM's intellectual property and provide lyric data *services*. *See* Compl. ¶ 134. As the leading treatise explains, services and "[l]icensing agreements covering intellectual property rights are not covered by §3 of the Clayton Act." Areeda & Hovenkamp, *supra* ¶ 1803e. Likewise, "[i]t is well-established that section 3 does not apply to services." *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1372 (9th Cir. 1983). Count 8 should accordingly be dismissed.

### III.  <u>LYRICFIND FAILS TO PLEAD ANY VALID STATE LAW CLAIMS</u>

#### A.  The Complaint Fails to State a Claim under California's Cartwright Act or Unfair Competition Law (Counts 9 and 10)

LyricFind's claims under California's Cartwright Act and Unfair Competition Law (Counts 9 and 10) fail for the same reasons the federal antitrust claims do. Because the Cartwright Act, Cal. Bus. & Prof. Code § 16720, "mirrors" the Sherman Act, claims under the two statutes "rise and fall together." *See, e.g.*, *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (affirming dismissal of Cartwright Act claim for same reasons as Sherman Act claim); *Sabol v. PayPal Holdings, Inc.*, No. 23-cv-05100, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024);

34

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) (affirming dismissal of Cartwright Act claims "[b]ecause the analysis under the Cartwright Act is identical to that under the Sherman Act" (citation omitted)).  Thus, for the reasons outlined in Sections II.C–F *supra*, LyricFind has failed to state a claim under the Cartwright Act.

Likewise, LyricFind's Unfair Competition Law ("UCL") claim is derivative of the Cartwright Act claim and fails for the same reasons.  The UCL prohibits "unlawful, unfair or fraudulent" conduct or practices.  Cal. Bus. & Prof. Code § 17200.  As a threshold matter, LyricFind lacks standing to bring a UCL claim because it cannot establish that its alleged economic injury was "caused by" the alleged violation.  *See HomeLight, Inc. v. Shkipin*, 721 F. Supp. 3d 1019, 1024 (N.D. Cal. 2024) (noting that standing to bring UCL claims is limited to plaintiffs who suffered economic injury caused by the UCL violation).  As discussed in connection with LyricFind's lack of antitrust standing, *see supra* Section II.C, LyricFind's alleged economic injury cannot fairly be traced to any unfair conduct by Musixmatch, but is instead the direct result of WCM's lawful licensing decision.  LyricFind therefore cannot establish causation for purposes of UCL standing.

In any event, LyricFind fails to plausibly plead a UCL violation under both the "unlawful" and "unfair" prongs.  *See* Compl. ¶ 246 (alleging "unlawful and unfair" acts).  LyricFind does not plausibly allege a predicate antitrust violation, and cannot rescue its antitrust claims by simply recasting them as "unfair" acts under the UCL.  *See In re Dynamic Random Access Memory Indirect Purchaser Litig.*, No. 18-cv-2518, 2020 WL 8459279, at *11 (N.D. Cal. Nov. 24, 2020) (dismissing "unlawful" UCL claim "for lack of a predicate violation of a separate statute"); *Sabol*, 2024 WL 3924686, at *4 (granting motion to dismiss, finding that plaintiffs failed to state a claim under the "unlawful" prong of the UCL where they failed to allege a predicate antitrust violation); *see also HomeLight, Inc.*, 721 F. Supp. 3d at 1025 (dismissing UCL claim under the "unfair" prong because it was "based on the same alleged conduct underlying the dismissed unlawful [claim]").  Counts 9 and 10 should therefore be dismissed.

35

**B.**      **The Complaint Fails to State a Claim for Interference (Intentional or Negligent) with Prospective Economic Advantage (Counts 11 and 12)**

LyricFind's claims for intentional and negligent inference with prospective economic advantage (Counts 11 and 12) also fail because LyricFind alleges neither an actual disruption of LyricFind's economic relationship nor resulting economic harm.   California law imposes a demanding five-element test for intentional interference with prospective economic advantage.[17] Negligent interference further requires a showing of a duty of care owed by the defendant to the plaintiff.[18]   Central to both torts—and fatal to LyricFind's claims—are the requirements that (1) Musixmatch's conduct "actual[ly] disrupt[ed]" the identified economic relationship and (2) LyricFind suffered "economic harm . . . proximately caused by" Musixmatch's actions. *E & E Co. v. Kam Hing Enters., Inc.*, No. C-08-871, 2008 WL 4962991, at *3 (N.D. Cal. Nov. 19, 2008) (citation omitted).

