Kellie Lerner (*pro hac vice*)
Ben Steinberg (*pro hac vice*)
Lily Fagin (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
(646) 960-8601
kellie@scl-llp.com
benjamin@scl-llp.com
lfagin@scl-llp.com

Brian D. Caplan
Julie Wlodinguer (*pro hac vice*)
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
(212) 209-3050
bcaplan@reitlerlaw.com
jwlodinguer@reitlerlaw.com

David C. Brownstein (SBN: 141929)
**FARMER BROWNSTEIN JAEGER GOLSTEIN KLEIN & SIEGEL LLP**
155 Montgomery Street, Suite 301
San Francisco, CA 94104
(415) 962-2873
dbrownstein@fbjgk.com

*Attorneys for Plaintiff LyricFind, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| LYRICFIND, INC.,<br><br>                         Plaintiff,<br><br>    v.<br><br>MUSIXMATCH S.P.A. and TPG GLOBAL, LLC,<br><br>                     Defendants. | Case No. 3:25-cv-02265-JSC<br><br>**PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6)**<br><br>Hon. Jacqueline Scott Corley<br><br>Hearing Date: August 21, 2025<br><br>Time: 10:00 AM |

## <u>TABLE OF CONTENTS</u>

**MEMORANDUM OF POINTS AND AUTHORITIES** ...........................................................1

**STATEMENT OF ISSUES TO BE DECIDED** ....................................................................1

**PRELIMINARY STATEMENT** ......................................................................................1

**STATEMENT OF FACTS** ............................................................................................3

**ARGUMENT** ............................................................................................................5

I.     Legal Standard ................................................................................................5

II.    The Court May Exercise Specific Personal Jurisdiction over Musixmatch .........................6

    1.     Musixmatch Purposefully Directed Anticompetitive Conduct at the United States and California. ........................................................................8

    2.     Musixmatch Purposefully Availed Itself to this Forum. ....................................10

    3.     LyricFind's Claims Stem from Musixmatch's Forum-Related Conduct ..................12

    4.     Exercising Jurisdiction Over Musixmatch Is Fair and Reasonable. .........................13

    5.     The Court Has Pendent Personal Jurisdiction Over the State Law Claims. ................14

    6.     Alternatively, LyricFind is Entitled to Jurisdictional Discovery ...........................14

III.   LyricFind Has Antitrust Standing and Suffered Antitrust Injury ......................................14

IV.    Musixmatch's Exclusivity Arrangement Unlawfully Restrains Trade ................................17

    1.     Musixmatch's Exclusivity is Sufficiently Durable ...........................................18

    2.     Musixmatch Has Foreclosed a Substantial Share of the Relevant Markets ..............21

    3.     Copyright Law Does Not Shield Musixmatch from Antitrust Liability ...................24

V.     Musixmatch Has Monopoly and Market Power in the Relevant Markets ............................26

    1.     LyricFind Has Properly Defined the Relevant Markets......................................26

    2.     LyricFind Has Plausibly Alleged Direct and Indirect Evidence of Musixmatch's Monopoly and Market Power .................................................29

VI.    Musixmatch Engaged in Concerted Action with WCM .......................................33

VII.   LyricFind Has Properly Alleged WCM's Intent to Monopolize........................................35

VIII.  LyricFind States a Claim for Monopoly Leveraging .......................................36

IX.    Musixmatch Violated California's Cartwright Act and Unfair Competition Law................37

X.     Musixmatch Interfered with LyricFind's Prospective Economic Advantage ......................37

XI.    Musixmatch Breached Its Non-Disclosure Agreement with LyricFind................................39

XII.    LyricFind Withdraws Its Claims Under Section 3 of the Clayton Act ................................40

**CONCLUSION**...................................................................................................................40

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(S)**

*10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 266 (D. Del. 2023)....................................45

*AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*,
   No. 19-CV-04789-PJH, 2020 U.S. Dist. LEXIS56328 (N.D. Cal. Mar. 31, 2020).......................13

*Accuimage Diagnostics Corp. v. Terarecon, Inc.*,
   260 F. Supp. 2d 941 (N.D. Cal. 2003..........................................................................................38

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*,
   368 F.3d 1174 (9th Cir. 2004)..........................................................................................6, 7, 14

*AirWair International Ltd. v. Schultz*,
   73 F. Supp. 3d 1225 (N.D. Cal. 2014) ........................................................................................14

*Alexis v. Rogers*,
   No. 15-cv-691, 2016 U.S. Dist. LEXIS 47031(S.D. C al. Feb. 26, 2016)....................................11

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010)......................................................................................................22

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999 ............................15

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)....................................................................................................................34

*Am. Spirit & Cheer Essentials Inc. v. Varsity Brands, LLC*,
   No. 2:20-cv-02782-SHL-tmp, 2022 U.S. Dist. LEXIS 254674 (W.D. Tenn. Mar. 30, 2022). .......20

*Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996)....................................................................15

*Arcell v. Google LLC*,
   No. 22-cv-02499, 2024 U.S. Dist. LEXIS 45530 (C.D. Cal. Feb. 5, 2024) ...................................25

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*,
   480 U.S. 102 (1987)....................................................................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662, (2009) ....................................................................................................................6

*Ass'n for L.A. Deputy Sheriffs v. City. of Los Angeles*,
   648 F.3d 986 (9th Cir. 2011)........................................................................................................6

*AT & T Co. v. Compagnie Bruxelles Lambert*,
   94 F.3d 586 (9th Cir. 1996)..........................................................................................................6

*Audubon Imports, LLC v. Bayerische Motoren Werke Aktiengesellschaft (In re German Auto. Mfrs. Antitrust Litig.)*, No. 20-17139, 2021 U.S. App. LEXIS 32094 (9th Cir. Oct. 26, 2021 ................ 29

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
    11 F.4th 972 (9th Cir. 2021) ...................................................................................................... 7

*Azzarello v. Navagility*, No. C-08-2371,
    2008 U.S. Dist. LEXIS 117119 (N.D. Cal. Oct. 16, 2008) ........................................................ 12

*Barry Wright Corp. v. Pacific Science Corp.*,
    724 F.2d 227 (1st Cir. 1983) ..................................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................................... 6

*Biddle v. Walt Disney Co.*,
    696 F. Supp. 3d 865 (N.D. Cal. 2023) ................................................................................. 27, 33

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008) ................................................................................................... 11

*Briskin v. Shopify, Inc.*,
    135 F.4th 739 (9th Cir. 2025) ............................................................................. 7, 8, 10, 13, 17

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
    No. 16-cv-0057, 2016 U.S. Dist. LEXIS 74571 (N.D. Okla. June 8, 2016) ................................. 32

*Brown Shoe v. United States*,
    370 U.S. 294 (1962) ............................................................................................................ 27, 29

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .................................................................................................................. 11

*Cal. Steel & Tube v. Kaiser Steel Corp.*,
    650 F.2d 1001 (9th Cir. 1981) ................................................................................................... 36

*Calder v. Jones*,
    465 U.S. 783 (1984) ............................................................................................................. 8, 13

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    973 P.2d 527 (Cal. 1999) ........................................................................................................... 37

*Chaganti v. I2 Phone Int'l Inc.*,
    No. C 04-0987 VRW, 2005 U.S. Dist. LEXIS 46449 (N.D. Cal. Mar. 10, 2005) .......................... 39

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
    No. C-10-4429 EMC, 2011 U.S. Dist. LEXIS 35969 (N.D. Cal. Apr. 1, 2011) ........................... 21

*City of San Diego*,
   762 F. App'x 383 (9th Cir. 2019) ......................................................................................... 9

*Code Rebel, LLC v. Aqua Connect, Inc.*,
   2013 U.S. Dist. LEXIS 137937 (C.D. Cal. Sept. 24, 2013 ............................................... 39

*CollegeNet, Inc. v. Common Application, Inc.*,
   355 F. Supp. 3d 926 (D. Or. 2018) .................................................................................... 21

*Collins v. Associated Pathologists, Ltd.*,
   844 F.2d 473, 479 (7th Cir.1988)....................................................................................... 23

*Complete Ent. Res. LLC v. Live Nation Ent., Inc.*,
   No. 15-cv-9814-DSF, 2017 U.S. Dist. LEXIS 183213 (C.D. Cal. Oct. 16, 2017) ............ 18, 24

*Contrast PNY Techs., Inc. v. SanDisk Corp.*,
   No. 11-CV-04689, 2014 U.S. Dist. LEXIS 58108 (N.D. Cal. Apr. 25, 2014) ................... 21

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ........................................................................................................... 34

*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
   99 F.3d 937, 951 (9th Cir. 1996)................................................................................... 36, 37

*Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
   No. 23-55662, 2025 U.S. App. LEXIS 15354 (9th Cir. June 23, 2025) ................................. *passim*

*Covad Commcns Co. v. Pac. Bell*,
   No. C 98-1887, 1999 U.S. Dist. LEXIS 22789 (N.D. Cal. Dec. 14, 1999) ......................... 6

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
   479 F.3d 1099 (9th Cir. 2007) ........................................................................................... 38

*Cung Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ................................................................................ 20

*D'Augusta v. Am. Petro. Inst.*,
   117 F.4th 1094 (9th Cir. 2024) ............................................................................................ 7

*Davis v. Cranfield Aerospace Sols., Ltd.*,
   71 F.4th 1154 (9th Cir. 2023) ....................................................................................... 12, 14

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001)............................................................................................... 12

*E & E Co., Ltd. v. Kam Hing Enters., Inc.*,
   2008 U.S. Dist. LEXIS 96755 (N.D. Cal. Nov. 19, 2008)................................................. 38

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992)............................................................................................................ 27

*Electrograph Sys., Inc. v. Epson Imaging Devices Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, No. M 07-1827, 2012 U.S. Dist. LEXIS 12063 (N.D. Cal. Feb. 1, 2012) .......................... 10

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ............................................................................... 17, 29, 31

*Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*,
312 U.S. 457 (1941) ............................................................................................... 25

*Fed Trade Comm'n v. Microsoft Corp.*,
136 F.4th 954 (9th Cir. 2025) ............................................................................... 25

*Fed Trade Comm'n v. Staples*,
970 F. Supp. 1066 (D.D.C. 1997) ......................................................................... 29

*Fed Trade Comm'n v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020) ........................................................................ 20

*Fed. Trade Comm'n v. Qualcomm Inc.*,
No. 17-CV-00220, 2017 U.S. Dist. LEXIS 98632 (N.D. Cal. June 26, 2017) ................................ 25

*Fields v. Sedgwick Associated Risks, Ltd.*,
796 F.2d 299 (9th Cir. 1986) ................................................................................ 14

*Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*,
103 F.3d 888 (9th Cir. 1996) ................................................................................ 13

*Foman v. Davis*,
371 U.S. 178 (1962) .............................................................................................. 40

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .............................................................................. 31

*Fuld v. Palestine Libeation Org.*,
145 S. Ct. 2090 (2025) ............................................................................................ 7

*Gamboa v. Apple Inc.*,
No. 24-cv-01270-EKL, 2025 U.S. Dist. LEXIS 114715 (N.D. Cal. June 16, 2025) ...................... 28

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
972 F.3d 1101 (9th Cir. 2020) .............................................................................. 11

*Go-Video, Inc. v. Akai Elec. Co.*,
885 F.2d 1406 (9th Cir. 1989) ................................................................................ 7

*Heckman v. Live Nation Ent., Inc.*,
No. CV 22-0047-GW-GJSx, 2025 U.S. Dist. LEXIS 69885 (C.D. Cal. Apr. 11, 2025) .......... *passim*

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) .................................................................................. 29

*Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*,
   485 F.3d 450 (9th Cir. 2007) .................................................................................... 7

*Honey Bum, LLC v. Fashion Nova, Inc.*,
   No. 20-cv-11233, 2021 U.S. Dist. LEXIS 182308 (C.D. Cal. Mar. 26, 2021) .............................. 28

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980) ............................................................................... 30, 36

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   27 F. Supp. 3d 1002 (N.D. Cal. 2014) ............................................................................ 8

*In re Copaxone Antitrust Litig.*,
   2025 U.S. Dist. LEXIS 77193 (D.N.J. Feb. 27, 2025) .......................................................... 20

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) ........................................................................... 34

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) .......................................................................... 29

*In re Indep. Serv. Orgs. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000) ................................................................................ 25

*In re Packaged Seafood Prods. Antitrust Litig.*,
   338 F. Supp. 3d 1118 (S.D. Cal. 2018) ..................................................................... 10, 14

*In re Pandora Media, LLC*,
   No. 22-cv-00809, 2023 U.S. Dist. LEXIS 181230 (C.D. Cal. Apr. 5, 2023) ................................... 35

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
   940 F. Supp. 2d 367 (E.D. La. 2013) ..................................................................... 24, 29, 36

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
   715 F.3d 716 (9th Cir. 2013) .................................................................................... 9

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ................................................................................. 33

*Int'l Wood Processors v. Power Dry, Inc.*,
   792 F.2d 416 (4th Cir. 1986) .................................................................................. 26

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945) .......................................................................................... 13

*Jensen Enters. Inc. v. Oldcastle, Inc.*,

2006 U.S. Dist. LEXIS 68262 (N.D. Cal. Sept. 7, 2006) ............................................. 38

*Jobscience, Inc. v. CVPartners, Inc.*,
No. C 13-04519, 2014 U.S. Dist. LEXIS 2741 (N.D. Cal. Jan. 9, 2014) ......................... 38

*Klein v. Facebook, Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) .......................................................................... 32

*Korea Supply Co. v. Lockheed Martin Corp.*,
63 P.3d 937 (Cal. 2003) ................................................................................................ 38

*Levi Case Co. v. ATS Prods., Inc.*,
788 F. Supp. 428 (N.D. Cal. 1992) ......................................................................... 34, 35

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, et al.*,
726 F.2d 1381 (9th Cir. 1984) ...................................................................................... 36

*Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) ................................................................................ 16, 17

*Mannington Mills, Inc. v. Congoleum Industries*,
610 F.2d 1059 (3d Cir. 1979) ....................................................................................... 25

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
No. CV-02-4770, 2006 U.S. Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006) ................... 22

*McCarthy Corp. PLC v. KPMG LLP* (2006),
O.J. No. 1492 (Can. Ont. Supreme Ct. of Justice) ......................................................... 39

*McWane, Inc. v. Fed Trade Comm'n*,
783 F.3d 814 (11th Cir. 2015) ................................................................................ 19, 22

*Mewawalla v. Middleman*,
601 F. Supp. 3d 574 (N.D. Cal. 2022) .......................................................................... 11

*MLW Media LLC v. World Wrestling Ent., Inc.*,
2023 U.S. Dist. LEXIS 104499 (N.D. Cal. 2023) ........................................................... 17

*Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*,
933 F.3d 1136 (9th Cir. 2019) ...................................................................................... 36

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ............................................................................ 27, 28, 29

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
No. 18-cv-03587, 2018 U.S. Dist. LEXIS 173788 (N.D. Cal. Oct. 9, 2018) ................... 22

*NSS Labs, Inc. v. Symantec Corp.*,
No. 18-cv-05711, 2019 U.S. Dist. LEXIS 136742 (N.D. Cal. Aug. 13, 2019) ............... 28

