1

2

3

4                               UNITED STATES DISTRICT COURT

5                              NORTHERN DISTRICT OF CALIFORNIA

6

7    LYRICFIND, INC.,                          Case No.  25-cv-02265-JSC

8              Plaintiff,

9         v.                                   **ORDER RE: MOTIONS TO DISMISS**

10   MUSIXMATCH, S.P.A., et al.,                Re: Dkt. Nos. 53, 55

11             Defendants.

12        LyricFind, Inc. sues Musixmatch, S.p.A. and TPG Global, LLC—the "private equity group

13   that owns, controls, and directs Musixmatch"—alleging Musixmatch and TPG "orchestrated an

14   anticompetitive scheme . . . to foreclose competition . . . and thus cement Musixmatch's monopoly

15   position" as the provider of music lyric services.  (Dkt. No. 50 ¶ 1.)[1]  Now pending before the

16   Court are motions to dismiss filed by Musixmatch and TPG.  (Dkt. Nos. 53, 55.)  Having carefully

17   considered the parties submissions, and with the benefit of oral argument on August 21, 2025, the

18   Court DENIES Musixmatch's 12(b)(2) motion to dismiss for lack of personal jurisdiction.  The

19   Court GRANTS in part and DENIES in part Musixmatch's 12(b)(6) motion to dismiss.  LyricFind

20   plausibly alleges Musixmatch entered an exclusive agreement causing injury of the type antitrust

21   laws are intended to prevent and substantially foreclosing competition.  The Court also GRANTS

22   in part and DENIES in part TGP's motion to dismiss.  LyricFind plausibly alleges TPG

23   independently participated in the "buy-or-bury" scheme.

24                                       **BACKGROUND**

25   **I.    COMPLAINT ALLEGATIONS**

26        LyricFind is organized under the laws of Canada and has its principal place of business in

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

Canada.  (Dkt. No. 50 ¶ 30.)  Musixmatch is organized under the laws of Italy, with its principal place of business in Italy.  (*Id.* ¶ 31.)  "TPG is a large private equity firm that, upon information and belief, owns a controlling stake in Musixmatch."  (*Id.* ¶ 32.)  TPG exists under the laws of Delaware with its principal place of business in Texas.  (*Id.*)

"LyricFind and Musixmatch are competitors who provide music lyric services to digital services providers ('DSPs'), like Spotify and YouTube Music, which display music lyrics on their digital streaming platforms."  (*Id.* ¶ 1.)  The services LyricFind and Musixmatch provide fall into two categories: (1) "Lyric Rights Licensing," in which they obtain from music publishers licenses to display lyrics and convey those rights to DSPs, (*id.* ¶¶ 2, 54); and (2) "Lyric Data Services," in which they provide "a transcription of the lyrics in the form of digital files" and "the ability to administer royalty payments to the holders of the lyric rights."  (*Id.* ¶ 3.)  Lyric Data Services enable "detailed translations and synchronization data, which allow lyrics to be displayed line-by-line or word-by-word in synch with music."  (*Id.* ¶ 63.)  Some DSPs "obtain both Lyric Rights Licensing and Lyric Data Services from a single lyric service provider, like LyricFind or Musixmatch."  (*Id.* ¶ 65.)  Others—including some of the largest DSPs—obtain the licenses to lyrics themselves but "still need to procure Lyric Data Services to display lyrics to users" from LyricFind, Musixmatch, or another provider.  (*Id.* ¶ 65.)

"As the two largest competitors in the Lyric Data Services and Lyric Rights Licensing Markets, LyricFind and Musixmatch have competed for years to offer the best service and pricing for Lyric Data Services and Lyric Rights Licensing."  (*Id.* ¶ 96.)  Musixmatch's contract with Spotify—"the largest and most important . . . customer of Lyric Data Services and Lyric Rights Licensing"—was set to expire in 2024.  (*Id.* ¶ 98.)  In the fall of 2023, LyricFind began "negotiating with Spotify to take over Musixmatch's role as Spotify's supplier of Lyric Data Services."  (*Id.* ¶ 102.)  Fearing Spotify and other DSPs would switch to LyricFind, TPG and Musixmatch concocted a four-part "buy-or-bury" scheme "to exclude LyricFind and other providers from the market so it could continue charging unlawfully inflated prices without the risk of losing business."  (*Id.* ¶¶ 3, 101.)

First, TPG tried to purchase LyricFind to insulate Musixmatch from competition.  (*Id.* ¶

United States District Court
Northern District of California

115.)  Shortly after acquiring a controlling stake in Musixmatch, "TPG informed LyricFind it was interested in acquiring it and proposed opening negotiations and a due diligence review subject to a non-disclosure agreement."  (*Id.* ¶ 116.)  "Subject to the NDA's protections, and to facilitate TPG's potential acquisition, LyricFind gave TPG and Musixmatch access to a wide range of confidential information about its business, including financials, commercial relationships, and regulatory concerns."  (*Id.* ¶ 121.)  "LyricFind and TPG were unable to agree on acquisition terms and ended negotiations in December 2023."  (*Id.* ¶ 123.)

Having failed to acquire LyricFind, TPG and Musixmatch proceeded to the second step of their "buy-or-bury" scheme.  They "plotted to disrupt LyricFind's negotiations with Spotify by wrongfully leaking confidential and NDA-protected information about LyricFind to Spotify, which TPG and Musixmatch had obtained during TPG's proposed acquisition of LyricFind a few months earlier."  (*Id.* ¶ 127.)  "Even though Defendants' breach of the NDA hampered the discussions between LyricFind and Spotify, Spotify chose to continue negotiating with LyricFind."  (*Id.* ¶ 130.)

Having failed to stop negotiations, Musixmatch—"at the direction of TPG"—entered into an exclusive agreement (the "Exclusive") with music publisher Warner Chappell Music, Inc. ("WCM").  (*Id.* ¶¶ 6, 134.)  The Exclusive gave "Musixmatch (1) the exclusive right to provide Lyric Data Services for WCM's titles and (2) the exclusive right to sublicense Lyric Rights Licensing for WCM's titles."  (*Id.* ¶ 134.)  As a result of the agreement, LyricFind "cannot provide Lyric Data Services or Lyric Rights Licensing for approximately 30% of streams and around 60% of the top 100 songs, which are owned in whole or in part by WCM."  (*Id.* ¶ 23.)

Fourth, to foreclose the possibility Spotify and other DSPs would obtain direct licenses from WCM without Musixmatch's involvement, "TPG and Musixmatch took the additional step of . . . forc[ing] Spotify to obtain both Lyric Rights Licensing *and* Lyric Data Services from Musixmatch."  (*Id.* ¶¶ 150-51.)  "This *de facto* bundling of Lyric Rights Licensing and Lyric Data Services reinforces Musixmatch's dominance, and eliminates competition":

> Because most DSPs use only one lyric service provider, a DSP that is forced to obtain Lyric Rights Licensing from Musixmatch will also generally use Musixmatch for Lyric Data Services.  And vice versa:

3

> a DSP that is forced to obtain Lyric Data Services from Musixmatch
> will generally also use Musixmatch for Lyric Rights Licensing.

(*Id.* ¶ 153.)

## II.    PROCEDURAL BACKGROUND

On March 5, 2025, LyricFind filed suit.  (Dkt. No. 1.)  Initially, LyricFind moved to file under seal portions of the complaint "concern[ing] the Parties' confidential business strategies and negotiations."  (Dkt. No. 14 at 1.)  The Court denied the motion without prejudice because the requested redactions were overbroad.  (Dkt. No. 28.)  On May 30, 2025, LyricFind filed the operative entirely unredacted complaint.  (Dkt. No. 50.)

LyricFind's complaint alleges the following 13 causes of action:

> (**1**) violation of 15 U.S.C. § 1;
> (**2**) monopolization of the Lyric Data Services Market in violation of 15 U.S.C. § 2;
> (**3**) attempted monopolization of the Lyric Data Services Market in violation 15 U.S.C. § 2;
> (**4**) conspiracy to monopolize the Lyric Data Services Market in violation of 15 U.S.C. § 2;
> (**5**) monopoly leveraging the Lyric Data Services Market in violation of 15 U.S.C. § 2;
> (**6**) attempted monopolization of the Lyric Rights Licensing Market in violation 15 U.S.C. § 2;
> (**7**) conspiracy to monopolize the Lyric Rights Licensing Market in violation 15 U.S.C. § 2;
> (**8**) unlawful exclusionary arrangement in violation of 15 U.S.C. § 14;
> (**9**) violation of the Cartwright Act, § 16720 of the California Business and Professions Code;
> (**10**) unlawful and unfair business acts or practices in violation of California Business and Professions Code §§ 17200;
> (**11**) intentional interference with prospective economic advantage;
> (**12**) negligent interference with prospective economic advantage; and
> (**13**) breach of contract.

The monopolization, attempted monopolization, and monopoly leveraging causes of action are alleged against Musixmatch alone.  The remaining causes of action are alleged against TPG and Musixmatch.

Musixmatch and TPG each moved to dismiss the complaint, with "TPG incorporat[ing] by reference the arguments set forth in Musixmatch's motion to dismiss" and "Musixmatch adopt[ing] all of the arguments stated in TPG's separate Motion to Dismiss."  (Dkt. No. 53 at 25

n.9; Dkt. No. 55 at 8, n.1.)  LyricFind opposes dismissal.[2]

**DISCUSSION**

## I.     MUSIXMATCH'S 12(B)(2) MOTION TO DISMISS

Musixmatch first argues the complaint against it "must be dismissed under Rule 12(b)(2) for lack of personal jurisdiction." (Dkt. No. at 16.)  To exercise personal jurisdiction over a nonresident defendant, a court must establish the defendant had at least "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up). Personal jurisdiction can be either general or specific.  General personal jurisdiction exists "when a defendant is essentially at home in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (cleaned up).  And specific personal jurisdiction arises when a defendant takes "some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* at 359 (cleaned up).

The plaintiff "bears the burden" of establishing personal jurisdiction exists. *In re Boon Global Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019).  The Court may consider declarations and other evidence outside the pleadings to determine whether it has personal jurisdiction.  *Id.* "[U]ncontroverted allegations in plaintiff's complaint must be taken as true," but courts "may not assume the truth of allegations in a pleading which are controverted by affidavit."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (cleaned up).  Any "factual disputes" must be "resolve[d] . . . in the plaintiff's favor."  *Id.*

### A.     General Jurisdiction

Musixmatch asserts it is not subject to general jurisdiction in California, and LyricFind does not contend otherwise.  As alleged in the complaint, Musixmatch is "a company organized and existing under the laws of Italy, with its principal place of business located at Via San Vitale, 5, Bologna, Italy."  (Dkt. No. 50 ¶ 31.)  Because Musixmatch is not "essentially at home" in this forum, Musixmatch is not subject to general jurisdiction here.  *See Ford Motor*, 592 U.S. at 358.

---

[2] LyricFind's administrative motion requesting leave to file supplemental authority (Dkt. No. 62) is GRANTED.

