1

2   David C. Brownstein (SB: 141929)          Kellie Lerner (*pro hac vice*)
    **FARMER BROWNSTEIN JAEGER**             Ben Steinberg (*pro hac vice*)
3   **GOLDSTEIN KLEIN & SIEGEL**             Lily Fagin (*pro hac vice*)
    **LLP**                                   **SHINDER CANTOR LERNER LLP**
4   155 Montgomery Street, Suite 301          14 Penn Plaza, 19th Floor
    San Francisco, CA 94104-2733              New York, NY 10122
5   Telephone: (415) 962-2873                 Telephone: (646) 960-8601
6   Facsimile: (415) 520-5678                 Facsimile: (646) 960-8625
    dbrownstein@fbjgk.com                     kellie@scl-llp.com
7                                             benjamin@scl-llp.com
8                                             lfagin@scl-llp.com

9

10  Brian D. Caplan
    Julie Wlodinguer (*pro hac vice*)
11  **REITLER KAILAS & ROSENBLATT LLP**
    885 Third Avenue, 20th Floor
12  New York, New York 10022
13  Telephone: 212-209-3050
    Fax: 212-371-5500
14  bcaplan@reitlerlaw.com
    jwlodinguer@reitlerlaw.com
15

16

17                  UNITED STATES DISTRICT COURT

18           FOR THE NORTHERN DISTRICT OF CALIFORNIA

19

20  LYRICFIND, INC.,                          Case No.  3:25-cv-02265-JSC

21                 Plaintiff,                  **FIRST AMENDED**
                                               **COMPLAINT**
22
                                               **JURY TRIAL DEMANDED**
23  v.

24  MUSIXMATCH S.P.A. and TPG
    Global, LLC,
25

26                 Defendants.

27

28

1
2

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................. 1

THE PARTIES ....................................................................................... 9

RELEVANT THIRD PARTIES............................................................ 10

JURISDICTION AND VENUE ............................................................ 10

FACTUAL ALLEGATIONS ................................................................ 11

I.    INDUSTRY BACKGROUND .................................................... 11

    A.    MUSIC STREAMING AND THE INCREASING DEMAND FOR SYNCED LYRIC DATA.............................................. 11

    B.    MUSIC PUBLISHERS' ROLE IN THE INDUSTRY........................ 15

    C.    COPYRIGHT ENFORCEMENT BY MUSIC PUBLISHERS........... 17

    D.    LYRIC SERVICE PROVIDERS.................................................... 18

    E.    DSPS REQUIRE A COMPLETE LYRICAL CATALOG ................ 20

    F.    LYRICFIND'S LONG AND PROFITABLE RELATIONSHIP WITH WCM .......................................................................... 22

II.   THE RELEVANT MARKETS ..................................................... 23

    A.    THE LYRIC RIGHTS LICENSING MARKET ................................ 23

    B.    THE LYRIC DATA SERVICES MARKET ...................................... 25

    C.    THE RELEVANT GEOGRAPHIC MARKET IS WORLDWIDE ................................................................. 26

    D.    BARRIERS TO ENTRY ................................................................ 26

III.  MUSIXMATCH FACED GROWING COMPETITION FROM LYRICFIND, WHICH LED TO DEFENDANTS' SCHEME ...................... 28

IV.   DEFENDANTS' SCHEME TO ELIMINATE COMPETITION IN THE RELEVANT MARKETS ................................................................. 32

    A.    TPG TRIES TO BUY LYRICFIND TO INSULATE

i

|  |  | MUSIXMATCH FROM COMPETITION............................................32 |

|  | B. | DEFENDANTS UNLAWFULLY LEAK LYRICFIND'S CONFIDENTIAL INFORMATION. ....................................36 |

|  | C. | TPG AND MUSIXMATCH COORDINATED WITH WCM TO IMPOSE THE WCM-MUSIXMATCH EXCLUSIVE.................37 |

|  | D. | LYRICFIND IS CUT-OFF FROM SERVICING WCM'S CATALOG....................................................................................40 |

|  | E. | SPOTIFY IS FORCED TO SUBLICENSE WCM'S LYRIC RIGHTS FROM MUSIXMATCH. ...................................42 |

| V. | MUSIXMATCH HAS MARKET POWER IN THE RELEVANT MARKETS ................................................................................43 |

|  | A. | MUSIXMATCH'S MONOPOLY IN THE LYRIC DATA SERVICES MARKET ................................................43 |

|  | B. | MUSIXMATCH'S MARKET POWER IN THE LYRIC RIGHTS LICENSING MARKET AND ITS MONOPOLIZATION OF THE SUBLICENSING SUBMARKET ................................................................45 |

| VI. | DEFENDANTS HAVE FORECLOSED COMPETITION IN THE RELEVANT MARKETS AND CAUSED MARKETWIDE HARM ..........46 |

CAUSES OF ACTION...........................................................................50

FIRST CAUSE OF ACTION VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGAINST TPG AND MUSIXMATCH)..........50

SECOND CAUSE OF ACTION MONOPOLIZATION OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST TPG AND MUSIXMATCH)..........51

THIRD CAUSE OF ACTION ATTEMPTED MONOPOLIZATION OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST TPG AND MUSIXMATCH)...........................................................................52

FOURTH CAUSE OF ACTION MONOPOLY LEVERAGING OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST TPG AND

ii

1
2

MUSIXMATCH)..................................................................................53

FIFTH CAUSE OF ACTION MONOPOLIZATION OF THE LYRIC
RIGHTS SUBLICENSING SUBMARKET IN VIOLATION OF SECTION
2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST TPG AND
MUSIXMATCH)..................................................................................54

SIXTH CAUSE OF ACTION ATTEMPTED MONOPOLIZATION OF
THE LYRIC RIGHTS SUBLICENSING SUBMARKET IN VIOLATION
OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST
TPG AND MUSIXMATCH) ...............................................................56

SEVENTH CAUSE OF ACTION AGREEMENT IN VIOLATION OF
CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§
16720 ET SEQ. (AGAINST TPG AND MUSIXMATCH)....................57

EIGHTH CAUSE OF ACTION UNFAIR COMPETITION IN
VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL.
BUS. & PROF. CODE §§ 17200 ET SEQ. (AGAINST TPG AND
MUSIXMATCH)..................................................................................58

NINTH CAUSE OF ACTION INTENTIONAL INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TPG AND
MUSIXMATCH)..................................................................................59

TENTH CAUSE OF ACTION BREACH OF CONTRACT (AGAINST
TPG AND MUSIXMATCH) ...............................................................60

PRAYER FOR RELIEF .........................................................................63

JURY TRIAL DEMAND ......................................................................64

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

Plaintiff LyricFind, Inc. ("LyricFind" or "Plaintiff") brings this Complaint and requests a jury trial against Defendants Musixmatch, S.p.A. ("Musixmatch"), and TPG Global, LLC ("TPG") (collectively, "Defendants"). LyricFind alleges, upon personal knowledge as to events or actions taking place in its presence, and upon information and belief as to all other events or actions, as follows:

## NATURE OF THE ACTION

1.     LyricFind and Musixmatch are competitors who provide music lyric services to digital services providers ("DSPs"), like Spotify and YouTube Music, which display music lyrics on their digital streaming platforms. LyricFind brings this Complaint to redress the unlawful misconduct of Musixmatch, the dominant supplier of lyric data fulfillment and administration services, and TPG, the private equity group that owns, controls, and directs Musixmatch. Among other wrongdoing, Musixmatch and TPG orchestrated an anticompetitive scheme with the music publisher Warner Chappell Music, Inc. ("WCM") to foreclose competition from Musixmatch's sole global competitor, LyricFind, as well as other smaller competitors, and thus cement Musixmatch's monopoly position.

2.     To display lyrics on their platforms and services, DSPs need three things: (i) a license conveying the rights to display the lyrics, (ii) a transcription of the lyrics in the form of digital files, and (iii) the ability to administer royalty payments to the holders of the lyric rights. The first component above constitutes "Lyric Rights Licensing." The latter two components constitute "Lyric Data Services." LyricFind and others compete with Musixmatch to provide both Lyric Rights Licensing and Lyric Data Services to DSPs.

3.     LyricFind has worked for years to erode Musixmatch's monopoly over Lyric Data Services by offering higher-quality lyric services to DSPs at lower prices. As this competitive threat from LyricFind grew, TPG and Musixmatch embarked on a multi-faceted "buy or bury" scheme to exclude LyricFind and other providers from

the market so it could continue charging unlawfully inflated prices without the risk of losing business.

4.    First, in 2023, TPG attempted to acquire LyricFind so that Musixmatch would no longer have to compete with it. During acquisition negotiations, TPG and Musixmatch gained access to LyricFind's confidential information and competitive intelligence subject to a non-disclosure agreement. TPG viewed LyricFind as a competitive threat to Musixmatch and sought to purchase LyricFind to suppress this competition.

5.    When TPG's attempt to acquire LyricFind failed, TPG and Musixmatch hatched a new plan to extinguish competition: ensuring only Musixmatch, and not LyricFind or any other provider, could access the full range of lyric data and licenses needed to provide lyric services to DSPs.

6.    Central to this anticompetitive scheme was an exclusive agreement between Musixmatch and the music publisher WCM that cut off LyricFind's and other providers' previous non-exclusive access to WCM's lyric catalog, and with it, many of the popular lyrics needed to compete for any DSPs' business. Specifically, Musixmatch gained exclusive access to two critical inputs that DSPs need to display lyrics: (1) Lyric Data Services and (2) Lyric Rights Licensing, as each is defined below.

7.    To foreclose this competition, Musixmatch, working together with TPG, paid WCM to become the exclusive provider of Lyric Data Services and the exclusive sub-licensor of Lyric Rights Licensing for all WCM titles. This agreement, referred to herein as the "WCM-Musixmatch Exclusive" or "Exclusive," was unprecedented in the music industry and cut-off LyricFind's and others' ability to furnish Lyric Data Services and Lyric Rights Licensing for WCM lyrics, which LyricFind had provided for more than 15 years. Historically, all so-called "major" music publishers, including Sony Music Publishing, Universal Music Publishing Group, and WCM, permitted both LyricFind and Musixmatch to provide Lyric Data Services for their

catalogs on a non-exclusive basis. This permitted Musixmatch and LyricFind to compete for DSPs' business—that is, until the WCM-Musixmatch Exclusive abruptly ended this competition.

8.      TPG and Musixmatch's anticompetitive scheme did not end there. To further force DSPs to contract with Musixmatch, TPG and Musixmatch conspired to force DSPs to remove lyrics supplied by anyone but Musixmatch and quickly caused WCM to terminate its contractual relationship with LyricFind. Defendants also coordinated with WCM to ensure WCM would not provide a direct lyric rights license to Spotify (despite their prior licensing negotiations), nor to other DSPs, and would instead force Spotify and other DSPs to sublicense lyric rights and data from Musixmatch.

9.      TPG's and Musixmatch's goal was simple: make sure that Spotify, and other DSPs, have no choice but to obtain Lyric Data Services and Lyric Rights Licensing from Musixmatch despite its higher fees—a plainly anticompetitive result. LyricFind brings this lawsuit to stop Defendants' unlawful conduct, which has eliminated competition and raised prices for Lyric Data Services and Lyric Rights Licensing worldwide and in the United States, in violation of state and federal law.

10.     As a result of the scheme identified herein, TPG-owned Musixmatch has maintained and expanded its monopoly in the sale of Lyric Data Services and foreclosed competition for Lyric Rights Licensing—the essential services that allow DSPs to display song lyrics, typically in a choice of languages synced in time with music. Musixmatch, which is owned and directed by TPG, one of the largest private equity groups in the world, services more than 80% of DSPs by streaming volume and has agreements with six of the seven largest DSPs by global subscribers.

11.     LyricFind, by contrast, was founded by three friends fresh out of college twenty years ago and has taken no institutional investment. LyricFind is the only significant global competitor to Musixmatch, servicing most of the remaining market.

12.     WCM is one of just three major music publishers which own, administer, and control the lyrics that are necessary to provide Lyric Data Services and Lyric Rights Licensing. The other two major publishers are Sony Music Publishing and Universal Music Publishing Group. Collectively, these "Big Three" publishers own or administer rights to over 10 million titles worldwide, including most of the world's most popular and important songs. WCM's market control is substantial. WCM has full or partial ownership, and thus effective control, of approximately 30% of all streams licensed on major platforms. As of November 2024, WCM also effectively controlled 64 of the top 100 songs on Billboard's Top Radio Airplay Chart, and 59 of the top 100 songs on Billboard's Hot 100 Songs Chart.

13.     The most common customers for Lyric Data Services are music DSPs, which display lyrics alongside musical content. These DSPs include the world's most popular music streaming services like Spotify, Apple Music, YouTube Music, Amazon Music, Deezer, Pandora, and many others.

14.     To display lyrics, DSPs need a license from the rights holders of each song. DSPs typically obtain Lyric Rights Licensing from a lyric services provider like Musixmatch or LyricFind, and at times, in the case of large DSPs, directly from certain publishers.

15.     Separately, and in addition to this licensing, DSPs need an actual copy of the lyrics to display, which they obtain from lyric data services providers like LyricFind and Musixmatch. Music publishers typically do not invest the resources necessary to create copies of the lyrics for the songs they control in a workable digital format, so LyricFind and Musixmatch have undertaken the significant time and effort to maintain and administer their large databases of lyric text files with translations and synchronization data (synchronizing the display of the lyrics in time with audio), which they provide to DSPs for a fee. Musixmatch and LyricFind compete to provide these Lyric Data Services to customers like DSPs.

- 4 -

16.    To compete effectively, LyricFind and Musixmatch must be able to provide Lyric Data Services for all major publishers' song titles, including WCM's. DSPs expect that providers of Lyric Data Services will have access to WCM's catalog because it represents a key portion of what users wish to stream; without it, DSPs would not be able to display lyrics for many, and in some cases a majority of, popular songs. Until March 2024, LyricFind enjoyed a long-standing, mutually profitable relationship with WCM, partnering together on a non-exclusive basis with respect to Lyric Rights Licensing and Lyric Data Services for more than 15 years without issue.