By LyricFind's own admission, neither of these requirements are met.   LyricFind claims in conclusory fashion that the WCM/Musixmatch agreement interfered with its prospective commercial relationships with Spotify and iHeartRadio.   *See* Compl. ¶¶ 257, 265.   Significantly, LyricFind concedes that Musixmatch's alleged disclosure of confidential information "failed to stop LyricFind's negotiations with Spotify."  Compl. ¶ 131; *see also id.* ¶¶ 21, 106, 130 (acknowledging that Spotify continued to negotiate after the alleged disclosures).   LyricFind's relationship with Spotify thus was not disrupted by the disclosures, nor did the disclosure "proximately cause" LyricFind's loss of the Spotify contract.   LyricFind's interference claims should accordingly

---

[17] *See Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064, 1066–67 (N.D. Cal. 2005) (a claim of intentional interference with prospective economic advantage requires "(1) an economic relationship between the plaintiff and third party containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, and (5) damages to the plaintiff proximately caused by the acts of the defendant").

[18] *See AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) ("To state a claim for negligent interference with economic advantage, plaintiff must allege defendant owed plaintiff a duty of care in addition to the elements required to state a cause of action for intentional interference with economic advantage." (citing *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803–04 (1979)).

36

1    be dismissed. *See, e.g., Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-04519, 2014 WL 93976,

2    at *3–4 (N.D. Cal. Jan. 9, 2014) (dismissing intentional and negligent interference claims where

3    complaint did not plead that defendants' conduct actually disrupted an economic relationship).

4        Moreover, intentional or negligent interference claims require allegations of conduct that is

5    "wrongful by some measure beyond the fact of the interference itself." *E & E Co.*, 2008 WL

6    4962991, at *3 (citation omitted) ("[A]n act is independently wrongful if it is unlawful." (alteration

7    in original)). Here, LyricFind has not plausibly alleged any independently wrongful conduct, *see*

8    *supra* Section II. This means that its interference with prospective advantage claims, which are

9    premised on the same agreement, must also be dismissed. *See id.* at *4 (dismissing interference

10   claim where plaintiff failed to adequately allege a claim for defamation, "and thus has likewise failed

11   to allege an independently wrongful act as required"); *AccuImage Diagnostics Corp v. Terarecon,*

12   *Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) (dismissing interference claims alongside underlying

13   Lanham Act claims).

14       Count 12 fails for additional reasons unique to negligent interference claims: LyricFind fails

15   to allege either (1) a duty of care running to it from Musixmatch or (2) negligent—not intentional—

16   conduct. *See J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803–04 (1979); *AccuImage*, 260 F. Supp. 2d

17   at 957 (no duty of care between competitors).

18       **C.    The Complaint Fails to State a Claim for Breach of Contract (Count 13)**

19       LyricFind has not adequately stated a breach of contract claim. Not only do its vague claims

20   about purported disclosures of confidential information fail to raise its entitlement to relief above a

21   speculative level, but LyricFind concedes that the alleged breach did not cause its purported

22   economic damage.

23       LyricFind stumbles first at the Rule 8 threshold because its vague claims about violation of a

24   non-disclosure agreement fail to meet basic pleading standards. LyricFind does not explain what

25   purportedly "confidential" information was improperly disclosed, and it fails to put forth any

26   well-pleaded facts that would allow either Musixmatch or this Court to discern the boundaries of the

27   purported violation. *Cf. Space Data Corp. v. X*, No. 16-cv-03260, 2017 WL 5013363, at *2

28

37

1  (N.D. Cal. Feb. 16, 2017) (dismissing claims in action alleging trade secret misappropriation, finding

2  that high-level overview of the purported trade secrets and allegations of improper use, with no

3  factual allegations about their nature and how their use violated the non-disclosure obligations, did

4  not satisfy Rule 8).