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

ix

*O. S. C. Corp. v. Toshiba Am., Inc.*,
   491 F.2d 1064 (9th Cir. 1974) .................................................................................... 12

*Ocean SW, Inc. v. Canam Pet Treats, Inc.*,
   No. 14-cv-2059, 2015 U.S. Dist. LEXIS 60839 (S.D. Cal. May 7, 2015) ..................................... 13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ..................................................................................... 37

*Ohio v. Am. Express* Co.,
   585 U.S. 529 (2018) .............................................................................................. 30

*Orchid Biosciences, Inc. v. St. Louis Univ.*,
   198 F.R.D. 670 (S.D. Cal. 2001) .................................................................................. 15

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
   967 F. Supp. 2d 1347 (N.D. Cal. 2013) ................................................................. 17, 18, 23, 24

*Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*,
   526 F.2d 1196 (9th Cir. 1975) .................................................................................... 32

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   791 P.2d 587 (Cal. 1990) ......................................................................................... 38

*Pac. Steel Grp. v. Commer. Metals Co.*,
   600 F. Supp. 3d 1056 (N.D. Cal. 2022) ....................................................................... 18, 26

*Paddock Publishers v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ...................................................................................... 21

*Pecover v. Electronics Arts Inc.*,
   633 F. Supp. 2d 976 (N.D. Cal. 2009) ........................................................................... 26

*PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ...................................................................................... 6

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   No. SACV 12-2102, 2013 U.S. Dist. LEXIS 169856 (C.D. Cal. Dec. 2, 2013) ............................... 21

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
   769 F. Supp. 3d 1067 (N.D. Cal. 2025) .......................................................................... 36

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ..................................................................................... 30

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
   41 F. Supp. 3d 906 (C.D. Cal. 2014) ......................................................................... 17, 18

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

x

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2007) ...................................................................... 28

*Senne v. Kansas City Royals Baseball Corp.*,
  105 F. Supp. 3d 981 (N.D. Cal. 2015) ...................................................................... 11

*Shields v. Fédération Internationale de Natation*,
  419 F. Supp. 3d 1188 (N.D. Cal. 2019) ....................................................... 7, 10, 13, 14

*Software Servs. v. Cyberbest Tech., Inc.*,
  No. C-13-04217 DMR, 2014 U.S. Dist. LEXIS 934653373924 (N.D. Cal. July 9, 2014) ............. 12

*Space Data Corp. v. X*,
  No. 16-CV-03260-BLF, 2017 U.S. Dist. LEXIS 22571 (N.D. Cal. Feb. 16, 2017) ...................... 40

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1983) ............................................................. 18, 26, 32, 33

*Tampa Electric Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ........................................................................... 23, 25

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  No. C-05-01673, 2008 U.S. Dist. LEXIS 111866 (N.D. Cal. Oct. 28, 2008) ................................ 31

*Tevra Brands LLC v. Bayer Healthcare LLC*,
  No. 19-cv-04312, 2024 U.S. Dist. LEXIS 79934 (N.D. Cal. May 1, 2024) ................................... 20

*Tevra Brands, LLC v. Elanco Animal Health Inc.*,
  No. 24-cv-04683, 2025 U.S. Dist. LEXIS 61641 (N.D. Cal. Mar. 31, 2025) ................................. 22

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ...................................................................... 22

*Total Renal Care Inc. v. W. Nephrology Metabolic Bone Disease, P.C.*,
  No. 08-cv-00513, 2009 U.S. Dist. LEXIS 80821 (D. Colo. Aug. 21, 2009) ................................. 28

*Townshend v. Rockwell Int'l Corp.*,
  No. C99-0400SBA, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000) ................... 33, 34, 35

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, Inc.,
  676 F.2d 1291 (9th Cir. 1982) ................................................................. 18, 22, 27

*Ultronics, Inc. v. Cox Cable of San Diego, Inc.*,
  1991 U.S. Dist. LEXIS 9509 (S.D. Cal. 1991) ....................................................... 26

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................ 25

*United States v. Dentsply Int'l, Inc.*,

399 F.3d 181 (3d Cir. 2005), *cert denied* 133 S. Ct. 2025 (2013) ................................. 20

*United States v. Microsoft Corp.*,
253 F.3d 34(D.C. Cir. 2001) ........................................................................ 22, 25

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................ 28

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) .............................................................................. 39

*United States v. U.S. Sugar Corp.*,
No. 21-1644, 2022 U.S. Dist. LEXIS 175817 (D. Del. Sep. 23, 2022) .......................... 29

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
143 F. Supp. 3d 982 (N.D. Cal. 2015) ................................................................... 39

*W. Parcel Express v. United Parcel Service of Am., Inc.*,
65 F. Supp. 2d 1052 (N.D. Cal. 1998) .............................................................. 21, 32

*Wallace Sales & Consulting, LLC v. Tuopo N. Am., Ltd.*,
2015 U.S. Dist. LEXIS 96681 (E.D. Mich. July 24, 2015) .......................................... 39

*Will Co., Ltd. v. Lee*,
47 F.4th 917 (9th Cir. 2022) ............................................................................... 9

*Wisconsin v. Indivior Inc. (In re Suboxone (Buprenorphine Hydrochloride & Naloxone)*
*Antitrust Litig.)*, No. 13-MD-2445, 2017 U.S. Dist. LEXIS 179101 (E.D. Pa. Oct. 30, 2017) ....... 35

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ....................................................................................... 14

*X Corp. v. Bright Data Ltd.*,
No. C 23-03698 WHA, 2025 U.S. Dist. LEXIS 75033 (N.D. Cal. Apr. 18, 2025) ......... 25, 2, 26, 29

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'antisemitisme*,
433 F.3d 1199 (9th Cir. 2006) ............................................................................ 10

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254, 287 (3d Cir. 2012) ....................................................................... 20

## Statutes

15 U.S.C. § 22 .................................................................................................. 7

## Other Authorities

Cal. Civ. Proc. Code § 410.10 ............................................................................... 6

Fed. R. Civ. P. 12(b)(6). ..................................................................................... 1

Fed. R. Civ. P. 15 ............................................................................................................ 40

Fed. R. Civ. P. 8(a)(2) .................................................................................................... 40

Thomas Krattenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209, 224 (1986) ........................................................... 18

Phillip E. Areeda and Herbert Hovenkamp, 2 Antitrust Law ¶ 348 (4th ed. 2024) ...................... 15, 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

Whether the Court may exercise personal jurisdiction over Defendant Musixmatch, S.p.A. ("Musixmatch").

Whether plaintiff LyricFind, Inc. ("LyricFind") has plausibly stated claims against Musixmatch under Fed. R. Civ. P. 12(b)(6).

### PRELIMINARY STATEMENT

This case concerns a multi-faceted scheme by Musixmatch and its private-equity owner TPG Global, LLC ("TPG") (together "Defendants") to foreclose competition in the markets for Lyric Data Services and Lyric Rights Licensing—two inputs that digital service providers ("DSPs") need to display song lyrics on their platforms. Plaintiff LyricFind is Musixmatch's only significant rival in these markets and, until recently, had threatened to erode Musixmatch's monopoly by offering better prices and higher-quality services to DSPs. Rather than face this competition, Musixmatch and TPG schemed to end it—first by trying to buy LyricFind, and then by paying a major music publisher, California-based Warner Chappell Music ("WCM"), to help drive LyricFind from the market. To do so, Defendant paid WCM to cut off LyricFind's ability to provide lyric services for WCM's titles, and limit those rights exclusively to Musixmatch, so that DSPs would be forced to contract with Musixmatch. This arrangement, referred to herein as the "Exclusive," has already foreclosed virtually all competition in the relevant markets, in the United States and elsewhere, violating Sections 1 and 2 of the Sherman Act, the Cartwright Act, and the other laws set forth in the Complaint. (ECF No. 50).

Courts have long condemned exclusivity schemes like the Exclusive, where a seller or distributor forecloses its rivals' access to key inputs, thereby driving them from the market, so it can raise prices. Musixmatch's Motion to Dismiss ("Motion") (ECF No. 53), which attempts to miscast this dispute as a unilateral termination of licensing rights disconnected from the U.S., is belied by governing precedent and LyricFind's well-pled allegations, as well as Musixmatch's deep roots in and intentional targeting of the United States.

Each of Musixmatch's dismissal arguments fails.

*First*, this Court has personal jurisdiction over Musixmatch because it purposefully directed its anticompetitive conduct at the United States and California. The United States is the epicenter of the lyric-services industry, home to WCM's licensing business, much of Musixmatch's leadership, and nearly all major DSPs impacted by the Exclusive. The Exclusive's effects—higher prices and less choice for DSPs—were inextricably targeted at the United States, which is the relevant forum for LyricFind's antitrust claims. Musixmatch also purposefully availed itself to this forum in myriad ways, including through its multiple U.S.-based executives and directors, its coordination with U.S.-based WCM, and its extensive business relationships with U.S.-based DSPs and publishers.

*Second*, LyricFind has suffered quintessential antitrust injury. Its lost profits and depressed value flow directly from Musixmatch's efforts to foreclose competition and reduce market choices—precisely the type of harms that the antitrust laws were designed to prevent.

*Third*, the Exclusive is sufficiently durable and forecloses a sufficient share of the relevant markets. The Ninth Circuit's recent decision in *Costar Grp., Inc. v. Com. Real Est. Exch., Inc*., No. 23-55662, 2025 U.S. App. LEXIS 15354, at *8 (9th Cir. June 23, 2025) rejected Musixmatch's arguments that the Exclusive's specific end date must be alleged and that foreclosure should be measured based on WCM's share of the upstream publishing market.

*Fourth*, copyright law does not shield Musixmatch from antitrust liability. Courts have consistently rejected the notion that exclusivity arrangements involving intellectual property are beyond the reach of the Sherman Act. Musixmatch and WCM are independent economic actors with distinct motivations who can conspire under Section 1 as a licensor and licensee.

*Fifth*, the relevant markets in the Complaint are plausible. The Lyric Data Services and Lyric Rights Licensing and Sublicensing markets reflect commercial realities and have well-defined boundaries. These market definitions are coherent and sufficient at the pleading stage. LyricFind also alleges both direct and indirect evidence of Musixmatch's monopoly power, including supracompetitive pricing, degraded service quality, and dominant market shares of approximately 80% and 66%. These allegations are more than sufficient to support LyricFind's Section 2 claims.

*Finally*, LyricFind plausibly alleges that Musixmatch interfered with its prospective business relationships with Spotify and iHeartRadio by disrupting negotiations and improperly disclosing

confidential information. The Complaint sufficiently pleads all required elements, including actual disruption and resulting harm. LyricFind also states a valid claim for breach of the Non-Disclosure Agreement ("NDA"), sufficiently identifying the contract, Musixmatch's breach, and the resulting costs and business disruption.

For all these reasons, Musixmatch's Motion should be denied in its entirety.

## STATEMENT OF FACTS

LyricFind and Musixmatch compete in the markets for Lyric Data Services and Lyric Rights Licensing, which are distinct but complementary services that DSPs need to display song lyrics to consumers. Lyric Data Services consist of the technical infrastructure—lyrical text files, translations, synchronization data, and royalty administration—that enable DSPs to stream lyrics on their digital platforms and allocate royalties. Compl. ¶¶ 2, 85. Lyric Rights Licensing provides the legal authorization that DSPs need from rights holders, like music publishers, to display lyrics under U.S. law. *Id.* ¶¶ 1–5, 40, 100–110. Because DSPs often cannot obtain Lyric Rights Licensing directly from music publishers, there is a distinct submarket for Lyric Rights *Sub*licensing, in which lyric-service providers sublicense lyric rights to DSPs on behalf of music publishers. *Id.* ¶¶ 80–85. Musixmatch is a monopolist in the Lyric Data Services and Lyric Rights Sublicensing markets, with market shares of 80% and 66%, respectively. *Id.* ¶¶ 156, 162.

The United States is the epicenter of both markets. *See* Declaration of Darryl Ballantyne, dated July 10, 2025 ("Ballantyne Decl.") ¶¶ 14–18. Virtually all the major music publishers that supply lyric rights to LyricFind and Musixmatch are based in the United States, including the "Big Three": WCM, Sony Music Publishing ("Sony"), and Universal Music Publishing Group ("UMPG"). *Id.* ¶ 6; Compl. ¶ 12. Most of LyricFind's and Musixmatch's DSP customers are also based in the United States, including Apple Music, YouTube, Instagram, Facebook, Microsoft, Amazon Music, Tidal, Snapchat, and iHeartRadio. Declaration of Benjamin Steinberg, dated July 10, 2025 ("Steinberg Decl.") ¶ 9, Ex. G. In sum, the United States is where Musixmatch and LyricFind both obtain lyric inputs and service their customers—and thus, where they compete. Indeed, both of Musixmatch's co-Presidents are based in the United States, *id.* ¶¶ 3-4, Exs. A-B; two-thirds of Musixmatch's board members are based in the United States., *id.* ¶¶ 11-13, Exs. 11-13; and, until this

lawsuit was filed, Musixmatch's website said it was located in San Francisco, with a prominent image of the Golden Gate Bridge. *Id*. ¶¶ 6-7, Exs. D-E.

Historically, all major publishers, including WCM, worked with lyric-services providers on a non-exclusive basis, enabling Musixmatch and LyricFind to compete for DSPs' business on price and quality. Compl. ¶¶ 145–150. In this competitive environment, LyricFind was able to gain market share and became a true competitive threat to Musixmatch's monopoly. *See id.* ¶¶ 3, 67, 96–100. As LyricFind neared a lucrative deal with Spotify, one of Musixmatch's largest customers, Musixmatch devised a multifaceted scheme to eliminate LyricFind as a competitive threat once and for all. *Id.* ¶¶ 101–10. It did so together with TPG, the U.S.-based private equity fund that acquired Musixmatch in 2022, and whose U.S.-based partners direct Musixmatch's board. *Id.* ¶¶ 50–60, 180–190.

First, in 2023, TPG tried to acquire LyricFind to remove it from the market. The potential acquisition was evaluated under the NDA that prohibited Musixmatch and TPG from using LyricFind's confidential information for any other purpose. *Id.* ¶¶ 117–120. When TPG's acquisition bid failed, Musixmatch and TPG leaked NDA-protected information about LyricFind to Spotify to try to prevent Spotify from signing with LyricFind, violating the NDA. *Id.* ¶¶ 104–05, 127–30.

Musixmatch's fear of losing Spotify was acute: LyricFind had nearly finalized a deal with Spotify to become its lyrics provider at rates substantially below Musixmatch's. *Id.* ¶¶ 17, 103, 106. Instead of lowering its prices or making a better offer to Spotify, Musixmatch and TPG opted to foreclose competition altogether by cutting off LyricFind's ability to supply the lyrics that DSPs demand, which LyricFind had been distributing successfully for more than fifteen years. *Id.* ¶ 144. To do so, Musixmatch paid one of the Big Three publishers, California-based WCM, for the exclusive right to distribute Lyric Data Services and Lyric Rights Licensing for WCM's titles. This ensured that Musixmatch, and no other lyric services provider, could provide lyric services for the songs controlled in whole or in part by WCM, which account for around 30% of all music streams and 60% of the top 100 songs. *Id.* ¶ 23. WCM's music licensing business, which oversees this lyric licensing, is based in the United States, and primarily operates out of Los Angeles. Ballantyne Decl. ¶¶ 6, 8–9.