United States District Court
Northern District of California

### B.   Specific Jurisdiction

Musixmatch also asserts it is not subject to specific jurisdiction in California.  The Ninth Circuit "use[s] a three-prong test for analyzing claims of specific jurisdiction."  *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).  "First, the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws."  *Id.* (cleaned up).  "[P]urposeful availment and purposeful direction are distinct concepts": "[p]urposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort."  *Id.*  That said, Ninth Circuit "cases do not impose a rigid dividing line between purposeful direction and purposeful availment, and the first prong of the personal jurisdiction test may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof."  *Briskin v. Shopify, Inc.*, 135 F.4th 739, 751 n.10 (9th Cir. 2025) (cleaned up).  "Second, the claim must arise out of or relate to the defendant's forum-related activities."  *Glob. Commodities,* 972 F.3d at 1107.  "Finally, the exercise of jurisdiction must be reasonable."  *Id.*  The plaintiff "must satisfy the first two prongs of this test," at which point the burden shifts to the defendant to demonstrate the exercise of jurisdiction would be unreasonable.  *Id.*

#### 1.   Relevant Forum

As an initial matter, there is disagreement over the relevant forum for the jurisdictional analysis.  The complaint alleges "the Court has personal jurisdiction over Defendant Musixmatch because Musixmatch regularly transacts business within this district and *the state of California*."  (Dkt. No. 50 ¶ 35 (emphasis added).)  Musixmatch's motion thus argues "it is not subject to specific jurisdiction *in California*."  (Dkt. No. 53 at 18 (emphasis added).)  But, the Ninth Circuit "ha[s] interpreted Section 12 of the Clayton Act (15 U.S.C. § 22) to grant personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation."  *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024); *see also Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1415 (9th Cir. 1989) (applying "national contacts analysis" to suit against foreign

defendant brought under the Clayton Act alleging violation of the Sherman Act). So, the relevant forum for the Court's jurisdictional analysis is the United States.

### 2. Purposeful Direction

To find purposeful direction, Musixmatch must have "(1) commit[ted] an intentional act, that is (2) expressly aimed at the [United States], and (3) which causes harm that [Musixmatch] knows will be suffered in the [United States]." *See Briskin*, 135 F.4th at 751 (cleaned up). This test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Id.* It "does not require that the defendant be physically present in the forum state." *Id.* at 751-52.

While there is an intentional act—Musixmatch's entering the Exclusive with WCM—the parties to the Exclusive are foreign entities: Musixmatch is an Italian company with its principal place of business in Italy, (Dkt. No. 50 ¶ 31; Dkt. No. 54 ¶ 5), and WCM is incorporated in the UK with its principal place of business in the UK. (Dkt. No. 54 ¶¶ 12-13.) It is also undisputed Musixmatch negotiated and signed the Exclusive in Italy, and the Exclusive is governed by the laws of England and Wales with a London choice of venue clause. (*Id.* ¶ 10.)

Nevertheless, LyricFind's allegations and evidence support an inference the Exclusive's effects will be "felt" in the United States. *See Briskin*, 135 F.4th at 751. LyricFind's CEO testifies WCM has a United States-based affiliate, Warner Chappel Music, Inc. ("WCM US"), "which owns and/or controls a substantial portion of WCM's catalog," including "the most valuable and profitable compositions in WCM's global repertoire." (Dkt. No. 58-15 ¶ 8.) Based on the CEO's industry experience, a "license agreement from any WCM affiliate is nearly always a license for all of WCM's content, not just the content of the contracting affiliate." (*Id.* ¶ 10.) Thus, it is the CEO's belief the Exclusive provides Musixmatch rights for compositions owned by WCM US and the Exclusive's "greatest benefit" to Musixmatch comes from WCM US's works:

> Given that the musical compositions that WCM US owns and/or controls are among the most valuable and profitable compositions owned and/or controlled by WCM, it is my further belief and understanding that the greatest value and benefit to Musixmatch from the Exclusive is derived, not from WCM UK, but from its US affiliate, WCM US.

United States District Court
Northern District of California

1     (*Id.* ¶ 11.)

2           Musixmatch criticizes LyricFind's CEO's assertions as "speculative" but critically,

3     Musixmatch does not submit evidence challenging these assertions, including that the Exclusive

4     includes works owned by WCM US and the "greatest value" will be derived from those works.

5     LyricFind has thus made a prima facie showing of jurisdictional facts sufficient to establish the

6     Exclusive's effects will be felt in the United States.  Given the uncontested evidence the Exclusive

7     involves valuable compositions owned by WCM US, Musixmatch's "connection with the [United

8     States] [is] such that [it] should reasonably anticipate being haled into court []here." *See Burger*

9     *King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Put another way, the evidence that

10    Musixmatch obtained exclusive rights to songs owned by a United States affiliate of WCM—and

11    that those are the most valuable part of the agreement—tips the Exclusive's effects beyond merely

12    foreseeable.  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 744 (9th Cir.

13    2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ("By alleging acts

14    'intended to have' an effect in [the forum], the Plaintiffs went beyond alleging acts with a 'mere

15    foreseeable effect' in the forum.").

16          LyricFind also presents evidence the Exclusive's effects will be felt in the United States

17    because "many of the world's largest DSPs are located in the United States," including "Vevo,

18    Amazon, Meta, Apple, Google, YouTube, Instagram, Facebook, Microsoft, Snapchat, Pandora and

19    iHeartRadio." (Dkt. No. 58-15 ¶ 15.)  That Musixmatch has customers in the United States by

20    itself is insufficient to establish personal jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 285

21    (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State

22    itself, not the defendant's contacts with persons who reside there.").  However, the complaint

23    alleges that under the Exclusive's terms, DSPs "that wish to display lyrics for WCM's titles must

24    now obtain Lyric Data Services from Musixmatch at whatever cost it imposes, even those DSPs

25    that previously sourced Lyric Data from LyricFind or others at a fraction of the price." (Dkt. No.

26    50 ¶ 136.)  Because many DSPs are based in the United States, LyricFind plausibly alleges the

27    allegedly anticompetitive behavior is targeted at the United States. *See In re Cathode Ray Tube*

28    *(CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) (citing *Wholesale Nat. Gas*

United States District Court
Northern District of California

*Antitrust Litig.*, 715 F.3d at 743 ("An antitrust defendant 'expressly aims' an intentional act at a forum state when its allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself.").

That the Exclusive's effects will be felt elsewhere in addition to the United States does not change this conclusion.  The Ninth Circuit recently overruled cases "requir[ing] some sort of differential treatment of the forum state for a finding of 'express aiming' of the defendant's allegedly tortious conduct." *Briskin*, 135 F.4th at 758.  The defendant in *Briskin*—an e-commerce platform that installed tracking cookies on the plaintiff's device—argued "because its business lacks a forum-specific focus, it [was] not expressly aimed at California." *Id.* at 757.  The defendant noted "only 8% of its worldwide merchants [were] located in California." *Id.*  The Ninth Circuit nevertheless found the defendant was subject to personal jurisdiction in California. If "differential treatment of the forum state" were required to find express aiming, then a corporation that "direct[s] its activities toward all 50 states" could "escape specific personal jurisdiction in each of those states for claims arising from or relating to their relevant contacts in the forum state that injure that state's residents."  *Id.* at 758; *see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) ("If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state.").

Extrapolating from *Briskin*, a defendant that operates in a global market cannot rely on the fact of that global market to escape specific personal jurisdiction in the United States.  So here, that the Exclusive will allegedly have worldwide effects does not prevent the United States from exercising personal jurisdiction when those effects are also targeted at and will be felt in the United States.

Musixmatch's reliance on *Lenovo (United States) Inc. v. IPCom GmbH & Co., KG*, No. 5:19-CV-01389-EJD, 2019 WL 6771784 (N.D. Cal. Dec. 12, 2019), does not persuade the Court otherwise.  In *Lenovo*, the plaintiffs provided wireless devices, the cellular connectivity for which "require[d] the use of widely adopted cellular standards . . . adopted by various standard setting organizations," including the European Telecommunications Standard Institute.  *Id.* at *1.  The

plaintiffs alleged the defendant made false declarations to the European Telecommunications Standard Institute and by doing so, obtained a monopoly worldwide. *Id.* at *5. Because the European Telecommunications Standard Institute is a French organization that develops worldwide standards, the district court concluded the defendant's declarations to this organization were "not directed to any particular jurisdiction" and instead "were directed internationally." *Id.* *6, *7. In doing so, the court distinguished cases not "involv[ing] standards or standard setting organizations" and instead involving defendants who "allegedly took physical actions in the real world—price fixing—that were expressly aimed at the forum state." *Id.* at *7. The present case does not involve worldwide standard setting organizations and instead involves Musximatch's act of entering an agreement targeted at the United States. By the *Lenovo* court's own acknowledgement, then, this case is distinguishable.

The *Lenovo* court also concluded the defendant's licensing negotiations with the plaintiff's parent company, a Chinese company, were insufficient to establish purposeful direction. Although some of the negotiations occurred through the plaintiff's United States affiliate, the defendant "believed at all times that it was engaged in negotiations with" the Chinese parent company. *Id.* *8. Here, in contrast, LyricFind presents evidence Musixmatch knew the Exclusive would include songs owned by WCM's United States-based affiliate.

In sum, LyricFind made a sufficient showing the Exclusive implicates valuable works owned by WCM US and further, that the Exclusive's anti-competitive effects are targeted at DSPs, many of which are based in the United States. As Judge Gould stated in dissent in *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1222 (9th Cir. 2020), which the *Briskin* court cites with approval, to "hold that there is no express aiming here [would be] to construe the facts in the light *least* favorable to the plaintiff and to blind ourselves to the clear inference that [Musixmatch] knows—either actually or constructively—about its" exploitation of the United States market. Thus, LyricFind has made a sufficient showing the Exclusive was expressly aimed at the United States and Musixmatch knew the allegedly anticompetitive harm would be suffered in the United States.

### 3.    Purposeful Availment

The Court reaches the same result if it applies the purposeful availment test.  "To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."  *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (cleaned up). There is purposeful availment here because Musixmatch advertised a San Francisco office.  In February and July 2024, Musixmatch's website's "contact" page stated "We're in Bologna, London and San Francisco" with a picture of San Francisco's Golden Gate Bridge:



(Dkt. No. 58-1 ¶¶ 6-7; Dkt. No. 58-5; Dkt. No. 58-6.)  In so advertising, Musixmatch "performed . . . affirmative conduct which . . . promote[d] the transaction of business within" California and the United States generally.  *See Boschetto*, 539 F.3d at 1016.

As of July 2025, Musixmatch's website no longer references San Francisco.  (Dkt. No. 58-1 ¶ 9; Dkt. No. 58-7.)  Moreover, Musixmatch emphasizes it "has not at any time had an office in California," (Dkt. No. 54 ¶ 6), and argues "[s]ignificantly, LyricFind never provides the address for the alleged California office, because it does not exist."  (Dkt. No. 59 at 13.)  Regardless of whether Musixmatch has or had an office in California, LyricFind presents evidence Musixmatch publicly represented as much.  Given "many of the world's largest DSPs are located in the United States," (Dkt. No. 58-15 at 4), it is plausible Musixmatch would hold itself out as having a

location in California to promote the transaction of business in California. Musixmatch's prior website thus establishes Musixmatch purposefully availed itself of the benefits of conducting business in California specifically and the United States generally. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). As such, Musixmatch must "submit to the burdens of litigation in th[is] forum." *See id.* (cleaned up).

Musixmatch cites *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001), in which the Ninth Circuit concluded purposeful availment was lacking. *Unocal* involved agreements negotiated outside the United States and not governed by United States law. *Id.* Musixmatch argues that here, as in *Unocal*, there has been no purposeful availment of the forum because the Exclusive was negotiated outside the forum, is governed by foreign law, and involves subject matter unrelated to the forum. But in *Unocal*, the agreements "relate[d] to [a] pipeline in Burma and ha[d] nothing to do with California." *Id.* Here, in contrast, the Court would have to draw inferences against LyricFind to conclude the Exclusive has "nothing to do with [the United States]." *See id.* As discussed above, there is evidence the most valuable songs from the Exclusive are owned by WCM's United States-based affiliate and evidence the Exclusive's alleged anti-competitive effects are targeted at United States-based DSPs. So, while the contract negotiations did not occur in this forum, LyricFind's uncontroverted evidence supports a plausible inference its contemplated future consequences will implicate this forum.