17.    That changed when Musixmatch and TPG discovered that Spotify, the largest customer in the market for Lyric Data Services, was very far along in negotiations with LyricFind to replace Musixmatch as Spotify's Lyric Data Services provider. Spotify claims to account for as much as 50% of the total streamed songs worldwide and is particularly crucial for independent and new artists. Spotify's negotiations with LyricFind progressed quickly from the fall of 2023 into March 2024. One of the challenges in switching from one lyric provider to another is the technical integration required to source lyrics from the new provider. Spotify had undertaken and largely finalized the technological integration needed to switch from Musixmatch to LyricFind, including a successful internal test using LyricFind lyrics. The parties were in the final stages of negotiating the contract through which LyricFind would provide Lyric Data Services for Spotify, on information and belief, at a significant discount to the rates commanded by Musixmatch.

18.    TPG and Musixmatch were desperate. Having failed to acquire LyricFind, they now risked losing Spotify, Musixmatch's largest customer, to its main competitor. Rather than compete against LyricFind on the merits through lower prices and better services, TPG and Musixmatch seized the opportunity to cement Musixmatch's monopoly and extinguish the competitive threat posed by LyricFind once and for all. To do so, TPG and Musixmatch paid WCM a significant premium

- 5 -

to execute the first-of-its-kind Exclusive that would block Spotify from signing with LyricFind and force Spotify, along with all other major DSPs, to purchase Lyric Data Services from Musixmatch at substantially higher prices.

19.     TPG's and Musixmatch's scheme to "buy-or-bury" LyricFind had four main parts. *First*, after acquiring Musixmatch in 2022, TPG quickly tried to acquire LyricFind so it could consolidate, and suppress competition between, the only two major competitors in the relevant markets.

20.     *Second*, after TPG's attempt to acquire LyricFind failed, TPG and Musixmatch sought to suppress competition by wrongfully leaking to Spotify certain confidential information they had obtained about LyricFind during the acquisition bid in the hopes that doing so would help them avoid competing on price or quality. In a clear breach of their non-disclosure agreement, TPG and Musixmatch disclosed and mischaracterized confidential information about LyricFind to Spotify to try to prevent Spotify from replacing Musixmatch with LyricFind.

21.     *Third*, when the discussions between Spotify and LyricFind continued notwithstanding Defendants' wrongful disclosures, TPG and Musixmatch orchestrated the unprecedented Exclusive with WCM that cut-off LyricFind's ability to furnish Lyric Data Services and Lyric Rights Licensing for WCM titles. On information and belief, Musixmatch paid WCM an amount that far exceeds any legitimate commercial goal to become the exclusive provider of Lyric Data Services and exclusive sub-licensor of Lyric Rights Licensing for all WCM titles, meaning only Musixmatch can provide Lyric Data Services for WCM's titles and only Musixmatch can sublicense rights to WCM's lyrics. Underscoring the anticompetitive nature of the Exclusive, neither Defendants nor WCM has publicly disclosed the Exclusive, despite their longstanding practice of disclosing commercial deals of this import.

22.     *Fourth,* based on the rights Musixmatch obtained in the Exclusive, TPG, Musixmatch, and WCM conspired to force Spotify to sign with Musixmatch for both

1    Lyric Data Services and Lyric Rights Licensing. Upon information and belief, WCM

2    ended its direct-licensing negotiations with Spotify and informed Spotify that its only

3    option for obtaining licenses and lyric data for WCM's titles was from Musixmatch.

4    Spotify was forced to abruptly end its negotiations with LyricFind for Lyric Data

5    Services, as well as end its negotiations with WCM for direct Lyric Rights Licensing.

6    Musixmatch has also sought to fortify the Exclusive by signing similar exclusivity

7    deals with other publishers.

8         23.    Defendants' scheme had the intended effect: it foreclosed competition

9    for Lyric Data Services and Lyric Rights Licensing and allowed Musixmatch to

10   charge unlawfully inflated fees. DSPs, especially major DSPs like Spotify, need

11   access to all three major publishers' lyrics to provide a comprehensive product to

12   their users, otherwise they cannot display lyrics for many popular songs. As a result

13   of the WCM-Musixmatch Exclusive, LyricFind and other lyric service providers are

14   no longer able to compete with Musixmatch because they cannot provide Lyric Data

15   Services or Lyric Rights Licensing for approximately 30% of streams and around

16   60% of the top 100 songs, which are owned in whole or in part by WCM. Simply

17   put, Spotify and other DSPs cannot offer the market a viable lyric product without

18   the lyrics in WCM's catalog. The only remaining practical choice for DSPs is to

19   contract with Musixmatch, at whatever price Musixmatch demands.

20        24.    In April 2024, Spotify informed LyricFind that because of the WCM-

21   Musixmatch Exclusive, Spotify had no choice but to halt its potential transition to

22   LyricFind. Spotify then renewed its agreement with Musixmatch, on information and

23   belief, despite Spotify having already negotiated a significantly better price and

24   service with LyricFind. LyricFind was robbed of an opportunity to partner with

25   Spotify on a contract worth tens of millions of dollars to LyricFind, and that would

26   have strengthened LyricFind's competitive position in the rest of the market.

27        25.    The WCM-Musixmatch Exclusive also forecloses LyricFind from

28   signing new agreements, or renewing existing agreements, with other DSPs that need

- 7 -

to display WCM's lyrics, as all major DSPs do. For example, iHeartRadio, another significant DSP, recently ended renewal negotiations with LyricFind when it learned that LyricFind would no longer be able to service WCM's catalog. iHeartRadio was then forced to sign with Musixmatch at a price over five times higher than what LyricFind had previously charged iHeartRadio. Other DSPs that have already invested great sums to integrate LyricFind's system will also be forced to switch to Musixmatch, and nobody else, at a significant cost, while paying Musixmatch's monopoly fees. LyricFind's viability as a business is now in jeopardy, as it can no longer compete for DSPs' business.

26.    The WCM-Musixmatch Exclusive will also foreclose other providers from participating in the Lyric Data Services and Lyric Rights Licensing markets. A handful of smaller competitors, as well as artists, labels, and distributors that have provided WCM lyrics directly to DSPs, are now barred from doing so under the Exclusive. With only Musixmatch left to service the market, prices will rise; choices will be limited; there will be fewer songs with lyrics, translations, sync, and premium data available; and the competitive impetus for innovation for Lyric Data Services and Lyric Rights Licensing will grind to a halt.

27.    Nor is the harm limited to Lyric Service Providers and DSPs. Other publishers, collective management organizations, and songwriters that jointly own and control song rights with WCM are also harmed by the Exclusive because their lyrics must now be provided only by Musixmatch. Artists and record labels whose works are associated with WCM are now dependent on Musixmatch to provide Lyric Data Services and Lyric Rights Licensing for their songs and cannot do so independently or through another provider.

28.    There is no legitimate business justification for the WCM-Musixmatch Exclusive. Rather than compete based on price or quality, TPG and Musixmatch undertook an anticompetitive scheme to protect, maintain, and increase Musixmatch's monopoly in the Lyric Data Services market and its dominance in the

1   Lyric Rights Licensing market. Because Musixmatch has been a monopolist in the
2   Lyric Data Services market at all times relevant to this lawsuit, Defendants' actions
3   were intended to maintain and further that monopoly power in violation of state and
4   federal law.

5       29.    As a result of Defendants' anticompetitive practices, LyricFind seeks
6   damages, costs, and attorneys' fees pursuant to Section 1 and 2 of the Sherman Act,
7   Section 3 of the Clayton Act, California's Cartwright Act, and California's Unfair
8   Competition Law. While subject to proof at trial, LyricFind estimates that its
9   damages may exceed $1 billion post-trebling. LyricFind also seeks damages with
10  respect to Defendants' breach of the parties' non-disclosure agreement and their
11  intentional and/or negligent interference with LyricFind's prospective economic
12  advantage.

13                          **THE PARTIES**
14

15      30.    Plaintiff LyricFind is a company organized and existing under the laws
16  of Ontario, Canada, with its principal place of business located at 40 Eglinton Avenue
17  East, Suite 400, Toronto, Ontario, Canada. LyricFind is a global provider of Lyric
18  Data Services and Lyric Rights Licensing for a broad range of customers.

19      31.    Upon information and belief, Defendant Musixmatch is a company
20  organized and existing under the laws of Italy, with its principal place of business
21  located at Via San Vitale, 5, Bologna, Italy. Musixmatch is a competitor of
22  LyricFind's in the markets for Lyric Data Services and Lyric Rights Licensing. Upon
23  information and belief, at all relevant times herein, Musixmatch has maintained and
24  operated from offices in San Francisco, California and frequently transacts business
25  in this district.

26      32.    Upon information and belief, Defendant TPG is a limited liability
27  company existing under the laws of Delaware, with its principal place of business at
28  301 Commerce St #3300, Fort Worth, TX 76102. Upon information and belief, at all

- 9 -

1    relevant times herein, TPG has maintained and operated from offices at 345

2    California Street, #3300, San Francisco, California and frequently transacts business

3    in this district. TPG is a large private equity firm that, upon information and belief,

4    owns a controlling stake in Musixmatch, which it purchased in or around July 2022.

5

6                                **RELEVANT THIRD PARTIES**

7         33.    WCM is a company organized and existing under the laws of California,

8    with its principal place of business at 777 Santa Fe Avenue, Los Angeles, California.

9    WCM is the global publishing arm of Warner Music Group and publishes and

10   administers the rights to a wide array of popular musical compositions written by

11   songwriters.

12

13                                **JURISDICTION AND VENUE**

14        34.    This action arises in part under Sections 1 and 2 of the Sherman Act, 15

15   U.S.C. §§ 1, 2. The Court has subject matter jurisdiction under 28 U.S.C. § 1331

16   (federal question), 15 U.S.C. § 15 (antitrust), and 15 U.S.C. § 26 (injunctive relief).

17   The Court also has supplemental jurisdiction with respect to Plaintiff's state law

18   claims pursuant to 28 U.S.C. § 1367(a).

19        35.    The Court has personal jurisdiction over Defendant Musixmatch

20   because Musixmatch regularly transacts business within this district and the state of

21   California, including by contracting with WCM and other licensors within California,

22   contracting with customers and licensees within California, engaging in marketing

23   and business development within this district and elsewhere in California, providing

24   lyric products and services to consumers in this district and California, attending key

25   executives' meetings in this district, and maintaining an office in San Francisco,

26   California.

27        36.    The Court has personal jurisdiction over Defendant TPG because TPG

28   regularly transacts business within this district and the state of California, including

1    by its ownership and control over Musixmatch, contracting with customers within
2    California, engaging in marketing and business development within this district and
3    elsewhere in California, attending key executives' meetings in this district, and
4    maintaining an office in San Francisco, California. TPG Growth, the division of TPG
5    that manages and directs Musixmatch, has its headquarters in San Francisco.

6        37.    The violations of law alleged in this Complaint took place in part in this
7    judicial district. Venue is therefore appropriate in the Northern District of California
8    under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)
9    and (c).

10       38.    The conduct complained of herein has occurred in and had a substantial
11   effect on interstate trade and commerce.

## FACTUAL ALLEGATIONS

### I.    INDUSTRY BACKGROUND

15       39.    This case involves the infrastructure that supports online music
16   streaming, which has become the dominant method by which consumers access and
17   listen to music in today's digital world. The Lyric Data Services and Lyric Rights
18   Licensing that LyricFind and Musixmatch provide—which enable the display of real
19   time lyrics with music—are part of the music streaming experience that consumers
20   now expect and demand. The following background is necessary to show how
21   Defendants' scheme has caused and will continue to cause harm to lyric service
22   providers like LyricFind, along with consumers, musicians, and various other parties.

### A.    Music Streaming and the Increasing Demand for Synced Lyric Data

25       40.    The advent of digital streaming has transformed how people enjoy
26   music. Today, modern music streaming services allow people to access extensive
27   music libraries for a relatively low subscription fee (and in some cases, for free, often
28   supplemented by advertising), enabling listeners to explore a wide range of genres

- 11 -

and artists without purchasing individual albums or tracks. These music streaming services, known as DSPs, include Spotify, Apple Music, YouTube Music, Amazon Music, Deezer, Pandora, and many others. Table A below shows the major DSPs' subscriber market share in the U.S. as of early 2024. Figure A below displays the major DSPs' share of subscribers worldwide as of the 3rd quarter of 2023.

**Table A – Share of Music Streaming Subscribers in the U.S.**

| | |
|---|---|
| Spotify | 36% |
| Apple Music | 30.7% |
| Amazon Music | 23.8% |
| YouTube Music | 6.8% |
| Pandora | 1.9% |
| Tidal | 0.5% |

1

2

3

**Figure A – Share of Music Streaming Subscribers Worldwide**

4

5

6

7

8

9

10

11

12

13

14



15

**Note(s):** Worldwide; Q3 2023
Further information regarding this statistic can be found on page 8.
**Source(s):** MIDiA Research; Music Industry Blog; ID 653926

16

17    41.    These music streaming services have continually evolved to meet

18    consumer demands. DSPs use sophisticated algorithms to offer personalized music

19    recommendations and curated playlists to help users discover new and emerging

20    artists. One popular feature that consumers demand across all streaming platforms is

21    the synchronized display of lyrics with songs. Most music consumers consider lyrics

22    to be a key part of their music experience and are more likely to pay for a streaming

23    service that offers compelling lyrics features across its streaming library.

24    42.    Over the past decade, DSPs have responded to this demand by

25    integrating new lyrics features into their platforms. DSPs like Spotify, Apple Music,

26    Amazon Music, YouTube Music, and Deezer offer synchronized lyrics for many of

27    their songs, allowing users to read or sing along with lyrics synchronized line-by-line

28    or word-by-word with music. These platforms also provide lyric content for users to

share with others on social media. Additionally, as the demand for lyrics has increased, platforms like Spotify have experimented with driving subscriber growth by restricting access to lyrics for their non-subscriber customers.