5         Additionally, LyricFind fails to carry its pleading burden with respect to damages.  A cause

6  of action for breach of contract exists only where the plaintiff can plead and ultimately prove

7  "appreciable and actual damage" that was proximately caused by the defendant's breach.  California

8  law is unequivocal that "a breach of contract without damage is not actionable." *Aguilera v. Pirelli*

9  *Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (quoting *Pat. Scaffolding Co. v. William*

10 *Simpson Constr. Co.*, 256 Cal. App. 2d 506, 511 (1967)); *see also Low v. LinkedIn Corp.*,

11 900 F. Supp. 2d 1010, 1028 (N.D. Cal. 2012).[19]  The pleading burden is therefore two-fold: the

12 plaintiff must allege not only that it suffered an injury that is appreciable and actual, but must also

13 plead factual matter showing that the injury was caused by the defendant's purported breach.  The

14 Complaint fails on both fronts.  LyricFind at most asserts that, as a result of Musixmatch's alleged

15 disclosure of its confidential information, it lost the opportunity to partner with Spotify.  But it

16 separately admits that Spotify was undeterred by Musixmatch's alleged breach and that "discussions

17 between Spotify and LyricFind continued notwithstanding [the alleged] wrongful disclosures."

18 Compl. ¶ 21; *see id.* ¶¶ 106, 130.  That admission is dispositive.  The alleged breach did not cause

19 Spotify to terminate its negotiations with LyricFind, and therefore was not the cause of LyricFind's

20 loss of the Spotify contract.

21        Because LyricFind's own allegations defeat the causal link required to state a breach of

22 contract claim, Count 13 must be dismissed.

23

24 ────────────────

25 [19] California and Ontario law are in accord on this issue.  *See, e.g.*, *Wallace Sales & Consulting, LLC v. Tuopo N. Am., Ltd.*, No. 2:15-cv-10748, 2015 WL 4509349, at *3 (E.D. Mich. July 24, 2015)

26 ("Under Ontario law, a viable breach of contract claim requires 'the particulars of the alleged contract including the terms, the nature of the alleged breach, causation and damages that are alleged to have

27 flowed from the breach.'" (citation ommitted)); *Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*, No. 13-cv-00297, 2019 WL 3767510, at *4 (D. Conn. Aug. 9, 2019) (same); *Am. Pan Co. v.*

28 *Lockwood Mfg., Inc.*, No. C-3-06-197, 2008 WL 471685, at *6 (S.D. Ohio Feb. 15, 2008) (same).

38

1

## CONCLUSION

2      LyricFind's claims are a textbook example of a disappointed competitor seeking to use the

3  courts to achieve what it could not in the marketplace. But LyricFind, a foreign plaintiff, has neither

4  the right to hale Musixmatch, a foreign defendant, before California courts, nor has it pled any

5  plausible claims that would entitle it to any relief.

6      For the foregoing reasons, the Court should dismiss LyricFind's Complaint against

7  Musixmatch with prejudice.

8

9  Dated: June 5, 2025                          Respectfully submitted,

10                                              */s/ Matthew L. McGinnis*
                                                Matthew L. McGinnis (admitted *pro hac vice*)
11                                              matthew.mcginnis@ropesgray.com
                                                ROPES & GRAY LLP
12                                              Prudential Tower
                                                800 Boylston Street
13                                              Boston, MA 02199
                                                T: (617) 951-7000
14                                              F: (617) 951-7050

15
                                                Rocky C. Tsai (Cal. Bar No. 221452)
16                                              rocky.tsai@ropesgray.com
                                                ROPES & GRAY LLP
17                                              Three Embarcadero Center
                                                San Francisco, CA 94111
18                                              T: (415) 315-6300
                                                F: (415) 315-6350
19

20                                              David A. Young (admitted *pro hac vice*)
                                                david.young@ropesgray.com
21                                              Adam R. Safadi (admitted *pro hac vice*)
                                                adam.safadi@ropesgray.com
22                                              ROPES & GRAY LLP
                                                2099 Pennsylvania Avenue NW
23                                              Washington, DC 20006
                                                T: (202) 508-4600
24                                              F: (202) 508-4650
25

26                                              *Attorneys for Defendant Musixmatch S.p.A.*

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on June 5, 2025, the foregoing was filed through the Court's electronic filing system, which will send electronic notice of this filing to all counsel of record.


*/s/ Matthew L. McGinnis*
Matthew L. McGinnis (admitted *pro hac vice*)

*Attorney for Defendant Musixmatch S.p.A.*