This exclusive arrangement—the "Exclusive"—was unprecedented in the lyrics industry and was consummated behind closed doors, without notice, bidding, or public disclosure. *Id.* ¶¶ 7, 21,

107, 133, 137–39, 141. Never before had a lyric services provider commandeered the exclusive right to provide Lyric Data Services for a major publisher's catalog, as the only reason to do so would be to foreclose competition. *Id.* ¶¶ 7, 21, 107, 133, 139. That is precisely what occurred.

The Exclusive has foreclosed virtually all competition for Lyric Data Service and Lyric Rights Sublicensing, forcing DSPs to contract with Musixmatch at supracompetitive prices. *Id.* ¶ 140, 152–54, 161, 164–65. In April 2024, Spotify was forced to re-sign with Musixmatch at prices well above what LyricFind had offered. *Id.* ¶¶ 18, 24, 108. New York-based iHeartRadio, another major DSP, similarly terminated renewal discussions with LyricFind and was forced to switch to Musixmatch, at prices five-times higher than what LyricFind had charged. *Id.* ¶¶ 25, 169. All other major DSPs, almost all of whom are based in the United States, will be forced to pay Musixmatch's supracompetitive prices to continue displaying lyrics for popular songs. *Id.* ¶¶ 18, 25, 70, 108, 136, 154; Ballantyne Decl. ¶15. This near-complete foreclosure of competition will persist for years given that most DSPs sign multi-year contracts and cannot practically source lyrics from multiple providers. *Id.* ¶¶ 68–69, 95, 148.

The anticompetitive effects of the Exclusive are thus concrete, ongoing, and durable, and they emanate from and will be felt overwhelmingly in the United States. Ballantyne Decl. ¶¶ 15–18. The Exclusive was jointly orchestrated by Musixmatch's co-Presidents and directors in the United States, who worked together with Musixmatch's owner, TPG, based in Texas and San Francisco. Compl. ¶¶ 7, 32, 101–10. The WCM lyrics business over which Musixmatch has gained exclusivity is also based in the United States, as are most of the DSPs who will be forced to pay Musixmatch's supracompetitive prices. In short, the Exclusive's elimination of choice, innovation, and competitive pricing was aimed at the United States and will be borne by U.S. customers. *Id.* ¶¶ 133–135, 275–285. LyricFind brings this lawsuit to restore this U.S.-centric competition, prevent further harm to its business, and recover for the ongoing losses it has incurred.

## ARGUMENT

### I.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When considering a motion to dismiss, [courts] accept all facts alleged in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Costar*, 2025 U.S. App. LEXIS 15354, at *8 (citing *Ass'n for L.A. Deputy Sheriffs v. City of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011)). At the pleading stage, "a plaintiff need only state a facially plausible claim, such that a court can 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Costar*, 2025 U.S. App. LEXIS 15354, at *8 (quoting *Iqbal*, 556 U.S. at 578). Because the Cartwright Act mirrors the Sherman Act, courts analyze both claims together. *See PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831–32 (9th Cir. 2022).[1]

At this motion to dismiss stage, LyricFind "need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). The uncontroverted allegations in the Complaint must be taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Covad Commc'ns Co. v. Pac. Bell,* No. C 98-1887, 1999 U.S. Dist. LEXIS 22789, at *15 (N.D. Cal. Dec. 14, 1999) (quoting *AT & T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)).

## II.    The Court May Exercise Specific Personal Jurisdiction over Musixmatch

A court may assert personal jurisdiction over a defendant if (1) a statute confers jurisdiction, and (2) the exercise of jurisdiction comports with constitutional due process. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004). Musixmatch focuses on the latter,[2] claiming this Court does not have personal jurisdiction over it because it is a foreign entity with no ties to California. Musixmatch is wrong.

Initially, Musixmatch's jurisdictional analysis is too narrow; the relevant forum for LyricFind's federal antitrust claims is the United States, not California.[3] *See D'Augusta v. Am. Petro. Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024) ("We have interpreted Section 12 of the Clayton Act

---

[1] LyricFind incorporates by reference the arguments set forth in its Opposition to TPG Global, LLC's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6).

[2] Musixmatch does not argue that there is no applicable statute to confer jurisdiction. In any event, 15 U.S.C. § 22 and Cal. Civ. Proc. Code § 410.10 provide statutory bases for personal jurisdiction.

[3] Here, the distinction between the forums of the United States and California is largely immaterial, as Musixmatch has sufficient contacts with both.

(15 U.S.C. § 22) to grant personal jurisdiction over any corporate antitrust defendant with minimum

contacts with the nation.") (internal citation omitted); *Shields v. Fédération Internationale de*

*Natation*, 419 F. Supp. 3d 1188, 1209 (N.D. Cal. 2019) ("There is no dispute that the relevant forum

for the Court's jurisdictional analysis in these antitrust actions is the United States as a whole, and not

merely California.") (citing *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1415 (9th Cir. 1989);

*Action Embroidery*, 368 F.3d at 1177).[4]

The exercise of specific personal jurisdiction over a foreign defendant like Musixmatch is

warranted where: (1) the defendant "purposefully directs" its activities at the forum or a resident

thereof or "purposefully avails" itself of the privilege of conducting activities in the forum; (2) the

plaintiff's claims arise out of or relate to the forum-related conduct; and (3) the exercise of

jurisdiction is reasonable and comports with due process. *Briskin v. Shopify, Inc*., 135 F.4th 739, 750–

51 (9th Cir. 2025). The first prong may be satisfied by "purposeful availment, purposeful direction, or

by some combination thereof." *Id*. at 751 n.10. Under either analysis, Musixmatch is subject to

specific personal jurisdiction in this Court.

First, as detailed below, Musixmatch purposefully directed its anticompetitive activity at the

United States, which is the epicenter of the lyric services industry. Ballantyne Decl. ¶¶ 10, 15–17.

The WCM lyrics business over which Musixmatch gained exclusivity is based in the United States, as

are most of the DSPs who will be forced to pay Musixmatch's supracompetitive prices. *Id*. ¶¶ 8–9,

11, 15–18. The WCM representatives who are enforcing the Exclusive are also based in the United

---

4 Musixmatch is subject to nationwide jurisdiction under the Clayton Act because it is an Italian Società per Azioni (S.p.A.), which is the functional equivalent of a corporation. *See* Mot. 5 (admitting "Musixmatch is incorporated . . . in Italy") (emphasis added). Musixmatch is subject to nationwide jurisdiction on other grounds too. First, nationwide personal jurisdiction would be proper against Musixmatch under Rule 4(k)(2) of the Federal Rules of Civil Procedure. This is because "(1) the action arises under federal law;" (2) Musixmatch will claim it is "not subject to jurisdiction in any state's courts of general jurisdiction"; and (3) "the court's exercise of jurisdiction comports with due process." *Ayla, LLC v. Alya Skin Pty. Ltd*., 11 F.4th 972, 978 (9th Cir. 2021). Like an analysis of personal jurisdiction pursuant to the Clayton Act, "[u]nder Rule 4(k)(2), the due process analysis . . . 'consider[s] contacts with the nation as a whole.'" *Id*. (quoting *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007)). Second, in *Fuld v. Palestine Liberation Org*., 145 S. Ct. 2090, 2105 (2025), the Supreme Court held that when a federal statute authorizes personal jurisdiction, like the Sherman Act here, the traditional *International Shoe* "minimum contacts" test for specific personal jurisdiction does not apply. Instead, it's a "more flexible" standard than the traditional test. *Id*.

States and California. *Id.* ¶¶ 12–13. The Exclusive's elimination of choice, innovation, and competitive pricing was aimed at the United States and will be borne by U.S. customers.

Second, Musixmatch purposefully availed itself of the benefits of the United States and California and has a strong corporate presence in each. Until this litigation began, Musixmatch's website claimed it was located in San Francisco. Steinberg Decl. ¶¶ 6-7. Moreover, both of its co-Presidents are based in the United States, and its Board of Directors, which meets in San Francisco, is comprised of three members, two of whom are based in the United States. *Id.* ¶¶ 3–4, 10-13.

Third, LyricFind's claims arise out of unlawful, anticompetitive conduct that was purposefully directed at the United States and Musixmatch's dealings with the United States.

Last, exercising personal jurisdiction over Musixmatch is reasonable and would not create any undue burden or sovereignty concerns as Musixmatch suggests. The Court can also exercise pendent personal jurisdiction over the remaining state law claims.

### 1. Musixmatch Purposefully Directed Anticompetitive Conduct at the United States and California.

By entering the Exclusive, and regardless of the domicile of WCM's signatory, Musixmatch "purposefully directed" its anticompetitive conduct at the United States, which is the locus of the lyric services market. "Purposeful direction" requires that Musixmatch have "(1) committed an intentional act, (2) expressly aimed at the forum [ ], (3) causing harm that the defendant knows is likely to be suffered in the forum[.]" *Briskin,* 135 F.4th at 751 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). An antitrust defendant "expressly aims" an intentional act at a forum when its allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) *("CRT"); see also Soler v. City of San Diego*, 762 F. App'x 383, 385 (9th Cir. 2019) (holding personal jurisdiction can be asserted over foreign defendant if the effect of the conduct is felt in the forum even where defendant did not establish physical contact with the forum).

The United States is the epicenter of the lyric services market and thus the Exclusive's primary and inextricable target. Ballantyne Decl. ¶ 10, 15–18. The "Big Three" music publishers that supply lyrics rights to LyricFind and Musixmatch (WCM, Sony, and UMPG) are each headquartered

in the United States. *Id*. ¶ 6; Compl. ¶ 12. The vast majority of the major DSP customers to whom

Musixmatch provides lyric services, and who are affected by the Exclusive, are also based in the

United States. *Id*. ¶ 15; Steinberg Decl. ¶ 9, Ex. G. *See also* ECF No. 54 (Khullar Declaration) ¶ 15.

Put simply, the United States is where LyricFind and Musixmatch primarily obtain lyric rights and

service DSP customers, and thus where they compete.

Musixmatch thus "expressly aimed" its anticompetitive conduct at the United States by

seeking to restrain competition in the U.S.-based lyric services market, including in California. *See*

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp*., 457 F. Supp. 3d 401, 411 (S.D.N.Y. 2020) (holding

that alleged conspiracy to "restrain competition in the purchase and sale of [currencies] in the United

States and elsewhere" was sufficient to allege that the defendant's conduct "took place in, or was

directed into, the United States."); *Nw. Aluminum Co. v. Hydro Aluminum Deutschland GmbH*, No.

CIV. 02-398, 2003 U.S. Dist. LEXIS 25542, at *12 (D. Or. Sept. 23, 2003) (stating that allegations

that a conspiracy was intended to affect a worldwide market and that the U.S. is a major component

of that market "could suffice to demonstrate 'express aiming'").

Put another way, Musixmatch knew and intended that the Exclusive's consequences would be

felt in the United States, as that is where most DSPs and music publishers are located. *See In re W.*

*States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743–44 (9th Cir. 2013) (defendants

"expressly aimed" price manipulation at Wisconsin where defendants knew its consequences would

be felt in that forum); *Will Co., Ltd. v. Lee*, 47 F.4th 917 (9th Cir. 2022) (Hong Kong-based defendant

expressly aimed its conduct at Washington due to business decisions reflecting an "intent to cultivate

an audience in the United States").

Indeed, the Exclusive directly restrained the lyrics licensing business of WCM US, a

California and U.S.-based company. Even if a U.K. subsidiary formally signed the Exclusive, the

Exclusive covers all WCM content, including the valuable and popular content of WCM US.

Ballantyne Decl. ¶ 11. The Exclusive thus intentionally restrained WCM's U.S.-based licensing

business.[5] *See In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1158 (S.D. Cal.

---

5 The Exclusive's harm in the United States and California, as alleged, is not theoretical. WCM's
U.S.-based representatives already are enforcing the Exclusive, including by demanding that
LyricFind stop providing lyric services to DSPs that are based in California. Ballantyne Decl. ¶ 13.

2018) (finding personal jurisdiction where price-fixing would cause foreseeable harm in the U.S.);
*Electrograph Sys., Inc. v. Epson Imaging Devices Corp. (In re TFT-LCD (Flat Panel) Antitrust
Litig.),* No. M 07-1827, 2012 U.S. Dist. LEXIS 12063, at *39 (N.D. Cal. Feb. 1, 2012) (holding that
defendant's goal of affecting pricing to Dell, an American company, constituted purposeful
direction). That the Exclusive also has a global impact does not negate that it was targeted at the
United States. *See Shields*, 419 F. Supp. 3d at 1209–10; *Yahoo! Inc. v. La Ligue Contre Le Racisme et
L'antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (conduct need not be aimed solely at the U.S.
so long as the U.S. is within the targeted region).

      Furthermore, the Exclusive's anticompetitive effects—higher prices and reduced choice—will
be borne by DSP customers who overwhelmingly are located in the United States. This alone
demonstrates "express aiming." The *CRT* case is instructive. There, a Chinese company allegedly
price-fixed component-parts that were later packaged into goods sold in the United States. The
Chinese company was located abroad, had no U.S. property nor U.S. employees, and had few U.S.
customers. *CRT*, 27 F. Supp. 3d at 1012. Nonetheless, personal jurisdiction was proper because the
foreign company's anticompetitive conduct in China "ensured United States customers paid
supracompetitive prices"—just as the Exclusive does here. *Id.*

### 2. Musixmatch Purposefully Availed Itself to this Forum.

      Musixmatch also purposefully availed itself of the privileges of the United States and
California such that the Court may exercise personal jurisdiction. *Briskin*, 135 F.4th at 750–51.
Purposeful availment requires "perform[ing] some type of affirmative conduct which allows or
promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011,
1016 (9th Cir. 2008) (internal quotation omitted). The Court must look at Musixmatch's "entire
course of dealing, not solely the particular contract or tortious conduct giving rise to" LyricFind's
claims. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101,
1108 (9th Cir. 2020). The relevant question is whether Musixmatch "reach[ed] out beyond [Italy]" to
"create continuing relationships and obligations with citizens of" the United States and California. *Id.*
(citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Musixmatch undoubtedly did.

Musixmatch has extensive ties and a robust corporate presence in the United States and California. Shortly before this case was filed, Musixmatch's website claimed that it was located in San Francisco: "We're in Bologna, London **and San Francisco.**" Steinberg Decl. ¶¶ 6–7, Exs. D–E. (emphasis added). Indeed, the first photo on Musixmatch's "Contact" webpage was the Golden Gate Bridge. *Id.* Conspicuously, this information was recently removed.[6] *Id.* ¶ 9, Ex. G. Both of Musixmatch's co-Presidents, Marco Paglia and Rio Caraeff, are also based in United States, in California and Texas, respectively. *Id*. ¶¶ 3–4, Exs. A–B. Through these extensive U.S. connections, Musixmatch has availed itself to this forum's protections; a formal office is not required. *See Mewawalla v. Middleman*, 601 F. Supp. 3d 574, 595 (N.D. Cal. 2022); *see also Senne v. Kansas City Royals Baseball Corp*., 105 F. Supp. 3d 981, 1029–1031 (N.D. Cal. 2015) (holding that non-resident MLB teams were subject to California jurisdiction by recruiting California-based baseball players); *Alexis v. Rogers*, No. 15-cv-691, 2016 U.S. Dist. LEXIS 47031, at *35 (S.D. Cal. Feb. 26, 2016) (finding personal jurisdiction where defendant hired a single California resident to work from home).