### 4. Causal Nexus

The second prong of the specific jurisdiction test asks whether the claim "arises out of or relates to the defendant's forum-related activities." *Schwarzenegger*, 374 F.3d at 802. Under the Ninth Circuit's "'but for' test, a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." *Fireman's Fund Ins. Co. v. Nat'l Bank of Cooperatives*, 103 F.3d 888, 894 (9th Cir. 1996). Here, Musixmatch's contacts with the forum include its entry into an allegedly anticompetitive agreement targeted at the United States. LyricFind alleges that agreement violates antitrust laws. So, there is a nexus between Musixmatch's contacts with the United States and LyricFind's cause of action: but for Musixmatch's entry into the Exclusive, LyricFind would have no reason to sue. *See Wholesale*

United States District Court
Northern District of California

1    *Nat. Gas Antitrust Litig.*, 715 F.3d at 742–43 (concluding the plaintiff's claims arose out of the

2    defendants' alleged forum-related activities when "[t]here [was] no question that the Plaintiffs'

3    state antitrust claims arise out of the . . . Defendants' collusive manipulation of the gas price

4    indices").

5                    **5.    Reasonableness**

6           The Ninth Circuit employs a multi-factor balancing test to determine the reasonableness of

7    exercising personal jurisdiction over a non-resident defendant, assessing:

8                    1) the extent of the defendant's purposeful interjection into the forum
                     state's affairs;
9                    2) the burden on the defendant;
                     3) conflicts of law between the forum and defendant's home
10                   jurisdiction;
                     4) the forum's interest in adjudicating the dispute;
11                   5) the most efficient judicial resolution of the dispute;
                     6) the plaintiff's interest in convenient and effective relief; and
12                   7) the existence of an alternative forum.

13    *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir. 1991).  "No single factor is dispositive." *Silk*

14    *v. Bond*, 65 F.4th 445, 458 (9th Cir. 2023).

15           The first factor weighs in favor of exercising jurisdiction for the reasons discussed above.

16    *See Amoco Egypt Oil Co. v. Leonis Nav. Co.*, 1 F.3d 848, 852 (9th Cir. 1993) (noting the extent of

17    purposeful interjection factor "parallels the question of minimum contacts").

18           The second factor, the burden on the defendant, weighs against exercising personal

19    jurisdiction.  Musixmatch asserts the burden is high because it is "a foreign defendant with no

20    office in the forum."  (Dkt. No. 53 at 23.)  It is true "[t]he unique burdens placed upon one who

21    must defend oneself in a foreign legal system should have significant weight in assessing the

22    reasonableness of stretching the long arm of personal jurisdiction over national borders."  *Asahi*

23    *Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987).  However,

24    Musixmatch's recent representation "We're in . . . San Francisco" undercuts its insistence that

25    California is inconvenient.  LyricFind also presents evidence Musixmatch's co-presidents, two-

26    thirds of its board, and many of its major customers reside in the United States—further

27    undermining Musixmatch's assertions of inconvenience.  (Dkt. No. 58-1 ¶¶ 3-5; 11-13; Dkt. No.

28    58-10; Dkt. No. 58-11; Dkt. No. 58-15 ¶ 15.)  So, while this factor weighs against exercising

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1   jurisdiction, it does so only slightly.  *See Silk*, 65 F.4th at 458 (when the defendant "has not

2   presented evidence that the inconvenience is so great as to constitute a deprivation of due process,

3   . . . this factor just barely weighs against the exercise of personal jurisdiction") (cleaned up).

4        The third factor asks whether an exercise of jurisdiction would conflict with another

5   country's sovereignty.  *Ballard v. Savage*, 65 F.3d 1495, 1501 (9th Cir. 1995).  Italy and the UK

6   have an interest in resolving this dispute because Musixmatch—an Italian corporation—entered an

7   agreement with a UK corporation governed by the laws of England and Wales.  So, this factor

8   weighs against exercising jurisdiction because it implicates the sovereignty of Italy and the UK.

9   But "it is by no means controlling."  *Id.* (citation omitted); *see also Gates Learjet Corp. v. Jensen*,

10  743 F.2d 1325, 1333 (9th Cir. 1984) ("[T]his factor is not dispositive because, if given controlling

11  weight, it would always prevent suit against a foreign national in a United States court.").

12       The fourth factor—the forum's interest in adjudicating the dispute—weighs in favor of

13  exercising jurisdiction.  It is beyond dispute that the United States has a strong interest in

14  enforcing the antitrust policies underlying the Sherman Act.  Because LyricFind has made a prima

15  facie showing that Musixmatch purposefully directed its anticompetitive conduct at the United

16  States, the United States has a significant interest in adjudicating this case.

17       The fifth factor—efficient judicial resolution of the dispute—"is no longer weighed

18  heavily given the modern advances in communication and transportation."  *Silk*, 65 F.4th at 459.

19  So, this factor is neutral.

20       The sixth factor is convenience to the plaintiff.  In this case, while LyricFind is a Canadian

21  corporation, LyricFind chose to sue in the United States.  So, this factor is neutral or weighs

22  slightly in favor of exercising jurisdiction.  In any event, "the plaintiff's convenience is not of

23  paramount importance."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1116 (9th Cir. 2002).

24       The seventh factor is the existence of alternate fora.  LyricFind does not establish it would

25  be precluded from suing Musixmatch in Italy or England.  *See Harris Rutsky & Co. Ins. Servs. v.*

26  *Bell & Clements Ltd.*, 328 F.3d 1122, 1133–34 (9th Cir. 2003) ("The plaintiff bears the burden of

27  proving the unavailability of an alternative forum.").  So, this factor weighs against exercising

28  jurisdiction.

14

***

On balance, Musixmatch "has not met its burden of presenting a compelling case that the exercise of jurisdiction would not comport with fair play and substantial justice." *See Harris Rutsky*, 328 F.3d at 1134; *see also Roth,* 942 F.2d at 625 (finding exercise of jurisdiction was reasonable even though only two reasonableness factors favored plaintiff, while three favored defendant).  While Musixmatch entered an agreement with WCM, a UK corporation, the uncontroverted evidence establishes the most valuable compositions from that agreement are those owned by WCM's United States-based affiliate.  And as recently as July 2024, Musixmatch advertised San Francisco as one of its three locations.  On these facts, Musixmatch would have to establish the balance of the seven factors weighs heavily against exercising jurisdiction to make the requisite "compelling case." *See Roth*, 942 F.2d at 625.  It has not.  So, the Court DENIES Musixmatch's 12(b)(2) motion to dismiss.

## II.    MUSIXMATCH'S AND TPG'S 12(B)(6) MOTIONS TO DISMISS

Both Musixmatch and TPG move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  The Court begins with Musixmatch and TPG arguments' pertaining to the antitrust claims, then turns to their arguments to dismiss the remaining state law claims.

### A.    Musixmatch's Arguments regarding Antitrust Claims

As an initial matter, in response to Musixmatch's motion to dismiss, "LyricFind agrees to withdraw its claims under Section 3 of the Clayton Act (Count 8)."  (Dkt. No. 58 at 53.)  So, the Court GRANTS Musixmatch's motion to dismiss the Eighth Cause of Action and does not below address Musixmatch's additional arguments as they pertain to that cause of action.

#### 1.    Antitrust Standing (Causes of Action 1-10)

Musixmatch moves to dismiss Causes of Action One through Ten on the ground LyricFind fails to adequately allege antitrust injury and standing.  "[T]o acquire antitrust standing, a plaintiff must adequately allege and eventually prove antitrust injury." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003).  "Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the type the antitrust laws were

United States District Court
Northern District of California

1  intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.*

2  (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

3    The antitrust standing inquiry is guided by several cases, beginning with *Brunswick*.  The

4  *Brunswick* defendant manufactured bowling equipment.  429 U.S. at 479.  Following a sharp

5  decline in the bowling industry, the defendant "experienced great difficulty in collecting money

6  owed" from equipment sales secured by credit.  *Id.*  "To meet this difficulty," the defendant

7  "began acquiring and operating defaulting bowling centers when [its] equipment could not be

8  resold and a positive cash flow could be expected from operating the centers." *Id.* at 479-80.

9  Through these acquisitions, the defendant became "the largest operator of bowling centers."  *Id.* at

10  480.  The plaintiffs—several bowling centers—sued, alleging the defendant's acquisitions in three

11  markets where the plaintiffs operated might substantially lessen competition or tend to create a

12  monopoly.  *Id.*  The Supreme Court concluded the plaintiffs could not recover antitrust damages

13  because their injury "was not of the type that [antitrust laws] [were] intended to forestall."  *Id.* at

14  487-88 (cleaned up).  Antitrust laws "were enacted for the protection of competition not

15  competitors" and "[a]t base, [the plaintiffs] complain[ed] that by acquiring the failing centers [the

16  defendant] preserved competition, thereby depriving [the plaintiffs] of the benefits of increased

17  concentration."  *Id.* at 488 (cleaned up).  The court noted the plaintiffs "would have suffered the

18  identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or

19  been purchased by 'shallow pocket' parents."  *Id.* at 487.

20    Relying on *Brunswick*, the court in *Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone,*

21  *Inc.*, 140 F.3d 1228 (9th Cir. 1998) determined the plaintiff had not alleged antitrust injury.  The

22  plaintiff, Lucas Automative Engineering, Inc., competed with the defendant, Coker Tire Company,

23  Inc., in the vintage tire market.  *Id.* at 1230.  At one point, both Lucas Automative and Coker Tire

24  distributed Bridgestone/Firestone, Inc.'s ("Firestone") vintage tires.  Firestone subsequently

25  invited the two companies "to submit bids for an exclusive license to manufacture and distribute

26  Firestone brand vintage tires worldwide."  *Id.*  Firestone ultimately selected Coker Tire as its

27  exclusive distributor, which allegedly "increased Coker Tire's share of the vintage tire market

28  from 49% to 74%, and increased Coker Tire's share of the original equipment vintage tire market

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    to 90%." *Id.* at 1230-33.  Lucas Automotive sued Coker Tire.  In considering whether "Lucas

2    Automotive ha[d] standing to bring an action for treble damages against Coker Tire" under

3    sections 4 and 16 of the Clayton Act, the Ninth Circuit decided it did not.  *Id.* at 1232.  Lucas

4    Automotive's alleged injury was "that it ha[d] been foreclosed from serving as a primary-line

5    supplier of vintage tires." *Id.* at 1233.  This was insufficient for purposes of antitrust standing

6    because "Lucas Automotive would have suffered the same injury had a small business acquired

7    the exclusive right to manufacture and to distribute Firestone tires." *Id.*

8            Five years later, in *Glen Holly*, the Ninth Circuit distinguished *Lucas Automotive*,

9    *Brunswick*, and other cases where the alleged injury "was simply a loss of greater profits caused

10   by *increased* competition stemming from the alleged wrongful acts." 352 F.3d at 377.  *Glen Holly*

11   involved an agreement between two competing manufacturers of non-linear editing systems,

12   Tektronix and Avid.  *Id.* at 368.  The plaintiff—which "purchased its entire stock of non-linear

13   editing equipment from Tektronix"—leased that equipment to film companies or used it to

14   perform professional editing for customers.  *Id.*  "[A]bruptly, without warning, and contrary to

15   previous representations, Avid and Tektronix entered into an 'alliance' whereby Tektronix agreed

16   to cease manufacturing and selling its [non-linear editing] system, and to become a distributor for

17   its previous competitor Avid's non-linear film editing products." *Id.* at 369.  The plaintiff—

18   "[u]nable to switch products because of costs and allegedly insurmountable change-over

19   complications"—was forced out of business.  *Id.* at 370.  The Ninth Circuit concluded the

20   plaintiff's injury was "of the type the antitrust laws were intended to prevent." *Id.* at 373.  It

21   reasoned the plaintiff's loss stemmed from "an unlawful agreement, dressed up as a competitor

22   collaboration, to kill off a product in order to end competition." *Id.*  Unlike *Lucas* and others in

23   "the *Brunswick* line of cases," in *Glen Holly* "there [was] no pro competitive aspect of the

24   defendant's strategic alliance, none." *Id.*  Applying the motion to dismiss standard, the *Glen Holly*

25   court concluded the plaintiff's allegations of an agreement which left "only one product, no

26   choices, and no competition in its wake" were sufficient to allege antitrust injury.  *Id.*

27           Here, LyricFind's allegations likewise support a plausible inference the Exclusive will

28   result in "no choices[] and no competition" for lyric services.  *See id.*  LyricFind alleges "given the

17

United States District Court
Northern District of California

scope of WCM's catalog and the commercial need for DSPs to display WCM's lyrics, the only option for most DSPs will be to contract with Musixmatch, effectively excluding LyricFind, and all other providers, from the Relevant Markets while threatening their ability to remain operational." (Dkt. No. 50 ¶ 140.) LyricFind's allegations also support a plausible inference that, as in *Glen Holly*, there is "no pro competitive aspect" to the Exclusive. *See Glen Holly*, 352 F.3d at 368. (Dkt. No. 50 ¶ 23 ("The only remaining practical choice for DSPs is to contract with Musixmatch, at whatever price Musixmatch demands.").) So, LyricFind plausibly alleges antitrust injury.