43.    Figures B and C below illustrates how Spotify, the largest DSP, incorporates lyrics on its mobile and desktop platforms by prominently displaying them at the center of the user interface when a song is played or selected.

**Figure B -
Spotify's Desktop Display**

**Figure C – Spotify's
Mobile Display**



44.    Music streaming platforms are not the only music service providers that demand lyric-related features. Social media platforms also have started incorporating lyrics features when music is played. For example, Instagram and Facebook have introduced features that allow users to add song lyrics to their Reels and Stories when they use music from Meta's library. All DSPs recognize, and are exploring ways to satisfy, consumers' increasing demand for lyrical content.

45.    As a result, DSPs have an increasing demand for Lyric Data Services and Lyric Rights Licensing, which are the necessary inputs required to display lyrics

1    on their platforms. Music publishers and songwriters, who hold the rights to lyrical

2    works and other rights associated with musical works, play a crucial role in the Lyric

3    Data Services and Lyric Rights Licensing markets.

4                    **B.    Music Publishers' Role in the Industry**

5        46.    Music publishers secure and manage copyrights for musical

6    compositions, including promoting their catalog's songs to recording artists,

7    licensing compositions for use by films, television, advertisements, and music

8    streaming services, monitoring song usage, and collecting and distributing royalties

9    to their clients.

10       47.    The Independent Music Publishers International Forum reports that the

11   global music publishing business was estimated to be worth $15.5 billion in 2023, an

12   increase of 15% from the previous year.

13       48.    The largest music publishers include WCM, Sony Music Publishing

14   ("Sony"), Universal Music Publishing Group ("UMPG"), Kobalt Music Publishing

15   ("Kobalt"), BMG Rights Management, and Concord Music Publishing. The Big

16   Three major music publishers—Sony, UMPG, and WCM—collectively accounted

17   for over 60% of the global music publishing market on a revenue basis in 2024, with

18   Sony accounting for 25%, UMPG 23%, and WCM 12%. The Big Three publishers

19   collectively own or administer over 10 million compositions.

20       49.    However, the scope of the major music publishers' industry influence

21   exceeds their revenue-based market shares due to the size and shared control of their

22   musical catalogs. For example, according to its 2023 annual report, Warner Music

23   Group (WCM's parent) believes its catalog is "differentiated by the scale, reach and

24   broad appeal of our music" and that its "collection of owned and controlled recording

25   and musical compositions, spanning a large variety of genres and geographies over

26   many decades, cannot be replicated." In Warner Music Group's words: "[a]s one of

27   the world's largest music entertainment companies, we believe we are well

28   positioned to take advantage of growth in digital distribution and emerging

- 15 -

1    technologies to maximize the value of our assets." In 2024, WCM generated over $1

2    billion in music publishing revenue, an increase of 11% from the prior year.

3        50.    One area where publishers can "take advantage of growth in distribution

4    and emerging technologies" is Lyric Rights Licensing. Music publishers such as

5    WCM understand the value of lyrics to both consumers and DSPs and have made it

6    an important part of their business and a growing source of revenue. The importance

7    of lyrics is expected to continue to grow as new technologies enable users to enjoy

8    and interact with lyrics in new ways.

9        51.    Music publishers license rights to lyrical works differently from other

10   rights associated with music compositions. While music publishers own or

11   administer the copyrights of musical compositions, performing rights organizations

12   ("PROs"), collective management organizations ("CMOs"), and the Mechanical

13   Licensing Collective ("MLC") often represent publishers in granting licenses for

14   non-lyrical musical rights, including to DSPs. In the U.S., for example, PROs like

15   the American Society of Composers, Authors and Publishers ("ASCAP") and

16   Broadcast Music, Inc. ("BMI") offer blanket licenses for public performance rights

17   on behalf of many songwriters and publishers, and the Mechanical Licensing

18   Collective ("MLC") was established to administer a blanket license for certain

19   mechanical rights under the Music Modernization Act.

20       52.    The government has regulated some PROs through consent decrees and

21   regulates the MLC's licensing practices under the Music Modernization Act. The two

22   largest U.S. PROs—ASCAP and BMI—are each regulated by separate antitrust

23   consent decrees that require them to offer equivalent license terms to similarly

24   situated services and venues, facilitating market entry for competing services and

25   generating more revenue for publishers and songwriters.

26       53.    Unlike the regulated blanket license regime for non-lyrical music rights,

27   lyric rights are licensed on a music publisher-by-music publisher basis. Customers

28   seeking to license lyric rights negotiate a license directly with each music publisher,

1    or indirectly through lyric service providers like LyricFind or Musixmatch, which

2    are authorized to sublicense rights on behalf of contracted music publishers.

3               **C.    Copyright Enforcement by Music Publishers**

4          54.    Because many songs, especially popular songs, are written by multiple

5    songwriters, the intellectual property rights for those songs are often owned by

6    multiple songwriters and/or music publishers, which jointly administer the rights to

7    their songs and lyrics. Co-written songs are thus often controlled by multiple

8    publishers. For example, if a song's lyrics and music have three equal co-writers, one

9    writer may be represented by WCM, another by Sony, and the third by UMPG, each

10   of which may hold a 33.33% interest—i.e. a "fractional interest"— in the copyright,

11   including the lyrics.

12         55.    Under U.S. copyright law, the default rule for joint works (including

13   non-musical works) is that co-owners hold the copyright as tenants-in-common,

14   allowing each co-owner to grant non-exclusive licenses to the full work in the

15   absence of a contract to the contrary. However, in music publishing, co-owners

16   generally do not grant full licenses out of respect for all publishers and contributing

17   writers. Thus, for split works, a co-owner typically will not grant a "full work" license

18   unilaterally. Instead, each co-owner typically grants "fractional licenses," which

19   cover only the rights to the particular fraction of the work that each publisher owns

20   or controls.

21         56.    As a result, multiple publishers often own or control fractional rights to

22   the same song, which can be effectively licensed only if all fractional owners agree

23   to license their respective interests. This is the case for a large percentage of the most

24   popular songs on streaming services. Any publisher that holds a fractional interest to

25   a song can only effectively license its fractional share and thus depends on the other

26   publishers/owners to also grant licenses for their fractional interests. This means that

27   any single fractional rights holder has effective control to deny the licensing over any

28   song in which they have any partial rights, even with as little as 1% ownership (or

- 17 -

1  less). Music service providers understand that a fractional license from one publisher

2  will not suffice to avoid infringement risk. They must identify all songwriters, verify

3  the various publishers that represent them, and obtain licenses from each co-

4  publisher.

5       57.    As one example, WCM has a 1.2% ownership stake in the hit song "7

6  Rings" by Ariana Grande, which has been streamed 2.4 billion times on Spotify and

7  1.4 billion times on YouTube. Despite WCM's minimal ownership interest in this

8  song, DSPs still must obtain WCM's licensing approval before they can display the

9  song's lyrics on their platforms. Thus, WCM can effectively control the display rights

10  for "7 Rings," along with approximately 60% of other top songs, based on its

11  fractional ownership stakes that can be as low as 1%.

12       58.    Due to this fractional-ownership framework, and the high concentration

13  of music publishers, each publisher wields greater market power than its revenue-

14  based market shares might suggest—a concern that regulators have scrutinized. A

15  publisher wields the same effective control over a song if it holds a 100% interest or

16  a 25% interest. Music publishers' market power thus hinges on the amount of songs

17  they effectively control through fractional ownership.

18       59.    On information and belief, WCM controls approximately 30% of the

19  lyric display rights serviced by LyricFind, accounting for both partial and whole

20  ownership. WCM's effective market share is notably higher for popular

21  contemporary music, which is critical to the commercial success of major DSPs like

22  Spotify. According to Billboard's November 2024 Publishers Quarterly, WCM has

23  effective control, in whole or in part, of 64 of the top 100 songs on Billboard's Top

24  Radio Airplay Chart and 59 of the top 100 songs on Billboard's Hot 100 Songs Chart

25  in the United States.

26                    **D.    Lyric Service Providers**

27       60.    For the same reason that blanket licensing and collective societies

28  emerged to help administer non-lyrical music rights—to lower transaction costs,

- 18 -

make the licensing process more efficient, and facilitate copyright enforcement—a similar need arose for intermediaries to collect, manage, and furnish lyrical works on behalf of publishers, labels, and songwriters. Lyric service providers like LyricFind and Musixmatch fulfill these roles, which include Lyric Data Services and Lyric Rights Licensing.

61.    To facilitate Lyric Rights Licensing, lyric service providers source lyric rights licenses from tens of thousands of music publishers, collection societies, and songwriters. They then aggregate these licenses and sublicense them to clients, like DSPs, who display lyrics to their customers. LyricFind's current suite of licensing rights covers over 50,000 music publishers around the world. LyricFind sublicenses these rights to more than 50 clients, including Amazon, YouTube Music, Pandora, and many other DSPs.

62.    LyricFind's contracts with its customers require that DSPs obtain a license to display the lyrics to any song for which they display lyric data provided by LyricFind, regardless of whether the license is obtained from LyricFind or a music publisher directly. Not all DSPs use lyric service providers for Lyric Rights Licensing. Some large DSPs secure their own licenses directly from music publishers, especially from major publishers like Sony, UMPG, and WMG.

63.    In addition to, and separate from, Lyric Rights Licensing, lyric service providers provide Lyric Data Services to customers like DSPs. While music publishers usually own or control the copyright in song lyrics, they do not typically possess or invest in the creation of actual transcriptions of the lyrics, and therefore cannot offer them to DSPs. DSPs instead obtain lyrical transcriptions and associated data from lyric services providers like LyricFind and Musixmatch. Lyric service providers furnish these Lyric Data Services by sourcing or transcribing lyrics and creating text files that contain the lyrical transcriptions. These text files often also include detailed translations and synchronization data, which allow lyrics to be displayed line-by-line or word-by-word in synch with music.

- 19 -

64.     In addition to these text files, Lyric Data Services also include royalty administration services, i.e. collecting, allocating, and paying lyric-related royalties to the correct rights holders. For example, LyricFind's royalty administration system utilizes the usage data tracked and/or submitted by clients and applies the amounts paid by each client, type of use, territory of use, minimum guarantees or advances, and royalty rates, to allocate the appropriate amounts due to each copyright owner in each country for each DSP.

65.     Many customers obtain both Lyric Rights Licensing and Lyric Data Services from a single lyric service provider, like LyricFind or Musixmatch. However, many DSPs, including many of the largest DSPs, do not need a provider's help to license lyrics from major publishers because they obtain their own direct licenses from them. These DSPs still seek licenses from smaller publishers through a lyric service provider. Regardless of how DSPs license lyrics—directly or via sublicense—they still need to procure Lyric Data Services to display lyrics to users. Providers of Lyric Data Services thus strive to maintain as complete a lyrical catalog as possible, even for songs they do not have the right to sublicense, because DSPs may still need Lyric Data Services for songs that are separately licensed.

### E.     DSPs Require a Complete Lyrical Catalog

66.     In the modern era of music streaming, music consumers expect that major music platforms will allow them to stream most, if not all, mainstream music. As such, major DSPs like Spotify and Apple Music host music from all major publishers' catalogs and do not tend to compete on the number of songs on their platforms. DSPs instead compete on other aspects of their services like product features and price. This is markedly different from the film or television industry, where streaming platforms like Netflix and Hulu fiercely compete based on their differing, and sometimes exclusive, content offerings.

67.     Thus, when sourcing Lyric Data Services, DSPs expect providers to offer a complete catalog of lyrics from all major publishers in order to cover an

1   adequate portion of lyric requests. To fill this need, lyric service providers like
2   LyricFind and Musixmatch strive to aggregate all lyrics from all major publishers,
3   along with independent publishers and songwriters, regardless of whether they have
4   lyric licenses in place for all of the subject works. While LyricFind and Musixmatch's
5   lyrics offerings do not completely overlap, both have historically maintained
6   databases that, at a minimum, contain the vast majority of lyrics for the musical
7   compositions controlled by all the major publishers. In the years before the Exclusive,
8   LyricFind and Musixmatch competed based on price, the quality of their Lyric Data,
9   and the scope of their lyric offerings for works not controlled by the major publishers.
10  Some DSPs preferred LyricFind's offering while others may have preferred
11  Musixmatch's.

12          68.     Most DSPs expect to source Lyric Data Services from a single provider
13  because it is not practical or economical to integrate Lyric Data from multiple
14  databases or switch among them. Building the infrastructure to source Lyric Data
15  requires a significant investment of time and resources to ingest, maintain and operate
16  a provider's unique database. Therefore, DSPs typically are not willing to spend the
17  resources to source Lyric Data from multiple providers. While two large DSPs,
18  Amazon Music and Google/YouTube Music, have chosen to incur the extra expense
19  of sourcing Lyric Data from both LyricFind and Musixmatch, they are the exception
20  because of their vast resources. For most DSPs, such a cost cannot be justified.

21          69.     Once a DSP partners with one lyric services provider, it tends to remain
22  with that provider due to the significant costs associated with switching, absent strong
23  competition from another provider. This is particularly true if an incumbent were to
24  obtain the exclusive rights to furnish a major publisher's Lyric Data. In that event,
25  DSPs effectively would have no choice but to stay with the incumbent, as no other
26  provider would be able to furnish Lyric Data Services associated with that major
27  publisher's titles.

28

- 21 -

70.     WCM, with whom TPG and Musixmatch orchestrated the Exclusive, is one of the Big Three publishers with effective control of approximately 30% of total music streams and around 60% of the top 100 most popular songs. By locking up the exclusive right to provide Lyric Data Services for these WCM titles and offer associated Lyric Rights Licensing, TPG and Musixmatch have ensured that only Musixmatch will be a viable option for most, if not all, DSPs, as no other provider will be able to offer a viable lyrical catalog without WCM's titles.