Musixmatch's conduct surrounding the Exclusive shows additional purposeful availment. Musixmatch's co-President, Mr. Caraeff, who "oversee[s]" Musixmatch's "legal and licensing teams," like the ones responsible for the Exclusive, is based in the United States. Steinberg Decl. ¶¶ 4-5, Exs. B-C. Musixmatch's Board of Directors has also met in San Francisco, including with Musixmatch's Chief Executive Officer. *Id.* ¶ 10, Ex. H. Indeed, two of the three members of Musixmatch's Board of Directors are based in the United States. *Id.* ¶¶ 11-13, Exs. I-K. Moreover, the main WCM employee who negotiated the Exclusive was Natalie Madaj, who is based in the U.S. *Id.* ¶ 14; Ballantyne Decl. ¶ 12. Musixmatch also worked closely with its U.S. owner, TPG, to orchestrate the Exclusive, through its San Francisco arm "TPG Growth." Compl. ¶¶ 36, 133–137.

Finally, the Exclusive necessarily requires performance in the United States and California. Musixmatch must engage with U.S.- and California-based DSPs to carry out and monetize the

---

6 Musixmatch has since changed its website to remove any textual or photographic reference to San Francisco, ostensibly for the purpose of contesting personal jurisdiction in this matter. *Compare Contact*, Musixmatch, https://about.musixmatch.com/contact [https://web.archive.org/web/20240713182927/https://about.musixmatch.com/contact] (archived Feb. 24, 2024) ("We're in . . . San Francisco.") *with Contact*, Musixmatch, https://about.musixmatch.com/contact (last visited July 10, 2025). These webpages are also attached as Exs. D-E to the Steinberg Decl. (pre-lawsuit in 2024) and Ex. F (current webpage).

exclusive rights granted to it by WCM. "[T]he future consequences . . . are the real object of the business transaction." *Burger King*, 471 U.S. at 479 (internal citation omitted). Moreover, the WCM representatives enforcing the Exclusive—i.e., the employees and business units demanding that LyricFind cease providing WCM lyrics to DSPs—are based in the United States and California. Ballantyne Decl. ¶ 13. *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1164 (9th Cir. 2023) is thus inapplicable; there, unlike here, the court found that the contracts did not yield future consequences in the alleged forums.[7] Musixmatch's relationships with U.S.-based DSPs are relevant here because, unlike in the cases Musixmatch cites,[8] those entities are affected by the Exclusive.

### 3.  LyricFind's Claims Stem from Musixmatch's Forum-Related Conduct

Under the second prong of the specific personal jurisdiction analysis, personal jurisdiction is proper if LyricFind's claim "arises out of or relates to the defendant's forum-related activities." *Briskin*, 135 F.4th at 750–51. In particular, and under the Ninth Circuit's "but for" test, the Court must ask if LyricFind's injury would not have occurred but for Musixmatch's contacts with the United States and/or California. *See Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996). That test is satisfied. Musixmatch's purposeful direction of its anticompetitive conduct at the United States is directly related to LyricFind's injury; thus, "but for" the Exclusive, LyricFind would still be able to compete for DSPs' business. LyricFind meets this second prong. *Shields*, 419 F. Supp. 3d at 1210 (holding that "but for" defendant's anticompetitive conduct, the harm would not have occurred).[9]

---

7 The Exclusive is different than the contracts in the cases cited by Musixmatch, as the Exclusive directly implicates the United States, whereas those contracts did not implicate the relevant forum. In *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001), the contract at issue concerned oil pipelines in Burma with oil being sent to Thailand and Burma, not the U.S. In *Davis*, 71 F.4th at 1164, the purpose of the contract was to obtain certification from European aviation authorities and the Washington, D.C.-based FAA; there was no intended consequence or nexus with Idaho. The defendant in *O. S. C. Corp. v. Toshiba Am., Inc.*, 491 F.2d 1064, 1065 (9th Cir. 1974), unlike Musixmatch, did not engage in any post-contract conduct in the United States as a result of the contract. In that case, a Japanese defendant sold electronic calculators to its co-defendant, who then sold the products in the United States.

8 *Azzarello v. Navagility*, No. C-08-2371, 2008 U.S. Dist. LEXIS 117119, at *12 (N.D. Cal. Oct. 16, 2008); *Software Servs. v. Cyberbest Tech., Inc.*, No. C-13-04217, 2014 U.S. Dist. LEXIS 93465, at *7 (N.D. Cal. July 9, 2014).

9 Each of the cases cited by Musixmatch are distinguishable because the alleged forum-related conduct did not relate to the underlying claims. *AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, No. 19-CV-04789, 2020 U.S. Dist. LEXIS 56328, at *7 (N.D. Cal. Mar. 31, 2020) (defendant's conduct and

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

12

### 4. Exercising Jurisdiction Over Musixmatch Is Fair and Reasonable.

Under the third prong of the personal jurisdiction test, Musixmatch carries the burden of presenting "compelling" reasons why exercising personal jurisdiction over it would be unfair and unreasonable. *Briskin*, 135 F.4th at 751. Musixmatch has not done so. Exercising personal jurisdiction over Musixmatch is fair and reasonable under the seven-factor *Briskin* test and "does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Musixmatch's claim that it has not "purposefully interjected" itself into United States is belied by its purposeful direction, as described above. *Briskin*, 135 F.4th at 761. Musixmatch also fails to support its conclusory assertion that it would be unduly burdened by defending this action in the United States. Mot. 11. Musixmatch is a sophisticated global company. Its owner, both co-Presidents, two-thirds of its board, and most of its major customers all reside in the United States. Furthermore, courts have long recognized that technological progress has diminished concerns arising from the burden of foreign litigation. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980).

Musixmatch is also wrong that exercising personal jurisdiction would raise sovereignty concerns. Mot. 10-11. Musixmatch does not point to any "conflict" with Italian or UK law. *See AirWair Int'l Ltd. v. Schultz*, 73 F. Supp. 3d 1225, 1240 (N.D. Cal. 2014) ("[T]his factor is 'by no means controlling', otherwise 'it would always prevent suit against a foreign national in a United States court.'") (internal citation omitted).

Moreover, the United States has a strong interest in adjudicating Musixmatch's conduct, as it restrains U.S.-centric competition. *Shields*, 419 F. Supp. 3d at 1212 ("[I]t is beyond dispute that the United States has a strong interest in enforcing the antitrust policies underlying the Sherman Act"). Neither California's nor the United States' public policy interests in ensuring compliance with safety standards are implicated here, rendering *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987) and *Davis*, 71 F.4th at 1166, inapplicable. Finally, even assuming

---

forum contacts before settlement agreement were not related to breach of settlement agreement); *Ocean SW, Inc. v. Canam Pet Treats, Inc.*, 2015 U.S. Dist. LEXIS 60839, at *8 (S.D. Cal. May 7, 2015) (allegations of forum-related marketing and sales of pet-treat products by defendant were irrelevant to debt repayment claims).

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

13

*arguendo* that this case could be brought in England or Italy, "the availability of those alternative fora does not outweigh the other factors showing that jurisdiction in California is not unfair." *Briskin*, 135 F.4th at 761; *cf. Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 303 (9th Cir. 1986) (finding England to be alternative forum where plaintiff, unlike LyricFind, was from the proposed alternative forum and all of the seven *Briskin* factors weighed against exercising personal jurisdiction).

### 5. The Court Has Pendent Personal Jurisdiction Over the State Law Claims.

The Court may also exercise pendent personal jurisdiction over Musixmatch with respect to LyricFind's state law claims for which there is not nationwide personal jurisdiction. *See Action Embroidery*, 368 F.3d at 1180–81. LyricFind's federal and state claims— for unfair competition, interference with prospective economic advantage, and breach of contract— arise out of the same nucleus of operative facts such that pendent personal jurisdiction is appropriate. *See In re Packaged Seafood Prods.*, 338 F. Supp. 3d at 1173.

### 6. Alternatively, LyricFind is Entitled to Jurisdictional Discovery

In the alternative, to the extent the foregoing does not dispositively resolve the personal jurisdiction portion of Musixmatch's Motion in LyricFind's favor, LyricFind respectfully requests jurisdictional discovery to test Musixmatch's jurisdictional assertions.[10]

## III. LyricFind Has Antitrust Standing and Suffered Antitrust Injury

LyricFind "clearly has standing" and antitrust injury based on "the conduct of rival(s) that . . . tends to exclude [it] from the market, thus leading to reduced output and higher prices." *See* Phillip E. Areeda and Herbert Hovenkamp, 2 Antitrust Law ¶ 348 (4th ed. 2024); *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996) ("[A] competitor of an alleged attempted monopolist had standing where it was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist.") (citing cases).

---

10 *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 673 (S.D. Cal. 2001) ("Discovery should be denied only where 'it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.'"); *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008); *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (holding it was an abuse of discretion to deny jurisdictional discovery that "might well demonstrate" jurisdictionally relevant facts).

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

14

Antitrust injury consists of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). A plaintiff harmed by a rival's conduct suffers antitrust injury when its injury flows from the aspects of the rival's conduct that harm *competition*, as opposed to procompetitive conduct that harms just LyricFind. *See* Areeda, ¶ 348 ("[A] "rival's loss is compensable [as antitrust injury] when it results from conduct that, if successful, would have caused the type of market damage the antitrust laws seek to prevent.").

By ensuring that no other lyric service provider can compete for DSPs' business, Musixmatch has harmed competition in several ways that give rise to antitrust injury. Musixmatch has: (1) driven LyricFind and other competitors from the market, Compl. ¶¶ 23–26, 134, 140, 146, 153–54, 167–168, 171; (2) imposed drastic and immediate price increases on DSP consumers, *id.* ¶¶ 24–25, 108, 133, 136, 169; (3) limited the selection of lyric services available to DSPs, *id.* ¶¶ 26, 134–36, 140, 152–54, 168, 172–73; (4) erected barriers to new market entrants, *id.* ¶¶ 159–161, 164–65; and (5) decreased the quality of lyrics services in the market, *id.* ¶¶ 99–100. *See PLS.COM, Ltd. Liab. Co.*, 32 F.4th at 840 (finding antitrust injury where rivals prevented plaintiff from "gaining a foothold in the market and ma[de] it virtually impossible for new competitors to enter, leaving [customers] with fewer choices, supracompetitive prices, and lower quality products.").

Because the Exclusive caused both this competitive harm and LyricFind's injuries, LyricFind's injury flows from that which makes Musixmatch's conduct unlawful, establishing antitrust injury. *See CollegeNET, Inc. v. The Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (holding a competitor "may assert antitrust injury from coercive activity that prevents consumers from making free choices between market alternatives as well as restraints that artificially erect barriers to market entry") (cleaned up) (citing *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374–75 (9th Cir. 2003)).

Citing *Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998), Musixmatch argues that LyricFind lacks antitrust injury because LyricFind "would have suffered the same" lost business from lawful behavior, like a unilateral termination of its licensing

1 rights. Mot. 17. But the Ninth Circuit has held that *Lucas Auto* bars antitrust injury only where lost

2 profits were caused by conduct that is beneficial or neutral to competition—like a competitive

3 bidding process—not from a rival's anticompetitive efforts to restrain a plaintiff's business by

4 locking up key inputs. *See Glen Holly*, 352 F.3d at 377 (limiting *Lucas Auto* and the other

5 "*Brunswick* line of cases" to situations where injury was "caused by *increased* competition" and

6 finding antitrust injury where rival and supplier conspired to restrict inputs to a competitor) (emphasis

7 in original).

8      In *Lucas Auto*, a tire distributor lost a bid to its rival to become the exclusive distributor for a

9 tire brand. 140 F.3d at 1231. The Ninth Circuit held the plaintiff's lost bid did not establish antitrust

10 injury, even if the winning bidder were a monopolist, because the lost bid did not stem from

11 anticompetitive conduct and would have occurred if the winner were a non-monopolist. *Id.* at 1233.

12      *Lucas Auto* does not apply to the scheme Defendants used here, where a seller gains exclusive

13 control of key inputs to drive its competitors from the market. *See Glen Holly*, 352 F.3d at 377

14 (holding *Lucas Auto* inapplicable where seller and supplier conspired to restrict film editing

15 equipment to rival seller); *Retrophin, Inc. v. Questcor Pharms., Inc.,* 41 F. Supp. 3d 906, 913–14

16 (C.D. Cal. 2014) (upholding antitrust injury and finding *Lucas Auto* inapplicable where a drug

17 manufacturer purchased the exclusive right to drug ingredients to stop the plaintiff from developing a

18 competing drug); *Orchard Supply Hardware LLC v. Home Depot USA, Inc*., 967 F. Supp. 2d 1347,

19 1359–60 (N.D. Cal. 2013) (finding antitrust injury properly alleged where Home Depot acquired the

20 exclusive rights to sell tool brands that the plaintiff, a rival retailer, needed to effectively compete);

21 *MLW Media LLC v. World Wrestling Ent., Inc*., 2023 U.S. Dist. LEXIS 104499, at *6, *20–21 (N.D.

22 Cal. 2023) (upholding allegations of antitrust injury where pro-wrestling promoter acquired exclusive

23 right to work with performers and venues, denying access to rival).

24      Musixmatch's foreclosure of competition through the Exclusive gives rise to antitrust injury

25 and bears no resemblance to the lost bid in *Lucas Auto*. LyricFind's injuries were not caused by

26 procompetitive or competitively neutral conduct like a bidding process, but rather from a deliberate,

27 anticompetitive scheme to ensure no other lyric services company could compete. Under such

28 circumstances, LyricFind's antitrust injury is "clear and seldom challenged," as it stems directly from

1    Defendants' efforts to restrain competition. Areeda ¶ 348 ("Standing is clear and seldom challenged

2    when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market

3    of the plaintiff, to preclude its entry or raise its costs, so that the defendant could maintain or create a

4    monopoly.").

5    **IV.    Musixmatch's Exclusivity Arrangement Unlawfully Restrains Trade**

6        Musixmatch's exclusivity arrangement with WCM is analyzed under the "rule of reason" for

7    purposes of Sections 1 and 2 of the Sherman Act. *Costar*, 2025 U.S. App. LEXIS 15354, at *9; *Epic*

8    *Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 998 (9th Cir. 2023) *cert. denied*, 144 S. Ct. 682 (2024)

9    ("The anticompetitive-conduct requirement of § 2 is essentially the same as the Rule of Reason

10   inquiry applicable to § 1 claims.") (cleaned up). An exclusive arrangement violates the rule of reason

11   when it "forecloses competition in a substantial share of the relevant market." *Costar*, 2025 U.S. App.