Musixmatch's heavy reliance on *Lucas Automotive* is unpersuasive. First, while *Lucas Automotive* bears some factual resemblance to this case, the procedural posture is different. In *Lucas Automotive*, the Ninth Circuit reviewed the district court's summary judgment order, which concluded "Lucas Automotive ha[d] not *produced evidence* to show that its losses flow from any alleged monopoly by Coker Tire." 140 F.3d at 1231 (emphasis added). Instead, the evidence revealed Coker Tire's "bid proposal was superior to Lucas Automotive's." *Id.* Specifically, Coker Tire's marketing approach was consistent with the approach used by Firestone; Coker Tire's license fee was preferable to Lucas Automotive's; Coker Tire's leader "demonstrated 'far superior public relations skills' than those" of Lucas Automotive's leader; and "Coker Tire had several management-level employees whereas Stanley Lucas was the sole management-level employee at Lucas Automotive." *Id.* There was also evidence Lucas Automotive's proposal "lacked the required financial statements and business and credit references." *Id.* With the benefit of this evidence, the court concluded Lucas Automotive had not "*prove[d]* that its alleged injury flow[ed] from that which ma[de] defendants' acts unlawful." *Id.* at 1233 (emphasis added) (cleaned up).

Here, in contrast, the Court is not reviewing a summary judgment record but is instead considering the sufficiency of LyricFind's allegations. *See Glen Holly*, 352 F.3d at 377 (the "case *at this stage* is not *Brunswick* . . . [or] *Lucas Automotive*") (emphasis added); *see also id.* (evaluating the case "as the record now stands"). At this stage*,* as the record now stands, LyricFind's allegations support an inference of antitrust injury. *See Retrophin, Inc. v. Questcor*

18

1   *Pharms., Inc.*, 41 F. Supp. 3d 906, 913 (C.D. Cal. 2014) (concluding the plaintiff alleged antitrust

2   injury because "as in *Glen Holly,* and unlike *Lucas* or *Brunswick,* there [was] no alleged

3   procompetitive aspect to the challenged conduct").

4         Second, while *Lucas Automotive* held there was no injury because the same injury would

5   have occurred had a small competitor purchased the exclusive right to Firestone tires, in *Glenn*

6   *Holly* the court deemed the possibility that other scenarios could result in the same injury

7   irrelevant at the motion to dismiss stage.  *Id.* at 377 ("[W]hatever might have happened to [the

8   plaintiff], had some other event occurred resulting in the demise of [Tektronix's non-linear editing

9   equipment], is irrelevant in this context.").  Moreover, contrary to Musixmatch's assertion at oral

10  argument, the complaint supports an inference WCM would have continued working with

11  LyricFind if not for the Exclusive.  LyricFind alleges "[p]rior to the WCM-Musixmatch Exclusive,

12  LyricFind and WCM had worked together successfully for more than fifteen years" and

13  "LyricFind . . . was not aware of any concerns from WCM about its performance."  (Dkt. No. 50 ¶

14  144.)

15        Musixmatch also cites *Curtin Maritime Corp. v. Santa Catalina Island Co.*, 786 F. App'x

16  675 (9th Cir. 2019), an unpublished case involving an exclusive lease that precluded the plaintiff

17  from using a specific freight seaport.  As Musixmatch observes, the *Curtin* majority "disagree[d]

18  with the dissent that both *Brunswick* and *Lucas Automotive* stand for the proposition that a

19  plaintiff does not suffer an antitrust injury merely because a large player competes in the market,"

20  explaining it "did not condition [its] holding in *Lucas* on the pro-competitive aspects of the

21  executive license."  *Id.* at 677 (cleaned up).  The majority opinion is not binding because the case

22  is unpublished, and its persuasiveness is somewhat diminished by a footnote stating "[e]ven if

23  *Lucas* was incorrectly decided, we are bound by decisions of prior panels."  *Id.* at 677 n.1.  In any

24  event, while the *Curtin* majority affirmed dismissal of the plaintiff's Section 1 claim for failure to

25  allege antitrust injury, it concluded the plaintiff adequately alleged antitrust injury for its Section 2

26  claim.  *Id.* at 677-78.  The Section 2 claim alleged the defendant entered an exclusive deal then

27  "conducted a sham RFP process" in which it "awarded" the exclusive lease to the rival shipper.

28  *Id.* at 678.  *Curtin* thus suggests a plaintiff suffers antitrust injury when the defendant enters an

United States District Court
Northern District of California

19

exclusive deal outside of a competitive bidding process that "preclude[s] competition." *Id.* That is essentially what LyricFind alleges here: that Musixmatch entered an exclusive deal with WCM—"never ask[ing] LyricFind for a competing bid"—which precludes LyricFind from offering services for WCM-controlled compositions, which account "for approximately 30% of streams and around 60% of the top 100 songs." (Dkt. No. 50 ¶¶ 23, 138.)  So, applying *Curtin*, LyricFind's allegations support an inference of anticompetitive injury.

Because LyricFind plausibly alleges antitrust injury, the Court DENIES Musixmatch's request to dismiss Causes of Action One through Ten on this ground.

### 2.    Exclusive Contract (Causes of Action 1-10)

Musixmatch also argues Causes of Action One through Ten should be dismissed because LyricFind fails to adequately allege an unlawful exclusive agreement.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) ("[E]ven though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.").  "[A] § 1 exclusive dealing claim requires a substantial foreclosure of competition."  *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1085 (9th Cir. 2025).  For both a monopolization and an attempted monopolization claim under Section 2 of the Sherman Act, a plaintiff "must . . . plausibly allege that the defendant engaged in anticompetitive conduct to achieve (or attempt to achieve) monopoly power and caused antitrust injury."  *CoStar*, 141 F.4th at 1085.  "[E]xclusive agreements are an example of anticompetitive conduct."  *Id.* at 1086.  Thus, Musixmatch moves to dismiss Causes of Action One through Seven—and the related state law claims—on the ground LyricFind does not allege the requisite substantial foreclosure. Musixmatch raises three substantial foreclosure arguments, which the Court addresses in turn.

### a.    Duration of Agreement

First, Musixmatch argues LyricFind does not plausibly allege it has been foreclosed from competing for a "substantial share" of any relevant market because the complaint "does not allege that the agreement is of such an extended duration as to result in substantial foreclosure." (Dkt. No. 53 at 30.)  Musixmatch observes the complaint is silent "about the duration or terminability of

United States District Court
Northern District of California

the WCM/Musixmatch agreement." (*Id.* at 31.)  This argument is unpersuasive for two reasons.

First, the Ninth Circuit recently cautioned against an "overly formalistic" application of the exclusive dealing requirement.  *CoStar*, 141 F.4th at 1092.  *CoStar* involved an agreement with terms that were "not expressly exclusive."  *Id.* at 1092.  Nevertheless, because the allegations supported an inference the agreement, "in practice," required customers to exclusively use the alleged monopolist's services, the allegations were "sufficient to support an inference that the contracts create an exclusive relationship."  *Id.*  In reaching this conclusion, the Ninth Circuit noted other courts of appeals recognize de facto exclusive agreements and cited an Eleventh Circuit case when an agreement was found to be exclusive "even though it was short-term and voluntary."  *Id.* (citing *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 833-35 (11th Cir. 2015)).  Given the Ninth Circuit's recognition agreements without expressly exclusive terms can operate as exclusive agreements that substantially foreclose competition, the Court declines to conclude LyricFind fails as a matter of law to allege substantial foreclosure because LyricFind does not allege the Exclusive's end date.  That is especially so given the allegation "WCM and Musixmatch have not publicly announced the existence or specific terms of the WCM-Musixmatch Exclusive, despite their practice of publicly announcing commercial deals."  (Dkt. No. 50 ¶ 141.)

Second, the complaint alleges lyric providers' agreements with DSPs often span multiple years.  (*Id.* ¶ 95.)  Drawing all reasonable inferences in LyricFind's favor, even if the Exclusive were short in duration, the allegations support an inference that DSPs who presently contract with Musixmatch because of its exclusive access to WCM titles will be locked into that contract with Musixmatch for several years.  Thus, LyricFind plausibly alleges that regardless of its exact duration, the Exclusive will have the effect of substantially foreclosing competition.

### b.    Foreclosure from a Substantial Share of the Relevant Market

Next, Musixmatch argues the complaint fails to allege substantial foreclosure because, even accepting the complaint's allegation that WCM controls 30% of all streams licensed on major platforms, "30% foreclosure has repeatedly been found insufficient to sustain an exclusive dealing claim."  (Dkt. No. 53 at 33.)  As Musixmatch correctly notes, "[c]ourts have quantified substantial share as 40% to 50% of the relevant market."  *Nicolosi Distrib., Inc. v. FinishMaster,*

United States District Court
Northern District of California

*Inc.*, No. 18-CV-03587-BLF, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018).  But Musixmatch misstates the relevant market.  The percentage of songs WCM controls in the *music publishing industry* does not determine whether the Exclusive substantially forecloses competition in the *Lyric Data Services and Lyric Rights Licensing markets*.  So, Musixmatch's arguments regarding how the complaint defines and calculates WCM's control in the music publishing industry do not preclude LyricFind from alleging substantial disclosure.

Nor does *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), which Musixmatch cites.  In *Paddock*, the number three Chicago newspaper alleged the pattern of exclusive distribution rights violated antitrust laws because it deprived smaller papers of the "most popular" and "best" supplemental services, such as cartoons and op-ed pieces.  *Id.* at 44.  The Seventh Circuit affirmed dismissal, reasoning "[t]here are hundreds, if not thousands, of opinion and entertainment features; a newspaper deprived of access to the *New York Times* crosswords puzzles can find others, even if the *Times* has the best known one."  *Id.*  The court thus rejected the plaintiff's attempt to use antitrust law to secure access to the comics and puzzles it deemed better than the alternatives available to it.  Here, in contrast, LyricFind's issue is not that Musixmatch has access to better songs.  The thrust of LyricFind's complaint is its business depends on its ability to offer a complete catalog, and without WCM songs, LyricFind cannot do so.  So, *Paddock* is distinguishable: accepting LyricFind's allegations as true, it cannot replace the WCM titles with other songs the way the *Paddock* plaintiff could publish a different crossword puzzle.