71.     In Spotify's prescient words: "The music industry has a high level of concentration, which means that one or a small number of entities may, on their own, take actions that adversely affect our business." "Our business may be adversely affected if our access to music is limited or delayed because of deterioration in our relationship with one or more of these rights holders or if they choose not to license to us for any reason. These rights holders also may attempt to take advantage of their market power (including by leveraging their publishing affiliate) to seek onerous financial or other terms from us or otherwise impose restrictions that hinder our ability to further innovate our service offerings."

**F.     LyricFind's Long and Profitable Relationship with WCM**

72.     LyricFind recognizes the importance of offering a comprehensive catalog of lyrics to its clients. LyricFind has consistently sourced lyrics from a diverse range of publishers, distributors, and songwriters so that its catalog meets the needs of its clients.

73.     Among the music publishers that have partnered with LyricFind, the Big Three—Sony, UMPG, and WCM—are particularly significant, as their large catalogs are crucial to clients like DSPs. WCM is especially notable because it owns and/or controls copyright interests in many of the most popular songs that consumers expect to stream on DSPs' platforms. Until the WCM-Musixmatch Exclusive, LyricFind had, for many years, provided Lyric Data Services to customers for all three major

- 22 -

publishers' songs, regardless of whether the customers obtained a sublicense from LyricFind or a direct license from the publisher.

74.    LyricFind's partnership with WCM began in 2008, and the two companies have maintained a strong and amiable working relationship since. LyricFind's most recent agreement with WCM was executed in 2018 and has been extended/amended twice until June 30, 2024.

75.    This business relationship, spanning over fifteen years, has been mutually beneficial and profitable. In 2023, for example, LyricFind administered lyrical rights for hundreds of thousands of songs for WCM on a non-exclusive basis and through its sublicensing and administration of direct licenses helped generate millions of dollars of royalties for WCM.

## II.    THE RELEVANT MARKETS

76.    Lyric service providers like LyricFind and Musixmatch operate in two related, but separate relevant markets: (1) the Market for Lyric Data Services ("Lyric Data Services Market"); and (2) the market for Lyric Rights Licensing ("Lyric Rights Licensing Market"), which contains a submarket for the *sublicensing* of Lyric Rights from lyric service providers ("Lyric Rights Sublicensing Submarket") (collectively, the "Relevant Markets"). The relevant geographic market for each of the relevant product markets is worldwide, as described below.

### A.    The Lyric Rights Licensing Market

77.    Market participants in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket are lyric service providers that sublicense the lyric rights owned or administered by major music publishers or other rights holders. Other rights holders can include aggregators of music licensing rights, independent publishers, and songwriters themselves.

78.    DSPs are customers in the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket. In some cases, DSPs obtain lyric rights through sublicenses administered by lyric service providers. Other times, DSPs negotiate with

- 23 -

1    large rights holders like WCM to license lyric rights directly. Regardless of whether

2    a license is obtained directly or via sublicense, DSPs still need to procure Lyric Data

3    Services to display lyrics on their platforms. It is therefore well recognized that Lyric

4    Rights Licensing and Lyric Data Services are distinct products with distinct market

5    demands.

6         79.    The Lyric Rights Sublicensing Submarket, i.e. the sublicensing of lyric

7    rights by lyric service providers, is a distinct submarket of the Lyric Rights Licensing

8    Market because DSPs often do not have the resources to obtain direct licensing from

9    music publishers at the scale required for their platforms, nor the resources to

10   administer a large volume of lyric license agreements. As a result, in many cases,

11   DSPs must rely on lyric service providers to obtain and administer lyric rights via

12   sublicenses. Thus, for many lyric rights, DSPs can only obtain sublicenses in the

13   Lyric Rights Sublicensing Submarket and cannot reasonably switch to direct licenses

14   in the event of a non-transitory price increase.

15        80.    At all relevant times, Musixmatch has had market power in the Lyric

16   Rights Licensing Market and monopoly power in the Lyric Rights Sublicensing

17   Submarket. On information and belief, before the Exclusive, Musixmatch serviced

18   approximately 31% of the Lyric Right Licensing Market based on licensing revenue,

19   while LyricFind serviced approximately 16% of the market. Most of the rest of the

20   Lyric Rights Licensing Market, approximately 53%, was comprised of direct

21   licensing by music publishers. Musixmatch's market share in the Lyric Rights

22   Sublicensing Submarket before the Exclusive was approximately 66% by licensing

23   revenue.

24        81.    A key component of the Lyric Rights Licensing Market and Lyric

25   Rights Sublicensing Submarket is the need for lyric service providers to offer

26   sublicenses for the works of all major publishers with whom DSPs do not have a

27   direct license. Nearly all DSPs seek "one stop shopping" for their lyric licensing

28

- 24 -

needs, meaning they want a single provider to provide sublicenses for all of the major publishers' catalogs and as many smaller publishers/songwriters as possible.

82.    Given a small but substantial, non-transitory increase in the price of licensing within the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket, within the relevant geographic market, actual and prospective customers would not substitute to a different service without the necessary characteristics.

## B.    The Lyric Data Services Market

83.    The Lyric Data Services Market is related to, but distinct from, the Lyric Rights Licensing Market. Lyric service providers in the Lyric Data Services Market provide lyric data and royalty administration, which is the technical infrastructure required to implement the lyric display licenses and allocate related royalties.

84.    The primary participants in the Lyric Data Services Market are Musixmatch and LyricFind. At all relevant times, Musixmatch has been a monopolist in the Lyric Data Services Market, with a current market share of approximately 80%. The rest of the Lyric Data Services Market is primarily serviced by LyricFind. Other minor participants in the Lyric Data Services market include entities such as Genius (which provides Lyric Data Services to Apple), and Sockets and SyncPower (which provide Lyric Data Services in Japan). On information and belief, these other providers of Lyric Data Services collectively account for a *de minimis* share of the Lyric Data Services Market by revenue.

85.    Fulfilling Lyric Data requires the creation of data files that contain the actual text of lyrical transcriptions, as well as the data to synchronize the transcriptions to sound recordings, either line-by-line or word-by-word. Lyric Data Services also include processing and distributing lyric-related royalties. Lyric service providers process usage data to determine the appropriate royalties due to each rights holder, based on factors set forth in the relevant licensing agreements (e.g., amount of use, type of use, territory of use, minimum guarantees, advances, etc.). They then

1  pay the appropriate amounts due to each rights holder on a song-by-song, customer-

2  by-customer, and country-by-country basis.

3       86.    Customers in the Lyric Data Services Market are primarily DSPs. As in

4  the Lyric Rights Licensing Market, nearly all customers expect a single provider to

5  fulfill Lyric Data Services for all publishers, including major publishers, because it

6  is not economical to integrate data from multiple providers.

7       87.    Given a small but substantial, non-transitory increase in the price of

8  Lyric Data Services within a relevant geographic market, actual and prospective

9  customers would not substitute to a different service without the necessary

10  characteristics.

11  **C.    The Relevant Geographic Market is Worldwide**

12       88.    The relevant geographic market for both the Lyric Rights Licensing

13  Market and Lyric Data Services Market is worldwide. Customers and providers in

14  both markets primarily operate on a global basis. While certain local and regional

15  DSPs exist, DSPs that operate on a global basis represent more than 90% of total

16  global streams and revenue within the markets.

17       89.    In the Lyric Rights Licensing Market, the typical license granted by a

18  music publisher is global in nature, as are most of the sublicenses granted by lyric

19  services providers. In the Lyric Data Services Market, Lyric Data is the same

20  globally, so DSPs typically use a single global provider of Lyric Data Services, as it

21  does not make sense to source the same lyric file separately in different countries.

22       90.    As such, customers in both the Lyric Rights Licensing Market and Lyric

23  Data Services Market typically require global service from lyric service providers.

24  **D.    Barriers to Entry**

25       91.    There are just two main lyric service providers that participate in both

26  the Lyric Rights Licensing Market and the Lyric Data Services Market at scale:

27  Musixmatch and LyricFind. This market concentration is due, in part, to substantial

28  barriers to entry in both Relevant Markets.

92.     In the Lyric Data Services Market, creating a comprehensive catalog of song data and accompanying lyric files, and building the infrastructure to administer royalty calculations and payments, takes years of effort, and substantial expenditures. Although some publishers make small amounts of Lyric Data available, developing a lyric database requires creating lyric transcriptions and translations, as well as synchronization data, for the vast majority of songs for which lyrics are displayed. Less than 0.1% of the lyrics in LyricFind's database have been provided by major publishers, despite them owning or controlling roughly 60% of the rights market.

93.     Further, the cost to develop the technology to administer Lyric Data Services for various DSPs requires many millions of dollars of investment and years of development time. These upfront costs inhibit market entry and expansion.

94.     Additionally, in the Lyric Rights Licensing Market, providers must engage in individual negotiations with numerous publishers and songwriters, and major publishers often require significant advances and minimum guarantees to secure sublicensing rights. The technical infrastructure needed to manage those sublicenses is also very significant, constituting a further barrier to entry.

95.     High switching costs also bar entry to the Relevant Markets. The vast majority of the Relevant Markets (roughly 90% by revenue) is limited to a small number of major DSPs, all of which have an existing Lyric Data Service provider. These DSPs have already expended substantial costs to integrate their technology with a specific provider's infrastructure and are often bound by multi-year agreements. This makes switching to a new third-party lyric services provider more difficult because it would take a significant improvement in price or quality to justify the added costs of a new provider, particularly if it would require terminating an existing contract. Thus, once an incumbent lyric services provider is in place, there is usually a substantial "stickiness" that reduces the opportunities for other providers to compete for a DSP's business.

### III.  MUSIXMATCH FACED GROWING COMPETITION FROM LYRICFIND, WHICH LED TO DEFENDANTS' SCHEME

96.    As the two largest competitors in the Lyric Data Services and Lyric Rights Licensing Markets, LyricFind and Musixmatch have competed for years to offer the best service and pricing for Lyric Data Services and Lyric Rights Licensing. This includes many instances of head-to-head competition, which has intensified in recent years. Defendants' anticompetitive scheme, detailed below, was a direct response to this intensifying competition from LyricFind, which threatened to dislodge Musixmatch's monopoly in the Lyric Data Services Market and reduce its market power in the Lyric Rights Licensing Market.

97.    In 2022, for example, Meta (at the time, and still, a Musixmatch customer) negotiated with both Musixmatch and LyricFind over a new contract for Lyric Data Services and Lyric Rights Licensing. Although LyricFind did not win the business, on information and belief, Musixmatch had to significantly lower its proposed price, reportedly by over a million dollars, to retain Meta as a customer. Meta also informed LyricFind that because of Musixmatch's price reduction, and despite LyricFind's better offer, it could not justify the switching costs to bring on LyricFind as its lyric service provider.

98.    Similarly, in 2023, LyricFind competed aggressively against Musixmatch to provide Lyric Data Services and Lyric Rights Licensing to Tidal, another major DSP. On information and belief, Musixmatch was forced to make significant price concessions to maintain the Tidal business due to LyricFind's competing offer. This heightened competition loomed even larger with respect to Spotify, the largest and most important DSP customer of Lyric Data Services and Lyric Rights Licensing, whose contract with Musixmatch was set to expire in 2024.

99.    In addition to its higher prices, Musixmatch risked losing these DSPs' business due to the lower quality of its services. For years, consumers have complained that Musixmatch's lyrics are, among other things, inaccurate, slow or fail to appear, do not properly synch with music, and lack accurate translations.

- 28 -

Musicians are equally frustrated: they complain that Musixmatch's process for submitting lyrics is cumbersome, non-functional, and bug-ridden, while at the same time lacking customer service. Publicly, consumers have described Musixmatch's lyric services as a "living nightmare," "as close as it gets to a scam," and "unfathomably bad," leading some to question why the world's premier DSP would partner with such a poorly regarded service. As one user wrote, "[Musixmatch] somehow secured an exclusive deal with Spotify, and does a terrible, terrible job at its only task. . . . The only positive is that their contract will expire at some point, and the music industry won't have to deal with [Musixmatch] anymore."

100.  The growing competitive threat from LyricFind also stemmed from LyricFind's consistent improvements to its products and services. For example, in December 2023, LyricFind acquired Rotor Videos, which provides self-service video creation tools that musicians use to create videos for streaming platforms alongside LyricFind's existing "Videos by LyricFind" feature. These tools allow users to create their own video content, e.g., Spotify Canvas Videos, Lyric Videos, Music Videos, Art Videos, Apple Motion Art Videos, and more. LyricFind has also developed LyricIQ, a set of innovative data analysis and filtering tools that analyze the content of music lyrics and categorize them based on themes, topics, and content categories. LyricIQ allows customers to identify and curate music playlists for their business environments—e.g., limiting a stream to child-friendly music, or music appropriate for an in-store shopping environment.

101.  As LyricFind's competitive advantages mounted, TPG and Musixmatch became increasingly concerned that DSPs like Spotify would switch to LyricFind due to its better services and lower prices as their contracts with Musixmatch expired. This fear led TPG and Musixmatch to concoct the "buy or bury" scheme described herein.

102.  After their first tactic—TPG's acquisition attempt—failed, TPG and Musixmatch realized they now risked losing Musixmatch's contract for Spotify, its

- 29 -

largest DSP customer, which was set to expire at the end of April 2024. Their fears were legitimate. From the fall of 2023 through April of 2024, LyricFind had been negotiating with Spotify to take over Musixmatch's role as Spotify's supplier of Lyric Data Services. LyricFind was also negotiating with Spotify to become the sub-licensor of Lyric Rights Licensing for all of the music publishers that LyricFind licenses, other than WCM, Sony, Universal, and Kobalt, from whom Spotify planned to obtain licenses directly.

103.    Because Spotify was negotiating to obtain lyric licenses directly from these major publishers, including WCM, its negotiations with LyricFind focused on Lyric Data Services and sub-licenses for "non-major" publishers. These negotiations accelerated between the fall of 2023 and March 2024. LyricFind and Spotify met several times, including multiple in-person meetings at Spotify's offices. By early 2024, LyricFind and Spotify had completed the framework for a potential agreement under which LyricFind would provide Lyric Data Services and Lyric Rights Licensing to Spotify on a global basis.