12   LEXIS 15354, at *10. Because Musixmatch has monopoly power, "any exclusive agreements [it]

13   entered substantially foreclosed competition" presumptively without the need for further analysis. *Id.*

14   at *9, *12 (finding substantial foreclosure where defendant "entered exclusive agreements while

15   holding monopoly power").

16       Exclusivity arrangements, like the Exclusive here, violate the antitrust laws when used by a

17   seller to lock up key inputs that its rivals need to compete, as this forecloses rivals from the market,

18   freeing the seller to charge supracompetitive prices. *See id.* at *12 (condemning exclusivity

19   agreements where they "exclude competitors from so much of the market that they cannot gain a

20   solid foothold to compete," allowing the defendant to charge supracompetitive prices); *see also*

21   Thomas Krattenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve*

22   *Power Over Price*, 96 Yale L.J. 209, 224 (1986) ("[A] firm may gain the ability to raise price by

23   contracting with input suppliers for the suppliers' agreements not to deal with the purchasing firm's

24   competitors . . . restraining the supply of inputs available to rivals [can give] the purchaser power to

25   raise prices in its output market.").

26       Courts in this Circuit overwhelmingly uphold Section 1 and 2 claims where a seller or

27   distributor gains exclusive control over an input to foreclose its rivals from competing, as Defendants

28   have done here. *See, e.g., Costar*, 2025 U.S. App. LEXIS 15354, at *33–34 (reversing district court

1   and upholding §§1 and 2 claims where online distributor of real estate listings used exclusive

2   agreements with listing suppliers to deny listings to rivals); *Complete Ent. Res. LLC v. Live Nation*

3   *Ent., Inc.*, No. 15-cv-9814, 2017 U.S. Dist. LEXIS 183213, at *5 (C.D. Cal. Oct. 16, 2017)

4   (upholding claims against Ticketmaster for exclusive agreements with concert venues that prevented

5   rival ticket sellers from accessing venues); *Orchard Supply Hardware*, 967 F. Supp. 2d at 1360

6   (upholding claims against Home Depot for exclusive agreement with tool brands that cut off rival

7   retailers' supply); *Retrophin,* 41 F. Supp. 3d at 918 (upholding claims against drug maker for

8   exclusive agreement with supplier that cut off rival's access to pharmaceutical ingredients); *Twin City*

9   *Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1309 (9th Cir. 1982) (same for food

10  vendor's exclusive agreements with stadiums); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990,

11  993 (9th Cir. 1983) (same for movie theatres' exclusive agreements with motion picture suppliers);

12  *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1075 (N.D. Cal. 2022) (same for rebar

13  manufacturers' exclusive agreement with supplier of manufacturing technology).

14      Musixmatch's Exclusive follows the same playbook and should be condemned for the same

15  reasons. Musixmatch paid WCM to cut off its rivals from distributing lyric data and licenses for

16  WCM titles, not for any procompetitive reason, but to substantially foreclose the competition that

17  threatened Musixmatch's monopoly. Compl. ¶¶ 134–37, 142. Contrary to what Musixmatch argues,

18  its exclusivity is sufficiently durable, and forecloses a sufficient share of the relevant markets, to

19  violate Sections 1 and 2 of the Sherman Act and the Cartwright Act.

20      **1.    Musixmatch's Exclusivity is Sufficiently Durable**

21      Musixmatch argues that LyricFind inadequately alleged substantial foreclosure by failing to

22  allege the Exclusive's end date, Mot. 19–20, a detail Musixmatch has yet to disclose. Compl. ¶ 138

23  (noting Musixmatch has not disclosed "the specific terms" of the Exclusive). This argument is at odds

24  with Ninth Circuit precedent and ignores LyricFind's allegations, which plausibly allege that

25  substantial foreclosure will occur, and has occurred, regardless of the Exclusive's formal end date. *Id*.

26  ¶¶ 147, 166–68, (alleging the Exclusive "forecloses virtually all current and potential business" and

27  "future competition," "mak[ing] it near-impossible for anyone but Musixmatch to compete for new

28  contracts, or maintain their existing contracts long-term").

Musixmatch's argument is doomed from the start: the Ninth Circuit does not require that any express term of exclusivity *exist*, much less be alleged in the Complaint. The Ninth Circuit recently rejected such a requirement in *Costar*, holding that "de facto" exclusivity can exist despite no express term of exclusivity or where formal exclusivity is "short-term and voluntary." *See Costar,* 2025 U.S. App. LEXIS 15354, at *26–30 (citing *McWane, Inc. v. Fed Trade Comm'n*, 783 F.3d 814, 819–20, 833–35 (11th Cir. 2015)). In rejecting "formalistic" exclusivity analysis, the Ninth Circuit directed courts to assess exclusive arrangements based on practical indicia and not express terms alone. *Costar,* 2025 U.S. App. LEXIS 15354, at *30. *Costar* singlehandedly defeats Musixmatch's argument, as no formal length of exclusivity need exist, let alone be alleged at the pleading stage, under binding Ninth Circuit precedent.

*Costar* also disposes of Musixmatch's argument for another reason: substantial foreclosure is inferred when a defendant plausibly has monopoly power, as Musixmatch does here. *Id.* at *13. Pleading "monopoly power . . . is sufficient to allege the substantial foreclosure element of exclusive dealing." *Id.* As in *Costar*, Musixmatch's monopoly power, as detailed below (*infra* § V) and in the Complaint (Compl. ¶¶ 155–65), obviates the need for a detailed analysis and is sufficient to show substantial foreclosure.

Indeed, even before *Costar,* LyricFind was not required to plead the specific duration of exclusivity to show substantial foreclosure. *See, e.g.*, *Cung Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1167 (D. Nev. 2016) (denying motion to dismiss despite failure to show "duration of exclusivity"); *In re Copaxone Antitrust Litig.*, No. 2:22-cv-1232, 2025 U.S. Dist. LEXIS 77193, at *39 (D.N.J. Feb. 27, 2025) (denying motion to dismiss and rejecting argument that substantial foreclosure requires allegations of long duration and non-terminability). At the pleading stage, when "exact information [regarding the duration of an exclusive agreement] is within Defendants' exclusive control, dismissal is not appropriate." *Am. Spirit & Cheer Essentials Inc. v. Varsity Brands, LLC*, No. 2:20-cv-02782, 2022 U.S. Dist. LEXIS 254674, at *50–51 (W.D. Tenn. Mar. 30, 2022).

Under the more practical standard that applies, substantial foreclosure depends on *several* factors and market realities; the duration of an agreement, even when short-term, is not dispositive. *See Tevra Brands LLC v. Bayer Healthcare LLC*, No. 19-cv-04312, 2024 U.S. Dist. LEXIS 79934, at

*20–27 (N.D. Cal. 2024) (denying summary judgment, despite exclusives' short term, where exclusivity was reenforced by other "realities in the marketplace"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287 (3d Cir. 2012) (affirming jury verdict for plaintiff despite easy terminability of exclusive, where the parties "had a strong economic incentive to adhere to the terms of the [exclusive agreement], and therefore were not free to walk away . . . ") (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005)), *cert denied* 133 S. Ct. 2025 (2013)); *Fed Trade Comm'n v. Surescripts, LLC*, 424 F. Supp. 3d 92, 104 (D.D.C. 2020) (upholding antitrust claims where exclusives were "short term and easily terminable" where "the nature of the two relevant markets and [defendant's] dominant monopoly position, had the effect of foreclosing large parts of both markets").

Judged against this proper standard, which the Ninth Circuit further liberalized in *Costar*, LyricFind adequately alleges that Musixmatch's exclusivity is durable and will substantially foreclose competition. In addition to Musixmatch's monopoly power (which alone is sufficient), its exclusivity has never been subject to bidding: the Exclusive was an unprecedented scheme that Defendants plotted behind closed doors, for which LyricFind never had a chance to compete (nor did anyone else). Compl. ¶ 138. *See Pro Search Plus*, 2013 U.S. Dist. LEXIS 169856, at *17 (sustaining allegations of substantial foreclosure where defendant with market power entered contracts that "are continually renewed and not open to rebidding"). By contrast, the exclusive agreements in *Paddock Publishers v. Chicago Tribune Co.* were commonplace and subject to rebidding, and the newspapers with exclusivity were not alleged to have monopoly power. 103 F.3d 42, 44 (7th Cir. 1996).[11]

---

[11] Defendants' remaining cases related to substantial foreclosure are inapposite. In *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, the court upheld claims under Section 1 and Section 2 of the Sherman Act because there, as here, the exclusive agreements were part of defendant's overarching scheme to restrain trade. No. C-10-4429, 2011 U.S. Dist. LEXIS 35969, at *53 (N.D. Cal. Apr. 1, 2011). In *W. Parcel Express v. United Parcel Service of Am., Inc.*, the court granted summary judgment after discovery revealed the underlying contracts at issue were not expressly or de facto exclusive and thus had not foreclosed competition. 65 F. Supp. 2d 1052, 1065 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999). And in *Barry Wright Corp. v. Pac. Sci. Corp.*, the District Court made similar findings of fact, including that the underlying contracts provided the buyer with flexibility to source from defendant's competitors. 724 F.2d 227, 238 (1st Cir. 1983). By contrast, the Exclusive here already has caused LyricFind to lose DSP contracts to Musixmatch, demonstrating substantial foreclosure and monopoly power through direct evidence, even before discovery. Compl. ¶¶ 133–34, 149–52, 169. *See Costar*, 2025 U.S. App. LEXIS 15354, at *22.

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

20

Musixmatch's competitive foreclosure is furthered by its multi-year agreements with DSPs, Compl. ¶ 95, and the high costs and technical integration required for DSPs to switch between providers. *Id.* ¶¶ 68–69, 95, 106, 159, 163. These long contracts and high switching costs effectively lock in the Exclusive regardless of its formal end date; LyricFind will have to wait years for Musixmatch's DSP contracts to expire before it has another chance to compete.[12] *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 953 (D. Or. 2018) (denying motion to dismiss where *"*high switching" meant that "parties are unlikely to terminate" their agreements); *see also Pro Search Plus, LLC v. VFM Leonardo, Inc.,* No. SACV 12-2102, 2013 U.S. Dist. LEXIS 169856, at *18 (C.D. Cal. Dec. 2, 2013) (denying motion to dismiss where "cost of switching" distributors was "prohibitive"). *Contrast PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689, 2014 U.S. Dist. LEXIS 58108, at *4 (N.D. Cal. Apr. 25, 2014) (finding no substantial foreclosure where plaintiff made no allegations regarding switching costs or entry barriers) *with* Compl. ¶¶ 68–69, 95, 106, 159, 163. LyricFind has adequately alleged that Defendants' competitive foreclosure will be durable.

### 2.    Musixmatch Has Foreclosed a Substantial Share of the Relevant Markets

Defendants have also foreclosed a sufficient *share* of the relevant markets. An exclusive agreement forecloses a substantial share of the market when it "exclude[s] competitors from so much of the market they cannot gain a solid foothold to compete." *Costar*, 2025 U.S. App. LEXIS 15354, at *12 (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)). There is no "set percentage for how much of the relevant market must be foreclosed." *See Tevra Brands, LLC v. Elanco Animal Health Inc.*, No. 24-cv-04683, 2025 U.S. Dist. LEXIS 61641, at *37 (N.D. Cal. Mar. 31, 2025) (quoting *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV-02-4770, 2006 U.S. Dist. LEXIS 29977, at *4 (C.D. Cal. Mar. 22, 2006). Generally, however, substantial foreclosure exists where a defendant forecloses or controls more than 40% of the relevant market.[13] *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002–03 (9th Cir. 2008)

---

12 This is not a situation where LyricFind can simply "wait for the contracts to expire or make alluring offers to initiate termination" due to high switching costs. *See* Mot. 19 (citing In re EpiPen (Epinephrine Injection, USP) Mktg., *Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022)).

13 *Accord* Mot. 21 (citing *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-cv-03587, 2018 U.S. Dist. LEXIS 173788, at *12 (N.D. Cal. Oct. 9, 2018); *McWane*, 783 F.3d at 837; *United States v.*

(40-60% sufficient); *Twin City Sportservice, Inc.*, 676 F.2d at 1301, 1304 (24% foreclosure unlawful where contracts were long-term).

One bright-line rule does exist: any exclusivity arrangement entered by a monopolist is presumed to substantially foreclose competition in the monopolized market. *Costar*, 2025 U.S. App. LEXIS 15354, at *12 ("[A] § 1 exclusive dealing claim requires a substantial foreclosure of competition, and monopoly power establishes such a foreclosure."). Thus, to the extent LyricFind plausibly alleges that Musixmatch has monopoly power in the relevant markets (it does), LyricFind also has plausibly shown that the Exclusive forecloses a substantial share of competition. *Id.*

LyricFind easily meets these standards. First, as discussed *infra* § V, LyricFind has plausibly alleged that Musixmatch possesses monopoly power in the Lyric Data Services and Lyric Rights Sublicensing markets, based on both direct evidence of its supracompetitive pricing and its dominant market shares of 80% and 66%, respectively. Compl. ¶¶ 80, 84. This alone is sufficient to plausibly allege that the Exclusive substantially foreclosed competition.

In addition, LyricFind alleges that Musixmatch has completely (not just substantially) foreclosed competition in the Lyric Data Services and Lyric Rights Sublicensing markets. *Id.* ¶¶ 161, 168, 236. By cutting off all lyric providers other than Musixmatch from sublicensing and distributing data for WCM lyrics, the Exclusive has precluded every other lyric service provider from competing for DSPs' business. *Id.* ¶ 168. As just two examples, Spotify and iHeartRadio, the two major DSPs who have solicited bids since the Exclusive, were each forced to contract with Musixmatch for Lyric Data Services and Lyric Rights Sublicensing at supracompetitive prices because no other providers could compete. *Id.* ¶¶ 133–34, 169. Substantial foreclosure thus has already occurred. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (defining substantial foreclosure as where the "opportunities for other traders to enter into or remain in that market [are] significantly limited"); *Orchard Supply Hardware LLC*, 967 F. Supp. 2d at 1360 (bypassing analysis of

---

*Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc). While Musixmatch cites *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.* for its 40% threshold, that case actually noted foreclosure of 30% of the relevant market can raise competitive concerns. 373 F.3d 57, 68 (1st Cir. 2004).

1   foreclosure percentages where Home Depot's exclusivity over certain tool brands had already

2   "completely foreclosed previously existing competition" for tool sales).

3        To distract from its complete foreclosure of the *relevant markets*, Musixmatch tries to shift

4   attention to a *different* market: "the portion of the *music publishing* market that WCM controls." Mot.