### c.    Multisourcing Lyric Content

Finally, Musixmatch argues the complaint fails to allege substantial foreclosure because "it acknowledges that DSPs can and do multisource lyric content from both LyricFind and Musixmatch at the same time."  (Dkt. No. 53 at 31.)  The complaint alleges "[m]ost DSPs expect to source Lyric Data Services from a single provider because it is not practical or economical to integrate Lyric Data from multiple databases or switch among them."  (Dkt. No. 50 ¶ 68.)  The complaint acknowledges "two large DSPs, Amazon Music and Google/YouTube Music, have chosen to incur the extra expense of sourcing Lyric Data from both LyricFind and Musixmatch."  (*Id.*)  But it alleges Amazon and Google "are the exception because of their vast resources.  For

most DSPs, such a cost cannot be justified."  (*Id.*)

Musixmatch argues "LyricFind's allegation that Amazon, Google, and YouTube are the only customers with the 'vast' technical and financial resources necessary to multisource is dubious."  (Dkt. No. 53 at 36.)  But at the motion to dismiss stage, the Court accepts the allegations as true, and so it accepts as true the allegation that for most DSPs, it is not practical or economical to source from multiple lyric providers.  This assertion is supported by allegations of fact.  (*See, e.g.,* Dkt. No. 50 ¶ 95 (describing the "substantial costs" DSPs expend "to integrate their technology with a specific provider's infrastructure"); *id.* ¶ 159 ("Once a customer begins sourcing Lyric Data Services from a given provider, there are substantial costs related to switching to a competitor; namely, engineering a solution that will be compatible with a new provider's technologies.").)  The Court cannot grant Musixmatch's motion by instead accepting Musixmatch's argument that an allegation is "dubious."

At oral argument, Musixmatch argued LyricFind does not allege substantial foreclosure because, by its own allegations, 97.3% of the major DSPs work with more than one lyric services provider.  The complaint alleges the following percentages:

| DSP | Global Subscribers[1] | Subscriber Share in the U.S.[2] | Lyric Services Provider |
|---|---|---|---|
| Spotify | 239 million globally | 36% | Musixmatch |
| Apple | 92 million globally | 30.7% | Musixmatch |
| Amazon | 83 million globally | 23.8% | Musixmatch & LyricFind |
| YouTube Music | 100 million globally (global data is in combination with YouTube Premium) | 6.8% | Musixmatch & LyricFind |
| Tidal | Unknown | 0.5% | Musixmatch |
| Pandora | 6 million paid subscribers (46 million monthly active users) (U.S. only) | 1.9% | LyricFind |
| JioSaavn | 100 million active users (not subscribers) | N/A | Musixmatch |

Table B – Major DSPs and Their Lyric Service Providers

(Dkt. No. 50 ¶ 156.)  LyricFind separately alleges the Lyric Data Services Market includes "minor

23

participants . . . such as Genius (which provides Lyric Data Services to Apple)." (*Id.* ¶ 84.)  So, Musixmatch argues, Apple multisources its lyrics, too.  Furthermore, Musixmatch argues, because Spotify considered switching to LyricFind, Spotify should be considered as multisourcing its lyrics, too.  Under these assumptions, Musixmatch calculates the DSPs who multisource as accounting for 97.3% of the market (36% + 30.7% + 23.8% + 6.8%).  But the Court can only accept this argument if it construes the facts in *Musixmatch's* favor.  Construing the facts in LyricFind's favor, the complaint supports a plausible inference Spotify was not going to use two lyric services providers but was going to switch to LyricFind as its single lyric services provider. (Dkt. No. 50 ¶ 102 ("From the fall of 2023 through April of 2024, LyricFind had been negotiating with Spotify to *take over* Musixmatch's role as Spotify's supplier of Lyric Data Services.") (emphasis added).)  At bottom, Apple receiving Lyric Data Services from a "minor participant" in the market and Spotify considering a contract with LyricFind do not render implausible LyricFind's allegations that the Exclusive substantially foreclosed competition in the lyric services markets.  Put another way, LyricFind plausibly alleges that even if it offered superior services and prices, DSPs would still contract with Musixmatch because they need access to WCM songs and are unwilling to bear the cost and inconvenience of contracting with Musixmatch for WCM songs and with LyricFind for the rest.

Because LyricFind plausibly alleges substantial foreclosure, the Court DENIES Musixmatch's request to dismiss Causes of Action One through Ten on this ground.

### 3.    Market and Monopoly Power (Causes of Action 1, 2, 3, 5, 6, 9 and 10)

To state a valid Sherman Act claim, a plaintiff must allege (1) "a 'relevant market' exists" and (2) "the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  The first inquiry—whether a relevant market exists—is guided by several legal principles.  First, "the relevant market must be a *product* market."  *Id.*  "Second, the market must encompass the product at issue as well as all economic substitutes for the product."  *Id.*  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Id.* (citation omitted); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421,

1    1435 (9th Cir. 1995) (explaining "cross-elasticity of demand" refers to "whether consumers view

2    the products as substitutes for each other").  "Third, although the general market must include all

3    economic substitutes, it is legally permissible to premise antitrust allegations on a submarket.

4    That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or

5    monopolization of a small part of the general market of substitutable products."  *Id.*

6          A plaintiff who plausibly alleges a relevant market must also allege the defendant has

7    market or monopoly power within the relevant market.  *See Epic Games, Inc. v. Apple, Inc.*, 67

8    F.4th 946, 998 (9th Cir. 2023) ("Monopoly power differs in degree from market power, requiring

9    'something greater.'").  Market and monopoly power "may be demonstrated through either of two

10   types of proof."  *Rebel Oil*, 51 F.3d at 1434.  "One type of proof is direct evidence of the injurious

11   exercise of market power," *id.*, which includes "evidence of either supracompetitive pricing or

12   reduced output."  *CoStar*, 141 F.4th at 1087.  "The more common type of proof is circumstantial

13   evidence pertaining to the structure of the market."  *Rebel Oil*, 51 F.3d at 1438.  To demonstrate

14   market power circumstantially, a plaintiff must:

15          (1) define the relevant market,
       (2) show that the defendant owns a dominant share of that market, and
16       (3) show that there are significant barriers to entry and show that
       existing competitors lack the capacity to increase their output in the
17       short run.

18   *Id*.

19          Here, the complaint alleges two markets: "(1) the Market for Lyric Data Services ('Lyric

20   Data Services Market'); and (2) the market for Lyric Rights Licensing ('Lyric Rights Licensing

21   Market'), which contains a submarket for the *sublicensing* of Lyric Rights from lyric service

22   providers ('Lyric Rights Sublicensing Submarket')."  (Dkt. No. 50 ¶ 76.)  Musixmatch moves to

23   dismiss Causes of Action One, Two, Three, Five, Six, Nine, and Ten, "to the extent LyricFind's

24   California Unfair Competition Law claim . . . is premised on an alleged antitrust violation, on the

25   ground LyricFind fails to "plausibly allege that Musixmatch has (or is dangerously close to

26   achieving) monopoly or market power in any relevant market.  (Dkt. No. 53 at 37.)  Specifically,

27   Musixmatch argues the complaint (1) fails to define proper relevant markets and (2) fails to

28   plausibly allege Musixmatch has market or monopoly power in those markets.  The Court starts

United States District Court
Northern District of California

25

1    with Musixmatch's arguments pertaining to the Lyric Data Services Market, then turns to

2    Musixmatch's arguments regarding the Lyric Rights Licensing Market/Sublicensing Submarket.

### a.    Lyric Data Services Market

### i.    Relevant Market

5         In terms of defining the relevant market, there is no "fatal legal defect" warranting

6    dismissal at this stage.  *See Newcal*, 513 F.3d at 1045 ("An antitrust complaint survives a Rule

7    12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers

8    a fatal legal defect.").  The market includes "the creation of data files that contain the actual text of

9    lyrical transcriptions," "the data to synchronize the transcriptions to sound recordings, either line-

10   by-line or word-by-word," and "processing and distributing lyric-related royalties."  (Dkt. No. 50

11   ¶ 85.)  The complaint identifies the primary and minor participants in this market.  (*Id.* ¶ 84.)  It

12   thus includes "the group or groups of sellers or producers who have actual or potential ability to

13   deprive each other of significant levels of business."  *See Newcal*, 513 F.3d at 1045.

14        Musixmatch asserts the market definition is insufficient because "LyricFind does not

15   explain why DSPs could not turn to other transcription or royalty administration solutions (or even

16   artificial intelligence)."  (Dkt. No. 53 at 38.)  But at the motion to dismiss stage, when LyricFind

17   alleges a specific product market, the hypothetical possibility that DSPs might opt to use artificial

18   intelligence instead does not render the market definition legally deficient.  *See Gamboa v. Apple

19   Inc.*, No. 24-CV-01270-EKL, 2025 WL 1684890, at *2 (N.D. Cal. June 16, 2025) (concluding "it

20   would be premature at this [motion to dismiss] stage to conclude that Plaintiffs' proposed market

21   is 'facially unsustainable' because it excludes" a potential substitute).

22        The cases Musixmatch cites on this point are unpersuasive.  For example, *United States v.

23   Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004), involved a bench trial.  As such, the *Oracle*

24   court considered whether the plaintiffs had shown by a preponderance of the evidence an

25   articulable and distinct product market, and in doing so, considered that the plaintiffs' own expert

26   witnesses treated certain mid-market vendors as part of the market.  *Id.* at 1158-59.  At the motion

27   to dismiss stage, in contrast, "[a]n antitrust complaint survives a Rule 12(b)(6) motion unless it is

28   apparent from the face of the complaint that the alleged market suffers a fatal legal defect."

United States District Court
Northern District of California

*Newcal*, 513 F.3d at 1045.  Musixmatch also cites a case where the court found the market allegations "vague and conclusory" noting, for example, the plaintiffs "fail[ed] to adequately describe what they meant by a 'mini zip code market.'"  *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010), *aff'd sub nom. Reudy v. CBS Corp.*, 430 F. App'x 568 (9th Cir. 2011).  Here, in contrast, LyricFind describes what fulfillment of lyric data entails.  (Dkt. No. 50 ¶¶ 83-85.)

### ii.   Market/Monopoly Power

LyricFind also alleges facts supporting a plausible inference of supracompetitive pricing, which serves as direct evidence of the injurious exercise of market power.  *See CoStar*, 141 F.4th at 1087.  "A supracompetitive price is simply a price above competitive levels."  *Id.* (cleaned up).  LyricFind alleges that after the Exclusive, iHeartRadio—a "significant" DSP—"signed with Musixmatch at a price over five times higher than what iHeartRadio had been paying LyricFind."  (Dkt. No. 50 ¶ 169.)  The complaint also alleges "Spotify was forced to renew its agreement with Musixmatch at substantially higher fees than those offered by LyricFind" because of the Exclusive.  (*Id.* ¶ 108.)   These allegations support a plausible inference the Exclusive enabled Musixmatch to charge "price[s] above competitive levels."  *See CoStar*, 141 F.4th at 1087 (cleaned up).  So, LyricFind plausibly alleges direct evidence of market/monopoly power.