104.    As detailed below, it was at this time, in January 2024, when TPG and Musixmatch first tried to disrupt these negotiations by improperly disclosing and misrepresenting confidential business information about LyricFind to Spotify—information which TPG and Musixmatch had obtained subject to a non-disclosure agreement during TPG's 2023 bid to acquire LyricFind.

105. Defendants' wrongful disclosure of LyricFind's confidential information impaired the negotiations between Spotify and LyricFind, causing a substantial disruption to LyricFind's business and requiring LyricFind to incur additional costs and expend additional resources to address Defendants' misconduct. These additional costs included tens-of-thousands of dollars in legal fees associated with investigating and trying to mitigate Defendants' wrongful disclosure, separate and apart from the legal fees associated with this litigation, as well as substantial

1  employee time investigating and attempting to mitigate Defendants' wrongful
2  disclosure.

3      106.   Spotify, however, continued to negotiate with LyricFind because the
4  terms of its offer were considerably better than Musixmatch's. With the terms of their
5  potential agreement nearly finalized, Spotify made significant investments in the
6  technology and infrastructure necessary to switch from Musixmatch to LyricFind.
7  This included the technical integration of Lyric Data Services needed to switch to
8  LyricFind and a successful internal beta test with Spotify staff using LyricFind's data.

9      107.   At the last moment, however, Spotify was forced to abandon its plans
10  with LyricFind and remain with Musixmatch because of the unprecedented WCM-
11  Musixmatch Exclusive. On the eve of Spotify's renewal deadline with Musixmatch,
12  WCM broke the news of the WCM-Musixmatch Exclusive to Spotify (even before
13  informing LyricFind). WCM informed Spotify that, because of the Exclusive,
14  LyricFind could no longer supply Lyric Data Services for WCM's titles, and WCM
15  would not directly license lyric rights to Spotify despite their prior negotiations.
16  Because each DSP needs to have WCM content available to its customer base,
17  LyricFind no longer could offer a full and comprehensive range of lyric services to
18  Spotify.

19      108.   Because of the Exclusive and WCM's refusal to directly license lyrics
20  to Spotify, Spotify was forced to renew its agreement with Musixmatch at
21  substantially higher fees than those offered by LyricFind. Indeed, all other major
22  DSPs, as their contracts expire, will be forced to do the same.

23      109.   This outcome was not the result of competition, but a multifaceted
24  scheme by Defendants to eliminate competition in the Lyric Data Services Market,
25  and restrain competition in the Lyric Rights Licensing Market, through
26  anticompetitive means. The various aspects of Defendants' "buy-or-bury" scheme
27  are described below.

28

## IV. DEFENDANTS' SCHEME TO ELIMINATE COMPETITION IN THE RELEVANT MARKETS

### A. TPG Tries to Buy LyricFind to Insulate Musixmatch from Competition

110. Defendant TPG is one of the world's largest and most prominent private equity firms, managing over $100 billion in assets. TPG operates globally across North America, Europe, and Asia, and has a particular focus in acquiring and investing in companies in the entertainment and music industry.

111. Like other private equity firms, TPG's business model focuses on acquiring and investing in "portfolio companies" that it can later sell for a profit. Under this private equity model, after TPG acquires a portfolio company, it typically seeks to make it more profitable by reorganizing its operations, appointing new executives and directors, and overseeing key strategic decisions. TPG typically then seeks to sell the portfolio company within three to seven years of its acquisition. It is therefore important that TPG quickly improve its portfolio companies' profitability, often through operational and strategic changes within the first few years.

112. One common way private equity firms like TPG can quickly boost a portfolio company's profitability is by acquiring its competitors through so-called "bolt-on" or "roll-up" acquisitions. These consolidations involve acquiring multiple competitors within the same industry to reduce competitive pressure, which in turn allows the portfolio companies to charge higher prices, and TPG to achieve greater returns. TPG often engages in these consolidation strategies, including in the entertainment sector. As part of one recent "roll-up" strategy, for example, TPG acquired the talent agency Untitled Entertainment in June 2024, and then merged it with Grandview talent agency, which it acquired in October 2024.

113. A related market-consolidation tactic is a so-called "buy or bury" strategy. This occurs when a firm acquires a company and then seeks to increase its profits either by acquiring a key competitor (i.e. "buying" it) or eliminating it from

- 32 -

the market (i.e. "burying" it). In the first stage of a "buy or bury" scheme, the private equity fund aggressively tries to acquire its portfolio company's competitor, like it would in a traditional bolt-on acquisition or roll-up. If the acquisition fails, the private equity firm then seeks to push the competitor out of the market, often by directing the portfolio company to corner the market through exclusionary tactics.

114.   Antitrust regulators have taken notice of these anticompetitive strategies. In May 2024, the Federal Trade Commission and the Justice Department's Antitrust Division jointly launched a public inquiry to identify anticompetitive acquisition strategies by private equity firms. As FTC Chair Lina M. Kahn stated, "Firms can use serial acquisitions to roll up markets, consolidate power, and undermine fair competition, all while jacking up prices and degrading quality." The FTC and state attorneys general have also brought litigation over buy-or-bury strategies.

115.   TPG's scheme to insulate Musixmatch from competition was a textbook "buy or bury" strategy. In July 2022, TPG acquired a controlling stake in Musixmatch, believed to be around 80%. Quickly thereafter, TPG focused on maximizing Musixmatch's profits not by improving its services but by expanding its monopoly power and shielding it from competition, particularly from LyricFind. As described below, TPG first did so by trying to purchase LyricFind. When that failed, TPG and Musixmatch wrongfully leaked confidential information about LyricFind to Spotify in hopes that doing so would help them avoid competition. When that also failed, TPG resorted to orchestrating the anticompetitive Exclusive between WCM and Musixmatch—while also seeking exclusives with other publishers—to exclude LyricFind, and all other competitors, from the Lyric Data Services Market.

116.   TPG laid the groundwork for its scheme almost immediately after acquiring Musixmatch in July 2022. TPG quickly appointed multiple TPG Partners to Musixmatch's board of directors, including David Trujillo and Jacqui Hawwa. Shortly thereafter, TPG informed LyricFind it was interested in acquiring it and

- 33 -

proposed opening negotiations and a due diligence review subject to a non-disclosure agreement.

117.   On January 12, 2023, TPG and LyricFind entered into a written Mutual Non-Disclosure Agreement (hereinafter, the "NDA") so that the parties could exchange confidential information to evaluate TPG's proposed acquisition.

118.   The NDA defined "Confidential Information" broadly to include any information about LyricFind that was non-public, confidential, or proprietary in nature.

119.   The NDA prohibited TPG and its authorized "Representatives" from disclosing LyricFind's confidential information to any non-Representative third-parties or using it for any purpose other than for the potential acquisition.

120.   In a letter dated March 2, 2023 (the "March 2, 2023 Consent Letter"), at TPG's request, LyricFind authorized TPG to disclose select Confidential Information to Musixmatch on the condition that Musixmatch would also be bound by the terms of the NDA.

121.   Subject to the NDA's protections, and to facilitate TPG's potential acquisition, LyricFind gave TPG and Musixmatch access to a wide range of confidential information about its business, including financials, commercial relationships, and regulatory concerns. TPG became aware that if it did not acquire LyricFind, LyricFind planned to compete aggressively for Spotify's business when Musixmatch's contract with Spotify ended in April 2024.

122.   Upon information and belief, it was through this detailed review of LyricFind's confidential information that TPG began to crystallize its plan to exclude LyricFind from the market, through the WCM-Musixmatch Exclusive, in the event its proposed acquisition was not successful.

123.   That is ultimately what occurred. After months of discussions and due diligence, LyricFind and TPG were unable to agree on acquisition terms and ended negotiations in December 2023. Having failed to buy LyricFind, TPG now

1    transitioned to the next stage of its scheme: eliminating LyricFind and other

2    competition from the Relevant Markets.

3        124.   Of particular concern to both TPG and Musixmatch was the possibility

4    that LyricFind would take over Musixmatch's contract with Spotify, which was set

5    to expire in 2024 and generated millions of dollars of annual revenue for

6    Musixmatch. In addition to potentially losing this revenue, TPG and Musixmatch

7    were concerned that Musixmatch would no longer be Spotify's exclusive lyric

8    services provider, which was a critical selling point for the Musixmatch Pro service.

9    Musixmatch Pro is a subscription service that purportedly helps independent

10   songwriters and publishers get their lyrics on major streaming platforms. The

11   Musixmatch Pro service is offered to independent artists, songwriters, and publishers

12   at several annual pricing tiers, from $36 to more than $350, as shown in Figure D.

13   All of the tiers are premised on the idea that independent artists and publishers can

14   get their lyrics on major streaming platforms—particularly Spotify—only by paying

15   for Musixmatch Pro.

16       125.   On information and belief, the Musixmatch Pro service is responsible

17   for a substantial share of Musixmatch's total revenue and profit on an annual basis.

18   If TPG and Musixmatch lost the ability to ensure lyric availability on Spotify, the

19   revenue generated from Musixmatch Pro would be substantially reduced, as would

20   Musixmatch's overall profitability and overall enterprise value to TPG.

21

22

23

24

25

26

27

28

1    **Figure D – May 29, 2024, Screenshot of Musixmatch Webpage**



16    **B.    Defendants Unlawfully Leak LyricFind's Confidential**
17    **Information.**

18    126.    TPG and Musixmatch's fears about losing Spotify's business mounted

19    as LyricFind's negotiations with Spotify progressed towards the end of 2023. TPG

20    and Musixmatch were aware of LyricFind's negotiations with Spotify and became

21    increasingly concerned that Musixmatch would lose Spotify's business to LyricFind

22    due to LyricFind's better services and lower prices.

23    127.    Yet rather than compete with LyricFind on these bases, TPG and

24    Musixmatch plotted to disrupt LyricFind's negotiations with Spotify by wrongfully

25    leaking confidential and NDA-protected information about LyricFind to Spotify,

26    which TPG and Musixmatch had obtained during TPG's proposed acquisition of

27    LyricFind a few months earlier. In or around January 2024, TPG and Musixmatch

28    intentionally disclosed and misrepresented this confidential information about

- 36 -

LyricFind's perceived vulnerabilities to Spotify in breach of the NDA and their other legal obligations.

128.   Defendants' disclosures to Spotify breached the express terms of the NDA, which prohibited TPG and Musixmatch from disclosing LyricFind's confidential information to third parties or using it for any purpose other than the proposed acquisition.

129.   By improperly leaking this information, TPG and Musixmatch hoped to upend LyricFind's negotiations with Spotify and preserve Musixmatch's monopoly without having to lawfully compete with LyricFind based on quality and price.

130.   Even though Defendants' breach of the NDA hampered the discussions between LyricFind and Spotify, Spotify chose to continue negotiating with LyricFind. At the same time, Spotify continued integrating LyricFind's technical infrastructure for Lyric Data Services in anticipation of potentially switching from Musixmatch to LyricFind. It was not until the WCM-Musixmatch Exclusive that these negotiations came to a decisive end.

### C.    TPG and Musixmatch Coordinated with WCM to Impose the WCM-Musixmatch Exclusive.

131.   When their illegal disclosures failed to stop LyricFind's negotiations with Spotify, TPG and Musixmatch hatched a new plan to force DSPs to sign with Musixmatch: ensuring only Musixmatch, and no other provider, could provide Lyric Data Services and Lyric Rights Licensing for WCM's songs.

132.   Before the Exclusive, LyricFind and Musixmatch were both able to fulfill this role. Publishers like WCM had never restricted which companies could furnish Lyric Data Services for their songs, allowing LyricFind and Musixmatch to compete based on price and quality. When their other anticompetitive tactics failed, TPG and Musixmatch realized they could avoid this competition by locking up an exclusive deal for a major publisher's catalog, like WCM's, as DSPs would not be

- 37 -

1    willing to deal with LyricFind or other providers that lacked the ability to provide

2    lyric services for WCM's songs.

3    133.    This is the anticompetitive path TPG and Musixmatch chose rather than

4    to compete fairly on price or quality. As Spotify grew closer to signing with

5    LyricFind, TPG and Musixmatch coordinated with WCM to impose the

6    unprecedented Exclusive that would force Spotify and other major DSPs to sign with

7    Musixmatch at substantially higher rates.

8    134.    At the direction of TPG, Musixmatch entered into the WCM-

9    Musixmatch Exclusive on or around March 20, 2024, just before Spotify was slated

10    to potentially finalize its deal with LyricFind. Although LyricFind has not yet

11    received an executed copy of the written Exclusive contract, WCM informed

12    LyricFind of its contents. Specifically, the WCM-Musixmatch Exclusive gives

13    Musixmatch (1) the exclusive right to provide Lyric Data Services for WCM's titles

14    and (2) the exclusive right to sublicense Lyric Rights Licensing for WCM's titles. In

15    effect, the Exclusive makes Musixmatch the only practical supplier of Lyric Data

16    Services, and the only practical sub-licensor of Lyric Rights Licensing, for most

17    DSPs.

18    135.    On information and belief, in return for these dual exclusivity rights,

19    Musixmatch, at TPG's direction, agreed to make substantial monetary payments and

20    financial incentives to WCM, which amounted to an anticompetitive bribe.

21    136.    Under the terms of the Exclusive, DSPs like Spotify that wish to display

22    lyrics for WCM's titles must now obtain Lyric Data Services from Musixmatch at

23    whatever cost it imposes, even those DSPs that previously sourced Lyric Data from

24    LyricFind or others at a fraction of the price. As WCM confirmed to LyricFind, under

25    the Exclusive, "all DSPs/partners can only source WCM lyrics from Musixmatch and

26    would need to remove lyric data from other sources." The WCM-Musixmatch

27    Exclusive thus purports to prevent DSPs from sourcing Lyric Data from LyricFind

28

1    or other providers, generating it themselves, or, incredulously, even obtaining it from

2    the songwriters, artists, or even co-publishers who own the lyric rights.