5   20–22 (emphasis added). But that is not a relevant market in which the parties compete and is not

6   relevant to the substantial foreclosure analysis.[14] Substantial foreclosure focuses on the degree of

7   competition remaining in the relevant markets, not WCM's market share in the upstream market for

8   music publishing. *See Costar*, 2025 U.S. App. LEXIS 15354 (measuring substantial foreclosure based

9   on defendant's market power in the relevant markets); *see also Collins v. Associated Pathologists,*

10  *Ltd*. 844 F.2d 473, 479 (7th Cir.), cert. denied, 488 U.S. 852 (1988) ("In determining whether this

11  exclusive arrangement forecloses competition, the focus is upon competition between [competitors in

12  the relevant markets]"). Musixmatch's lengthy discourse on how to measure WCM's market share in

13  the music publishing market misses the point. Mot. at 20–23.[15]

14        Musixmatch is also mistaken when it compares LyricFind's allegations to an "essential

15  facilities" claim. Mot. 22. LyricFind is not asserting such a claim. Rather, LyricFind alleges a well-

16  accepted dynamic in exclusivity jurisprudence: that a distributor can exploit its exclusivity over one

17  set of inputs to foreclose competition more broadly. *See, e.g., Complete Ent. Res. LLC*, 2017 U.S.

18  Dist. LEXIS 183213 at *6 (finding that Ticketmaster's exclusive rights to sell presale tickets with

19  "even a small number of [music] venues" could foreclose competition to service music venues

20  nationwide); *Orchard Supply Hardware*, 967 F. Supp. 2d at 1360 (upholding allegations that Home

21  Depot's exclusivity over just two tool brands allowed it to foreclose competition in the broader retail

22  hardware market); *In re Pool Prods. Distribution Mkt. Antitrust Litig*., 940 F. Supp. 2d 367, 398

23  (E.D. La. 2013) (upholding allegations that a distributor's exclusivity over certain pool products

24  allowed it to monopolize the broader pool product distribution market). This recurring dynamic, well-

25  recognized by courts, does not transform LyricFind's allegations into an essential facilities claim.

26  14 The Complaint addresses WCM's market share in the music publishing market, Compl. ¶ 59, to explain why Musixmatch's exclusive control over WCM titles can be exploited to foreclose

27  competition in the relevant distribution and licensing markets involving DSPs. *Id*. ¶¶ 166–69.

28  15 Measuring foreclosure in the proper market, the Exclusive easily surpasses Musixmatch's 40% threshold. *See supra* note 13.

Lastly, the small number of well-resourced DSPs that have, at times, sourced lyrics from multiple providers does not negate the fact that the Exclusive has substantially foreclosed competition. Musixmatch hypothesizes that certain major DSPs could theoretically partner with both LyricFind and Musixmatch at the same time. Mot. 23–24. But this is counterfactual: almost no DSPs dual source in the real world, a fact that Musixmatch has exploited to its own advantage. Compl. ¶ 68. Indeed, courts recognize that exclusivity arrangements are particularly prone to substantial foreclosure where practical realities dictate that customers deal with a single provider. *See Costar*, 2025 U.S. App. LEXIS 15354, at *31 ("Because it is costly to maintain a dynamic database of listings on several different platforms at once, many brokers keep their listings only on [Costar's] websites."); *Complete Ent. Res. LLC*, , 2017 U.S. Dist. LEXIS 183213 at *6 (finding exclusive ticketing at a subset of venues could cause substantial foreclosure because "artists prefer to purchase presale ticket servicing on an entire tour basis" from a single provider); *Orchard Supply Hardware LLC*, 967 F. Supp. 2d at 1358 (finding exclusive distribution agreement totally foreclosed competition because, despite the possibility of buying tools from multiple stores, professional customers simply stopped shopping at "deficient" stores).

At the pleading stage, LyricFind has plausibly alleged that the Exclusive has significantly limited "the opportunities for other [lyric service providers] to enter into or remain" in the relevant markets. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961); *see also Arcell v. Google LLC*, No. 22-cv-02499, 2024 U.S. Dist. LEXIS 45530, at *28 n.1 (C.D. Cal. Feb. 5, 2024) (holding that "a plaintiff is not necessarily required to allege a specific percentage of foreclosure" at the pleading stage) (quoting *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220, 2017 U.S. Dist. LEXIS 98632, at *24 (N.D. Cal. June 26, 2017)). This is sufficient to show that competition has been substantially foreclosed.

### 3. Copyright Law Does Not Shield Musixmatch from Antitrust Liability

"The antitrust laws still apply to anticompetitive conduct [that occurs] in the shadows of the Copyright Act." *See X Corp. v. Bright Data Ltd.*, No. C 23-03698 WHA, 2025 U.S. Dist. LEXIS 75033, at *18–19 (N.D. Cal. Apr. 18, 2025) (citing *Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 464 (1941)). "Intellectual property rights," including copyright protections,

"do not confer a privilege to violate the antitrust laws." *See United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001) (quoting *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000)).

Musixmatch cannot rebut this principle, nor does it try. Instead, Musixmatch peppers its Motion with "copyright" buzzwords to imply, without arguing, that copyright law somehow precludes antitrust enforcement. Mot. 1, 14–18, n.13.[16] Stripped of this tactic, the only cognizable copyright argument Musixmatch makes is that nonparty WCM may refuse to deal with LyricFind and may appoint an exclusive licensee. Mot. 1, 17–18. But LyricFind is not suing WCM on either theory. Rather, LyricFind is suing Musixmatch and TPG for scheming to drive rival lyric companies from the market by paying WCM to cut them off—both with respect to licenses and data distribution more broadly. Whatever licensing rights WCM has as a music publisher are not relevant to, and do not excuse, Musixmatch and TPG's scheme to foreclose competition at the lyric distribution level. *See Mannington Mills, Inc. v. Congoleum Industries*, 610 F.2d 1059, 1073 (3d Cir. 1979) (reversing grant of summary judgment where licensees induced a patent holder to terminate rival's license, holding that when distributors provide the impetus for exclusivity "there is a greater risk that the restriction is" anticompetitive); *Int'l Wood Processors v. Power Dry, Inc*, 792 F.2d 416, 429 (4th Cir. 1986) (affirming verdict against patent holder and licensees, holding, "a patentee's termination of a license in concert with a competing licensee . . . is not entitled to an antitrust exemption").

Indeed, courts in this Circuit uphold antitrust challenges to exclusivity schemes involving all sorts of copyright and patent licenses—from motion pictures to baseball telecasts—without wading into irrelevancies about intellectual property law. *See Syufy Enters.*, 793 F.2d at 993 (9th Cir. 1983) (licenses for motion pictures); *Ultronics, Inc. v. Cox Cable of San Diego, Inc.*, 1991 U.S. Dist. LEXIS 9509, at *12 (S.D. Cal. 1991) (licenses for San Diego Padres baseball telecasts)*; Pac. Steel Grp. v. Commer. Metals Co*., 600 F. Supp. 3d 1056, 1075 (N.D. Cal. 2022) (patented "micro-mill" technology); *Pecover v. Electronics Arts Inc*., 633 F. Supp. 2d 976, 979 (N.D. Cal. 2009) (licenses for

---

16 The few cases Defendants cite in passing deal with a copyright holder's unilateral control over the licensing of its rights, not, as here, a scheme imposed by downstream distributor. *See* Mot. 18 n.13 (citing *UMG Recordings, Inc. v. MP3.Com, Inc*., 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) and *Fed Trade Comm'n v. Microsoft Corp*., 136 F.4th 954, 971 (9th Cir. 2025).

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

25

1   major sports leagues' trademarks). Musixmatch, in contrast, does not cite a single authority

2   suggesting that a distributor's exclusivity scheme is immune from antitrust scrutiny simply because it

3   involves another party's intellectual property.

4         To the extent copyright law may be relevant to some issue in this case, which Musixmatch has

5   not shown, such hypothetical questions would be "factually sensitive" and cannot be decided under

6   the rule of reason at this stage. *See X Corp. v. Bright Data Ltd.*, 2025 U.S. Dist. LEXIS 75033, at *19

7   (holding that if "copyright-related concerns come into play at all . . . those concerns will be factually

8   sensitive, and under the rule of reason we cannot now decide they overtake or outweigh the alleged

9   harms to competitions").

10  **V.     Musixmatch Has Monopoly and Market Power in the Relevant Markets**

11        **1.   LyricFind Has Properly Defined the Relevant Markets**

12        LyricFind alleges two relevant markets: one for the technical infrastructure DSPs need to

13  display lyrics on streaming platform and allocate royalties (Lyric Data Services), and one for the

14  licenses that DSPs need to display lyrics from a legal perspective (Lyric Rights Licensing). Compl. ¶¶

15  76–87. There is also a distinct submarket for Lyric Rights *Sub*licensing given that direct licenses from

16  music publishers often are not practically available.

17        These market definitions reflect "a factual inquiry into [] commercial realities," *id.* (citing

18  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992)), which depend "upon the

19  special characteristics of the industry involved." *Twin City Sportservice, Inc.,* 676 F.2d at 1299.

20  "Allegations of a relevant market and market power generally pass the test at the pleading stage

21  unless the market definition is 'facially unsustainable.'" *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d

22  865, 882 (N.D. Cal. 2023) (citing *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir.

23  2008)).

24        Contrary to Musixmatch's assertions, Mot. 25–26, LyricFind properly defines the bounds of

25  the relevant markets by identifying "the reasonable interchangeability of use or the cross-elasticity of

26  demand" for both Lyric Data Services and Lyric Rights Licensing. *See Newcal*, 513 F.3d at 1045

27  (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).

28

The interchangeable services within the Lyric Data Services Market are the distribution of "data files that contain the actual text of lyrical transcriptions," "data to synchronize the transcriptions to sound recordings," and "usage data to determine the appropriate royalties due to each rights holder." Compl. ¶ 85; *see also id.* ¶ 2. These services are reasonably interchangeable because DSPs "expect a single provider to fulfill them" together. *Id.* ¶¶ 86–87. Other services are not interchangeable with Lyric Data Services because they would not provide the "technical infrastructure required" for DSPs to display lyrics and allocate royalites. *Id.* Purchasers of Lyric Data Services thus would not "substitute to a different service" in the event of a price increase. *Id.* ¶ 87.

The services in the Lyric Rights Licensing Market that are reasonably interchangeable are the licensing of "lyric rights owned by major music publishers and other rights holders." *Id.* ¶ 77. This licensing is not interchangeable with other services because DSPs need the legal right to display lyrics, and only Lyric Rights Licensing provides that right. *Id.* ¶¶ 2, 14, 62. Lyric Rights Licensing is distinct from Lyric Data Services because they fill different needs (legal vs. technical) and can be obtained separately from different providers. *Id.* ¶¶ 65, 78.

These market definitions reflect basic logic and common industry knowledge—a far cry from the convoluted or poorly pled market definitions that have been dismissed (on rare occasion) at the pleading stage in other cases.[17] Indeed, Musixmatch does not meaningfully contest these market definitions, much less show they are facially implausible as would be necessary to dismiss them at this stage. *See Gamboa v. Apple Inc.*, No. 24-cv-01270-EKL, 2025 U.S. Dist. LEXIS 114715, at *5 (N.D. Cal. June 16, 2025) (denying motion to dismiss and noting "it would be premature at this stage

---

17 *NSS Labs, Inc. v. Symantec Corp.*, No. 18-cv-05711, 2019 U.S. Dist. LEXIS 136742, at *28–29 (N.D. Cal. Aug. 13, 2019) (dismissing complaint that failed to "plead any facts regarding the cross-elasticity of demand between the Relevant Product Markets and their substitutes");*Total Renal Care Inc. v. W. Nephrology Metabolic Bone Disease, P.C.*, No. 08-cv-00513, 2009 U.S. Dist. LEXIS 80821, at *25 (D. Colo. Aug. 21, 2009) (dismissing complaint that contained "no reference – in name or in substance – to product interchangeability or cross-elasticity"); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2007) (dismissing complaint that alleged alternative markets in "vague and conclusory" terms); *Honey Bum, LLC v. Fashion Nova, Inc*. did. No. 20-cv-11233, 2021 U.S. Dist. LEXIS 182308, at *16 (C.D. Cal. Mar. 26, 2021) (rejecting market that "arbitrarily omit[ted] interchangeable competing products").

1   to conclude that Plaintiffs' proposed market is 'facially unsustainable' because it excludes" a

2   hypothetical substitute).[18]

3        Musixmatch's main critique of LyricFind's market definitions is that DSPs could use "other

4   transcription or royalty administration solutions" or "artificial intelligence"—purportedly as

5   alternatives to Lyric Data Services. Mot. 26. But the Lyric Data Services Market already

6   encompasses these solutions to the extent they exist. These "other" transcription and royalty solutions

7   would fall *within* the Lyric Data Services market so long as they provide DSPs with lyric data,

8   synchronization data, and usage data to display lyrics and royalites. Compl. ¶¶ 83–85. Musixmatch's

9   purported alternatives would be encompassed in the Lyric Data Services Market.

10       Musixmatch's other argument is that there is no distinct submarket for Lyric Rights

11  Sublicensing because lyric licenses and sublicense confer the same rights. Mot. 26. That misses the

12  point. While the rights are the same, lyric licenses and sublicenses are usually not both available to

13  DSP customers and thus not reasonably interchangeable. DSPs often cannot practically obtain direct

14  licensing from music publishers and can only obtain sublicensing from lyric companies—in other

15  words, they cannot substitute one for the other. Compl. ¶ 79. This is a quintessential hallmark of a

16  submarket and supports LyricFind's allegations. *See Newcal*, 513 F.3d at 1045 (holding a discrete

17  submarket may be shown through "distinct customers, distinct prices, sensitivity to price changes,

18  and specialized vendors") (quoting *Brown Shoe*, 370 U.S. at 325); *Fed Trade Comm'n v. Staples,* 970

19  F. Supp. 1066, 1080 (D.D.C. 1997) (finding different markets where the same office supplies were

20  sold through "superstores" vs. "non-superstores"); *In re Pool Products*, 940 F. Supp. 2d at 379

21  (finding different markets for wholesale vs. retail distribution of the same pool products).[19]

22  ---

18 In *United States v. Oracle Corp.*, where plaintiffs sought to enjoin a merger, the court rejected a
23  market definition only after making detailed findings of fact based on an extensive record including
    testimony from dozens of witnesses, including experts. 331 F. Supp. 2d 1098, 1123–65 (N.D. Cal.
24  2004).

25  19 In the cases Musixmatch cites regarding submarkets, plaintiffs either failed to demonstrate
    distinctions between the market and submarket, or the submarket was rejected upon a full factual
26  record. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (rejecting submarkets for
    particular forms of advertising to golf fans without demonstrating advertisers facing a price increase
    could not switch to alternative advertising methods); *In re German Auto. Mfrs. Antitrust Litig.*, 497 F.
27  Supp. 3d 745, 756 (N.D. Cal. 2020) (rejecting diesel passenger vehicle submarket because drivers
    facing a price increase could switch to non-diesel vehicles), aff'd sub nom. *Audubon Imports, LLC v.*
28  *Bayerische Motoren Werke Aktiengesellschaft (In re German Auto. Mfrs. Antitrust Litig.),* No. 20-

In any event, LyricFind need not "establish in the complaint[] that the alleged submarket is economically distinct from the general product market," as this is a fact issue not properly decided at this stage. *Heckman v. Live Nation Ent., Inc*., No. CV 22-0047, 2025 U.S. Dist. LEXIS 69885, at \*29 (C.D. Cal. Apr. 11, 2025) (quoting *Newcal*, 513 F.3d at 1045); *X Corp.,* 2025 U.S. Dist. LEXIS 75033, at \*21 ("If other platforms or data are in fact closer substitutes (or more competitively disciplining) than contended, such 'factual testing [will be] by summary judgment or trial.'") (quoting *Newcal*, 513 F.3d at 1045*).*

### 2.  LyricFind Has Plausibly Alleged Direct and Indirect Evidence of Musixmatch's Monopoly and Market Power

LyricFind has plausibly alleged that Musixmatch possesses monopoly power in the Lyric Data Services Market and Lyric Rights Sublicensing Submarket, as well as market power in the Lyric Rights Licensing Market.[20] Compl. ¶¶ 80, 84. "Monopoly power 'is the substantial ability to control prices or exclude competition.'" *Costar*, 2025 U.S. App. LEXIS 15354, at \*14 (quoting *Epic Games,* 67 F.4th at 998). "[M]onopoly power can be shown either directly, through evidence of the exercise of monopoly power, or indirectly, through evidence of a firm's predominant market share." *Costar*, 2025 U.S. App. LEXIS 15354, at \*15 (citing *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995)).