The Court is not persuaded by Musixmatch's arguments to the contrary.  Musixmatch asserts "the only factual allegations relating to prices in the Complaint are that Musixmatch commanded higher prices in its contracts with iHeart Radio and Spotify *compared to LyricFind's prices*" and "[t]hose allegations do not establish that Musixmatch and LyricFind offered those DSPs the same scope of services."  (Dkt. No. 59 at 22.)  That Musixmatch offers more or different services than LyricFind is *an* inference to be drawn from the allegation it charges higher prices.  But LyricFind's allegations support a plausible inference that Spotify paid "substantially" more and iHeartRadio paid five times more than what LyricFind charges not because Musixmatch offered more or better services, but because Musixmatch has exclusive access to WCM songs.  (Dkt. No. 50 ¶ 169 (alleging an iHeartRadio executive "explained that iHeartRadio could not continue sourcing lyrics from LyricFind if LyricFind lacked the ability to service WCM's titles").)

United States District Court
Northern District of California

United States District Court
Northern District of California

This is especially so given the allegations that Musixmatch's services are inferior.  (Dkt. No. 50 ¶ 99 ("For years, consumers have complained that Musixmatch's lyrics are, among other things, inaccurate, slow or fail to appear, do not properly synch with music, and lack accurate translations.").)  Moreover, LyricFind alleges "[t]he primary participants in the Lyric Data Services Market are Musixmatch and LyricFind," (Dkt. No. 50 ¶ 84), so LyricFind's prices are a relevant benchmark in determining what constitutes competitive pricing.

### b.  Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket

The Lyric Rights Licensing Market involves procuring licenses from music publishers to display lyrics.  Some DSPs procure licenses directly from the music publishers.  (Dkt. No. 50 ¶ 77.)  Other DSPs "obtain lyric rights through sublicenses administered by lyric service providers"— which LyricFind calls the Lyric Rights Sublicensing Submarket.  (*Id.*)  As alleged in the complaint, this sublicensing submarket is distinct from the Lyric Rights Licensing Market "because DSPs often do not have the resources to obtain direct licensing from music publishers at the scale required for their platforms, nor the resources to administer a large volume of lyric license agreements."  (*Id.* ¶ 79.)  "As a result, in many cases, DSPs must rely on lyric service providers to obtain and administer lyric rights via sublicenses."  (*Id.*)

### i.  Relevant Market: Lyric Rights Sublicensing Submarket

Beginning with the Lyric Rights Sublicensing Submarket, Musixmatch asserts the complaint fails to define a proper relevant market because LyricFind "does not and cannot allege that there is any meaningful difference between the rights conferred by a lyric license and those conferred by a lyric sublicense"; rather, the two "belong in the same market."  (Dkt. No. 53 at 38.)  "In order to establish the existence of a legally cognizable submarket, the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market."  *Newcal*, 513 F.3d at 1045.  Several "practical indicia" of an economically distinct submarket include: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and

1    specialized vendors." *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

2         As Musixmatch argues, LyricFind does not allege some of the "practical indicia" of an

3    economically distinct submarket.  The product is the same—lyric licenses and sublicenses confer

4    the same rights—and the customers (DSPs) are the same.  The complaint does not allege a DSP

5    pays a different price for a license it procures directly from the music publisher versus indirectly

6    from LyricFind/Musixmatch.

7         Nevertheless, LyricFind plausibly alleges an economically distinct submarket by alleging

8    LyricFind and Musixmatch act as "specialized vendors."  The complaint alleges "lyric rights are

9    licensed on a music publisher-by-music publisher basis," and "DSPs often do not have the

10   resources to obtain direct licensing from music publishers at the scale required for their platforms,

11   nor the resources to administer a large volume of lyric license agreements."  (Dkt. No. 50 ¶¶ 53,

12   79.)  Accepting these allegations as true, LyricFind plausibly alleges there is an economically

13   distinct submarket for DSPs seeking to sublicense rights from a lyric services provider rather than

14   negotiate and license directly from music publishers.  Put another way, if Musixmatch imposed a

15   small but significant price increase for its sublicensing services, the allegations support a plausible

16   inference that DSPs would pay that price increase rather than undertake the administratively

17   cumbersome and resource-intense process of negotiating with each music publisher directly.  This,

18   in turn, supports an inference the licensing and sublicensing markets are not "reasonably

19   interchangeable."  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018) (noting "one

20   method of determining whether a proposed market is viable is assessing whether a monopolist in

21   the proposed market could profitably impose a small but significant and nontransitory price

22   increase") (cleaned up); *see also In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp.

23   2d 367, 380 (E.D. La. 2013) ("[T]he plaintiffs . . . allege facts that suffice to make it plausible that

24   sales of pool products by distributors are distinct from sales of Pool Products through other means

25   in economically significant ways.").

26         So, at the motion to dismiss stage, LyricFind plausibly alleges the Lyric Rights

27   Sublicensing Submarket is a legally cognizable submarket.

28                              ii.      **Relevant Market: Lyric Rights Licensing Market**

United States District Court
Northern District of California

Musixmatch does not contest that LyricFind sufficiently alleges a Lyric Rights Licensing relevant market.

### iii.    Market/Monopoly Power: Lyric Rights Sublicensing Market

LyricFind plausibly alleges direct evidence of Musixmatch's market/monopoly power in the Lyric Rights Sublicensing Submarket.  LyricFind alleges that before the Exclusive, "Musixmatch serviced approximately 31% of the Lyric Right Licensing Market based on licensing revenue," "LyricFind serviced approximately 16% of the market," and "[m]ost of the rest of the Lyric Rights Licensing Market, approximately 53%, was comprised of direct licensing by music publishers."  (Dkt. No. 50 ¶ 80.)  So, as alleged in the complaint, LyricFind and Musixmatch are the two primary participants in the Lyric Rights Sublicensing Submarket.  As described above, then, the allegation that Musixmatch charged iHeartRadio and Spotify substantially higher fees than LyricFind charges supports an inference Musixmatch is charging supracompetitive prices in the Lyric Rights Sublicensing Submarket, which is direct evidence of market/monopoly power.

### iv.    Market/Monopoly Power: Lyric Rights Licensing Market

However, LyricFind does not plausibly allege Musixmatch has market/monopoly power in the Lyric Rights Licensing Market.  LyricFind does not argue the supracompetitive pricing described above applies to the Lyric Rights Licensing Market.  (Dkt. No. 58 at 43 ("Musixmatch's imposition of dramatic price increases on DSPs while simultaneously gaining market share provides direct evidence of its monopoly power in the *Lyric Data Services Market and Lyric Rights Sublicensing Submarket*.") (emphasis added).)  Regarding indirect evidence, LyricFind asserts it "has plausibly alleged indirect evidence of Musixmatch's monopoly power via its dominant shares of the Lyric Data Services Market (80%) and Lyric Rights Licensing Market (31%)."  (Dkt. No. 58 at 44; Dkt. No. 50 ¶ 162 (alleging "Musixmatch controls approximately 31% of the global Lyric Rights Licensing Market by licensing revenue").)  But all the cases LyricFind cites regarding indirect evidence involved a market share of greater than 31%.  *See Epic Games*, 67 F.4th at 985 (market share of 52% to 55%); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (market share of 60% to 69%); *Pac. Coast Agr. Exp. Ass'n v.*

*Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (market share of 45% to 70%). Indeed, a 31% market share is insufficient by LyricFind's own admission. (Dkt. No. 58 at 45 (stating 60% share is "generally required for monopoly power").) LyricFind does not explain why Musixmatch's alleged 31% share in the Lyric Rights Licensing market is nevertheless sufficient to state a Section 2 claim, nor does LyricFind argue a different standard governs attempted monopolization claims. Because LyricFind does not meaningfully argue market/monopoly power in the Lyric Rights Licensing Market, the Court understands Cause of Action Six to allege attempted monopolization of the Lyric Rights Sublicensing Submarket only, notwithstanding the complaint's language alleging attempted monopolization as to the Lyric Rights Licensing Market *and* Lyric Rights Sublicensing Submarket. (Dkt. No. 50 ¶ 217.)

***

In sum, the Court DENIES Musixmatch's request to dismiss Causes of Action One, Two, Three, Five, Six, Nine, and Ten because LyricFind plausibly alleges Musixmatch has monopoly/market power in the Lyric Data Services Market and the Lyric Rights Sublicensing Submarket.

### 4.    Concerted Action (Causes of Action 1, 4, 7, and 9)

Musixmatch asserts the causes of action premised on agreements or conspiracies (Causes of Action One, Four, Seven, and Nine) must be dismissed "because Musixmatch has not engaged, and cannot engage, in the requisite "concerted action" under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), with either TPG or WCM." (Dkt. No. 53 at 42.)

The parties agree as to TPG. LyricFind asserts "none of LyricFind's claims that require concerted action hinge on a conspiracy between Musixmatch and TPG. Musixmatch's concerted action with nonparty WCM is sufficient for each claim." (Dkt. No. 58 at 46 n.24.)

Turning to WCM, Musixmatch argues it is legally incapable of conspiring with WCM because WCM and Musixmatch are pursuing "a single, unified purpose: maximizing royalties from the licensing and distribution of WCM's lyrics." (Dkt. No. 53 at 44.) Musixmatch's argument stems from *Copperweld*, in which the Court described the risks of "concerted activity" between "separate entities":

United States District Court<br>Northern District of California

> Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit.

*Copperweld*, 467 U.S. at 768 (cleaned up). District courts have interpreted *Copperweld* to mean "coordinated activity by parties who lack independent sources of economic power and separate interests does not warrant scrutiny." *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 430 (N.D. Cal. 1992).

In *Levi*, the patent holder for a type of heating, ventilation and air conditioning ductwork formed ATS—of which he was the majority shareholder—and conveyed to ATS the exclusive patent licenses. *Id.* at 429. Then, the patent holder and his fellow shareholders sold ATS to Sterling Imperial and executed an exclusive licensing agreement with Sterling Imperial. *Id.* The district court concluded the patent holder and Sterling Imperial were not legally capable of entering into an antitrust conspiracy. *Id.* at 431-32. The court reasoned "it strain[ed] credibility to argue that [the patent holder] and ATS had any independent decisionmaking authority regarding the exploitation of the patent, or that any concerted activity the two defendants might take with regard to the patent would coalesce economic power previously directed at disparate goals." *Id.* at 432.

*Levi*, on which Musixmatch relies, does not support dismissal here. There, the relationship between the patent holder and his exclusive patent licensee did not deprive the marketplace of independent actors. Here, in contrast, the complaint supports a plausible inference Musixmatch and WCM have separate economic interests: Musixmatch seeks to exclude competition, and WCM seeks to maximize its own revenue.

The other cases Musixmatch cite are likewise distinguishable because they involve defendants alleged to have conspired with closely associated entities/individuals. *See, e.g.*, *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1029 (9th Cir. 2005) (concluding The Jack Russell Terrier Club of America and "several of its regional affiliates" were not capable of conspiring as separate entities, noting the "affiliates are best understood as

United States District Court
Northern District of California

1  extensions of the national club rather than independent economic actors"); *Calculators Hawaii,*

2  *Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1336 (9th Cir. 1983) (concluding the manufacturer of a

3  money-handling machine could not conspire with the sales agent who sold the machines, noting

4  the sales agent "merely took orders for [the manufacturer], forwarded the orders to [the

5  manufacturer], and received a percentage commission on sales made in his territory").  These

6  cases involve relationships resembling those "between a corporation and its officers or employees"

7  where the employee—or regional affiliate or sales agent—is merely an agent of the defendant

8  corporation, which precludes a finding of conspiracy.  *See Oltz v. St. Peter's Cmty. Hosp.*, 861

9  F.2d 1440, 1450 (9th Cir. 1988).  Here, in contrast, the Exclusive is between two entities with

10  sufficiently independent interests.

11         Because LyricFind plausibly alleges Musixmatch and WCM are legally capable of

12  conspiring, the Court DENIES Musixmatch's request to dismiss the causes of action requiring

13  concerted action.