3        137.    The WCM-Musixmatch Exclusive was not the byproduct of any

4    legitimate business needs, but rather a coordinated effort among TPG, Musixmatch,

5    and WCM to purchase market exclusivity for a substantial price. Upon information

6    and belief, Musixmatch entered into the Exclusive at the direction of TPG, which

7    after failing to acquire LyricFind, directly orchestrated and approved of the Exclusive

8    as an alternative means of boosting Musixmatch's value. Far from a passive owner,

9    TPG was directly involved in trying to end the competitive threat that LyricFind

10    posed to Musixmatch—first, by seeking to acquire LyricFind; second, by illegally

11    leaking LyricFind's confidential information to Spotify, and third, by orchestrating

12    the WCM-Musixmatch Exclusive that would foreclose LyricFind from the Relevant

13    Markets.

14        138.    Further underscoring the anticompetitive nature of the Exclusive, WCM

15    never asked LyricFind for a competing bid. LyricFind first learned of the Exclusive

16    when WCM informed LyricFind it was terminating its ability to provide Lyric Data

17    Services and Lyric Rights Licensing for WCM titles. Furthermore, Musixmatch and

18    WCM have yet to announce the agreement to the public, as would be expected with

19    an agreement of this magnitude.

20        139.    The WCM-Musixmatch Exclusive is unprecedented in the lyric services

21    industry. Never before has a music publisher granted a single lyric services provider

22    the exclusive right to provide Lyric Data Services for its catalog, much less the

23    exclusive right to provide *both* Lyric Data Services and Lyric Rights Licensing.

24        140.    As discussed above, given the scope of WCM's catalog and the

25    commercial need for DSPs to display WCM's lyrics, the only option for most DSPs

26    will be to contract with Musixmatch, effectively excluding LyricFind, and all other

27    providers, from the Relevant Markets while threatening their ability to remain

28    operational. Having rid itself of competition and cemented its monopoly through the

1    WCM-Musixmatch Exclusive, Musixmatch will be free to raise prices for Lyric Data

2    Services and Lyric Rights Licensing to supracompetitive levels.

3         141.    Unsurprisingly, WCM and Musixmatch have not publicly announced

4    the existence or specific terms of the WCM-Musixmatch Exclusive, despite their

5    practice of publicly announcing commercial deals. Indeed, Musixmatch announced

6    a deal regarding the licensing of its lyric video service on March 21, 2024, the day

7    after executing the WCM-Musixmatch Exclusive.

8         142.    There is no legitimate, pro-competitive justification for the WCM-

9    Musixmatch Exclusive. Its sole goal is to exclude competition for Lyric Data

10   Services and Lyric Rights Licensing, particularly from LyricFind, whose viability as

11   a business is now at risk.

12        143.    While the WCM-Musixmatch Exclusive will foreclose competition on

13   its own, Musixmatch also has pursued additional Lyric Rights Licensing and Lyric

14   Data Services exclusives with other notable music publishers to reenforce its market

15   power. On information and belief, in May 2024 Musixmatch proposed that Reservoir

16   Media, a large independent music publisher based in New York City, enter into an

17   exclusive deal similar to the WCM-Musixmatch Exclusive. Musixmatch also

18   approached Downtown Music Publishing, another New York City-based publisher,

19   for a similar exclusive deal. Upon information and belief, both music publishers

20   rejected Musixmatch's anticompetitive proposals.

21              **D.    LyricFind Is Cut-Off from Servicing WCM's Catalog.**

22        144.    Prior to the WCM-Musixmatch Exclusive, LyricFind and WCM had

23   worked together successfully for more than fifteen years. LyricFind considered its

24   relationship with WCM to be excellent, one of its strongest with any music publisher,

25   and was not aware of any concerns from WCM about its performance.

26        145.    LyricFind's relationship with WCM had been governed by written

27   agreements since 2008. Most recently, LyricFind and WCM entered into an

28   agreement in 2018 (the "2018 Agreement") that has been extended on a biennial basis

- 40 -

on mutually agreed terms. The 2018 Agreement authorized LyricFind, on a non-exclusive basis, to display, and to authorize third party sub-licensees to display, WCM-owned lyrics—that is, to provide Lyric Data Services and Lyric Rights Licensing for WCM's titles. Generally, there were no limitations to the length or terms of any third-party sublicense granted by LyricFind under the 2018 Agreement, and WCM's custom and practice was to permit LyricFind to enter into sublicenses at any time during the term of its agreement with WCM, and to grant sublicenses that extended beyond the term of the 2018 Agreement. In December 2023, WCM confirmed in writing that it would renew the terms of the 2018 Agreement through June 30, 2024.

146. Nonetheless, after entering into the WCM-Musixmatch Exclusive, WCM terminated LyricFind's right to provide Lyric Data Services and Lyric Rights Licensing for WCM's titles. LyricFind was told that, based on the Exclusive, (i) LyricFind must stop providing Lyric Data Services for WCM titles by March 20, 2025, and (ii) LyricFind's customers must remove any WCM-owned Lyric Data provided by LyricFind, or any other non-Musixmatch entity, by that same date. Thus, after March 20, 2025, DSPs wishing to display Lyric Data for WCM titles will be forced to contract with Musixmatch, and Musixmatch alone, at monopolistic prices.

147. In addition to foreclosing LyricFind and other providers from future competition, the Exclusive's March 20, 2025 cut-off date will force LyricFind to breach its existing customer contracts. Because the March 20, 2025 cut-off date precedes the termination date for many of the sublicenses that LyricFind issued under the 2018 Agreement, this purported deadline will cause LyricFind to breach its existing contractual terms with its customers.

148. LyricFind reasonably agreed to multi-year contract terms with its customers, consistent with its long-standing practice for WCM and other publishers, because the 2018 Agreement did not limit the length of the sublicenses that LyricFind

- 41 -

1    could issue. Nothing in the 2018 Agreement permitted WCM to cap the term of

2    LyricFind's sublicenses, much less do so retroactively.

3           **E.     Spotify is Forced to Sublicense WCM's Lyric Rights from
4                     Musixmatch.**

5           149.    Becoming the exclusive *sub*-licensor of lyric rights for WCM was not

6    enough for Musixmatch, as it feared DSPs might still evade its monopoly if they

7    could obtain lyric rights licenses directly from WCM. Indeed, before the Exclusive,

8    Spotify had been working to obtain Lyric Rights Licensing directly from Universal,

9    Sony, and Kobalt and, on information and belief, eventually obtained direct licenses

10   from each. Spotify had also been negotiating a direct licensing agreement with WCM,

11   and on information and belief, was close to executing that agreement before the

12   Exclusive.

13          150.    WCM's provision of direct licenses risked undercutting the Exclusive's

14   anticompetitive goals because DSPs who obtained direct licenses from WCM would

15   be one step closer to displaying WCM's lyrics without Musixmatch's involvement,

16   as they could potentially source Lyric Data from other providers.

17          151.    To foreclose that possibility, and fully corner the Relevant Markets,

18   TPG and Musixmatch took the additional step of ensuring that WCM would not

19   provide direct licenses to Spotify and instead would force Spotify to obtain both Lyric

20   Rights Licensing *and* Lyric Data Services from Musixmatch.

21          152.    By granting Musixmatch exclusivity over both Lyric Data Services and

22   Lyric Rights Licensing for WCM's titles, the Exclusive doubly ensures that DSPs

23   like Spotify will be forced to contract with Musixmatch, as each type of exclusivity

24   reenforces the other. Before the Exclusive, customers were free to source Lyric Data

25   Services and Lyric Rights Licensing separately. For example, some DSPs obtained

26   Lyric Rights Licensing directly from major publishers while separately obtaining

27   Lyric Data Services from LyricFind or Musixmatch. Now, Defendants have ended

28

FIRST AMENDED COMPLAINT
CASE NO: 3:25-cv-02265-JSC

this separation for WCM's titles by effectively requiring Spotify and other DSPs to obtain both Lyric Rights Licensing and Lyric Data Services from Musixmatch.

153.    This *de facto* bundling of Lyric Rights Licensing and Lyric Data Services reinforces Musixmatch's dominance, and eliminates competition, in each Relevant Market. Because most DSPs use only one lyric service provider, a DSP that is forced to obtain Lyric Rights Licensing from Musixmatch will also generally use Musixmatch for Lyric Data Services. And vice versa: a DSP that is forced to obtain Lyric Data Services from Musixmatch will generally also use Musixmatch for Lyric Rights Licensing.

154.    The Exclusive also empowers Musixmatch to leverage its exclusive access to WCM's catalog to ensure it becomes DSPs' sole lyrics provider. Musixmatch can now force DSPs that use other or multiple lyric providers—or might wish to do so in the future—to forego those relationships, and work exclusively with Musixmatch, as a condition of receiving WCM-controlled lyrics. This would foreclose competition for virtually all DSPs' business, including the few DSPs that have sourced lyrics from LyricFind and Musixmatch simultaneously.

## V.    MUSIXMATCH HAS MARKET POWER IN THE RELEVANT MARKETS

155.    By virtue of Musixmatch's market shares in the Relevant Markets, and the barriers to entry and switching costs in each, Musixmatch possesses, and at all relevant times has possessed, monopoly power in the Lyric Data Services Market and market power in the Lyric Rights Licensing Market. In both Relevant Markets, Musixmatch has possessed the power to control prices and/or exclude competition.

### A.    Musixmatch's Monopoly in the Lyric Data Services Market

156.    Musixmatch controls approximately 80% of the global Lyric Data Services Market and has possessed a similarly large market share for several years. Musixmatch provides Lyric Data Services to approximately 82% of DSPs on a global

- 43 -

basis by streaming revenue and, as shown in Table B below, has agreements with six of the seven largest DSPs, which account for more than 90% of global subscribers.

**Table B – Major DSPs and Their Lyric Service Providers**

| DSP | Global Subscribers[1] | Subscriber Share in the U.S.[2] | Lyric Services Provider |
|---|---|---|---|
| Spotify | 239 million globally | 36% | Musixmatch |
| Apple | 92 million globally | 30.7% | Musixmatch |
| Amazon | 83 million globally | 23.8% | Musixmatch & LyricFind |
| YouTube Music | 100 million globally (global data is in combination with YouTube Premium) | 6.8% | Musixmatch & LyricFind |
| Tidal | Unknown | 0.5% | Musixmatch |
| Pandora | 6 million paid subscribers (46 million monthly active users) (U.S. only) | 1.9% | LyricFind |
| JioSaavn | 100 million active users (not subscribers) | N/A | Musixmatch |

157.    In addition to the DSPs listed above, Musixmatch is also the current provider of Lyric Data Services to two of the largest social media platforms, Meta (Facebook/Instagram) and Snapchat, which incorporate Lyric Data Services to allow users to edit and create videos that include synced lyrics. Social media companies

---

[1] Based on the data available for each DSP between 2022 and 2024.
[2] Based on report dated July 2024.

1    like Meta and Snapchat are significant sources of revenue for music publishers and

2    Lyric Data Service providers, and key music consumption platforms.

3        158.    In addition to Musixmatch's high market share, the Lyric Data Services

4    Market is characterized by significant barriers to entry, as described above. There

5    have been few, if any, new entrants into the Lyric Data Services Market for at least

6    the last ten years. The lack of entry is due to the millions of dollars in capital

7    investment required to obtain and maintain a competitive database of Lyric Data.

8        159.    The Lyric Data Services Market is also characterized by significant

9    barriers to entry in the form of switching costs, as described above.  Once a customer

10   begins sourcing Lyric Data Services from a given provider, there are substantial costs

11   related to switching to a competitor; namely, engineering a solution that will be

12   compatible with a new provider's technologies. For many customers, this switching

13   cost is prohibitive and, in most cases, allows the incumbent provider to maintain their

14   position absent a breakdown in business relations.

15       160.    As a result of the above-described barriers to entry and switching costs,

16   Musixmatch's market power in the Lyric Data Services Market has been durable.  On

17   information and belief, Musixmatch has maintained at least 80% of the Lyric Data

18   Services Markets for years.

19       161.    The WCM-Musixmatch Exclusive and the other anticompetitive

20   conduct described herein will further foreclose competition for Lyric Data Services,

21   reenforcing Musixmatch's monopoly and allowing it to raise prices to

22   supracompetitive levels.

23       **B.    Musixmatch's Market Power in the Lyric Rights Licensing**
         **Market and Its Monopolization of the Sublicensing**
24       **Submarket**

25

26       162.    Upon information and belief, Musixmatch controls approximately 31%

27   of the global Lyric Rights Licensing Market by licensing revenue, and approximately

28   66% of Lyric Rights Sublicensing Submarket. As in the Lyric Data Services Market,

- 45 -

1  approximately 82% of DSPs on a global basis by streaming revenue use Musixmatch

2  for Lyric Rights Licensing, as do six of the seven largest DSPs by global subscribers.

3  At all relevant times, Musixmatch has had the ability to raise prices or reduce output

4  in the Lyric Rights Licensing Market and the Lyric Rights Sublicensing Submarket

5  above the competitive level without losing significant market share.

6  163.   The Exclusive seeks to expand Musixmatch's market power in the Lyric

7  Rights Licensing Market into monopoly power, and cement Musixmatch's monopoly

8  power in the Lyric Rights Sublicensing Submarket. As described above, due to the

9  technical infrastructure associated with Lyric Rights Licensing and the other

10 switching costs, most DSPs source Lyric Rights Licensing from a single lyric

11 services provider and use the same provider for both Lyric Rights Licensing and

12 Lyric Data Services.

13 164.   Thus, by forcing DSPs to obtain Lyric Data Services from Musixmatch,

14 the Exclusive practically ensures that DSPs will also obtain Lyric Rights Licensing

15 from Musixmatch, as DSPs will have no reason to source Lyric Rights Licensing

16 separately from LyricFind. As DSPs are forced to switch to (or stay with)

17 Musixmatch for Lyric Data Services, Musixmatch will also take control of the share

18 of the Lyric Rights Licensing Market previously serviced by LyricFind, transforming

19 Musixmatch's market-power into a monopoly.

20 165.   The WCM-Musixmatch Exclusive thus leverages Musixmatch's

21 monopoly in the Lyric Data Services market to expand its market power in the Lyric

22 Rights Licensing Market and Lyric Rights Sublicensing Submarket, making it all but

23 inevitable that Musixmatch will achieve monopoly power in each Relevant Market.