Direct evidence of monopoly power includes "reduced output, increased prices, *or* decreased quality in the relevant market." *Costar*, 2025 U.S. App. LEXIS 15354, at \*17 (emphasis in original) (quoting *Ohio v. Am. Express* Co., 585 U.S. 529, 542 (2018)). Indirect evidence can be shown through market shares of 60% or higher, although smaller shares can suffice when coupled with high barriers to entry. *See Costar*, 2025 U.S. App. LEXIS 15354, at \*19 ("[M]arket shares on the order of 60 percent to 70 percent have supported findings of monopoly power.") (quoting *Hunt-Wesson*

---

17139, 2021 U.S. App. LEXIS 32094 (9th Cir. Oct. 26, 2021); *United States v. U.S. Sugar Corp*., No. 21-1644, 2022 U.S. Dist. LEXIS 175817, at \*66–71 (D. Del. Sep. 23, 2022) (concluding based on detailed factual record that distributors and refiners belonged in the same product market because they competed to supply the same customers).

20 "Monopoly power differs in degree from market power, requiring something greater. Like market power, monopoly power can be established either directly or indirectly." *Epic Games, Inc*., 67 F.4th at 966. The direct and indirect evidence in the Complaint is relevant to both market and monopoly power.

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

29

1    *Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980)) (collecting cases), *cert.*

2    *denied*, 450 U.S. 921 (1981).

3          Here, Musixmatch's monopoly power is supported by both direct evidence in the form of

4    increased prices and lower quality lyric services, and indirect evidence in the form of its market

5    shares of 80% and 66%. Each is sufficient to support LyricFind's Section 2 claims.

6          <u>Direct Evidence</u>: Musixmatch's imposition of dramatic price increases on DSPs while

7    simultaneously gaining market share provides direct evidence of its monopoly power in the Lyric

8    Data Services Market and Lyric Rights Sublicensing Submarket. *See Costar*, 2025 U.S. App. LEXIS

9    15354, at *16 (reversing dismissal of Section 1 and 2 claims where plaintiff "plausibly alleged

10   supracompetitive pricing" as direct evidence of monopoly power). In late 2024, soon after the

11   Exclusive, iHeartRadio was forced to replace LyricFind with Musixmatch at prices "over five times

12   higher than" what LyricFind charged previously. Compl. ¶ 169. Likewise, another major DSP,

13   Spotify, was forced to contract with Musixmatch in April 2024 at "substantially higher fees than

14   those offered by LyricFind." *Id.* ¶ 108. Musixmatch has maintained these price increases despite

15   serious issues with its lyric offerings and growing customer complaints. *Id.* ¶ 99.

16          Musixmatch's ability to charge supracompetitive prices for inferior services while *expanding*

17   its market share is paradigmatic evidence of monopoly power in both relevant markets. *See* Areeda  §

18   50 (defining monopoly power as "the abilit[y] (1) to price substantially above the competitive level

19   and (2) to persist in doing so for a significant period without erosion by new entry or expansion.").[21]

20   In a competitive market, DSPs would respond to Musixmatch's price hikes by negotiating lower rates

21   with LyricFind or other providers. The Exclusive forecloses that option, practically forcing DSPs to

22

23   _____

24   21 Furthermore, the Ninth Circuit has flatly rejected Musixmatch's suggestion that LyricFind must
     allege reduced output, in addition to supracompetitive prices, to provide direct evidence of monopoly
25   power. *See Costar*, 2025 U.S. App. LEXIS 15354, at *17 ("[A] plaintiff need not allege both output
     restrictions and supracompetitive pricing to plead direct evidence of monopoly power."). In *Forsyth*
26   *v. Humana, Inc.*, at the summary judgment stage, the court found higher prices alone were not direct
     evidence of monopoly power "[w]ith no accompanying showing of restricted output" to demonstrate
     these prices were supracompetitive. 114 F.3d 1467, 1476 (9th Cir. 1997). LyricFind alleges not just
27   high prices, but supracompetitive prices, which easily satisfies its burden at the pleading stage. *See*
     *Costar*, 2025 U.S. App. LEXIS 15354, at *17.

28

1  contract with Musixmatch at whatever rates it charges. Compl. ¶¶ 107–08, 140, 146, 152–53, 161,

2  169, 172–73.

3    Musixmatch's supracompetitive prices are not "offhand" predictions about "future" pricing as

4  Musixmatch claims, Mot. 27, but real-world examples from 2024 that are still in place today. Compl.

5  ¶¶ 108, 169, 172. Musixmatch has no response to this direct evidence of its monopoly power other

6  than to mischaracterize its 2024 price hikes, puzzlingly, as conclusions about the "future."

7    Musixmatch's only remaining claim is that its higher prices have not been passed on to

8  "consumers," ostensibly referring to people who stream music on DSPs' platforms. Mot. 27, n.16.

9  But DSPs, not individuals who stream music, are the relevant purchasers for antitrust purposes, as

10  they are the customers who consume the content that Musixmatch and LyricFind distribute. *See*

11  *PLS.COM, Ltd. Liab. Co.,* 32 F.4th at 832 ("[A] business that uses a product as an input to create

12  another product or service is a consumer of that input for antitrust purposes . . . ."); *Tele Atlas N.V. v.*

13  *NAVTEQ Corp.*, 2008 U.S. Dist. LEXIS 111866, at *69 (N.D. Cal. 2008) ("The final consumers of

14  digital map data are the manufacturers of devices that use such data.").

15    Indirect Evidence: In addition to this direct evidence, LyricFind has plausibly alleged indirect

16  evidence of Musixmatch's monopoly power via its dominant shares of the Lyric Data Services

17  Market (80%) and Lyric Rights Licensing Market (31%). Compl. ¶¶ 91–95, 156, 159–60, 162.

18    Musixmatch's 80% share of the Lyric Data Services Market, *id.* ¶ 84, is well beyond the

19  typical 60% threshold required for monopoly power. *Epic Games*, 67 F.4th at 983 (52-55% market

20  share conferred market power sufficient to foreclose would-be competitors); *Syufy Enters.*, 793 F.2d

21  at 995 (affirming denial of defendant's motion for judgment n.o.v on Section 2 claims based on 60-

22  69% market share) *cert. denied*, 479 U.S. 1031 (1987); *Pac. Coast Agric. Exp. Ass'n v. Sunkist*

23  *Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir. 1975) (affirming Section 2 liability based on 45-70%

24  market share), *cert. denied*, 425 U.S. 959 (1976); *Heckman*, 2025 U.S. Dist. LEXIS 69885, at *31

25  (sustaining Section 1 and Section 2 allegations based on 60% market share).

26    Unable to contest its dominance, Musixmatch quibbles on the margins, claiming its 80%

27  market share may be somewhat inflated. Mot. 29. But such critiques would not warrant dismissal

28  even if they had merit: "the degree of [market share] overestimation and its effect on [Musixmatch's]

1  overall market share is a fact-intensive inquiry that cannot be resolved on a motion to dismiss."

2  *Costar*, 2025 U.S. App. LEXIS 15354, at *20. Moreover, "courts have repeatedly held that a rough

3  estimation of the defendant's market share, with no explanation of how that estimation was made, is

4  sufficient at the pleading stage." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 778 (N.D. Cal. 2022).

5      Musixmatch's critiques fail in any event. Musixmatch claims its 80% market share should not

6  be calculated based on the streaming revenue shares of the DSPs it services (82%). Mot. 29. But that

7  is just one metric that supports Musixmatch's 80% market share. Musixmatch's market share is also

8  based on its revenues relative to those of other lyric-services providers, which is around 80%. Compl.

9  ¶ 84 (noting the rest of the market is "primarily serviced by LyricFind" and that other providers

10  "account for a *de minimis* share by revenue").[22]

11      Turning to licensing, Musixmatch's 66% share of the Lyrics Rights Sublicensing Submarket

12  also exceeds the 60% shares generally required for monopoly power. *Id.* ¶ 80. This monopoly power

13  over lyric sublicensing—and Musixmatch's market power over lyric licensing generally—is further

14  entrenched by significant barriers to entry in the form of the costs, relationships, and technical know-

15  how needed to engage in lyric licensing, which have precluded new market entrants for years. *Id.* ¶¶

16  91–94. *See Heckman*, 2025 U.S. Dist. LEXIS 69885, at *31 (holding defendant's 60% market share

17  established market power "in conjunction with [] allegations that [defendant] has grown despite

18  higher fees than competitors in a market that disfavors new market entrants"); *Biddle*, 696 F. Supp.

19  3d at 885 (holding "developing custom file systems and software infrastructure" are "cost-prohibitive

20  to build from scratch" and thus barriers to entry).

21      Musixmatch's argument that it lacks market power over lyric licensing because songwriters

22  and publishers own the underlying copyrights is meritless. *See* Mot. 28. Businesses that compete to

23  distribute other parties' intellectual property may still monopolize their downstream distribution

24  markets. *See, e.g.*, *Costar*, 2025 U.S. App. LEXIS 15354, at *26 (upholding allegations that an online

25

26  ─────────────
22 Because LyricFind's allegations regarding Musixmatch's market share are based on its revenue
relative to lyric services providers and not on DSPs' streaming revenue, its citations to cases rejecting
27  market shares extrapolated from different markets are inapposite. *See* Mot. 28–29 (citing *W. Parcel
Express*, 65 F. Supp. 2d at 1061; *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield
Ass'n*, No. 16-cv-0057, 2016 U.S. Dist. LEXIS 74571, at *8 (N.D. Okla. June 8, 2016), aff'd 691 F.
28  App'x 515 (10th Cir. 2017)).

1  platform for real estate listings had monopoly power over the distribution of listing content owned by

2  brokers); *Syufy Enters*., 793 F.2d at 993 (holding movie theatre had monopoly power over display of

3  licensed motion pictures). Musixmatch does not cite a single case to the contrary.[23] Indeed,

4  Musixmatch's ability to exclude rivals in practice renders "ultimate control over the lyrics

5  copyrights" irrelevant, particularly at the pleading stage. Mot. 28 (*citing Ind. Grocery, Inc. v. Super*

6  *Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (affirming grant of summary judgment)).

7  **VI.    Musixmatch Engaged in Concerted Action with WCM**

8            A vertical exclusivity agreement between a distributor and supplier, like the Exclusive

9  between Musixmatch and WCM, constitutes concerted under Section 1 of the Sherman Act. Areeda ¶

10  1437 ("[C]ourts have long held manufacturer-dealer agreements . . . to be 'contracts, combinations, or

11  conspiracies' within the meaning of Sherman Act § 1").[24] A vertical *licensing* agreement also

12  constitutes concerted action so long as the licensor and licensee are independent economic actors.

13  *Townshend v. Rockwell Int'l Corp*., No. C99-0400SBA, 2000 U.S. Dist. LEXIS 5070, at *18 n.2,

14  (N.D. Cal. Mar. 28, 2000) (upholding claims licensor and licensee conspired under Section 1 where

15  they were "independent actors" with "independent motivations" and rejecting claim they could not

16  conspire); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.* 336 F.

17  Supp. 3d 1256, 1301–1302 (D. Kan. 2018) (upholding Section 1 conspiracy claims where licensor

18  and licensee were "separate entities" with "separate interests" and rejecting claims they "never can

19  conspire"). Only where a licensor and licensee comprise a single economic actor are they incapable

20  of conspiring because their agreement would not "deprive the market of independent sources of

21  economic power previously pursuing separate interests." *Levi Case Co. v. ATS Prods., Inc.*, 788 F.

22  Supp. 428, 432 (N.D. Cal. 1992) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S.

23  752, 769 (1984)).

24  23 The case *United Farmers Agents Assn v. Farmers Ins. Exch*., 89 F.3d 233, 236–37 (5th Cir. 1996)
    does not support Musixmatch's argument. There, the Fifth Circuit affirmed summary judgment
25  because, given the absence of switching costs or entry barriers, it found that the defendant lacked
    market power in the tying market. Here, Musixmatch's market power derives not only from its
26  control over songwriters' or publishers' intellectual property (*see* Mot. 28), but its leveraging of these
    switching costs in the downstream distribution market. Compl. ¶ 95.

27  24 Contrary to what Musixmatch suggests, Mot. 31, none of LyricFind's claims that require concerted
    action hinge on a conspiracy between Musixmatch and TPG. Musixmatch's concerted action with
28  nonparty WCM is sufficient for each claim.

Here, Musixmatch and WCM are independent economic actors pursuing separate interests and are not a single economic unit under *Copperweld*. Musixmatch and WCM each entered the Exclusive for separate reasons. Musixmatch wanted to exclude competitors. Compl. ¶ 142. WCM wanted to maximize its licensing revenue, which it previously did on a non-exclusive basis. *Id.* ¶¶ 132, 135. The Exclusive thus brought together "separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision-making and therefore of diversity of entrepreneurial interests." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (citation modified) (quoting *Copperweld*, 467 U.S. at 769).

This epitomizes concerted action under Section 1 of the Sherman Act, as numerous courts have held under similar facts. In *Townshend*, for example, the court upheld conspiracy claims where the licensor, like WCM, sought to "maximize licensing revenue," while the licensee, like Musixmatch, sought to "exclude[] competitors." *Townshend,* 2000 U.S. Dist. LEXIS 5070, at *18 n.2. The same dynamic established concerted action in *EpiPen* and *10x Genomics*. In both cases, the court upheld Section 1 claims where the licensor's interest was to sell the patented goods, while the licensee sought exclusivity to exclude its rivals. *See In re EpiPen,* 336 F. Supp. 3d 1256 at 1301–02 (upholding Section 1 claims where licensor and licensee "had separate interests": the licensor's was the "sale" of pharmaceuticals while the licensee's was "control . . . of competition."); *10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 266 (D. Del. 2023) (upholding Section 1 claims where 10x, the licensee, "had an interest in excluding competitors, whereas Harvard, as a licensor, had a different interest in maximiz[ing] the licensing revenue from [its] patents.") (citation modified) (citing *Townshend,* 2000 U.S. Dist. LEXIS 5070, at *6 n.2).