14         **5.    Intent to Monopolize (Causes of Action 4 and 7)**

15         Causes of Action Four and Seven allege a conspiracy to monopolize the Lyric Data

16  Services Market and the Lyric Rights Licensing Market, respectively.  "To establish a conspiracy

17  to monopolize claim under Section 2 [of the Sherman Act], plaintiffs must plead: "(1) the

18  existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

19  conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."  *In re Nat'l

20  Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019).

21  Musixmatch focuses on the third element, moving to dismiss Causes of Action Four and Seven on

22  the ground the complaint "casts WCM as the 'co-conspirator' of Musixmatch and TPG" but

23  "conspicuously omits averring that WCM specifically intended that Musixmatch monopolize the

24  alleged antitrust markets."  (Dkt. No. 53 at 45.)  The Court agrees.

25         "Specific intent to monopolize will normally be proved by inference from conduct."  *Hunt-

26  Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980); *William Inglis & Sons

27  Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981) ("[T]he existence of

28  specific intent may be established not only by direct evidence of unlawful design, but by

United States District Court
Northern District of California

circumstantial evidence, principally of illegal conduct.").  Specific intent "signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct that [the co-conspirator] is alleged to have pursued" and "means participating in that course of conduct for the specific, shared purpose of maintaining [the co-conspirator's] monopolies."  *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002).

Here, the complaint alleges two acts from which to infer WCM's intent: (1) WCM entering the Exclusive, and (2) WCM "inform[ing] Spotify that, because of the Exclusive, LyricFind could no longer supply Lyric Data Services for WCM's titles."  (Dkt. No. 50 ¶ 107.)  As currently pled, these allegations do not support a plausible inference WCM entered the Exclusive with the specific purpose of maintaining Musixmatch's monopoly in the lyric rights and services markets.  In fact, in its opposition brief, LyricFind offers a different plausible explanation for WCM's entering the Exclusive: to "maximize licensing revenue."  (Dkt. No. 58 at 47.)  LyricFind does not allege WCM intended for Musixmatch to monopolize the relevant markets, nor does LyricFind point to other allegations from which to plausibly infer WCM had such intent.  So, the Court GRANTS Musixmatch's motion to dismiss Causes of Action Four and Seven with leave to amend.

### 6.    Monopoly Leveraging (Cause of Action 5)

Cause of Action Five alleges "Musixmatch has leveraged its monopoly power in the Lyric Data Services Market to obtain or attempt to obtain a monopoly in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket in violation of Section 2 of the Sherman Act."  (Dkt. No. 50 ¶ 209.)  Relying on *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991), Musixmatch moves to dismiss this cause of action on the ground monopoly leveraging is not an independent theory of section 2 liability.

The *Alaksa Airlines* court rejected a Second Circuit decision announcing a "monopoly leveraging" doctrine with "only two rather loose elements: 1) there must be monopoly power in some market, and 2) such power must be 'exercise[d] . . . to the detriment of competition' in another market."  *Id.* (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979)).  The Ninth Circuit subsequently clarified that while it rejected *Berkey Photo*'s definition

34

of "monopoly leveraging" in *Alaska Airlines*, "to the extent that 'monopoly leveraging' is defined as an attempt to use monopoly power in one market to monopolize another market, this theory remains a viable theory under Section 2." *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 951 (9th Cir. 1996). The court continued that under the monopoly leveraging theory, a plaintiff "must establish each of the elements normally required to prove an attempted monopolization claim under section 2 of the Sherman Act." *Id.* at 942.

As the attempted monopolization claim survives, the Court DENIES Musixmatch's request to dismiss Causes of Action Five.

### 7. Cartwright Act and UCL Claims (Causes of Action 9 & 10)

Cause of Action Nine alleges "TPG and Musixmatch's actions, in particular their 'buy or bury' scheme and conspiracy to effectuate the WCM-Musixmatch Exclusive, constituted concerted action that was an unreasonable restraint of trade or commerce throughout California and the United States in violation of the Cartwright Act, § 16720 of the California Business and Professions Code." (Dkt. No. 50 ¶ 241.) Cause of Action Ten alleges "Defendants have violated the Sherman Act, Clayton Act, and the Cartwright Act and thus Defendants have violated California's Unfair Competition Law." (*Id.* ¶ 247.) Musixmatch argues "LyricFind's claims under California's Cartwright Act and Unfair Competition Law (Causes of Action 9 and 10) fail for the same reasons the federal antitrust claims do." (Dkt. No. 53 at 46.)

The parties agree the Cartwright Act mirrors the Sherman Act. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("[T]he analysis under the Cartwright Act, Cal. Bus. & Prof.Code §§ 16700–16770, is identical to that under the Sherman Act."). Having concluded LyricFind states a claim under the Sherman Act, LyricFind has thus stated a claim under the Cartwright Act. It also follows that LyricFind has stated a claim under the UCL. *See CoStar*, 141 F.4th at 1086 ("[B]ecause [the plaintiff's] claims under the UCL depend on the same underlying conduct as its §§ 1 and 2 claims, it also will have stated a claim under both the 'unfair' and 'unlawful' prongs of the UCL" if it plausibly alleges a violation of sections 1 and 2 of the Sherman Act).

United States District Court
Northern District of California

35

**B.      TPG's Arguments regarding Antitrust Claims**

Cause of Action One alleges TPG violated Section 1 of the Sherman Act, which "prohibits conspiracies 'in restraint of trade or commerce.'"  *Name.Space*, 795 F.3d at 1129 (quoting 15 U.S.C. § 1)).  "A complaint asserting a § 1 claim must allege facts plausibly suggesting (not merely consistent with) a conspiracy."  *Id.*  Causes of Action Four and Seven allege TPG violated of Section 2 of the Sherman Act, which "prohibits concerted and independent action that 'monopolize[s] or attempt[s] to monopolize.'"  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quoting 15 U.S.C. § 2).  TPG moves to dismiss these causes of action—and the causes of action alleging related state law violations—on the ground LyricFind fails to allege "TPG independently participated in the alleged anticompetitive conduct, directed or controlled Musixmatch's actions, or otherwise engaged in unlawful behavior."  (Dkt. No. 60 at 6.)

As an initial matter, the parties agree that, pursuant to *Copperweld*, TPG and Musixmatch constitute a single economic and legal entity and are thus incapable of conspiring with one another.  The complaint alleges "TPG acquired a controlling stake in Musixmatch, believed to be around 80%."  (Dkt. No. 50 ¶ 115.)  So, TPG cannot be liable on the theory it conspired with Musixmatch.  *See Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630 (9th Cir. 2018) ("[T]he *Copperweld* doctrine establishes that where there is substantial common ownership, individual firms function as an economic unit and are generally treated as a single entity") (cleaned up).

LyricFind instead argues TPG is liable on "four related but independent grounds: (1) TPG took direct acts to further the buy-or-bury scheme; (2) TPG directed Musixmatch to pursue the Exclusive; (3) TPG approved the Exclusive; and (4) TPG and Musixmatch coordinated their anticompetitive conduct as a single enterprise."  (Dkt. No. 57 at 12.)

**1.      Single-Enterprise Liability**

LyricFind asserts "TPG and Musixmatch coordinated their anticompetitive conduct within their corporate family, which makes them jointly liable as a 'single enterprise.'"  (Dkt. No. 57 at 19.)  The "single enterprise" theory of liability is an extension of *Copperweld*.  There, the Court concluded "a parent and its wholly owned subsidiary could not conspire with each other for

36

United States District Court
Northern District of California

purposes of Section 1 of the Sherman Act" because a "parent and its wholly owned subsidiary have a complete unity of interest."  *Arandell*, 900 F.3d at 631 (citing *Copperweld*, 467 U.S. at 771 (1984)).  The corollary to this principle is "[a] wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part."  *Id.* at 632; *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) ("[I]n a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim.").  In *Arandell*, the Ninth Circuit clarified *Copperweld* "does not supply a theory of unbounded vicarious liability for the *acts* of legally distinct entities"; rather, it "states that commonly-owned-but-legally-distinct entities are considered a 'single entity' for antitrust purposes where they engage in "coordinated activity."  900 F.3d at 633.  So, to hold a defendant liable, a plaintiff is "required to come forward with evidence that [it] independently participated in the enterprise's scheme."  *Id.* (citation omitted); *see also Lenox*, 847 F.3d at 1237 ("[N]othing in our prior discussion should be read to suggest that a corporation can be held liable under § 2 for the anticompetitive conduct of one or more related entities, merely by virtue of its place in the same corporate family.").

LyricFind plausibly alleges TPG independently participated in the "buy-or-bury scheme," which supports a plausibly inference it is liable under the single-enterprise theory.  As alleged in the complaint, TPG acquired a controlling stake in Musixmatch around July 2022.  (Dkt. No. 40 ¶ 32.)  The following year, TPG attempted to acquire LyricFind.  (*Id.* ¶ 19.)  Through that process, TPG gained "access to a wide range of confidential information about [LyricFind's] business," including the fact "LyricFind planned to compete aggressively for Spotify's business when Musixmatch's contract with Spotify ended in April 2024."  (*Id.* ¶ 121.)  In January 2024, approximately a month after LyricFind and TPG ended acquisition negotiations, "TPG and Musixmatch intentionally disclosed and misrepresented . . . confidential information about LyricFind's perceived vulnerabilities to Spotify."  (*Id.* ¶ 127.)  "When their illegal disclosures

37

failed to stop LyricFind's negotiations with Spotify, TPG and Musixmatch hatched a new plan to force DSPs to sign with Musixmatch: ensuring only Musixmatch, and no other provider, could provide Lyric Data Services and Lyric Rights Licensing for WCM's songs." (*Id.* ¶ 131.)  In March 2024, "just before Spotify was slated to potentially finalize its deal with LyricFind," Musixmatch entered the Exclusive "[a]t the direction of TPG."  (*Id.* ¶ 134.)

Less than two years elapsed between TPG's acquisition of Musixmatch and Musixmatch's entry into the Exclusive.  And approximately three months elapsed between TPG and LyricFind concluding acquisition negotiations and Musixmatch's entry into the Exclusive.  At the motion to dismiss stage, drawing all inferences in LyricFind's favor, these allegations support a plausible inference TPG's independent actions—including seeking to acquire LyricFind and gaining confidential information through the process—were in furtherance of a scheme that resulted in the allegedly anticompetitive Exclusive.  *See In re Packaged Seafood Prods. Antitrust Litig.* (*"Packaged Seafood I"*), No. 15-MD-2670 DMS (MDD), 2022 WL 836951, at *9 (S.D. Cal. Mar. 21, 2022) (citing *Arandell*, 900 F.3d at 634) ("None of the conspirators need participate in every act or transaction of the conspiracy to be liable.")  So, LyricFind plausibly alleges TPG is liable under the single enterprise theory.

TPG urges there is nothing unlawful about its attempt to acquire LyricFind.  But "[t]he Supreme Court has instructed courts to give plaintiffs in antitrust actions 'the full benefit of their proof without tightly compartmentalizing' each individual allegation, because the character and effect of an antitrust injury should not 'be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (quoting *Cont. Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").  As such, "a series of activities [can] combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation."  *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021).  The complaint alleges (1) Spotify's contract with Musixmatch was set to end in April 2024; (2)

TPG learned LyricFind planned to complete aggressively for that contract through its attempted acquisition of LyricFind; and (3) Musixmatch entered the Exclusive in March 2024, "just before Spotify was slated to potentially finalize its deal with LyricFind." (Dkt. No. 50 ¶ 134.) These allegations support a plausible inference that TPG and Musixmatch as a single enterprise furthered a scheme to restrain trade and commerce in the Lyric Data Services Market.