24    **VI.    DEFENDANTS HAVE FORECLOSED COMPETITION IN THE**
25            **RELEVANT MARKETS AND CAUSED MARKETWIDE HARM**

26 166.   TPG's and Musixmatch's anticompetitive conduct has foreclosed

27 competition in the Relevant Markets and cemented Musixmatch's monopoly in the

28 Lyric Data Services Market and Lyric Rights Licensing Submarket, resulting in

- 46 -

1    damages to LyricFind that may exceed $1 billion post-trebling. Defendants' conduct

2    has also harmed virtually every stakeholder in the Relevant Markets except for

3    Defendants and their co-conspirators. This includes LyricFind, other lyric service

4    providers, DSPs, DSP users, other music publishers, and musicians themselves.

5          167.    The harm to LyricFind, as well as other minor and potential lyric service

6    providers, such as Genuis, is substantial. Defendants have precluded LyricFind and

7    other providers from competing for DSPs' business in both the Lyric Data Services

8    Market and Lyric Rights Licensing Market. The harm to LyricFind is particularly

9    notable given the LyricFind was deprived of a rare and lucrative opportunity to

10   replace Musixmatch as Spotify's provider of Lyric Data Services and Lyric Rights

11   Licensing.

12         168.    The WCM-Musixmatch Exclusive forecloses virtually all current and

13   potential business opportunities in the Relevant Markets for all providers other than

14   Musixmatch. For example, 95% of LyricFind's present customers, which accounted

15   for more than 97% of its 2023 revenue, use LyricFind to obtain either Lyric Rights

16   Licensing or Lyric Data Services for WCM songs. By barring everyone other than

17   Musixmatch from servicing WCM's catalog, the WCM-Musixmatch Exclusive will

18   make it near-impossible for anyone but Musixmatch to compete for new contracts,

19   or maintain their existing contracts long-term.

20         169.    Indeed, one significant DSP, iHeartRadio, recently cut off contract

21   renewal negotiations with LyricFind as a result of the Exclusive. Despite once-

22   promising negotiations, iHeartRadio ultimately declined to renew with LyricFind

23   once it learned that LyricFind would no longer be able to provide lyrics for WCM's

24   catalog. In late September and early October, 2024 iHeartRadio's President of

25   Business Development & Strategic Partnerships, Michael Biondo, explained that

26   iHeartRadio could not continue sourcing lyrics from LyricFind if LyricFind lacked

27   the ability to service WCM's titles. Upon information belief, iHeartRadio then signed

28

1   with Musixmatch at a price over five times higher than what iHeartRadio had been

2   paying LyricFind, as now only Musixmatch could service WCM's catalog.

3       170.   As a result of Defendants' anticompetitive conduct, LyricFind has

4   suffered damages including, but not limited to, lost profits based on both existing and

5   potential business opportunities that were eliminated, as well as decreased enterprise

6   value. This includes the lost profits associated with LyricFind's loss of the Spotify

7   business. Given LyricFind's enterprise value before the Exclusive, and the fact that

8   its viability as a business is now at risk, LyricFind estimates that it will have suffered

9   damages exceeding $1 billion after automatic trebling.

10       171.   The anticompetitive conduct described herein harms other actual and

11  potential competitors in the Relevant Markets too. Because of the WCM-Musixmatch

12  Exclusive, no lyric service provider other than Musixmatch will be able to offer a full

13  catalog of Lyric Data Services or Lyric Rights Licensing to DSPs customers, and

14  thus will be foreclosed from meaningfully competing in both Relevant Markets.

15       172.   Defendants' scheme also will cause substantial harm to customers in the

16  Relevant Markets, particularly DSPs. By foreclosing competition, Musixmatch will

17  be able to eliminate choice and charge supracompetitive prices for both Lyric Data

18  Services and Lyric Rights Licensing. By reducing overall market output and

19  eliminating competitors, Musixmatch has been able, and will continue to be able, to

20  keep prices above what they would be in a competitive market. Customers, including

21  DSPs like Spotify, Tidal, Apple, Google, and Amazon, will end up paying higher

22  prices in both Relevant Markets.

23       173.   Musixmatch's dominance in the Relevant Markets harms consumers

24  globally and in this district. By increasing the costs of Lyric Rights Licensing and

25  Lyric Data Services, DSPs and other music service providers will end up charging

26  consumers more for their music streaming services. There is also a substantial

27  likelihood of reduced quality of service and innovation in the Lyric Rights Licensing

28  and Lyric Data Services markets. For instance, if a DSP chooses not to deal with

- 48 -

1    Musixmatch due to higher monopolistic prices, consumers will lose access to a range

2    of lyrics on that DSP's services.

3          174.   Defendants' scheme also harms other music publishers and songwriters.

4    Because of the WCM-Musixmatch Exclusive, music publishers that share ownership

5    of a work with WCM will be forced to accept Musixmatch as the provider of Lyric

6    Data Services for any shared works. Publishers and songwriters that wish to have

7    their lyrics provided to DSPs will be forced to accept lower payments for their works

8    due to the lack of competition in the Relevant Markets.

9          175.   Defendants' scheme will particularly harm independent songwriters.

10   Musixmatch already exploits these artists by forcing them to pay for Musixmatch Pro

11   to have their lyrics displayed on DSPs, particularly Spotify and Meta. LyricFind

12   provides the only meaningful competition to Musixmatch Pro by offering a *free*

13   service that helps independent artists get their lyrics on DSPs. By excluding

14   LyricFind and other providers from the Relevant Markets, Musixmatch will be free

15   to charge songwriters significantly more for a service LyricFind offers for free, both

16   raising costs for songwriters and reducing output for consumers.

17         176.   Defendants' conduct lacks any plausible procompetitive benefits or

18   justifications, and none exist that would outweigh the anticompetitive effects of

19   Defendants' scheme. The Exclusive, and TPG and Musixmatch's surrounding

20   scheme, are neither necessary nor reasonably tailored to any legitimate pro-

21   competitive goal. They only serve to increase Musixmatch's dominance and restrict

22   competition in the Relevant Markets in violation of Sections 1 and 2 of the Sherman

23   Act and the other laws set forth below.

24

25

26

27

28

- 49 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
## (AGAINST TPG AND MUSIXMATCH)

177.  LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

178.  As alleged above, TPG, Musixmatch, and WCM conspired to effectuate the WCM-Musixmatch Exclusive and surrounding anticompetitive scheme, with the effect of unreasonably restraining trade and commerce in both the Lyric Data Services Market and Lyric Rights Licensing Market.

179.  The WCM-Musixmatch Exclusive and surrounding conspiracy constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in both the Lyric Data Services Market and Lyric Rights Licensing Market in violation of Section 1 of the Sherman Act.

180.  The WCM-Musixmatch Exclusive and surrounding conspiracy foreclose a substantial share of competitors, and had anticompetitive effects, in both Relevant Markets.

181.  The WCM-Musixmatch Exclusive and surrounding conspiracy have no procompetitive benefits or justification. Their anticompetitive effects outweigh any purported procompetitive justifications.

182.  As a result of the WCM-Musixmatch Exclusive and the surrounding conspiracy, and the harm to competition they caused, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

183.  LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

- 50 -

**SECOND CAUSE OF ACTION**

**MONOPOLIZATION OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (AGAINST TPG AND MUSIXMATCH)**

184.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

185.   Musixmatch and TPG have monopolized the Lyric Data Services Market in violation of Section 2 of the Sherman Act.

186.   At all relevant times, Musixmatch possessed monopoly power in the Lyric Data Services Market, as demonstrated by its high market share, barriers to entry, Musixmatch's actual exclusion of competition, and its ability to charge supracompetitive prices in the Lyric Data Services Market.

187.   Through the scheme described above, and other conduct likely to be revealed in discovery, Musixmatch and TPG have willfully and unlawfully maintained and enhanced Musixmatch's monopoly power in the Lyric Data Services Market. Musixmatch's and TPG's conduct constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

188.   Musixmatch and TPG have suppressed competition and produced anticompetitive effects in the Lyric Data Services Market, including causing LyricFind's antitrust injury and damages.

189.   Musixmatch's and TPG's monopolistic conduct has no procompetitive benefit or justification. The anticompetitive effects of their monopolistic conduct outweigh any purported procompetitive justifications.

190.   TPG is liable with Musixmatch for monopolizing the Lyric Data Services Market because TPG, as Musixmatch's parent, participated in, directed, approved, and furthered the monopolistic scheme.

191.   As a result of Musixmatch's and TPG's monopolistic conduct, and the harm to competition caused by it, LyricFind has suffered substantial injuries to its

- 51 -

business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

192.   LyricFind is also entitled to recover from Musixmatch and TPG the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

**THIRD CAUSE OF ACTION**
**ATTEMPTED MONOPOLIZATION OF THE LYRIC DATA SERVICES MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(AGAINST TPG AND MUSIXMATCH)**

193.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

194.   As alleged above, Musixmatch and TPG have attempted to monopolize the Lyric Data Services Market in violation of Section 2 of the Sherman Act.

195.   Musixmatch possesses substantial market power in the Lyric Data Services Market, as demonstrated by its high market share, its actual exclusion of competition, and its ability to charge supracompetitive prices in the Lyric Data Services Market.

196.   Musixmatch and TPG have been implementing the anticompetitive scheme set forth above, and other conduct likely to be revealed in discovery, with the specific intent to monopolize the Lyric Data Services Market. Musixmatch's and TPG's scheme constitutes exclusionary conduct, within the meaning of Section 2 of the Sherman Act.

197.   There is a dangerous probability that Musixmatch and TPG will succeed in unlawfully extending Musixmatch's monopoly in the Lyric Data Services Market through its anticompetitive scheme.

198.   Musixmatch's and TPG's scheme has suppressed competition and has produced anticompetitive effects in the Lyric Data Services Market, including LyricFind's antitrust injury and damages.

1      199.  Musixmatch's and TPG's conduct has no procompetitive benefit or

2  justification; even if they were to argue it did, the anticompetitive effects of their

3  behavior outweigh any purported procompetitive justifications.

4      200.  TPG is liable with Musixmatch for attempting to monopolize the Lyric

5  Data Services Market because TPG, as Musixmatch's parent, participated in,

6  directed, approved, and furthered the monopolistic scheme.

7      201.  As a result of Musixmatch's and TPG's conduct, and the harm to

8  competition caused by it, LyricFind has suffered substantial and continuing injuries

9  to its business and property in an amount to be proven at trial and automatically

10  trebled, as provided by 15 U.S.C. § 15.

11      202.  LyricFind is also entitled to recover from Musixmatch and TPG the

12  costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

13  

**FOURTH CAUSE OF ACTION**

14  **MONOPOLY LEVERAGING OF THE LYRIC DATA SERVICES MARKET**
**IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT,**

15  **15 U.S.C. § 2**

16  **(AGAINST TPG AND MUSIXMATCH)**

17      203.  LyricFind re-alleges and incorporates by reference each of the

18  allegations set forth above.

19      204.  Musixmatch and TPG have leveraged Musixmatch's monopoly power

20  in the Lyric Data Services Market to obtain or attempt to obtain a monopoly in the

21  Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket in violation

22  of Section 2 of the Sherman Act.

23      205.  At all relevant times, Musixmatch possessed monopoly power in the

24  Lyric Data Services Market, as demonstrated by its high market share, barriers to

25  entry, Musixmatch's actual exclusion of competition, and its ability to charge

26  supracompetitive prices in the Lyric Data Services Market.

27

28

- 53 -

206.   Through the scheme described above, and other conduct likely to be revealed in discovery, Musixmatch and TPG willfully abused Musixmatch's monopoly power in the Lyric Data Services Market with the specific intent, and dangerous probability of success, of monopolizing the Lyric Rights Licensing Market and Lyric Rights Sublicensing Submarket.

207.   Musixmatch and TPG have suppressed competition and produced anticompetitive effects in Lyric Data Services Market and Lyric Rights Licensing Market, including causing LyricFind's antitrust injury and damages.

208.   Musixmatch's and TPG's monopolistic conduct has no procompetitive benefit or justification. The anticompetitive effects of their monopolistic conduct outweigh any purported procompetitive justifications.

209.   TPG is liable with Musixmatch for monopoly leveraging because TPG, as Musixmatch's parent, participated in, directed, approved, and furthered the monopolistic scheme.

210.   As a result of Musixmatch's and TPG's monopolistic conduct, and the harm to competition caused by it, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

211.   LyricFind is also entitled to recover from Musixmatch and TPG the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

## FIFTH CAUSE OF ACTION
**MONOPOLIZATION OF THE LYRIC RIGHTS SUBLICENSING SUBMARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(AGAINST TPG AND MUSIXMATCH)**

212.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

- 54 -

213.    Musixmatch and TPG have monopolized the Lyric Rights Sublicensing Submarket in violation of Section 2 of the Sherman Act.

214.    Musixmatch possesses monopoly power in Lyric Rights Sublicensing Submarket, as demonstrated by its high market share, its actual exclusion of competition, and its ability to charge supracompetitive prices in the Lyric Rights Sublicensing Submarket.

215.    Through the scheme described above, and other conduct likely to be revealed in discovery, Musixmatch and TPG have willfully and unlawfully maintained and enhanced Musixmatch's monopoly power in the Lyric Rights Sublicensing Submarket. Musixmatch's and TPG's conduct constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

216.    Musixmatch and TPG have suppressed competition and produced anticompetitive effects in the Lyric Rights Sublicensing Submarket, including causing LyricFind's antitrust injury and damages.