These separate interests were not present in *Levi,* where an individual patentor merely transferred his licensing rights to a company that he founded (and later, to its successor) for the shared purpose of licensing his patents. *Levi,* 788 F. Supp. 428. Nor was it the case in *Pandora*, where individual comedians, who rely on agents to license their works, transferred their licensing rights to two licensing agents to act on their behalf. *In re Pandora Media, LLC*, No. 22-cv-00809, 2023 U.S. Dist. LEXIS 181230, at *7–8 (C.D. Cal. Apr. 5, 2023) ("As alleged, no agreement between the comedians and [their licensing agents] involving the exploitation of the [licensing rights] in which

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

34

they both held an interest can be considered to deprive the marketplace of independent sources of economic power previously pursuing *separate* interests." (citation modified)).

Moreover, Musixmatch's Exclusive went beyond a mere licensing arrangement. The Exclusive restrained LyricFind's ability to distribute Lyric Data in addition to lyric licenses, which further distinguishes this case from *Levi* and *Pandora*. *Cf. Wisconsin v. Indivior Inc. (In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.)*, No. 13-MD-2445, 2017 U.S. Dist. LEXIS 179101, at *33–35 (E.D. Pa. Oct. 30, 2017) (upholding claims that a patent holder and licensee conspired under Section 1 because they were "two separate entities" with "independent economic interests" and the licensing relationship was "ancillary to the anticompetitive conduct at the heart of the alleged conspiracy").

Here, LyricFind has plausibly alleged that WCM and Musixmatch are "independent actors" with "independent motivations"—one to maximize revenue, and the other to exclude competitors. *Townshend*, 2000 U.S. Dist. LEXIS 5070, at *18. This sufficiently establishes that WCM and Musixmatch are capable of concerted action under Section 1, which in any case, "is a question of fact" not properly decided at this stage. *See 10x Genomics, Inc.* 681 F. Supp. 3d at 266 (quoting *Townshend*, 2000 U.S. Dist. LEXIS 5070, at *6). A licensor and licensee's "contention that they are incapable of entering into a conspiracy" as Musixmatch claims here, "cannot be resolved in a 12(b)(6) motion to dismiss." *Townshend*, 2000 U.S. Dist. LEXIS 5070, at *14 (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984)).

## VII.    LyricFind Has Properly Alleged WCM's Intent to Monopolize

Next, Musixmatch claims that LyricFind failed to allege WCM's specific intent to further Musixmatch's monopolization. Mot. 33. This argument fails for two distinct reasons.

First, WCM's intent can be inferred from the nature of the Exclusive. *Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*, 933 F.3d 1136, 1159 (9th Cir. 2019) (holding specific intent to monopolize can be inferred from conduct "designed to maintain market power"); *Cal. Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1004 (9th Cir. 1981) (same when conduct "is clearly threatening to competition or exclusionary"). Whatever WCM's motives, it understood that cutting off all lyric companies other than Musixmatch would foreclose competition and entrench

PLAINTIFF LYRICFIND INC.'S OPPOSITION TO MUSIXMATCH S.P.A.'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(2) & (6) (Case No. 3:25-cv-02265-JSC)

35

1  Musixmatch's monopoly. WCM's specific intent can thus be inferred from the Exclusive's terms.

2  *Hunt-Wesson Foods, Inc.*, 627 F.2d at 926 ("Specific intent to monopolize will normally be proved

3  by inference from conduct.").

4      WCM's specific intent is also adequately alleged in the Complaint. WCM was not a passive

5  bystander. WCM helped Musixmatch implement the Exclusive by telling Spotify that LyricFind was

6  cut off, while also refusing to provide Spotify a direct license. Compl. ¶ 107. WCM did this to avoid

7  undercutting "the Exclusive's anticompetitive goals." *Id.* ¶ 150. WCM's affirmative collaboration

8  with Musixmatch, as alleged, is sufficient to show its specific intent. *See, e.g., In re Pool Products*,

9  940 F. Supp. 2d at 396 (sustaining claims that supplier and distributor conspired to monopolize

10  distribution market where a "[distributor] directed the [supplier] not to deal with specific competitors,

11  and the [supplier] agreed not to do so"); *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp.

12  3d 1067 (N.D. Cal. 2025) (sustaining conspiracy to monopolize claim against licensees who

13  conspired with licensor to harm licensor's rival).

14  **VIII.  LyricFind States a Claim for Monopoly Leveraging**

15      In the Ninth Circuit, contrary to what Musixmatch argues, "monopoly leveraging . . . remains

16  a viable theory under Section 2" of the Sherman Act. *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas

17  Co.*, 99 F.3d 937, 951 (9th Cir. 1996); *see also Heckman*, 2025 U.S. Dist. LEXIS 69885, at *38

18  ("Monopoly leveraging remains a viable theory for an attempted monopolization or monopolization

19  claim under Section 2 of the Sherman Antitrust Act to the extent [it means] an attempt to use

20  monopoly power in one market to monopolize another market.") (cleaned up) (citing *Cost Mgmt.,* 99

21  F.3d at 951). While the elements of monopoly leveraging and attempted monopolization are the same,

22  they may be pursued under distinct labels to distinguish between distinct theories. *See Cost Mgmt.,* 99

23  F.3d at 952 (recognizing that a plaintiff may proceed with claims under both labels when pursuing

24  distinct theories of attempted monopolization). LyricFind did so here to distinguish between its

25  single-market attempted monopolization theories (counts 3 and 6) and its leveraging theory that

26

27

28

involves both markets (count 5). *See* Compl. ¶¶ 192–200, 208–214, 216–224. LyricFind's monopoly leveraging claim is adequately pled.[25]

## IX.  Musixmatch Violated California's Cartwright Act and Unfair Competition Law

LyricFind has plausibly alleged claims under the Cartwright Act for the same reasons it stated its claims under Sections 1 and 2 of the Sherman Act, as the Cartwright Act mirrors the Sherman Act. Compl. ¶¶ 240–50. *Costar*, 2025 U.S. App. LEXIS 15354, at *4 (sustaining claim that exclusive agreement violates California's Cartwright Act because that statute "mirrors" the Sherman Act) (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.8 (9th Cir. 2022) (en banc)). LyricFind has also stated claims under both the "unfair" and "unlawful" prongs of California's Unfair Competition Law based on violations of the Sherman and Cartwright Acts, which similarly borrow from one another. *See Costar*, 2025 U.S. App. LEXIS 15354, at *34; *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40, 544 (Cal. 1999) (the UCL's "unlawful" prong "borrows violations of other laws and treats them as unlawful practices").

## X.  Musixmatch Interfered with LyricFind's Prospective Economic Advantage

LyricFind has plausibly alleged a claim against Musixmatch for both negligent and intentional interference with LyricFind's prospective economic relationships with Spotify and iHeart Radio.[26] *See supra* Statement of Facts. The elements of a claim for interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007), *quoting Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 941 (Cal. 2003).

---

[25] Musixmatch also argues that LyricFind's monopoly leveraging claim fails because its attempted monopolization claims fail. Mot. 34. Musixmatch's Motion, however, does not present any arguments specific to LyricFind's attempted monopolization claim beyond the market share and market definition arguments that LyricFind has rebutted above. *See supra* § V.

[26] The allegations of the Complaint also make clear that Defendants also tortiously interfered with LyricFind's prospective economic relationship with WCM, and discovery may reveal further unlawful interference by TPG and Musixmatch with LyricFind's economic relationships.

LyricFind adequately alleges that Musixmatch in fact disrupted LyricFind's prospective economic relationships with Spotify and iHeartRadio, among others. Musixmatch fails to explain why these allegations are insufficient other than to label them "conclusory." Mot. 36.[27] Moreover, an alleged antitrust violation is sufficient to constitute an "independently wrongful act" for purposes of an intentional interference claim. *Jensen Enters. Inc. v. Oldcastle, Inc.*, 2006 U.S. Dist. LEXIS 68262, at *9 (N.D. Cal. Sept. 7, 2006). Musixmatch cannot, and does not, rule out that its anticompetitive conduct was the proximate cause of the disruption of LyricFind's anticipated business relationships with Spotify or iHeartRadio.

To the extent Musixmatch relies on Spotify's continued dialogue with LyricFind after Musixmatch's initial leak of NDA-protected information, the Complaint indicates otherwise. Compl. ¶ 105. "Disruption" for purposes of an interference claim does not necessarily require a breach of a contract or a complete severance of a relationship; it is sufficient if the plaintiff's performance in the economic relationship is "more costly or burdensome" due to the defendant's interference. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 592 (Cal. 1990). That is precisely what happened here. Further, unlike in *E & E Co., Ltd. v. Kam Hing Enters., Inc.*, 2008 U.S. Dist. LEXIS 96755 (N.D. Cal. Nov. 19, 2008) and *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003), where the plaintiffs failed to adequately allege the underlying independent wrong, LyricFind has adequately alleged that Musixmatch's disclosure of LyricFind's confidential information breached the NDA.

LyricFind's negligent interference claim is also sufficiently pled. "[A]ll persons are required to use ordinary care to prevent others from being injured as a result of their conduct," and Musixmatch, as a competitor, clearly knew or had reason to know that its conduct would impair and disrupt LyricFind's negotiations with both Spotify and iHeartRadio. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1014 (N.D. Cal. 2015); *Code Rebel, LLC v. Aqua Connect, Inc.*, 2013 U.S. Dist. LEXIS 137937, at *7 (C.D. Cal. Sept. 24, 2013).

---

27 In Jobscience, the plaintiff failed to demonstrate not only disruption, but also every other element of its interference claim. *Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-04519, 2014 U.S. Dist. LEXIS 2741, at *10 (N.D. Cal. Jan. 9, 2014). The court accordingly did not apply the "disruption" or "proximate cause" elements to factual allegations comparable to those in the Complaint.

1    **XI.**     **Musixmatch Breached Its Non-Disclosure Agreement with LyricFind**

2        Musixmatch incorrectly applies California law, rather than Ontario law, to its analysis of

3 LyricFind's breach of contract claim. *See* Declaration of Darryl Ballantyne in Opposition to TPG

4 Global, LLC's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), Ex. A ¶ 15 (ECF No. 57-2).[28]

5 The essential elements of a breach of contract claim under Ontario law are "the particulars of the

6 alleged contract including the terms, the nature of the alleged breach, [and] causation and damages

7 that are alleged to have flowed from the breach." *Wallace Sales & Consulting, LLC v. Tuopo N. Am.,*

8 *Ltd.*, 2015 U.S. Dist. LEXIS 96681, at *3 (E.D. Mich. July 24, 2015) (applying Ontario law in

9 denying motion to dismiss), *quoting McCarthy Corp. PLC v. KPMG LLP* (2006), O.J. No. 1492,

10 para. 41 (Can. Ont. Supreme Ct. of Justice). LyricFind has adequately pled each element with respect

11 to Musixmatch's breach of the NDA.

12        Musixmatch's argument that LyricFind did not describe the confidential information at issue

13 with sufficient particularity applies the wrong pleading standard and should be rejected. *Chaganti v.*

14 *I2 Phone Int'l Inc.*, No. C 04-0987, 2005 U.S. Dist. LEXIS 46449, at *8 (N.D. Cal. Mar. 10, 2005)

15 ("Notice pleading does not impose heightened pleading standards when alleging a breach of

16 contract.").[29] All that is required for a breach of contract claim is a "short and plain statement of the

17 claim," which LyricFind has provided. Fed. R. Civ. P. 8(a)(2).

18        Musixmatch also misunderstands the nature of LyricFind's alleged damages. Musixmatch

19 incorrectly claims that LyricFind's only alleged injury is the "lost the opportunity to partner with

20 Spotify." Mot. 38. This ignores paragraph 105 of the Complaint, which provides that: "Defendants'

21 wrongful disclosure of LyricFind's confidential information impaired the negotiations between

22 Spotify and LyricFind, causing a substantial disruption to LyricFind's business and *requiring*

23 *LyricFind to incur additional costs and expend additional resources to address Defendants'*

---

24 28 The NDA is referenced extensively in the Complaint and is therefore incorporated by reference
therein. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). It may therefore be considered on
25 this motion.

26 29 *Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 U.S. Dist. LEXIS 22571, at *2 (N.D. Cal.
Feb. 16, 2017) is inapposite. In addition to being decided under California, not Ontario, law, the
27 Space Data plaintiff's breach of contract claim was dismissed because the complaint did not specify
"how" the use of the confidential information at issue "violated the NDA." *Id.* That is not the case
28 here, where LyricFind did specify how Musixmatch's revelation of LyricFind's confidential
information breached the NDA.

1  *misconduct*." Compl. ¶ 105 (emphasis added). Musixmatch cannot, and does not, claim that there is

2  no causal link between these alleged damages ("additional costs" and expenditure of "additional

3  resources") and its breach.

4  **XII.    LyricFind Withdraws Its Claims Under Section 3 of the Clayton Act**

5        Lastly, in response to Musixmatch's arguments at Mot. 34, LyricFind agrees to withdraw its

6  claims under Section 3 of the Clayton Act (Count 8). *See* Compl. ¶¶ 232–39.

7  <u>**CONCLUSION**</u>

8        For the foregoing reasons, Musixmatch's Motion should be denied in full.[30]

9

10  Dated: July 10, 2025                              Respectfully submitted,

11                                                    */s/ Kellie Lerner*

                                                      Kellie Lerner (*pro hac vice*)
12                                                    Ben Steinberg (*pro hac vice*)
                                                      Lily Fagin (*pro hac vice*)
13                                                    **SHINDER CANTOR LERNER LLP**
                                                      14 Penn Plaza, Suite 1900
14                                                    New York, NY 10122
                                                      (646) 960-8601
15                                                    kellie@scl-llp.com
                                                      benjamin@scl-llp.com
16                                                    lfagin@scl-llp.com

17
                                                      Brian D. Caplan
18                                                    Julie Wlodinguer (*pro hac vice*)
19                                                    **REITLER KAILAS & ROSENBLATT
                                                      LLP**
20                                                    885 Third Avenue, 20th Floor
                                                      New York, NY 10022
21                                                    (212) 209-3050
                                                      bcaplan@reitlerlaw.com
22                                                    jwlodinguer@reitlerlaw.com

23
                                                      David C. Brownstein (SBN: 141929)
24                                                    **FARMER BROWNSTEIN JAEGER
                                                      GOLDSTEIN KLEIN & SIEGEL LLP**
25                                                    155 Montgomery Street, Suite 301
                                                      San Francisco, CA 94104
26                                                    (415) 962-2873

27  ─────────────────────
    30 To the extent the Court finds that any of LyricFind's claims are not adequately stated, LyricFind
28  respectfully requests leave to amend its Complaint pursuant to Fed. R. Civ. P. 15, which requires that
    leave to amend be freely granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

dbrownstein@fbjgk.com

*Attorneys for Plaintiff LyricFind, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 10, 2025, the foregoing was filed through Court's electronic filing system, which will send electronic notice of this filing to all counsel of record.

<u>/s/ Kellie Lerner</u>
Kellie Lerner (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
(646) 960-8601
kellie@scl-llp.com

*Attorney for Plaintiff LyricFind, Inc.*