TPG also argues "[t]he Complaint relies entirely on conclusory allegations and speculation and provides no basis to conclude (or even infer) that TPG was engaged in an anticompetitive plot." (Dkt. No. 55 at 13.) As TPG observes, some of the TPG-specific allegations are made "upon information and belief." (Dkt. No. 50 ¶¶ 122, 135.) In addition, the complaint includes the conclusory allegation that Musixmatch entered the Exclusive "[a]t the direction of TPG." (*Id.* ¶¶ 134-135.) By themselves, these allegations would be insufficient to support a plausible inference of liability. But together with other specific allegations—for example, that Musixmatch entered the Exclusive approximately three months after TPG failed to acquire LyricFind and approximately one month before Musixmatch's contract with Spotify was set to expire—render plausible the allegation that Musixmatch entered the Exclusive at the direction of TPG.

Relatedly, TPG argues the complaint fails to "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Not so. The "who" is TPG. The "what" is a plausible inference TPG used information it gained through the attempted acquisition of LyricFind to engage in coordinated activity with Musixmatch to restrain trade in the lyric data services and lyric rights sublicensing markets. The "with whom" is Musixmatch. And the "when" is the sequence of events occurring over a several-month period that constitute the alleged "buy-or-bury" scheme.

## 2.    Approval and Ratification

LyricFind also plausibly alleges TPG is liable because it approved Musixmatch's unlawful acts. "Participation may be found not solely on the basis of direct action but may also consist of knowing approval or ratification of unlawful acts." *In re Packaged Seafood Prods. Antitrust Litig.* ("*Packaged Seafood II*"), No. 15-MD-2670 DMS (MSB), 2023 WL 5344133, at *18 (S.D. Cal. Aug. 18, 2023). The complaint alleges that shortly after acquiring Musixmatch, "TPG quickly

appointed multiple TPG Partners to Musixmatch's board of directors, including David Trujillo and Jacqui Hawwa." (Dkt. No. 50 ¶ 116.) This appointment alone would be insufficient to establish TPG directed, controlled, or ratified Musixmatch's allegedly anticompetitive conduct, since subsidiary board members are presumed to act in the subsidiary's interest. *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[C]ourts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary.") (cleaned up).

But the allegation that shortly after appointing its partners to Musixmatch's board, TPG attempted and failed to acquire LyricFind and shortly after that, Musixmatch entered the Exclusive supports a plausible inference Musixmatch's entry into that Exclusive "emanat[ed] from" TPG. *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004); *see also In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 469, 477 (M.D. Tenn. 2023) (denying parent company's motion to dismiss when parent company selected the subsidiary's CEO and COO and made one if its managing partners the chairman of the subsidiary's board); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 724 (W.D. Tenn. 2022) (concluding the plaintiffs "adequately alleged that [the holding company defendants] actively participated in and profited from [the] anticompetitive scheme of monopolization" when the defendants sat on the subsidiary's board of directors, "were . . . involved in [the subsidiary's] leadership when it was . . . entering into exclusive agreements," and provided funding for the subsidiary to acquire rivals).

TPG argues "[t]he *Nobody In Particular* case illustrates what is required to plausibly plead a defendant's 'direction' and 'control.'" (Dkt. No. 60 at 13.) But *Nobody In Particular* involved summary judgment motions. So, the court's discussion of the parents' involvement in the subsidiaries' payroll practices, staffing, meeting coordination, financial reporting, and policy setting was based on *evidence* in the summary judgment record, not *allegations* in the complaint. *Nobody In Particular*, *311* F. Supp. 2d at 1071. Similarly, while TPG claims *In re Packaged Seafood* involved "specific, fact-based allegations of a parent or sponsor's direction or control" and cites the motion to dismiss order in support of this argument, (Dkt. No. 60 at 15), the facts TPG cites as demonstrating direction or control are from the *Packaged Seafood* summary

40

judgment order.  *Packaged Seafood II*, 2023 WL 5344133, at *18 (concluding, based on deposition testimony, Lion Capital "turn[ed] a blind eye to Bumble Bee's collusion" which "enabled the conspiracy to continue").  Discovery may elucidate evidence that TPG did not approve or control Musixmatch's alleged anticompetitive conduct, but at this stage, drawing all inferences in LyricFind's favor, LyricFind plausibly alleges facts supporting an inference it did.

Whether under a single-enterprise theory of liability or an approval theory, LyricFind plausibly alleges facts supporting an inference that TPG through its own independent acts participated in and furthered the alleged antitrust violations.  So, the Court DENIES TPG's motion to dismiss Causes of Action One, Four, Seven, Nine, and Ten on the ground it is not independently liable.

### C.    State Law Claims

#### 1.    Breach of Contract (Cause of Action 13)

Cause of Action Thirteen alleges "LyricFind and TPG entered into the NDA in connection with a possible transaction between the parties" and "TPG and Musixmatch (as a Representative of TPG) materially breached their obligations pursuant to the NDA by disclosing LyricFind's Confidential Information to unauthorized third parties, including, but not limited to, Spotify, and using LyricFind's Confidential Information for a purpose other than the contemplated acquisition."  (Dkt. No. 50 ¶¶ 268, 273.)  Musixmatch and TPG move to dismiss Cause of Action 13 on the ground LyricFind does not plausibly allege breach or injury.

The parties acknowledge the NDA is governed by Ontario law, although they cite California cases, too.[3]  (Dkt. No. 57-2 at 5; Dkt. No. 57 at 21 n.12; Dkt. No. 53 at 50 n.19.)  Under both California and Ontario law, damages are an element of a breach of contract cause of action. *See Finvest Cap. Fund, Inc. v. Solid Box, LLC*, No. 20-06296 (ES) (MAH), 2021 WL 1153113, at

---

[3] LyricFind asserts "the NDA is referenced extensively in the Complaint and is therefore incorporated by reference therein."  (Dkt. No. 57 at 21 n.11.)  The Court agrees.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

United States District Court
Northern District of California

1    *4 (D.N.J. Mar. 26, 2021) ("A plaintiff can succeed on a breach of contract claim without

2    asserting damages, but where, as here, '[i]n a case where damages are sought, the proof of those

3    damages is . . . a fundamental element of the cause of action.'") (quoting *Rinc Consulting Inc. v.*

4    *Grant Thornton LLP*, 2019 ONSC 1844); *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d

5    1010, 1015 (9th Cir. 2000) ("Under California law, a breach of contract claim requires a showing

6    of appreciable and actual damage."). TPG and Musixmatch argue LyricFind fails to allege

7    sufficient facts supporting a plausible inference of damages, and the Court agrees.

8        Accepting as true the complaint's allegations, the disclosure of confidential information to

9    Spotify did not harm LyricFind's negotiations with Spotify because the negotiations continued

10    "notwithstanding Defendants' wrongful disclosures." (Dkt. No. 50 ¶ 21; *id.* ¶ 130 ("Even though

11    Defendants' breach of the NDA hampered the discussions between LyricFind and Spotify, Spotify

12    chose to continue negotiating with LyricFind. . . . It was not until the WCM-Musixmatch

13    Exclusive that these negotiations came to a decisive end.").)

14        LyricFind argues the complaint nevertheless alleges injury and references the following

15    paragraph:

16            Defendants' wrongful disclosure of LyricFind's confidential
            information impaired the negotiations between Spotify and
17            LyricFind, causing a substantial disruption to LyricFind's business
            and requiring LyricFind to incur additional costs and expend
18            additional resources to address Defendants' misconduct.

19    (Dkt. No. 50 ¶ 105.) LyricFind's opposition asserts these "additional costs" and "additional

20    resources" were legal fees, (Dkt. No. 57 at 23); but this is not alleged in the complaint. Instead,

21    the complaint contains the vague and conclusory allegation that LyricFind "incur[red] additional

22    costs and expend[ed] additional resources to address Defendants' misconduct" without specifying

23    the nature of those costs and resources. (Dkt. No. 50 ¶ 105.) This is insufficient to allege

24    damages. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of

25    a cause of action, supported by mere conclusory statements, do not suffice.").

26        LyricFind also fails to sufficiently allege breach. LyricFind alleges it "gave TPG and

27    Musixmatch access to a wide range of confidential information about its business, including

28    financials, commercial relationships, and regulatory concerns." (Dkt. No. 50 ¶ 121.) And

LyricFind alleges TPG and Musixmatch "intentionally disclosed and misrepresented this confidential information about LyricFind's perceived vulnerabilities." (*Id.* ¶ 127.) But LyricFind does not allege what information was disclosed and the circumstances of the disclosure. While LyricFind is correct "there is no heightened pleading requirement for breach of contract claims," LyricFind's vague allegations fall below the *Twombly* and *Iqbal* pleading requirements.

The Court thus GRANTS TPG's and Musixmatch's motions to dismiss the breach of contract cause of action.

### 2. Interference with Prospective Economic Advantage (Causes of Action 11 and 12)

Cause of Action Eleven alleges intentional interference with prospective economic advantage, and Cause of Action Twelve alleges negligent interference with prospective economic advantage. In both causes of action, LyricFind alleges "Defendants were aware of LyricFind's negotiations with Spotify and iHeartRadio, and its existing and prospective negotiations with other DSPs, and undertook the anticompetitive and unlawful scheme described herein to undermine LyricFind's negotiations and ensure that Musixmatch, not LyricFind, was awarded these contracts." (Dkt. No. 50 ¶¶ 254, 262.)

"The elements of a claim of interference with economic advantage and prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional or negligent acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Crown Imports, LLC v. Superior Ct.*, 223 Cal. App. 4th 1395, 1404 (2014) (cleaned up). The third element requires the plaintiff to allege "an act that is wrongful independent of the interference itself." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)).

TPG and Musixmatch urge LyricFind fails to allege an independently wrongful act. Not so. As discussed above, LyricFind plausibly alleges Musixmatch's entry into the Exclusive violates antitrust laws. As for TPG, LyricFind plausibly alleges Musixmatch entered the Exclusive at the direction of TPG and that TPG independently committed acts in coordination with Musixmatch that furthered the allegedly anticompetitive scheme. So, the Court DENIES Musixmatch's and TPG's motions to dismiss the intentional interference with prospective economic advantage claim.

However, the Court GRANTS Musixmatch's and TPG's motions to dismiss the negligent interference with prospective economic advantage claim. Both TPG and Musixmatch argue the negligent interference claim fails because LyricFind fails to allege a duty of care running from TPG to LyricFind. *Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1825 (1994) ("The tort of *negligent* interference with economic relationship arises only when the defendant owes the plaintiff a duty of care."). The complaint does not allege a duty of care. LyricFind's opposition briefly references a general "ordinary care" requirement but does not explain how or why it applies in this case. So, the Court dismisses the negligent interference claim with leave to amend.

### CONCLUSION

For the reasons discussed above, the Court DENIES Musixmatch's 12(b)(2) motion to dismiss for lack of personal jurisdiction. The Court grants in part and denies in part Musixmatch's and TPG's 12(b)(6) motions to dismiss. The Court GRANTS dismissal as to Causes of Action Four, Seven, Eight, Twelve and Thirteen with leave to amend. The Court otherwise DENIES Defendants' motions to dismiss.

If LyricFind elects to file an amended complaint, it must do so by September 30, 2025. The Court sets a case management conference for October 22, 2025 at 2:00 p.m. via Zoom video. A joint case management statement is due one week in advance. Discovery is not stayed.

//

//

//

1          This Order disposes of Docket Nos. 53, 55, and 62.

2          **IT IS SO ORDERED.**

3     Dated: September 3, 2025

4
5
6                                                    JACQUELINE SCOTT CORLEY
                                                     United States District Judge

7