217.    Musixmatch's and TPG's monopolistic conduct has no procompetitive benefit or justification. The anticompetitive effects of their monopolistic conduct outweigh any purported procompetitive justifications.

218.    TPG is liable with Musixmatch for monopolizing the Lyric Rights Sublicensing Submarket because TPG, as Musixmatch's parent, participated in, directed, approved, and furthered the monopolistic scheme

219.    As a result of Musixmatch's and TPG's conduct, and the harm to competition caused by it, LyricFind has suffered substantial and continuing injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

220.    LyricFind is also entitled to recover from Musixmatch and TPG the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

**SIXTH CAUSE OF ACTION**
**ATTEMPTED MONOPOLIZATION OF THE LYRIC RIGHTS**
**SUBLICENSING SUBMARKET IN VIOLATION OF SECTION 2 OF THE**
**SHERMAN ACT,**
**15 U.S.C. § 2**
**(AGAINST TPG AND MUSIXMATCH)**

221.  LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

222.  As alleged above, Musixmatch and TPG have attempted to monopolize the Lyric Rights Sublicensing Submarket in violation of Section 2 of the Sherman Act.

223.  Musixmatch possesses substantial market power in the Lyric Rights Sublicensing Submarket, as demonstrated by its high market share, its actual exclusion of competition, and its ability to charge supracompetitive prices.

224.  Musixmatch and TPG have been implementing the anticompetitive scheme set forth above, and other conduct likely to be revealed in discovery, with the specific intent to monopolize the Lyric Rights Sublicensing Submarket. Musixmatch's scheme constitutes exclusionary conduct, within the meaning of Section 2 of the Sherman Act.

225.  There is a dangerous probability that Musixmatch and TPG will succeed in obtaining monopoly power in the Lyric Rights Sublicensing Submarket through their anticompetitive scheme.

226.  Musixmatch's and TPG's scheme has suppressed competition and produced anticompetitive effects in the Lyric Rights Sublicensing Submarket, including LyricFind's antitrust injury and damages.

227.  Musixmatch's and TPG's conduct has no procompetitive benefit or justification; even if they were to argue it did, the anticompetitive effects of their behavior outweigh any purported procompetitive justifications.

- 56 -

228.   TPG is liable with Musixmatch for attempting to monopolize the Lyric Rights Sublicensing Submarket because TPG, as Musixmatch's parent, participated in, directed, approved, and furthered the monopolistic scheme

229.   As a result of Musixmatch's and TPG's conduct, and the harm to competition caused by it, LyricFind has suffered substantial and continuing injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

230.   LyricFind is also entitled to recover from Musixmatch and TPG the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

231.

## SEVENTH CAUSE OF ACTION
## AGREEMENT IN VIOLATION OF CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§ 16720 ET SEQ.
## (AGAINST TPG AND MUSIXMATCH)

232.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

233.   TPG and Musixmatch's actions, in particular their "buy or bury" scheme and conspiracy to effectuate the WCM-Musixmatch Exclusive, constituted concerted action that was an unreasonable restraint of trade or commerce throughout California and the United States in violation of the Cartwright Act, § 16720 of the California Business and Professions Code.  The WCM-Musixmatch Exclusive had the purpose of eliminating competition in the Relevant Markets and ensuring that Musixmatch maintained its monopoly in the Lyric Data Services Market.

234.   Plaintiff LyricFind has been injured as a direct and proximate result of the WCM-Musixmatch Exclusive and surrounding conduct. In addition, customers and suppliers in the Relevant Markets have been harmed by the actions of Defendants, and that harm is ongoing. The unlawful conspiracy between TPG, Musixmatch, and WCM has had the effect of increasing prices and/or limiting supply in the Relevant Markets, as well as reducing innovation in the market.

- 57 -

235.   As a result of Defendants' conduct, and the harm to competition caused by it, LyricFind has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by the Cartwright Act.

236.   LyricFind is also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by § 16750(a) of the California Business and Professions Code.

**EIGHTH CAUSE OF ACTION UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.**
**(AGAINST TPG AND MUSIXMATCH)**

237.   LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

238.   As set forth above, Defendants have engaged, and continue to engage in, unlawful and unfair business acts or practices in violation of California Business and Professions Code §§ 17200 et seq. ("California's Unfair Competition Law").

239.   Defendants have violated the Sherman Act, Clayton Act, and the Cartwright Act and thus Defendants have violated California's Unfair Competition Law.

240.   Defendants' acts and business practices, whether or not in violation of the Sherman Act, Clayton Act, or Cartwright Act, constitute unfair methods of competition in violation of California's Unfair Competition Law.

241.   Defendants' acts and business practices are otherwise unfair within the meaning of California's Unfair Competition Law, and thus Defendants have violated California's Unfair Competition Law.

242.   As a result of Defendants' violations of California Business and Professions Code § 17200, Defendants have been unjustly enriched at LyricFind's expense. The unjust enrichment continues to accrue as the unlawful and unfair

- 58 -

business acts and practices continue. Therefore, LyricFind is entitled to obtain restitutionary disgorgement in an amount to be determined at trial.

243.    Defendants should also be permanently enjoined from continuing their violations of California Business and Professions Code § 17200, as provided by § 17203 of the California Business and Professions Code. Without injunctive relief, LyricFind will continue to suffer irreparable injury as a result of Defendants' unlawful conduct. LyricFind's remedy at law is not by itself adequate to compensate LyricFind for the harm inflicted and threatened by Defendants.

## NINTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST TPG AND MUSIXMATCH)

244.    LyricFind re-alleges and incorporates by reference each of the allegations set forth above.

245.    At the time that TPG and Musixmatch conspired with WCM to effectuate the WCM-Musixmatch Exclusive, both LyricFind and Musixmatch were engaged in negotiations with Spotify and iHeartRadio as described above, and both LyricFind and Musixmatch anticipated engaging in similar negotiations with other DSPs. The combined value of the Spotify and iHeartRadio business to LyricFind, while subject to proof at trial, was tens of millions of dollars.

246.    Defendants were aware of LyricFind's negotiations with Spotify and iHeartRadio, and its existing and prospective negotiations with other DSPs, and undertook the anticompetitive and unlawful scheme described herein to undermine LyricFind's negotiations and ensure that Musixmatch, not LyricFind, was awarded these contracts.

247.    With respect to Spotify, TPG and Musixmatch first wrongfully disclosed to Spotify confidential information belonging to LyricFind in breach of the NDA and in a misguided attempt to disrupt LyricFind's and Spotify's ongoing negotiations. Then, after orchestrating the WCM-Musixmatch Exclusive,

1  Musixmatch informed Spotify about the unlawful and anticompetitive
2  WCM-Musixmatch Exclusive to discredit LyricFind, and interfere with LyricFind's
3  prospective commercial relationship with Spotify, by indicating that LyricFind no
4  longer had access to WCM's lyric catalog.

5      248. Through their conduct, Defendants intended to, and did, disrupt
6  LyricFind's relationship with Spotify, iHeartRadio, and other DSPs to favor
7  Musixmatch.

8      249. LyricFind's relationships with Spotify and iHeartRadio were ultimately
9  disrupted by Defendants' scheme, as Spotify and iHeartRadio informed LyricFind
10  they could not award LyricFind their business because of the WCM-Musixmatch
11  Exclusive, and instead awarded their business to Musixmatch.

12      250. LyricFind has been injured in its business or property through the loss
13  of past, present, and future profits, by the loss of customers and potential customers,
14  by the loss of goodwill and product image, and by the prospective destruction of its
15  business. Defendants' conduct was a substantial factor in causing this harm.

16      251. Defendants' conduct was intentional and deprived LyricFind of
17  business opportunities in violation of the law and otherwise caused injury and was
18  despicable conduct that subjected LyricFind to cruel and unjust hardship and
19  oppression in conscious disregard of its rights, so as to justify an award of exemplary
20  and punitive damages.

21                    **TENTH CAUSE OF ACTION**
22                    **BREACH OF CONTRACT**
23                    **(AGAINST TPG AND MUSIXMATCH)**

24      252. LyricFind re-alleges and incorporates by reference each of the
25  allegations set forth above.

26      253. LyricFind and TPG entered into the NDA in connection with a possible
27  transaction between the parties.

28

- 60 -

254.   The NDA is a viable and existing agreement between and among LyricFind and TPG.

255.   Pursuant to the terms of the NDA, LyricFind agreed to provide its Confidential Information (as that term is defined in the NDA) to TPG in exchange for TPG's agreement that TPG and its authorized "Representatives" were prohibited from using such Confidential Information for any purpose other than the parties' contemplated transaction and from disclosing such Confidential Information to any third parties.

256.   Pursuant to the March 2, 2023 Consent Letter, LyricFind agreed to provide some of its Confidential Information to TPG-owned Musixmatch provided that Musixmatch would be defined as a "Representative" of TPG under the terms of the NDA and Musixmatch would thus be bound by the terms and conditions of the NDA.

257.   LyricFind has performed all of its obligations under the NDA.

258.   As set forth above, TPG and Musixmatch (as a Representative of TPG) materially breached their obligations pursuant to the NDA by disclosing LyricFind's Confidential Information to unauthorized third parties, including, but not limited to, Spotify, and using LyricFind's Confidential Information for a purpose other than the contemplated acquisition.

259.   ████████████████████████████████████████████

260.   Yet, seeking to misuse and distort this confidential information to their advantage—namely, to dissuade Spotify from doing business with LyricFind—

- 61 -

1    Defendants falsely informed Spotify and potentially other third parties that LyricFind

2    had purportedly violated international sanctions related to Russia and purportedly

3    concealed its business dealings from regulators. This was not only a clear breach of

4    the NDA, it also was false: Defendants grossly and knowingly misrepresented the

5    confidential information that they leaked about LyricFind to try to harm LyricFind's

6    competitive position.

7        261.   As a direct and proximate result of Defendants' breach of contract,

8    LyricFind has been damaged in an amount to be determined at trial, but in no event

9    less than $75,000, plus prejudgment interest thereon. LyricFind's damages include

10   tens-of-thousands of dollars in outside legal fees that LyricFind paid to investigate

11   and attempt to mitigate Defendants' breach shortly after it occurred, separate and

12   apart from any legal work associated with this litigation.

13       262.   LyricFind's damages also include the substantial employee time and

14   resources it was forced to urgently expend to try to investigate and mitigate

15   Defendants' breach, including extensive work by personnel and contractors who

16   otherwise would have devoted their efforts to productive, revenue-generating

17   activities for LyricFind.

18       263.   Also, as a direct result of Defendants' breach, LyricFind has suffered

19   damages in the form of lost business goodwill and reputational harm. While

20   LyricFind's negotiations with Spotify eventually continued, after a period of delay,

21   following the breach, the confidential information that Defendants leaked and

22   mispresented about LyricFind remains in circulation, continues to cast false doubts

23   on LyricFind's business, and is susceptible to further dissemination within the

24   industry.

25       264.   Furthermore, Paragraph 10 of the NDA, titled "Specific Performance,"

26   states, "[b]ecause of the unique nature of the Confidential Information any breach of

27   this Agreement may cause [LyricFind] irreparable harm for which money damages

28   may not be adequate to compensate." Thus, Defendants agreed that LyricFind "shall

be entitled to seek equitable relief, including without limitation, injunctive relief and specific performance, as a remedy for any such breach" and that such relief "shall be in addition to, and not in lieu of, all other remedies."

265.    Pursuant to Paragraph 10 of the NDA, in addition to damages, LyricFind seeks injunctive relief and specific performance as a remedy for Defendants' breach of contract, including but not limited to a Court order requiring Defendants to cease any further use or dissemination of LyricFind's Confidential Information.

## **PRAYER FOR RELIEF**

266.    WHEREFORE, LyricFind respectfully requests the following relief from this Court:

- Awarding LyricFind money damages, trebled pursuant to law;
- Awarding LyricFind punitive damages;
- Awarding LyricFind the costs of the lawsuit, including reasonable attorneys' fees and court costs;
- Awarding appropriate injunctive relief, as the Court deems just and proper, to prevent and remedy Defendants' wrongful conduct;
- Disgorgement in the amount gained by Defendants due to Defendants' violation of the law;
- Declaring Defendants' conduct unlawful, improper, and in violation of the above-referenced laws; and
- Ordering such other and further relief as the Court may deem just, proper, and equitable.

- 63 -

1

## JURY TRIAL DEMAND

2

3      LyricFind hereby demands trial by jury on all issues so triable under Rule 38

of the Federal Rules of Civil Procedure.

4

5

6    Dated:  September 30, 2025          By:  ____*/s/ David C. Brownstein*____
                                        David C. Brownstein
7                                       **FARMER BROWNSTEIN JAEGER**
                                        **GOLDSTEIN KLEIN & SIEGEL LLP**
8                                       155 Montgomery Street, Suite 301
                                        San Francisco, CA 94104-2733
9                                       Telephone: (415) 962-2873
                                        Facsimile: (415)-520-5678
10                                      dbrownstein@fbjgk.com
11

12                                      Kellie Lerner (*pro hac vice*)
                                        Ben Steinberg (*pro hac vice*)
13                                      Lily Fagin (*pro hac vice*)
14                                      **SHINDER CANTOR LERNER LLP**
                                        14 Penn Plaza, 19th Floor
15                                      New York, NY 10122
                                        Telephone: (646) 960-8601
16                                      Facsimile: (646) 960-8625
17                                      kellie@scl-llp.com
                                        benjamin@scl-llp.com
18                                      lfagin@scl-llp.com
19

20                                      Brian D. Caplan
21                                      Julie Wlodinguer (*pro hac vice*)
                                        **REITLER KAILAS & ROSENBLATT**
22                                      **LLP**
23                                      885 Third Avenue, 20th Floor
                                        New York, New York 10022
24                                      Main: 212-209-3050
25                                      Fax: 212-371-5500
                                        bcaplan@reitlerlaw.com
26                                      jwlodinguer@reitlerlaw.com
27

28                                      *Attorneys for Plaintiff LyricFind*

- 64 -